## Index of Government's Excerpts of the Record

**Document**                                                    **Gov't E.R.**

### Volume I

1. Transcript (Jan. 19, 2011), Daubert Hearing…………………..…......1-127

2. Daubert Order (Mar. 2, 2011), Dkt. 140…………………….....128-132

3. Joint Consolidated Brief, Dkt. 173……………………………...133-138

   a. Gov't E.R. at 134-135 (defense counsel agrees not to allege that the indictment of defendant was politically motivated).

4. Transcript at 1, 24-27, 30 (Apr. 23, 2012), Voir Dire.................139-144

   a. Gov't E.R. at 140-143 (district court overrules defense counsel's objection to government's use of publically-available search engines to research prospective jurors).

   b. Gov't E.R. at 144 (district court describes four videos that defendant created).

5. Transcript at 1, 49-83 (Apr. 24, 2012)…………..……………......…145-180

   a. Gov't E.R. at 146-154 (joint stipulations of facts).

   b. Gov't E.R. at 155-180 (relevant portion of direct examination of FBI case agent James Myrick).

6. Transcript at 1, 90-95 (Apr. 25, 2012)…………………………181-187

    a. Gov't E.R. at 182-187 (relevant portion of direct examination of Detective Kyle Lewison).

7. Transcript at 1, 39-103 (Apr. 26, 2012)………………………...188-256

    a. Gov't E.R. at 189-231 (direct examination of defendant).

    b. Gov't E.R. at 231-256 (cross examination of defendant).

**Volume II**

8. Transcript at 1, 4-6, 11-31, 60-108, 131-142 (Apr. 27, 2012)….257-342

    a. Gov't E.R. at 262-281 (jury instructions).

    b. Gov't E.R. at 282-330 (defense counsel's closing argument).

    c. Gov't E.R. at 331-342 (district court responds to jury questions).

Government's Excerpts of the Record

Volume I

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     WESTERN DIVISION

4    THE HONORABLE GEORGE H. KING, UNITED STATES DISTRICT JUDGE

5

6    UNITED STATES OF AMERICA,     )
                                   )
7                   PLAINTIFF,     )
                                   )
8              VS.                 )   NO. CR 07-732(A)-GHK
                                   )
9    IRA ISAACS,                   )
                                   )
10                  DEFENDANT.     )
     _____)

11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              LOS ANGELES, CALIFORNIA

16         WEDNESDAY, JANUARY 19, 2011; 2:34 P.M.

17      DAUBERT HEARING; PAGES 1 THROUGH 127 INCLUSIVE

18

19

20

21

22

23                          MARY RIORDAN RICKEY
                            OFFICIAL COURT REPORTER
24                          255 EAST TEMPLE STREET
                            ROOM 181-G
25                          LOS ANGELES, CA  90012
                            MARY.USDC@YAHOO.COM

**001**

1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF:

4          UNITED STATES DEPARTMENT OF JUSTICE
           CRIMINAL DIVISION
5          CHILD EXPLOITATION AND OBSCENITY SECTION
           BY:  MICHAEL W. GRANT, TRIAL ATTORNEY
6               DAMON A. KING, DEPUTY CHIEF
                CHANTEL FEBUS, DEPUTY ATTORNEY GENERAL
7          1400 NEW YORK AVENUE, N.W.
           SIXTH FLOOR
8          WASHINGTON, D.C.  20005
           202-307-1982

9

10   FOR DEFENDANT:

11         LAW OFFICES OF ROGER J. DIAMOND
           BY:  ROGER J. DIAMOND
12              ATTORNEY AT LAW
           2115 MAIN STREET
13         SANTA MONICA, CALIFORNIA  90405
           310-399-9029

14

15   ALSO PRESENT:

16         IRA ISAACS

17

18

19

20

21

22

23

24

25

**002**

<u>**I N D E X**</u>

**JANUARY 19, 2011**

**WITNESSES**

| WITNESS | DIRECT | CROSS | REDIR | RECROSS | BY THE COURT |
|---------|--------|-------|-------|---------|--------------|
| IRA ISAACS | | 8 | | | 32 |
| (RESUMED) | | 68 | | | |

## I N D E X

### JANUARY 19, 2011

| GOVERNMENT'S | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| DH-1  SUD'S CLEANERS MAILER | 11 | 12 |
| DH-2  GINA'S PIZZA MAILER | 13 | |
| DH-3  RUSTY'S PIZZA MAILER | 13 | |

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 19, 2011

 2                            2:34 P.M.

 3                             --oOo--

 4              THE CLERK:  CALLING ITEM 1 ON THE COURT'S

 5    CALENDAR, CRIMINAL 07-732, UNITED STATES OF AMERICA VERSUS

 6    IRA ISAACS.

 7              COUNSEL, PLEASE STATE YOUR APPEARANCE FOR THE

 8    RECORD.

 9              MS. FEBUS:  GOOD AFTERNOON, YOUR HONOR.

10    CHANTEL FEBUS REPRESENTING THE UNITED STATES.

11              MR. GRANT:  GOOD AFTERNOON, YOUR HONOR.

12    MICHAEL GRANT REPRESENTING THE UNITED STATES.

13              THE COURT:  THANK YOU, GOOD AFTERNOON.

14              MR. DIAMOND:  GOOD AFTERNOON, YOUR HONOR.

15    ROGER DIAMOND WITH MR. ISAACS, WHO IS PRESENT.

16              THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

17              THIS MATTER'S ON THE COURT'S CALENDAR FOR A

18    DAUBERT HEARING WITH RESPECT TO THE PROPOSED EXPERT

19    TESTIMONY OF THE DEFENDANT.

20              MR. DIAMOND, MY UNDERSTANDING IS THAT THE

21    DEFENDANT HAS DECIDED TO FOREGO ANY EXPERT TESTIMONY BY

22    ANYONE OTHER THAN THE PROPOSED EXPERT, MR. ISAACS, HIMSELF.

23    IS THAT CORRECT?

24              MR. DIAMOND:  YES, YOUR HONOR.

25              THE COURT:  OKAY.  AND I HAVE RECEIVED YOUR
```

```
1    FILING, WHICH WAS TIMELY FILED ON OR ABOUT JANUARY 12, WHICH
2    PURPORTS TO SET FORTH WHAT THE QUALIFICATIONS ARE OF
3    MR. ISAACS TO TESTIFY AND, GENERALLY, WHAT HE INTENDS TO
4    TESTIFY ABOUT IF THE COURT WERE TO PERMIT HIM TO TESTIFY AS
5    AN EXPERT.
6              MR. DIAMOND:  YES, YOUR HONOR.
7              THE COURT:  ALL RIGHT.  AND WHO'S GOING TO ADDRESS
8    THE COURT AMONG THE COUNSEL FOR THE GOVERNMENT?
9              MR. GRANT:  I WILL, YOUR HONOR.
10             THE COURT:  ALL RIGHT.  MR. GRANT, THEN, I TAKE
11   IT, OF COURSE, YOU HAVE HAD A CHANCE TO REVIEW THAT
12   JANUARY 12 FILING WITH RESPECT TO MR. ISAACS.
13             MR. GRANT:  YES, YOUR HONOR.
14             THE COURT:  OKAY.  MY FEELING IS THIS, THAT WE GO
15   AHEAD AND PUT MR. ISAACS ON THE STAND, HE'S SWORN, AND
16   MR. GRANT BE GIVEN AN OPPORTUNITY TO CROSS-EXAMINE
17   MR. ISAACS ONLY, OF COURSE, ABOUT THESE PURPORTED
18   QUALIFICATIONS AND SCOPE AND METHODOLOGY AND REASONS FOR
19   REACHING WHATEVER CONCLUSION.
20             WE'RE NOT INTERESTED IN THE CONCLUSION ITSELF,
21   AS SUCH, BECAUSE WE'RE NOT HERE TO DEBATE WHETHER OR NOT
22   IT'S A RIGHT OR WRONG CONCLUSION; BUT WE ARE HERE TO
23   DETERMINE WHETHER HE'S QUALIFIED AS AN EXPERT TO TESTIFY TO
24   WHAT HE PURPORTS TO TESTIFY ABOUT AND WHETHER HE HAS
25   RELIABLE METHODOLOGY FOR THE APPLICATION OF THAT EXPERTISE
```

```
 1   TO THE OPINION AND THEN, TO SOME EXTENT, WHETHER OR NOT IT

 2   WOULD BE EVEN HELPFUL TO THE JURY FOR PURPOSES OF 702.

 3            SO THAT'S WHAT I PROPOSE TO DO.

 4            IS THAT SATISFACTORY WITH YOU, MR. DIAMOND?

 5            MR. DIAMOND:  YES, YOUR HONOR.

 6            THE COURT:  WITH YOU, MR. GRANT?

 7            MR. GRANT:  YES, YOUR HONOR.

 8            THE COURT:  ALL RIGHT.  MR. ISAACS, WOULD YOU

 9   PLEASE WALK AROUND AND BE PREPARED TO TAKE THE STAND AND BE

10   SWORN BY THE CLERK.

11            THE CLERK:  PLEASE WAIT BEHIND OUR COURT REPORTER,

12   AND RAISE YOUR RIGHT HAND TO BE SWORN.

13                      IRA ISAACS,

14       THE DEFENDANT, WAS SWORN, TESTIFIED AS FOLLOWS:

15            THE CLERK:  DO YOU SOLEMNLY SWEAR THAT THE

16   TESTIMONY YOU SHALL GIVE IN THE CAUSE NOW PENDING BEFORE THE

17   COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

18   THE TRUTH, SO HELP YOU GOD?

19            THE WITNESS:  YES.

20            THE CLERK:  THANK YOU, SIR.  YOU MAY GO AROUND AND

21   TAKE A SEAT, PLEASE.

22                      (PAUSE.)

23            THE CLERK:  PLEASE ADJUST THE MICROPHONE AND SPEAK

24   DIRECTLY INTO IT.

25            THE WITNESS:  HELLO.  HELLO.  IS THIS GOOD?
```

**007**

```
 1            THE CLERK:  YES.  STATE YOUR FULL NAME FOR THE
 2    RECORD AND SPELL YOUR FIRST AND LAST NAME PLEASE.
 3            THE WITNESS:  IRA ISAACS.  I-R-A, I-S-A-A-C-S.
 4            THE CLERK:  THANK YOU.
 5            THE COURT:  MR. GRANT.
 6            MR. GRANT:  THANK YOU, YOUR HONOR.
 7                      CROSS-EXAMINATION
 8    BY MR. GRANT:
 9    Q.    GOOD AFTERNOON, MR. ISAACS.
10    A.    GOOD AFTERNOON.
11    Q.    I WOULD LIKE TO TAKE A FEW MOMENTS JUST TO GO THROUGH
12    YOUR PLEADING AND SOME OF YOUR QUALIFICATIONS THAT YOU'VE
13    PUT FORTH IN THIS DOCUMENT.
14    A.    OKAY.
15    Q.    THERE'S A STATEMENT IN HERE THAT YOU RECEIVED A B.A.
16    DEGREE IN COMMUNICATION ARTS IN 1977.  IS THAT CORRECT?
17    A.    THAT IS CORRECT.
18    Q.    AND, MR. ISAACS, IS THAT THE DEGREE YOU RECEIVED AT
19    SUNY NEW PALTZ IN NEW YORK?
20    A.    YES, IT IS.
21    Q.    AND SINCE YOU ATTENDED COLLEGE IN 1977, HAVE YOU
22    RECEIVED ANY ADDITIONAL FORMAL EDUCATION?
23    A.    WHAT KIND OF EDUCATION, EXCUSE ME?
24    Q.    FORMAL EDUCATION.
25    A.    NO.
```

```
 1   Q.   MR. ISAACS, OTHER THAN YOUR INVOLVEMENT IN THIS CASE,

 2   HAVE YOU EVER BEEN QUALIFIED AS AN EXPERT IN THE AREA OF ART

 3   OR ART STUDIES?

 4   A.   NO, NO.

 5   Q.   HAVE YOU BEEN QUALIFIED AS AN EXPERT IN MEDIA OR FILM

 6   STUDIES?

 7   A.   MEDIA, YES.

 8   Q.   IN A COURT OF LAW, SIR?

 9   A.   NO.  COURT OF LAW, NO.

10   Q.   HOW ABOUT COMMUNICATION ARTS?  HAVE YOU EVER BEEN

11   QUALIFIED AS AN EXPERT IN COMMUNICATION ARTS IN ANY COURT OF

12   LAW?

13   A.   COURT OF LAW, NO.

14           THE COURT:  CAN I GET CLARIFICATION, MR. ISAACS.

15           IS YOUR DEGREE IN COMMUNICATIONS OR COMMUNICATION

16   ARTS?

17           THE WITNESS:  COMMUNICATION ARTS.

18           THE COURT:  OKAY.

19   BY MR. GRANT:

20   Q.   MR. ISAACS, OTHER THAN YOUR INVOLVEMENT IN THIS CASE,

21   HAVE YOU EVER BEEN QUALIFIED AS AN EXPERT IN ANY SUBJECT IN

22   ANY COURT OF LAW?

23   A.   NO.

24   Q.   NOW, I BELIEVE IN YOUR PLEADING YOU ALSO TALK ABOUT

25   YOUR EXPERIENCE IN THE TRADITIONAL ART WORLD WITH YOUR
```

1  MARKETING CAMPAIGN?

2  A.    YES, I DID.

3  Q.    AND, MR. ISAACS, IS THAT YOUR ADVERTISING COMPANY,

4  ISAACS' ADVERTISING?

5  A.    YES.

6  Q.    AND IN THAT ADVERTISING AGENCY, YOU PRODUCE MARKETING

7  LIKE ADVERTISING PAMPHLETS FOR COMPANIES.  CORRECT?

8  A.    I WOULDN'T CALL THEM PAMPHLETS, BUT YES.

9  Q.    OKAY.  IS IT A --

10  A.    BASICALLY, THEY'RE DIRECT MAIL ADVERTISING THAT

11  SOMEBODY WILL COME TO ME AND SAY, "I HAVE TEN STORES.  I

12  WANT TO BRING PEOPLE IN.  COULD YOU MARKET."

13        WE USE THE MEDIUM -- SOME PEOPLE USE T.V. OR

14  RADIO.  WE USE DIRECT MAIL, WHICH IT IS PAPER AND YOU MAIL

15  IT AND SO IN THAT SENSE, IT IS.  BUT IN A CONTENT SENSE,

16  IT'S VERY DIFFERENT THAN WHAT YOU MIGHT THINK WHAT A COUPON

17  WOULD BE.

18  Q.    BUT YOU DO ACTUALLY CREATE COUPONS FOR COMPANIES SUCH

19  AS DRY CLEANERS --

20  A.    ABSOLUTELY.

21  Q.    -- AND PIZZA PARLORS?

22  A.    YES.  RESTAURANTS, YES.

23  Q.    AND YOUR CLIENTS INCLUDE COMPANIES SUCH AS SUD'S COIN

24  LAUNDRY CENTER AND GINA'S PIZZA?

25  A.    GINA'S PIZZA -- YEAH, YEAH, YEAH.  GINA'S PIZZA IN

```
 1    SANTA BARBARA, YES, AND SUD'S I THINK THEY'RE IN THE
 2    MIDWEST.
 3              MR. GRANT:  YOUR HONOR, WITH YOUR PERMISSION, I'D
 4    LIKE TO SHOW THE WITNESS AN EXHIBIT.
 5              THE COURT:  ALL RIGHT.  DO YOU WANT TO MARK THAT
 6    AS EXHIBIT 1 FOR PURPOSES OF DAUBERT HEARING?
 7              MR. GRANT:  YES, SIR.
 8              THE COURT:  HAVE YOU SHOWN A COPY OF IT TO
 9    MR. DIAMOND?
10              MR. GRANT:  I'LL PROVIDE MR. DIAMOND A COPY NOW,
11    SIR.
12              THE COURT:  DO YOU HAVE AN EXTRA COPY FOR THE
13    COURT?
14              MR. GRANT:  YES, SIR, I DO.
15              PERMISSION TO APPROACH?
16              THE COURT:  YES.
17              MR. GRANT:  HANDING THE CLERK OF THE COURT A
18    WORKING COPY FOR THE JUDGE OF EXHIBIT A.
19              THE COURT:  EXHIBIT 1.  WE'LL USE NUMBERS.  OKAY.
20    SO WE'LL JUST GO AHEAD AND SAY DAUBERT HEARING EXHIBIT 1,
21    DH EXHIBIT 1.
22              MR. GRANT:  YES, YOUR HONOR.
23              PERMISSION TO APPROACH THE WITNESS?
24              THE COURT:  YES, YOU MAY.
25        (GOVERNMENT'S EXHIBIT DH-1, MARKED FOR IDENTIFICATION.)
```

BY MR. GRANT:

Q.   MR. ISAACS, I'M HANDING YOU WHAT'S BEEN MARKED AS DH-1.
DO YOU RECOGNIZE THAT DOCUMENT?

A.   YES.

Q.   WHAT IS THAT, MR. ISAACS?

A.   THESE ARE COPIES, COLOR COPIES OF DIRECT MAIL PIECES
THAT I'VE DONE FOR, IN THIS CASE, A DRY CLEANER, SUD'S.  I
THINK IT WAS IN THE MIDWEST.

Q.   IS THAT A FAIR AND ACCURATE COPY OF WHAT YOU PRODUCED
FOR SUD'S?

A.   YES.  IT'S A FAIR AND ACCURATE COLOR COPY, YES.

          MR. GRANT:  YOUR HONOR, WITH YOUR PERMISSION, I'D
LIKE TO ADMIT EXHIBIT DH-1 INTO EVIDENCE.

          THE COURT:  ANY OBJECTION, MR. DIAMOND?

          MR. DIAMOND:  NO, YOUR HONOR.

          THE COURT:  ALL RIGHT.  IT WILL BE RECEIVED.

          *(GOVERNMENT'S EXHIBIT DH-1 RECEIVED.)*

          THE WITNESS:  DO I KEEP THIS?

          THE COURT:  YOU CAN JUST LEAVE IT UP THERE FOR
NOW, MR. ISAACS.

          THE WITNESS:  THANK YOU.

          MR. GRANT:  YOUR HONOR, I HAVE WHAT'S BEEN
PREVIOUSLY MARKED AS DH-2.  I'M PROVIDING A COPY TO
MR. DIAMOND.

          THE COURT:  ALL RIGHT.

**012**

```
1          MR. GRANT:  I HAVE A WORKING COPY FOR THE COURT.

2          PERMISSION TO APPROACH, YOUR HONOR?

3          THE COURT:  YES.

4          MR. GRANT:  HANDING THE CLERK A WORKING COPY OF

5   DH-2.

6          THE COURT:  IF YOU HAVE SEVERAL OF THESE, WHY

7   DON'T WE DO IT ALL AT THE SAME TIME OR SEE IF HE RECOGNIZES

8   THEM, RATHER THAN JUST DOING IT PIECEMEAL.

9          DO YOU HAVE ANY OTHERS?

10         MR. GRANT:  YOUR HONOR, I JUST HAVE ONE MORE.

11         THE COURT:  OKAY.  WHY DON'T YOU DO IT RIGHT NOW,

12  AND WE'LL MARK THAT AS DH EXHIBIT 3.

13         MR. GRANT:  YES, SIR.

14         (GOVERNMENT'S EXHIBITS DH-2 AND DH-3

15              MARKED FOR IDENTIFICATION.)

16         THE COURT:  AND MAKE SURE THAT COUNSEL HAS AN

17  OPPORTUNITY TO REVIEW IT, PLEASE.

18         MR. GRANT:  I'M PROVIDING A COPY OF DH-3 TO

19  MR. DIAMOND AND HANDING THE CLERK A COPY OF DH-3 FOR THE

20  COURT.

21         THE COURT:  THANK YOU.

22         MR. GRANT:  PERMISSION TO APPROACH, YOUR HONOR?

23         THE COURT:  YES.

24  BY MR. GRANT:

25  Q.  MR. ISAACS, I'M HANDING YOU DH-2 AND DH-3.  WOULD YOU
```

**013**

```
 1    TAKE A LOOK AT THESE EXHIBITS, PLEASE.

 2    A.    SURE.  OKAY.

 3    Q.    MR. ISAACS, DO YOU RECOGNIZE THOSE EXHIBITS?

 4    A.    YES.

 5    Q.    AND WHAT ARE THOSE EXHIBITS?

 6    A.    THESE ARE, AGAIN, DIRECT MAILERS.  THIS TIME IT'S FOR A

 7    RESTAURANT CHAIN, GINA'S IN SANTA BARBARA.  IT'S LIKE A

 8    SUPERHERO PIZZA WE MADE.

 9    Q.    OKAY.  HOW ABOUT NO. 3.

10    A.    NUMBER 3 IS THE INSIDE OF THIS -- NO, NO, NO.  THREE

11    IS -- EXCUSE ME.  LET ME --

12              IF I REMEMBER CORRECTLY, WE'VE DONE SEVERAL PIECES

13    FOR GINA'S.  THIS WAS A DIFFERENT FORMAT FOR GINA'S.  IT

14    DIDN'T HAVE THIS COVER.  THIS WAS A SINGLE PIECE OF, YOU

15    KNOW, HARD PAPER.  THEY'RE BOTH GINA'S, BUT THEY'RE FROM

16    DIFFERENT PIECES THAT I PRODUCED FOR GINA'S.

17              THE COURT:  EXCUSE ME.  WHEN YOU SAY "THIS," ARE

18    YOU REFERRING TO EXHIBIT 2?

19              THE WITNESS:  I'M REFERRING TO -- THIS IS ONE

20    PIECE THAT STANDS ALONE.

21              THE COURT:  DON'T SAY "THIS."

22              THE WITNESS:  OH, I'M SORRY.

23              THE COURT:  REFER TO EXHIBIT 2 OR EXHIBIT 3 SO WE

24    HAVE A GOOD RECORD.

25              THE WITNESS:  EXHIBIT IT LOOKS LIKE 3 AND
```

**014**

```
 1   EXHIBIT 2 -- EXHIBIT 3 IS ONE SEPARATE PIECE, AND EXHIBIT 2
 2   IS THE SAME COMPANY BUT A TOTALLY DIFFERENT PIECE THAT WAS
 3   DONE AT A DIFFERENT TIME.
 4          THE COURT:  IS EXHIBIT 3 ALSO FOR GINA'S?
 5          THE WITNESS:  YES.
 6          THE COURT:  BUT IT SAYS --
 7          THE WITNESS:  NO.  EXCUSE ME.  RUSTY'S.  I'M
 8   SORRY, I'M SORRY.  I'M GETTING A LITTLE CONFUSED.  IT WAS
 9   QUITE A WHILE AGO.  I'M GLAD YOU POINTED THAT OUT.  I'M A
10   LITTLE NERVOUS.
11          THE COURT:  DON'T BE NERVOUS, BUT WAIT.  LET ME
12   ASK THE QUESTION.
13          THE WITNESS:  OKAY.
14          THE COURT:  EXHIBIT 2 RELATES TO SOME ADVERTISING
15   WORK THAT YOU DID FOR GINA'S PIZZA?
16          THE WITNESS:  YES, IN NEWPORT BEACH.  THAT IS
17   TRUE.
18          THE COURT:  AND THEN EXHIBIT 3 RELATES TO SOME
19   ADVERTISING WORK YOU DID FOR A RUSTY'S PIZZA PARLOR?
20          THE WITNESS:  YES, IN SANTA BARBARA.  THAT IS
21   EXACTLY RIGHT.
22          THE COURT:  ALL RIGHT.  VERY GOOD.
23          THE WITNESS:  THANK YOU.
24          THE COURT:  MR. GRANT.
25          MR. GRANT:  YES, SIR.
```

BY MR. GRANT:

Q.   MR. ISAACS, THE THREE EXHIBITS THAT I JUST PRESENTED TO
YOU, ARE THOSE FAIR REPRESENTATIONS OF THE WORK THAT ISAAC'S
ADVERTISING DOES?

A.   WELL, IN THE SENSE OF IT IS -- YEAH, IT'S PROBABLY A
FAIR -- YOU KNOW, WE DO DIFFERENT KINDS OF THINGS.  AND THAT
IS PROBABLY A FAIR REPRESENTATION EVEN THOUGH I'VE BEEN IN
BUSINESS FOR 25 YEARS.  THERE'S SO MUCH, AND I DON'T KNOW IF
YOU CAN BOIL IT DOWN TO THESE TWO.

          I HAPPENED TO BRING SOME EXHIBITS THAT ARE SIMILAR
TO THESE THAT WOULD -- I THINK WOULD REPRESENT A FAIRER
REPRESENTATION OF THE CREATIVE THING.  BUT I GUESS SO.  I
GUESS SO.  I DON'T SEE WHY NOT.

Q.   AND, MR. ISAACS, IN YOUR PLEADING ON THE SECOND PAGE
WHEN YOU TALK ABOUT THE TRADITIONAL ART WORLD AND YOUR
INVOLVEMENT IN PRODUCING MARKETING CAMPAIGNS --

A.   RIGHT.

Q.   -- IT'S FOR THIS BUSINESS.  CORRECT?

A.   YES.  AND ALSO I'M A PAINTER AND ARTIST AS WELL.

Q.   OKAY.  MR. ISAACS, THE ADVERTISING WORK THAT YOU DO FOR
ISAACS' ADVERTISING, IT'S NOT TIED TO THE FILMS THAT YOU DO
IN YOUR CAPACITY UNDER "STOLEN CAR FILMS," IS IT?

A.   WELL, IN A VERY ABSTRACT WAY IT IS BUT NOT IN A DIRECT
WAY.  IF YOU WANT ME TO EXPLAIN, I CAN.

Q.   WELL, I GUESS WHAT I'M GETTING AT IS YOU DON'T

**016**

```
 1   INCORPORATE THE PORNOGRAPHY FILMS THAT YOU MAKE INTO YOUR

 2   ADVERTISING CAMPAIGNS FOR GINA'S PIZZA, FOR EXAMPLE?

 3   A.   I WOULDN'T CHARACTERIZE MY WORK AS PORNOGRAPHY FILMS.

 4   BUT NO, THERE'S NO DIRECT RELATIONSHIP BETWEEN WHAT I DID

 5   FOR GINA'S PIZZA AND THE FILMS THAT I'VE DONE.

 6   Q.   OKAY.

 7            THE COURT:  BUT IS THAT TRUE FOR ALL OF YOUR

 8   ADVERTISING CUSTOMERS THROUGHOUT YOUR YEARS AS ISAAC'S

 9   ADVERTISING?

10            THE WITNESS:  NO.  WHAT I THINK -- NO.

11            THAT'S WHY I SAID ABSTRACTLY.  I DID THIS FOR

12   QUITE A LONG TIME, AND AT THE TIME IT WAS PRETTY -- VERY,

13   VERY NEW AND EXCITING STUFF, LIKE TAKING -- AND THESE ARE

14   ALL HAND PAINTINGS, BY THE WAY.

15            THE COURT:  NO, NO.  I JUST WANT YOU TO ANSWER MY

16   QUESTION AND THAT IS IS THERE ANY INCORPORATING OF ANY OF

17   THE TYPE OF WORK THAT YOU HAVE DONE THROUGH "STOLEN CARS" --

18            THE WITNESS:  RIGHT.

19            THE COURT:  -- INTO ANY OF THE WORK THAT YOU DO

20   FOR ANY OF YOUR CLIENTS AT ISAACS' ADVERTISING?

21            THE WITNESS:  OKAY.  I THINK ALL THE BOX COVERS

22   AND ALL THE MARKETING COMES DIRECTLY FROM THESE IDEAS.

23            THE COURT:  SO IS THERE ANY INCORPORATION OF ANY

24   OF THE IMAGERY --

25            THE WITNESS:  IN THE FILMS?
```

**017**

```
 1              THE COURT:  -- IN THE FILMS TO THE ADVERTISING?

 2              THE WITNESS:  NO, NO.

 3              THE COURT:  THANK YOU.

 4              MR. GRANT.

 5              MR. GRANT:  THANK YOU, YOUR HONOR.

 6    BY MR. GRANT:

 7    Q.   NOW, YOU ALSO DISCUSS IN YOUR PLEADING ABOUT YOUR

 8    EXPERIENCE IN MAKING THE FILMS LIKE THE FILMS CHARGED IN

 9    THIS CASE.  CORRECT?

10    A.   WELL, ONE OF THE FILMS I DID MAKE.

11    Q.   AND THAT IS --

12    A.   HOLLYWOOD SCAT AMATEURS 7, I ACTUALLY MADE.

13              THE COURT REPORTER:  EXCUSE ME?

14              THE WITNESS:  THE FILM IS HOLLYWOOD SCAT AMATEURS

15    NO. 7, A CHARGED FILM, I MADE, I DIRECTED AND PRODUCED.

16              THE COURT:  WHAT ABOUT THE OTHER TWO CHARGED

17    FILMS?  WHAT ROLE, IF ANY, DID YOU HAVE IN THEM?

18              THE WITNESS:  WELL, I DISTRIBUTED THEM.  I DIDN'T

19    MAKE THEM.

20              THE COURT:  YOU WEREN'T THE PRODUCER?

21              THE WITNESS:  NO, I WAS NOT A PRODUCER OR NOTHING.

22    I JUST WAS THE DISTRIBUTOR.

23              THE COURT:  I SEE.  OKAY.  THANK YOU.

24              ALL RIGHT.  MR. GRANT.

25    ///
```

BY MR. GRANT:

Q.   AND, MR. ISAACS, I BELIEVE IN YOUR PLEADING YOU STATE
THAT THE FACT THAT YOU WERE THE CREATOR AND DIRECTOR OF THIS
FILM THAT YOU CHARACTERIZE AS "H.S.A. NO. 7" --

A.   RIGHT.

Q.   -- THAT THAT GIVES YOU A SPECIAL INSIGHT?

A.   YES, I DO.

Q.   JUST TO BE CLEAR ABOUT YOUR ROLE AS THE PRODUCER AND
THE CREATOR, YOU CREATE THESE MOVIES AND YOU PLACE THEM ON A
WEBSITE FOR SALE.  IS THAT CORRECT?

A.   SOMETIMES, YES.

     I HAVEN'T PUT EVERYTHING I'VE EVER PRODUCED ON THE
WEBSITE.

Q.   WELL, LET'S JUST USE -- AND WE'LL CALL IT "H.S.A. 7,"
AS AN EXAMPLE.

A.   YES.

Q.   OKAY.  YOU MAKE THAT VIDEO, AND THEN YOU PLACE IT ON A
WEBSITE FOR SALE.

A.   YES.

Q.   AND YOU ACTUALLY SOLD THAT VIDEO.

A.   YES.

Q.   AND THE WAY THAT WORKS IS THAT ONCE IT'S ON THE
WEBSITE, A PURCHASER CAN COME TO THE WEBSITE, REVIEW THE
DIFFERENT VIDEOS, AND THEN BUY THAT VIDEO FROM YOU EITHER
OVER THE INTERNET OR VIA MAIL?

```
1    A.   WHAT'S THE LAST ONE?

2    Q.   OR THROUGH THE MAIL.

3    A.   OH, YES.

4    Q.   ALL RIGHT.  AND YOU CHARGED FOR THESE VIDEOS?

5    A.   YES.

6    Q.   HOW MUCH WERE YOU CHARGING FOR "H.S.A. 7," FOR EXAMPLE?

7    A.   YOU KNOW, IT DEPENDS.  ANYWHERE AS LITTLE AS $10 AND AS

8    MUCH AS $30.

9    Q.   NOW, MR. ISAACS, ONCE YOU SELL THAT VIDEO AND YOU SEND

10   IT TO THE PURCHASER, YOU HAVE NO CLUE WHAT THAT PERSON DOES

11   WITH THAT FILM.  IS THAT CORRECT?

12   A.   I'LL ASSUME HE WATCHES THE FILM, BUT OTHER THAN THAT,

13   I, YOU KNOW....

14   Q.   RIGHT.  THESE FILMS, IT'S A FAIR CHARACTERIZATION THAT

15   THEY'RE SEXUALLY ORIENTED.  CORRECT?

16   A.   WHAT DO YOU MEAN BY THAT?  WHAT DOES THAT MEAN

17   "SEXUALLY ORIENTED"?

18   Q.   WELL, THEY CONTAIN --

19   A.   DOES IT HAVE SEX IN IT?

20   Q.   THEY CONTAIN SEX ACTS?

21   A.   YES.

22   Q.   OKAY.  AND THE FILMS WE'RE TALKING ABOUT SPECIFICALLY

23   ARE FILMS THAT INVOLVE SEX ACTS INCORPORATING SOME FORM OF

24   FECES, URINATION?

25   A.   YES.
```

**020**

```
 1   Q.   OKAY.  AND YOU ADVERTISE THESE FILMS LIKE --
 2   A.   WELL, WELL, CAN I -- CAN I BACK UP AND ANSWER THAT A
 3   LITTLE BIT BETTER?
 4   Q.   OKAY.
 5   A.   EVEN THOUGH THERE'S SEX, THAT'S NOT THE POINT OF THESE
 6   FILMS.  SO IF IT DIDN'T HAVE -- MANY OF MY FILMS DON'T HAVE
 7   ANY SEX.  THE ONE THE GOVERNMENT HAPPENED TO PICK DID, BUT
 8   THAT IS NOT THE FOCAL POINT OF THESE MOVIES IS THE SEX.
 9   IT'S INCIDENTAL.
10   Q.   HOW MANY OF THESE VIDEOS HAVE YOU MADE, FOR EXAMPLE, IN
11   THE HOLLYWOOD H.S.A. CATEGORY, HOW MANY OF THOSE VIDEOS HAVE
12   YOU MADE?
13   A.   THIRTY-NINE.
14   Q.   ALL RIGHT.  ALL OF THOSE HAD SOME FORM OF SEXUAL ACT IN
15   THEM?
16   A.   NO.
17   Q.   NO?
18   A.   NO.  MOST DON'T.
19   Q.   PARDON ME?
20   A.   OKAY.  I DON'T KNOW HOW YOU DEFINE SEX, BUT FOR
21   EXAMPLE, IF SOMEBODY KISSES SOMEBODY, WOULD THAT BE SEX?
22   Q.   NO.  BUT I GUESS WHAT I'M GETTING AT --
23   A.   THERE ARE --
24            THE COURT:  WAIT.  DON'T TALK OVER EACH OTHER.
25            THE WITNESS:  OH, I'M SORRY.
```

**021**

```
 1              THE COURT:  SLOW DOWN.  WE HAVE TO GET A GOOD
 2    RECORD.  LET HIM ASK A QUESTION BEFORE YOU ANSWER, AND HE
 3    WILL LET YOU ANSWER BEFORE HE ASKS THE NEXT QUESTION.
 4              THE WITNESS:  OKAY.  THANK YOU.
 5              THE COURT:  ALL RIGHT.  VERY GOOD.
 6              GO AHEAD.  ASK YOUR NEXT QUESTION.
 7              MR. GRANT:  THANK YOU, YOUR HONOR.
 8    BY MR. GRANT:
 9    Q.  I GUESS WHAT I'M GETTING AT, MR. ISAACS, IS THAT
10    THERE'S SOME FORM OF SEXUAL ACT.
11    A.  NO.
12    Q.  NO.  OKAY.
13              HOW MANY FILMS OUT OF THE 39 OR SO FILMS DO NOT
14    INCLUDE SEXUAL ACTS?
15    A.  CAN I ASK YOU A QUESTION?
16              AM I ALLOWED?  HOW DO YOU DEFINE A SEXUAL ACT?
17    Q.  I'LL DEFINE THAT FOR YOU.
18    A.  OKAY.
19    Q.  INTERCOURSE, ORAL SEX, ANY DERIVATIVE OF THAT.
20    A.  OKAY.  I COULD ANSWER IT, BUT I'M NOT SURE WHAT
21    "DERIVATIVE" MEANS.  BUT MOST DON'T.  HOW MANY EXACTLY?  I
22    CAN'T TELL YOU.  BUT I WOULD SAY, YOU KNOW, THE EARLIER ONES
23    TEND TO HAVE MORE SEX, BUT THE LATER ONES DIDN'T.
24              THE LATER ONES WERE JUST, YOU KNOW, THE RAWNESS OF
25    IT; AND I REALIZED I DIDN'T NEED SEX FOR THOSE THINGS.  SEX
```

**022**

1   WAS KIND OF LIKE A MARKETING PLOY IN A SENSE.

2   Q.   ALL RIGHT.

3   A.   I WAS EXPERIMENTING A LOT.  SO I REALLY WAS ON VERY NEW

4   CREATIVE GROUND, AND I CAN'T BE, AS AN ARTIST -- BE AFRAID

5   TO MAKE MISTAKES.  SO THE LATER ONES I PRODUCED, GENERALLY,

6   HAD NO SEX AT ALL.

7   Q.   ALL RIGHT.  LET'S FOCUS ON THE CHARGED FILMS.

8   A.   OKAY.

9   Q.   "H.S.A. 7," DOES THAT INVOLVE SEX ACTS?

10  A.   YES.

11  Q.   AND THOSE ACTS INCLUDE ORAL SEX WHILE INVOLVING FECES?

12  A.   NO.

13        THE FECES IN THAT PARTICULAR MOVIE IS NOT REAL.

14  Q.   OKAY.

15  A.   SO IT'S REALLY NOT INVOLVING FECES AT ALL.

16  Q.   HOW ABOUT THE "MAKO" VIDEO?

17  A.   WHAT ABOUT IT?

18  Q.   THAT FILM INVOLVED FECES, URINE, AND SEX ACTS.

19  CORRECT?

20  A.   I THINK SO, YES.

21  Q.   AND THE VIDEO "HORSEPLAY"?

22  A.   YES.

23  Q.   THAT INCLUDES A SEX ACT WHERE A WOMAN IS PERFORMING

24  ORAL SEX ON A NUMBER OF HORSES.  CORRECT?

25  A.   TWO HORSES.

**023**

```
 1    Q.   RIGHT.

 2    A.   THAT'S THE NUMBER.

 3    Q.   OKAY.  AND ALSO HAVING INTERCOURSE WITH A HORSE?

 4    A.   YES.

 5    Q.   AND WOULD YOU AGREE WITH ME THAT THOSE ARE SEX ACTS?

 6    A.   YEAH, THOSE ARE SEX ACTS.

 7    Q.   AND, MR. ISAACS, YOU ADVERTISE AND SELL THESE FILMS

 8    THAT WE JUST DISCUSSED ON SITES SUCH AS SCATMOVIES.COM?

 9    A.   YES.

10    Q.   AND SCATCINEMAX.COM?

11    A.   YES.

12    Q.   MR. ISAACS, YOU DON'T ADVERTISE THESE FILMS ON SITES

13    SUCH AS THE ART DEALERS ASSOCIATION OF AMERICA OR THE ART

14    DEALERS ASSOCIATION OF CALIFORNIA, DO YOU?

15    A.   NO, BUT THERE IS A REASON.

16    Q.   NOW, YOU ALSO DISCUSS IN YOUR PLEADING SOMETHING ABOUT

17    A GALLERY INSTALLATION THAT YOU'RE WORKING ON.

18    A.   YES.

19    Q.   NOW, THAT'S A PROJECT THAT YOU STARTED AFTER YOU WERE

20    INDICTED IN THIS CASE.  CORRECT?

21    A.   NO.

22    Q.   THAT'S NOT TRUE?

23    A.   NO, IT'S NOT TRUE.

24    Q.   ALL RIGHT.  WELL, PRIOR TO THIS CASE, HAD YOU TAKEN ANY

25    OF YOUR OTHER 39 VIDEOS AND TRIED TO OPEN A GALLERY AS WHAT
```

**024**

1    YOU DESCRIBED HERE IN YOUR PLEADING?

2    A.   NO.

3    Q.   ALL RIGHT.  IS THE GALLERY UP AND RUNNING?

4    A.   OKAY.  FIRST OF ALL, IT'S NOT MY GALLERY.  THAT WOULD

5    BE A SELF-SERVING GALLERY.  THAT WOULD BE LIKE -- YOU KNOW,

6    IT'S LIKE A PURPLE -- YOU KNOW, IT'S LIKE A VANITY PRESS.

7    SO IT WOULDN'T BE MINE.  I WOULD NEVER DO THAT.

8         SO WHAT I'M TALKING ABOUT ARE OTHER PEOPLE WHO ARE

9    INTERESTED IN POSSIBLY SHOWING THIS INSTALLATION PIECE IN

10   THEIR GALLERY.

11   Q.   OKAY.  YOU DO DESCRIBE AN EXHIBIT IN YOUR PLEADING

12   ABOUT HOW YOU WERE GOING TO GO ABOUT PUTTING THAT TOGETHER.

13   CORRECT?

14   A.   YEAH, I DID.

15   Q.   OKAY.  AND HAVE YOU ACTUALLY COMPLETED THAT AND SHOWN

16   THAT TO AN AUDIENCE?

17   A.   NO BECAUSE IT'S NOT EXHIBITED YET.

18   Q.   OKAY.

19   A.   IT'S STILL -- IT'S STILL, YOU KNOW, WORKING IN MY MIND.

20        THE COURT:  SO YOU HAVEN'T EVEN APPROACHED ANY --

21        THE WITNESS:  NO, I ACTUALLY --

22        THE COURT:  YOU'VE GOT TO LET ME FINISH.

23        THE WITNESS:  I'M SORRY.

24        THE COURT:  SO YOU HAVE NOT APPROACHED ANY GALLERY

25   OWNER TO HAVE THIS INSTALLATION PUT IN HIS OR HER GALLERY?

**025**

```
 1            THE WITNESS:  I SPOKE TO A COUPLE, BUT THEIR MAJOR

 2   FEAR IS BECAUSE IT'S AN OBSCENITY -- FEDERAL OBSCENITY CASE,

 3   AT THIS POINT, THEY'RE AFRAID THEY'RE GOING TO GET ARRESTED.

 4   SO WE HAVEN'T WORKED OUT HOW THAT WOULD WORK.

 5            THE COURT:  ALL RIGHT.  AND NO GALLERY TO DATE HAS

 6   DISPLAYED THIS INSTALLATION.

 7            THE WITNESS:  CORRECT.

 8            THE COURT:  AND HAVE YOU CREATED EVEN THIS

 9   INSTALLATION HERE PHYSICALLY?

10            THE WITNESS:  WELL, YOU KNOW, INSTALLATION ART IS

11   NOT SOMETHING YOU DO LIKE A PAINTING, YOU CREATE AND, YOU

12   KNOW, YOU LEAVE IT IN YOUR APARTMENT, AND YOU BRING IT

13   SOMEPLACE AND SHOW IT.  YOU KNOW, IT'S A MASSIVE THING AND

14   YOU HAVE TO SET THE ROOM UP.

15            SO EVEN IF I CREATE IT, THERE WOULD BE NO WAY FOR

16   ME TO, YOU KNOW, BRING IT TO THEM.  SO WHAT I DID CREATE IS

17   A DRAWING.  AND I DON'T KNOW IF I COULD -- I HAVE THAT HERE.

18   I COULD SHOW THAT, BUT A DRAWING OF HOW IT WOULD BE, HOW IT

19   WOULD WORK.

20            THE COURT:  OKAY.  SO YOU HAVE AN IDEA, YOU HAVE A

21   RENDITION.

22            THE WITNESS:  YES.

23            THE COURT:  BUT YOU CANNOT SET IT UP BECAUSE YOU

24   DO NOT HAVE ANYBODY WHO HAS AUTHORIZED YOU TO USE THEIR

25   GALLERY FOR THAT PURPOSE?
```

```
 1              THE WITNESS:  AT THIS POINT, YES.

 2              THE COURT:  OKAY.

 3              MR. GRANT.

 4              MR. GRANT:  YES, YOUR HONOR.

 5   BY MR. GRANT:

 6   Q.   NOW, MR. ISAACS, IN THE PAST YOU'VE TESTIFIED -- AND I

 7   BELIEVE YOU EVEN SPOKE TO PEOPLE ABOUT HOW YOU DEFINE ART --

 8   AND I BELIEVE YOU STATED THAT "ART IS WHAT ARTISTS DO."

 9   A.   YEAH, YOU CAN SAY THAT.  YOU COULD SAY ART, AT THE VERY

10   LOWEST LEVEL, IS WHAT AN ARTIST DOES.  THAT IS TRUE.

11   Q.   OKAY.  SO I GUESS MY QUESTION TO YOU WOULD BE:

12              IF AN ARTIST PRODUCES SOMETHING, IS IT THEN

13   NECESSARILY ART?

14   A.   OKAY.  LET ME SAY IT THIS WAY:  ALL ARTISTS PRODUCE

15   ART, BUT THEY MIGHT NOT BE PRODUCING GOOD ART, TASTEFUL ART,

16   BAD ART, OR EVEN SERIOUS ART.

17              THE BAR FOR BEING ART IS A VERY LOW BAR BECAUSE I

18   DON'T THINK WE NEED TO START JUDGING PEOPLE EVEN IF WE DON'T

19   LIKE IT.  SO ART IS WHAT ARTISTS DO.  BUT THAT DOESN'T MEAN

20   IT'S A SERIOUS PIECE OF ART OR EVEN A GOOD PIECE OF ART OR

21   SOMETHING THAT ANYBODY WOULD EVEN WANT TO LOOK AT.

22              THE COURT:  I'M SORRY.  I DIDN'T MEAN TO INTERRUPT

23   YOU.

24              THE WITNESS:  IT'S OKAY.

25              THE COURT:  WHEN YOU SAY "SERIOUS ART," YOU MEAN
```

**027**

```
1    ART THAT HAS SERIOUS ARTISTIC VALUE?

2              THE WITNESS:  YES.

3              THE COURT:  WELL, YOU GO AHEAD.

4              MR. GRANT:  YES, SIR.

5              THE COURT:  I DON'T WANT TO INTERRUPT.  I JUST

6    WANTED TO CLARIFY THAT.

7    BY MR. GRANT:

8    Q.   SO, MR. ISAACS, IS THERE ANYTHING THAT AN ARTIST

9    PRODUCES OR CREATES THAT YOU WOULD CONSIDER AS NOT

10   QUALIFYING AS ART?

11   A.   AGAIN, DEPENDING ON HOW YOU -- IF YOU DEFINE ART THE

12   WAY I DEFINE IT, IF THE ARTIST SAYS, "IT'S NOT ART," IT'S

13   NOT ART.

14             THE COURT:  I'M SORRY.  I DIDN'T HEAR THAT LAST

15   PART.

16             THE WITNESS:  OKAY.  I DEFINE ART VERY, VERY

17   LOOSELY.  IT'S BASICALLY, IF AN ARTIST CREATES SOMETHING --

18   WHETHER IT'S GOOD, BAD, WHATEVER -- HE HAS A RIGHT TO SAY

19   "THIS IS MY ART."  BUT THAT DOESN'T MEAN IT'S GOOD ART OR

20   ADDS VALUE TO THE ART.  IT DOESN'T MEAN IT'S TASTEFUL OR

21   ANYTHING.

22             SO ART IS VERY -- A VERY LOW BAR TO MAKE IT ART.

23   SO IF AN ARTIST SAYS, "WELL, YOU KNOW, AS AN ARTIST, I THINK

24   WHAT I CREATED IS NOT ART," THEN I WOULD RESPECT THAT.

25   ///
```

**028**

BY MR. GRANT:

Q.   YOU SAID THAT THAT'S HOW YOU DEFINE ART.

     WHERE DO YOU GET THAT DEFINITION FROM?

A.   A PART OF THAT DEFINITION IS FROM MARCEL DUCHAMP AND

MANY PEOPLE IN THE POST MODERNISTIC MOVEMENT, AND IT'S A

VERY ACCEPTED THEORY OF WHAT PEOPLE THINK ART IS.  IT'S

MOSTLY MARCEL DUCHAMP.

Q.   MR. ISAACS, LET'S FOCUS ON PORNOGRAPHY FOR A MOMENT.

A.   OKAY.

Q.   CAN YOU COME UP WITH ANY TYPE OF PORNOGRAPHY THAT YOU

WOULD CONSIDER AS NOT QUALIFYING AS A PIECE OF ART?

A.   PIECE OF ART?

Q.   OR ART.

A.   NO, BUT IF YOU ASK ME -- IF YOU ASK ME HAVE I SEEN

PORNOGRAPHY THAT DOES NOT HAVE SERIOUS ARTISTIC VALUE, I

WOULD SAY MOST PORNOGRAPHY I'VE SEEN DOES NOT HAVE SERIOUS

ARTISTIC VALUE.  BUT IF YOU ASK ME, "IS IT ART," YEAH, WHY

NOT?  SOMEBODY CREATED IT; THEY TOOK SOME TIME TO DO THIS.

     LOOK, THINK OF IT THIS WAY:  IF I LOOK AT THAT

CLOCK BEHIND YOU AND THAT -- AND THAT -- I'D LOOK AT THE

SECONDHAND, BUT I CAN'T SEE THAT FAR.  BUT IF THE

SECONDHAND'S TICKING, THAT'S NOT ART.

     BUT IF I FILM THAT AND I INTENTIONALLY FILM THAT

FOR A POINT AND I FILM THAT, NOW IT BECOMES ART.  BUT IT

MIGHT NOT BE GOOD ART.  IT MIGHT BE LOW ART, OR IT MIGHT BE

**029**

1    TERRIBLE ART.  IT MIGHT NOT HAVE ANY VALUE.

2          BUT THE FACT THAT, AS AN ARTIST OR AS A HUMAN

3    BEING, I'VE DECIDED TO CAPTURE SOMETHING LIKE THAT WOULD

4    MAKE IT ART.  BUT IF IT'S JUST TICKING AWAY, IT'S NOT ART.

5    Q.   ALL RIGHT.  MR. ISAACS, LET'S FOCUS ON SERIOUS ARTISTIC

6    VALUE.

7          HOW DO YOU DEFINE SERIOUS ARTISTIC VALUE?

8    A.   WELL, I THINK FOR SOMETHING TO HAVE SERIOUS ARTISTIC

9    VALUE, IT'S IMPORTANT THAT IT ENGAGES THE VIEWER IN A

10   PROFOUND WAY.  AND IF IT MAKES THEM THINK ABOUT THEIR

11   DAY-TO-DAY OR MAKES THEM THINK ABOUT CERTAIN ISSUES OF THE

12   DAY, POLITICAL ISSUES, AND IT AFFECTS THEM IN A WAY THAT

13   ELEVATES DISCUSSION AND THINGS LIKE THAT, IT TENDS TO BE

14   SERIOUS ART.

15         ART THAT ENGAGES PEOPLE TO THINK ABOUT THINGS, I

16   THINK, IS SERIOUS ART OR HAS SERIOUS ARTISTIC VALUE, AND IT

17   COULD BE GOOD.  IF YOU TASTE IT, IT MIGHT BE -- YOU MIGHT

18   SAY, YOU KNOW, MY TASTE IS NOT THIS.  I THINK IT'S TERRIBLE.

19         SO SERIOUS ART, SERIOUS ARTISTIC VALUE COULD BE

20   TASTELESS.  TASTE AND PRODUCTION VALUE HAS NOTHING TO DO

21   WITH IT.  IT'S WHAT THE VIEWERS ULTIMATELY GET OUT OF THIS.

22   AND IF IT ENGAGES PEOPLE TO THINK ABOUT THINGS AND EVEN IF

23   IT'S NEGATIVE THINGS -- EVEN IF THEY SAY "I HATE THIS.  THIS

24   IS NEGATIVE.  THIS IS NOT ART.  THIS IS TERRIBLE," THAT IS

25   THE PURPOSE, I THINK, THAT GIVES IT SERIOUS ARTISTIC VALUE

```
 1   BECAUSE IT GIVES A DIALOGUE OF WHAT ART IS.
 2   Q.   MR. ISAACS, HAVE YOU EVER PUBLISHED ANY ARTICLE
 3   REGARDING THE SERIOUS ARTISTIC VALUE IN ANY JOURNAL?
 4   A.   ME, PERSONALLY?
 5   Q.   YES.
 6   A.   NO.
 7   Q.   HAVE YOU EVER LECTURED ON THE SERIOUS ARTISTIC VALUE AT
 8   ANY UNIVERSITIES, COLLEGES?
 9   A.   NO.
10        CAN I RESPOND TO THAT THOUGH?
11        I DON'T KNOW IF I --
12   Q.   WELL, LET ME JUST ASK YOU HOW WOULD YOU DETERMINE, IF
13   YOU WERE LOOKING AT SOMETHING THAT YOU DEEMED AS ART --
14   A.   YES.
15   Q.   -- HOW WOULD YOU ACTUALLY LOOK AT THAT AND DETERMINE IF
16   THAT PIECE HAD SERIOUS ARTISTIC VALUE?
17   A.   WELL, I THINK THERE'S A LOT OF THINGS YOU WOULD LOOK AT
18   AS AN EXPERT, YOU KNOW.  AS A PARTICULAR VIEW, IT'S WHAT I
19   GET OUT OF IT.  BUT AS AN EXPERT YOU LOOK AT, YOU KNOW,
20   WHAT'S OUT THERE, WHAT BOOKS ARE TALKING ABOUT IT, WHAT PEER
21   REVIEW OF THE ART MIGHT BE.
22        SO YOU KIND OF -- WHAT MUSEUMS, THINGS LIKE THAT.
23   SO YOU LOOK AT BASICALLY -- THE METHODOLOGY I WOULD USE IS
24   KIND OF LIKE -- IT'S NOT SCIENCE IN THE SENSE LIKE MATH IS
25   SCIENCE, BUT IT'S MORE LIKE PHILOSOPHY OR LIKE
```

```
1    PSYCHOANALYSIS.

2            BUT TAKE PHILOSOPHY, FOR EXAMPLE, IF I WAS GOING

3    TO TALK ABOUT THAT AND I WANTED TO CONCENTRATE ON

4    EXISTENTIALISM, I'D PROBABLY WANT TO READ KAFKA AND

5    NIETZSCHE AND CAMUS AND THINK OF THESE PEOPLE, WHAT THEY

6    HAVE TO SAY, LOOK AT OTHER ARTICLES, PEER REVIEWS OF THINGS

7    AND MAKE -- FROM ALL THAT EMPIRICAL INFORMATION, MAKE SOME

8    KIND OF INTELLIGENT DECISION.

9            BUT LIKE PSYCHOANALYSIS OR PHILOSOPHY, IT'S NOT A

10   HARD SCIENCE.  SO I CAN'T SAY, YOU KNOW, I HAVE A SCALE OF

11   NUMBERS, AND I ADD THEM UP, AND IT BECOMES SERIOUS ART.
```

                              **EXAMINATION**

```
13   BY THE COURT:

14   Q.   I THINK THAT'S MORE OF A DESCRIPTION THAN AN ANSWER.

15   I'M NOT SURE I QUITE APPRECIATE WHAT YOUR ANSWER IS.  I

16   MEAN, I CAN UNDERSTAND WHAT YOU'RE SAYING THAT IT'S NOT,

17   LIKE, MATHEMATICS OR ONE OF THE HARD SCIENCES, OF COURSE.

18           BUT WHEN YOU SAY YOU LOOK AT PEER REVIEW ARTICLES,

19   MUSEUMS -- WHATEVER -- WHAT IS IT THAT YOU'RE GETTING FROM

20   THIS THAT DRIVES YOUR METHODOLOGY?

21           I MEAN, YOU'RE JUST SAYING, "THESE ARE THINGS I

22   DO."

23           BUT WHAT IS IT ABOUT THOSE THINGS THAT YOU DO THAT

24   GIVES YOU SOME LEVEL OF METHODOLOGY OR PRINCIPLE THAT CAN BE

25   APPLIED RELIABLY TO DIFFERENT CIRCUMSTANCES?
```

**032**

```
 1   A.   OKAY.  LET ME SEE IF I CAN THOROUGHLY UNDERSTAND THAT

 2   QUESTION.

 3            I THINK ART, WHEN YOU HAVE TO APPLY METHODOLOGY,

 4   YOU HAVE TO APPLY IT LIKE -- NOT LIKE A HARD SCIENCE BECAUSE

 5   YOU JUST CANNOT DO THAT.

 6   Q.   I UNDERSTAND.  I'M NOT SUGGESTING THAT.

 7   A.   SO WHAT I TRY TO DO IS, FOR EXAMPLE, IF I'M GOING TO

 8   TALK ABOUT POSTMODERNISM, I'M GOING TO -- YOU KNOW, I

 9   RESEARCH IT; I LOOK AT NOT ONLY WHAT THINGS ARE WRITTEN

10   ABOUT IT, LET'S SAY, DUCHAMP OR PIERO MANZONI.  I READ ABOUT

11   WHAT THE PEER REVIEWS OF ART CRITICS WOULD SAY ABOUT IT AND

12   LOOK AT THE HISTORY OF THESE THINGS AND WAY SMARTER PEOPLE

13   THAN ME WHO TALK ABOUT THIS PERIOD OF POSTMODERNISM.

14            AND I BRING ALL THOSE THINGS TOGETHER AND MY OWN

15   EXPERTISE AS AN ARTIST, AND I THINK I COULD SHED LIGHT ON

16   THE VALIDITY OF THESE THINGS BY SHOWING OTHER THINGS.

17   Q.   WELL, BUT MY CONCERN IS THIS -- YOU SAY WHAT IS IT THAT

18   YOU'RE GETTING FROM YOUR READING OF THESE SO-CALLED

19   POST-MODERN ARTISTS' WORKS OR PUBLICATIONS -- OR WHATEVER IT

20   IS -- THAT ALLOWS YOU TO APPLY THEM TO DIFFERENT

21   CIRCUMSTANCES AND SAY NOW I'M GOING TO APPLY THE

22   CIRCUMSTANCES OF "H.S.A. NO. 7" AND, AS APPLIED, I CAN HAVE

23   THIS OPINION THAT THIS HAS SERIOUS ARTISTIC VALUE.

24            SO FAR, YOU'RE TELLING ME PROCESS WITH NO

25   METHODOLOGY.  I NEED TO KNOW WHAT IS THE METHODOLOGY BY
```

**033**

```
 1   WHICH OR THE PRINCIPLE THAT YOU USE, THAT YOU HAVE GLEANED

 2   FROM ALL OF YOUR READINGS, WHATEVER READINGS YOU HAVE

 3   DONE --

 4   A.   ARE YOU ASKING WHAT I GET OUT OF IT AND HOW DO I APPLY

 5   IT TO MY OWN --

 6   Q.   SAY THAT AGAIN.

 7   A.   ARE YOU ASKING ME WHAT I GET OUT OF THOSE READINGS AND

 8   HOW I APPLY IT TO MY FILM-MAKING?

 9   Q.   WHAT IS IT ABOUT THE READINGS, WHAT PRINCIPLES OR

10   FACTORS THAT YOU HAVE OBTAINED FROM YOUR READINGS THAT YOU

11   THINK WOULD BE THE KEY FACTORS FOR YOU, AS A PURPORTED

12   EXPERT, TO BE ABLE TO USE TO COME TO ANY CONCLUSION ABOUT

13   ANY PARTICULAR PIECE OF WORK AS TO ITS SERIOUS ARTISTIC

14   VALUE?

15        YOU KNOW, I GUESS WHAT I'M SAYING IS, IN A MORE

16   CONCRETE WAY, IF I WANT TO MEASURE WHAT YOUR TEMPERATURE IS,

17   THEY HAVE THERMOMETERS.  OKAY.  BECAUSE THERE'S CERTAIN --

18   BUT I'M NOT SAYING IT HAS TO BE THAT EXACT, BUT I STILL HAVE

19   TO HAVE SOMETHING MORE THAN JUST YOU SAYING, "I READ THIS.

20   THAT'S MY CONCLUSION."

21        WE'RE MISSING THE MIDDLE STEP OF, WELL, YOU READ

22   IT.

23        WHAT ABOUT WHAT YOU READ THAT CAUSES YOU TO HAVE

24   WHAT RELIABLE METHODOLOGY THAT THEN I CAN SEE IF THOSE CAN

25   RELATE TO THE KIND OF CONCLUSIONS YOU CAN DRAW FROM THEM.
```

```
 1   A.   I THINK, AS AN ARTIST AND A FILMMAKER AND ALSO AS A
 2   TRADITIONAL ARTIST DOING PAINTINGS AND THINGS LIKE THAT,
 3   YOU'RE INFLUENCED BY MANY, MANY PEOPLE.
 4        SO WHEN I READ ABOUT, LET'S SAY, MARCEL DUCHAMP
 5   AND I READ ABOUT "FOUNTAIN," WHICH IS, IN MY OPINION, ONE OF
 6   THE FIRST SHOCK ART PIECES.
 7        ARE YOU FAMILIAR WITH THAT?  BECAUSE I HAVE A
 8   PICTURE HERE.
 9   Q.   I READ ABOUT IT IN YOUR STATEMENT.
10   A.   OKAY.  IT'S A VERY, VERY TOUGH QUESTION.  BUT WHAT I
11   USE IS TRYING TO BE ON THE EDGE.  I TRY TO SEE WHAT OTHER
12   ARTISTS ARE DOING AND HOW I CAN TAKE IT AND HOW DO I BE ON
13   THE EDGE, HOW DO I DO SOMETHING NEW AND DIFFERENT.
14        AND CHRIS OFILI AND KIKI SMITH, THEY'VE ALL USED
15   THESE -- ALL THESE SCATOLOGICAL KIND OF THEMES IN THEIR ART,
16   AND IT'S BEEN VERY SUCCESSFUL.  IN FACT, THE TATE MUSEUM
17   OFFERS THIS THING CALLED "THE TURNER AWARD," AND THE LAST
18   COUPLE OF YEARS AGO, A WOMAN -- A MANNEQUIN ON A TOILET WINS
19   THE AWARD.
20        I THINK ART AND WHAT I GET OUT OF IT IS DOES IT
21   TRY TO CHALLENGE EXISTING KIND OF IDEAS.  HOW DO WE GO FROM
22   THE BAROQUE PERIOD TO THE CLASSICAL PERIOD TO THE EARLY
23   ROMANTIC AND SO ON AND SO FORTH.  HOW DO WE GO THERE?  WE
24   DON'T GO THERE ONE WAY.  BACH DIDN'T DIE IN 1750 AND
25   CLASSICAL STARTED.
```

```
 1          SO I TRY TO TAKE FROM THESE THINGS WHAT OTHER

 2   PEOPLE ARE DOING, PUT A NEW TILT ON IT, AND TRY TO ADVANCE

 3   THE ARTISTIC IDEAS, AND PART OF IT IS DECONSTRUCTING --

 4          I'M NOT REALLY SURE.  I KNOW THAT YOU'RE ASKING A

 5   VERY, VERY GOOD QUESTION.  I'M REALLY NOT GETTING WHAT KIND

 6   OF MECHANISM I WOULD USE, LIKE A THERMOMETER.  HOW I WOULD

 7   USE IT BESIDES AN OPINION AND SHOWING LIKE CASE LAW,

 8   DIFFERENT -- LIKE EACH ONE, LIKE I SHOW MARCEL DUCHAMP, IF I

 9   SHOW PIERO MANZONI.

10          THIS IS KIND OF LIKE ARTIST CASE LAW.  IT SHOWS

11   WHAT PEOPLE ARE DOING, AND I'M TRYING TO GO IN THE SAME VEIN

12   AND MAYBE EVEN ONE STEP FURTHER.

13   Q.   WELL, WHAT YOU'RE REALLY DOING IS YOU'RE ESSENTIALLY

14   USING THOSE THINGS IN THE EXHIBIT -- THE FOUNTAIN AND THE

15   OTHER THINGS THAT YOU REFER TO -- AS SOME SORT OF A

16   COMPARISON.

17   A.   YOU KNOW, I REALLY CAN'T COMPARE MYSELF TO MARCEL

18   DUCHAMP OR ANY OF THESE PEOPLE.  THEY WERE GREAT ARTISTS.

19   Q.   BUT YOU ARE, IN EFFECT, SAYING THAT'S WHAT THEY'RE

20   DOING, AND I AM DOING SOMETHING -- BUILDING FROM THAT, AND

21   THEREFORE, IF THAT'S ART, THIS HAS ARTISTIC VALUE.

22   A.   I WOULD SAY THE FIRST THING IS TRUE.  I AM TRYING TO

23   BUILD, AND THEY DO INFLUENCE ME, THESE PEOPLE.  BUT I'M NOT

24   SURE IF I'M MAKING THE NEXUS BETWEEN BECAUSE THEY DO ART,

25   MINE IS ART.
```

**036**

1   Q.   WELL, THEN, HOW DO YOU CONCLUDE -- BECAUSE YOU'RE HERE

2   TESTIFYING AS AN EXPERT, THEN HOW DO YOU CONCLUDE WHAT YOU

3   WANT TO CONCLUDE, WHICH IS, I TAKE IT, THAT YOU'RE PROPOSING

4   THAT WHAT YOU DID IN THESE THREE COUNTS HAS TO DO WITH

5   ARTISTIC VALUE?

6   A.   RIGHT.

7   Q.   THAT'S WHAT I'M GETTING AT IS THAT -- I'M NOT DISPUTING

8   OR ARGUING WITH YOUR CONCLUSION, IF YOU'RE PERMITTED TO

9   TESTIFY.  WHETHER ANYBODY AGREES WITH YOUR CONCLUSION IS NOT

10   GENERALLY THE BAROMETER BY WHICH WE MEASURE WHETHER YOU GET

11   TO BE AN EXPERT WITNESS OR NOT.

12   A.   RIGHT.

13   Q.   THAT'S FOR THE JURY TO DECIDE.  BUT BEFORE YOU CAN COME

14   TO THAT CONCLUSION, HOWEVER YOU COME TO THE CONCLUSION,

15   WHATEVER THE CONCLUSION IS -- THERE COULD BE AN EXPERT

16   WITNESS THAT THEY MIGHT CALL THAT SAYS "I ABSOLUTELY

17   DISAGREE WITH MR. ISAACS AS TO THE CONCLUSION," BUT THAT

18   DOESN'T MEAN THAT EITHER OF YOU CAN'T TESTIFY.  MAYBE BOTH

19   OF YOU CAN TESTIFY.

20        BUT BEFORE ANYBODY CAN TESTIFY, I HAVE TO

21   UNDERSTAND WHAT IS THE MEANS BY WHICH YOU GET TO THAT

22   CONCLUSION.

23   A.   OKAY.

24   Q.   IT CAN'T BE JUST BECAUSE "THAT'S MY OPINION."

25   A.   RIGHT.

**037**

```
1    Q.   IF THAT'S JUST MY OPINION THAT IS UNTETHERED TO A
2    CERTAIN METHODOLOGY THAT CAN BE TEST -- THAT CAN BE AT LEAST
3    EXAMINED --
4         I DON'T MEAN TESTED IN THE SENSE OF
5    EPIDEMIOLOGY, BUT THAT CAN BE EXAMINED, THEN I THINK WE HAVE
6    A PROBLEM.
7    A.   OKAY.
8    Q.   SO THAT'S WHAT MY QUESTION IS TO YOU.  I'M STILL TRYING
9    TO UNDERSTAND WHAT YOUR ANSWER IS AS TO HOW DO YOU GO FROM
10   LOOKING AT DUCHAMP OR ANY OF THOSE THINGS THAT YOU SAY YOU
11   WANT TO LOOK AT OR ANY OF THE OTHER INSTANCES WHERE FECES
12   HAD BEEN USED IN A DIFFERENT WAY --
13        HOW DO YOU GO, THEN, AND SAY OKAY, I CAN, HAVING
14   TAKEN THAT RECORD -- IF YOU WANT TO CALL IT THAT -- OF
15   WHAT'S EXISTING OUT THERE, BY APPLYING WHATEVER METHODOLOGY,
16   MY CONCLUSION IS THAT YOUR FILMS ARE WITH SERIOUS ARTISTIC
17   VALUE.
18   A.   OKAY.  I THINK THEY ARE COMPARABLE.
19        I THINK I DO LOOK TO THESE PEOPLE TO BE INFLUENCED
20   AND THERE ARE CERTAIN PEOPLE I LOOK AT AND OTHER PEOPLE I
21   DON'T.  THE FACT THAT MARCEL DUCHAMP HAS ENDURED, HIS WORK,
22   IS SOMETHING I LOOK TO AND TRY TO DO A NEW VERSION OF IT OR
23   ANY OF THESE OTHER PEOPLE.
24        SO I TRY TO BE IN THE COMPARABLE SYSTEM OF
25   POSTMODERNISM.  I'M TRYING TO DO THINGS IN A WAY THAT IS IN
```

```
 1    LINE WITH THAT AND TO HOPEFULLY BRING THINGS A LITTLE BIT

 2    FORWARD.

 3            SO THE BAROMETER IS WHAT OTHER PEOPLE HAVE DONE

 4    THAT HAS BEEN CONSIDERED BY ART CRITICS, MUSEUMS, AND THE

 5    LIKE OF SERIOUS ARTISTIC VALUE AND EMULATE THAT IN A WAY AND

 6    TO BRING -- YOU KNOW, IN FACT, LIKE MY FILMS.

 7            FOR EXAMPLE, ALL MY DIRECTOR'S CREDIT IS JOSEPH K.

 8    FROM THE CHARACTER FROM THE TRIAL BECAUSE, I BELIEVE, WHEN I

 9    FIRST MADE A FILM, I USED THAT CHARACTER BECAUSE KAFKA'S

10    "BEFORE THE LAW" STORY, YOU KNOW, OF GOING TO THE DOORS AND

11    EVENTUALLY BEING CLOSED WAS ALWAYS ONE OF THE BIGGEST THINGS

12    IN MY LIFE, TO NOT HAVE THE DOOR BEING CLOSED ON ME.

13    Q.  WELL, I DON'T MEAN TO INTERRUPT YOU, BUT I THINK WE ARE

14    GOING QUITE COLLATERALLY AT THIS POINT.

15            YOU STILL HAVE NOT ADDRESSED MY CONCERN.  WHAT

16    YOU'RE SAYING TO ME IS "I WAS INFLUENCED BY THESE PEOPLE."

17    OKAY.  THAT'S NOT THE ISSUE.

18            THE QUESTION IS NOT WHETHER YOU COULD BE

19    INFLUENCED BY THESE PEOPLE.  YOU'RE TESTIFYING AS AN EXPERT,

20    REGARDLESS OF WHETHER YOU'RE ALSO THE DEFENDANT.

21    A.  RIGHT.

22    Q.  YOU'RE PROFFERING YOURSELF AS AN EXPERT.  SO I WANT TO

23    KNOW WHAT METHODOLOGY PERMITS YOU OR ANY OTHER EXPERT TO GO

24    FROM WHAT YOU HAVE READ TO MAKING ANY KIND OF CALL ON THE

25    THREE FILMS.
```

**039**

```
 1              LET ME PUT IT ANOTHER WAY.

 2              BECAUSE CERTAIN OF THESE EXHIBITS THAT YOU HAVE

 3    TALKED ABOUT IN YOUR STATEMENT ALSO HAVE SOME USE OF

 4    FECES -- FOR INSTANCE, "TRAIL" OR WHATEVER -- DOES THAT MEAN

 5    ANY USE OF FECES IN VISUAL DEPICTION WOULD NECESSARILY BE OF

 6    SERIOUS ARTISTIC VALUE?

 7    A.   NO.

 8    Q.   WOULD THERE BE SOME INSTANCES WHERE THE USE OF FECES IN

 9    VISUAL DEPICTIONS, FOR EXAMPLE, WOULD LACK SERIOUS ARTISTIC

10    VALUE?

11    A.   YES.

12    Q.   NOW, THIS IS MY QUESTION:

13              WHAT IS THE METHODOLOGY BY WHICH YOU GO ABOUT

14    DISTINGUISHING THOSE USES OF FECES THAT WOULD HAVE SERIOUS

15    ARTISTIC VALUE VERSUS THOSE USES OF FECES THAT WOULD NOT?

16    A.   OKAY.  I THINK I UNDERSTAND IT BETTER NOW.

17    Q.   OKAY.

18    A.   I THINK A LARGE PART OF IT IS YOU HAVE THE OPPORTUNITY

19    TO SHOW YOUR WORK, AND I HAVE SHOWN MY WORK ON THE INTERNET.

20    IT'S BEEN DISCUSSED; PEOPLE HAVE BLOGGED ABOUT IT; PEOPLE

21    HAVE TALKED ABOUT IT.  I'VE BEEN -- AND I'M NOT JUST TALKING

22    ON THE NEWS OR A NEWS STORY, BUT A LOT OF PEOPLE HAVE

23    REACTED TO THIS, AND THEY'VE REACTED POSITIVE; THEY'VE

24    REACTED NEGATIVE.

25              SO THE POINT THAT I HAVE THE CONVERSATION -- THE
```

**040**

```
 1    POINT THAT I GO WITH AND GO ON AND, LIKE I SAID, PAT BOONE

 2    IS WRITING AN ARTICLE ABOUT ME --

 3           YOU KNOW, HOW I CONNECT WITH PAT BOONE IN MY LIFE

 4    IS THE MOST AMAZING THING, SHOWS THAT I GOT PEOPLE TO THINK

 5    ABOUT THE NATURE OF ART, WHAT IS ART, WHAT IS ANIMAL

 6    CRUELTY, WHAT IS -- YOU KNOW, WHAT'S TABOO.  AND EVEN THE

 7    NAZI SITES WRITE ABOUT ME.

 8           SO I THINK THE FACT THAT I'VE GOTTEN A LOT OF

 9    PEOPLE TO TALK ABOUT IT IS THE IMPORTANT THING.  VERY MUCH

10    LIKE RAUSCHENBERG'S "WHITE" PAINTING.

11           NOW, RAUSCHENBERG'S "WHITE" PAINTING IS -- MOST

12    PEOPLE'S REACTION TO IT IS THIS IS NOTHING; MY KID CAN DO

13    IT; IT'S NOT ART.  BUT IT'S A GREAT PIECE; IT'S IN A MUSEUM

14    BECAUSE IT GETS THE AUDIENCE TO REACT AND TALK ABOUT ART AND

15    BLAH, BLAH, BLAH.

16           THE "WHITE" PAINTING IN THE APARTMENT IS JUST A

17    WHITE PAINTING WITH NO SERIOUS ART, BUT THE AUDIENCE

18    ELEVATED THE STUFF TO SERIOUS ARTISTIC VALUE.

19    Q.   OKAY.  SO, THEN, APPLYING WHAT YOU JUST SAID, WHAT

20    WOULD BE AN INSTANCE WHERE THE USE OF FECES WOULD HAVE NO

21    SERIOUS ARTISTIC VALUE?

22    A.   WELL, YOU KNOW, EVERY PIECE IS DIFFERENT, AND YOU KNOW,

23    SOMETIMES ART COULD BE A MASTERPIECE BUT WE DON'T REALIZE IT

24    YET.

25    Q.   NO, I'M NOT TALKING ABOUT GENERALLY.
```

**041**

1    A.   OH, I SEE.

2    Q.   I'M ASKING YOU, AS A PROPOSED EXPERT, TO TELL ME,

3    USING THOSE CRITERIA THAT YOU SAID, WHAT WOULD BE AN

4    INSTANCE WHERE THE USE OF FECES WOULD, IN YOUR MIND, BE NO

5    SERIOUS ARTISTIC VALUE.  BECAUSE YOU SAID NOT EVERY USE OF

6    IT --

7    A.   NO, NO, AND I AGREE.  LET'S SAY IF YOU TOOK A FILM WITH

8    JUST A WOMAN IN THE BATHROOM JUST GOING TO THE TOILET WITH

9    NOTHING ELSE HAPPENING, I THINK -- AND IT WOULD HAVE FECES,

10   BUT I DON'T THINK IT WOULD NECESSARILY RISE TO THAT.

11   Q.   SO WAIT.  ARE YOU SAYING THAT THAT HAS NO SERIOUS

12   ARTISTIC VALUE?

13   A.   I THINK IF YOU JUST TOOK A FILM, THAT, IN MY OPINION,

14   YEAH -- I WOULD THINK JUST THAT ALONE, I'D SAY IT WOULD NOT.

15   Q.   WHAT IF THAT WERE ALSO PUT ON THE INTERNET?  WHAT IF

16   EVERYBODY STARTS COMMENTING ON IT?  DOES THAT THEN BECOME

17   SERIOUS?

18   A.   YEAH, THAT'S A VERY, VERY GOOD QUESTION WHAT BECOMES --

19   YOU KNOW, CAN SOMETHING THAT DOESN'T HAVE SERIOUS VALUE NOW

20   ALREADY BECOME SERIOUS VALUE.

21        AND, YOU KNOW, HONESTLY, I THINK ART CAN CHANGE.

22   I THINK IF YOU LOOK AT VAN GOGH IN HIS TIME, FOR EXAMPLE, HE

23   WASN'T REALLY CONSIDERED -- NOW HE'S A MASTER ARTIST.

24        SO, YEAH, I THINK IT CAN CHANGE.  SO I THINK IF

25   THAT PIECE DID GO ON THE INTERNET AND IT GOT REACTION VIDEOS

**042**

```
 1   AND IT BECAME THE BIGGEST TALK AND EVERYBODY WAS DISCUSSING
 2   IT AND THINGS LIKE THAT, I THINK IT WOULD BE ELEVATED TO
 3   SERIOUS ART.  IT WOULD BECOME THAT.
 4   Q.   DOES IT HAVE TO BE A LOT OF TALK?  IS THERE A QUANTUM
 5   OF TALK THAT'S REQUIRED BEFORE IT BECOMES SERIOUS IN YOUR
 6   MIND?
 7   A.   I THINK IT HAS TO, YOU KNOW -- IF YOU WANT TO TALK --
 8   IF YOU WANT TO LOOK AT IT IN ANY MEANINGFUL WAY, I THINK ONE
 9   OR TWO PEOPLE OR A HANDFUL OF PEOPLE IS NOT GOOD ENOUGH.
10   Q.   HOW MANY?  IS THERE A NUMBER?
11   A.   YOU KNOW, I CAN'T SAY HOW MANY, BUT I KNOW MY PIECES,
12   THERE ARE THOUSANDS OF PEOPLE TALKING ABOUT THEM FROM
13   SERIOUS ART CRITICS LIKE GRACE MOON TO PAT BOONE TO PEOPLE
14   BLOGGING A LOT OF DIFFERENT THINGS.
15        SO I DON'T KNOW WHAT THE NUMBER IS, BUT I THINK A
16   NUMBER ENOUGH THAT -- IF YOU'RE ON TELEVISION OR IF YOU'RE
17   ON RADIO, I THINK THERE'S PROBABLY A BIG ENOUGH NUMBER THAT
18   YOU'RE REACHING AND THAT ARE TUNING IN THAT -- THAT NUMBER.
19   BUT I CAN'T COME UP WITH AN EXACT NUMBER OF HOW MANY.
20   Q.   SO MY UNDERSTANDING IS THAT YOUR METHODOLOGY IS NOT
21   APRIORI, BUT YOUR METHODOLOGY IS POST HOC.
22        SO IF YOU DO SOMETHING AND THERE HAPPENS TO BE A
23   REACTION, THEN YOU SAY, "THAT MEANS IT'S SERIOUS," AND IF IT
24   TURNS OUT THAT YOU PUT IT ON THE INTERNET, PEOPLE COULDN'T
25   CARE LESS, MAYBE TWO OR THREE PEOPLE BLOGGED ABOUT IT, THEN
```

```
 1   YOU SAY, "IT'S NOT."

 2           IS THAT YOUR METHODOLOGY?

 3   A.   NO.  I'M SAYING IF YOU TAKE JUST THE QUESTION WE TALKED

 4   ABOUT OF FILMING, YOU KNOW, A WOMAN ON A TOILET, THAT IF

 5   YOU'RE TALKING ABOUT THAT --

 6   Q.   RIGHT.

 7   A.   -- THAT WOULD STILL BE MY ANSWER.

 8           BUT I THINK YOU NEED A LOT MORE THAN JUST THAT.  I

 9   THINK YOU NEED -- AGAIN, PEER REVIEW WOULD BE NICE -- TO SEE

10   WHAT OTHER PEOPLE, CRITICS THINK AND PEOPLE WHO ARE IN THE

11   ART WORLD, WHAT THEY THINK, THE CRITICS BASICALLY.  I THINK

12   IT COULD BE SERIOUS ART AND NOBODY EVER ON THE INTERNET --

13   ONLY ONE PERSON.

14           IT'S VERY HARD FOR ME TO PUT IN A BOX EXACTLY, YOU

15   KNOW, WHAT THE PARTICULAR PIECE IS, IF IT CHANGES.  BUT I

16   THINK, IN THEORY, SOMETHING COULD GO FROM NOT SO SERIOUS,

17   AND I THINK PEOPLE CAN MAKE IT SERIOUS IF IT ENGAGES PEOPLE.

18           SOMETIMES AN ARTIST DOESN'T NECESSARILY KNOW WHAT

19   HE'S CREATING.  SOMETIMES HE CREATES AND THINGS TAKE ITS OWN

20   LIFE.  BUT GENERALLY SPEAKING, I THINK IF YOU WERE GOING TO

21   DO IT IN AN ACADEMIC TYPE OF WAY, I THINK STUDYING WHAT

22   CRITICS SAY, WHAT THE LITERATURE OUT THERE IS ABOUT, WHAT

23   YOUR EXPERIENCE AS AN ARTIST CAN BRING TO IT AND WHAT THE

24   VIEWERS, YOU KNOW, TAKE AWAY FROM IT, I THINK IS A GOOD

25   BAROMETER OF WHETHER IT'S SERIOUS.  HOW SERIOUS?  YOU KNOW,
```

**044**

```
 1   DOES IT HIT THE BAR?  I THINK IT DOES.
 2          BUT, YOU KNOW, IT'S A TOUGH ONE TO BE EMPIRICAL --
 3   TOTALLY EMPIRICAL ABOUT IT BECAUSE I DON'T KNOW IF THERE'S A
 4   REAL RIGHT ANSWER.
 5   Q.   SO YOUR VIEW IS IT DOESN'T MATTER WHAT PEOPLE SAY SO
 6   LONG AS THEY SAY SOMETHING ABOUT IT?
 7   A.   THAT'S A PART OF THE VIEW, YEAH.  THAT'S A BIG ONE,
 8   YES.  THAT'S TRUE.
 9   Q.   SO JUST BECAUSE PEOPLE COMMENT, NO MATTER WHAT THE
10   COMMENT IS, THAT'S YOUR METHOD OF DETERMINING THAT IT'S
11   SERIOUS?
12   A.   WELL, I THINK THAT'S FOR THE VIEWER.
13          I THINK THE CRITIC, IT'S A DIFFERENT THING.  NOW,
14   THE CRITIC IS LOOKING AT IT THROUGH A CRITICAL EYE.  YOU
15   KNOW, THEY HAVE A BACKGROUND, THAT'S THEIR -- HOPEFULLY,
16   THEIR JOB, AND THEY'RE GOOD AT IT.
17          SO AS THE VIEWER, THAT'S WHAT THAT DOES.  BUT THE
18   CRITIC -- SO FOR EXAMPLE, THE VIEWERS MIGHT LOVE THE STUFF
19   AND THINK IT'S THE GREATEST THING SINCE APPLE PIE, AND IT
20   MIGHT BE THE TASTE MOST VIEWERS LIKE, BUT THAT DOESN'T MAKE
21   IT SERIOUS ART.
22   Q.   WHICH EXPERT ARE YOU TESTIFYING ABOUT -- PURPORTING TO
23   TESTIFY ABOUT?  WHAT EXPERTISE?  AS A CRITIC?  AS A VIEWER?
24   WHAT'S THE SOURCE OF YOUR EXPERTISE?
25   A.   AS A FILMMAKER.  AS A -- AS A FILMMAKER....
```

**045**

```
 1   Q.   SO YOU THINK THAT THESE FILMS, AS A FILMMAKER, HAVE
 2   SERIOUS ARTISTIC VALUE TO WHOM?
 3   A.   TO SOME PEOPLE WHO VIEW IT, AND I THINK CRITICS HAVE
 4   WROTE ABOUT IT, AND SOME CRITICS FEEL IT DOES; OTHER CRITICS
 5   DON'T.  SO IT DEPENDS.
 6        THE VIEWER TAKES OUT OF IT -- I THINK THE FACT
 7   THAT PEOPLE TALK ABOUT IT IS DIFFERENT THAN TASTE.  I THINK
 8   SOMETIMES WE THINK ABOUT TASTE, HOW GOOD IS SOMETHING WE
 9   LIKE OR HOW PRETTY IT IS --
10   Q.   I'M NOT TALKING ABOUT TASTE.  I'M TALKING ABOUT WHETHER
11   OR NOT -- WELL, LET ME PUT IT THIS WAY:
12        ARE YOU PURPORTING TO TESTIFY AS AN EXPERT ABOUT
13   WHAT A REASONABLE PERSON WOULD FIND TO BE WITH OR WITHOUT
14   SERIOUS ARTISTIC VALUE?
15   A.   A REASONABLE PERSON WOULD FIND -- I'M SORRY.  SAY THAT
16   AGAIN.
17   Q.   ARE YOU PURPORTING TO TESTIFY AS AN EXPERT ON WHAT A
18   REASONABLE PERSON WOULD FIND TO BE WITH OR WITHOUT SERIOUS
19   ARTISTIC VALUE IN THOSE THREE CHARGED FILMS?
20   A.   YES.  I THINK -- I THINK A REASONABLE PERSON, KNOWING
21   THE INFORMATION, WOULD FIND THAT THE --
22   Q.   WHAT IS THE BASIS OF YOU PURPORTING TO SAY, "I CAN
23   TESTIFY AS AN EXPERT ON THAT SUBJECT"?
24   A.   BECAUSE I BRING TO, SAY, THE JURY EXAMPLES OF OTHER
25   POST-MODERN ART IN THE SAME GENRE AND FEELING THAT IS
```

```
 1   CONSIDERED BY MANY -- AND I THINK WILL BE CONSIDERED BY
 2   THEM -- AS SERIOUS ARTISTIC VALUE.  AND WHEN YOU PUT THE
 3   CHARGED PIECES AGAINST THESE FOUR OR FIVE EXHIBITS, I THINK
 4   IT WILL BECOME CLEAR WHAT THEY DO HAVE IN COMMON AND THEY DO
 5   HAVE WHAT THEY NEED.
 6   Q.   OTHER THAN THE COMPARISON, WHAT DO YOU BRING TO THE
 7   TABLE, SO TO SPEAK, WHAT ASSISTANCE WILL YOU BE TO THE JURY?
 8   A.   WELL, I THINK OF MY MOVIES, BEING THE DIRECTOR OR
 9   PRODUCER, I CAN ALMOST TALK LIKE IT'S EPISTEMOLOGY -- WHAT
10   I'M TRYING TO DO, WHY I FEEL THIS IS SERIOUS ART, WHY IT'S
11   JUST NOT ME PUTTING A CAMERA AND JUST SHOOTING IT THIS WAY.
12   Q.   FROM YOUR SUBJECTIVE STANDPOINT?
13   A.   YES, FROM MY -- YES, BECAUSE I'M THE FILM DIRECTOR.
14   Q.   SO YOU BELIEVE THAT YOUR SUBJECTIVE STANDPOINT IS WHAT
15   YOU CAN HELP THE JURY WITH IN TERMS OF THIS COMPARISON?
16   A.   I DON'T THINK THAT'S THE MAIN THING I CAN HELP.
17   Q.   WHAT IS THE MAIN THING?
18   A.   I THINK THE MAIN THING IS LIKE I CAN SHOW 'EM -- OKAY.
19        CAN I GIVE YOU AN ANALOGY BECAUSE I'M A BIG
20   CLASSICAL MUSIC FAN.
21   Q.   OH, NO.  I'D RATHER NOT.  IF YOU WOULD JUST ANSWER MY
22   QUESTION.
23   A.   OKAY.  THE MAIN THING IS TO BRING THE JURY TO
24   UNDERSTAND WHAT'S HAPPENING IN A LEGITIMATE FORM OF ART
25   POSTMODERNISM THAT THEY MIGHT NOT NECESSARILY BE FAMILIAR
```

**047**

```
 1   WITH.

 2           I'M GIVING SOME EXAMPLES OF THAT.  THERE ARE MANY,

 3   MANY EXAMPLES I COULD HAVE PUT IN, BUT I'M GIVING SOME

 4   EXAMPLES.

 5   Q.   OKAY.  LET ME BACK UP THEN, AND SAY WHAT IS YOUR

 6   TRAINING AND BACKGROUND IN WHAT YOU CALL "POSTMODERNISM"?

 7   A.   WELL, MY TRAINING AND BACKGROUND, I GUESS, IS AS A

 8   POST-MODERN FILMMAKER FOR OVER TEN YEARS.  I'VE STUDIED

 9   POSTMODERNISM, BUT NO, I HAVEN'T --

10   Q.   WHEN YOU SAY YOU STUDIED, WHAT DO YOU MEAN?

11   A.   YOU KNOW, PERSONALLY, I READ BOOKS.

12   Q.   DO YOU TAKE CLASSES?

13   A.   NO, I DON'T GO -- I DON'T.

14   Q.   HAVE YOU READ BOOKS?

15   A.   YEAH, NO.  I'VE STUDIED AND I --

16   Q.   WHAT DID YOU READ?

17   A.   EXCUSE ME?

18   Q.   WHAT DID YOU READ OR --

19   A.   WHAT BOOK DID I READ?  OKAY.  FOR EXAMPLE, LEO --

20   Q.   WE HAVE TO DO THIS ONE AT A TIME.

21   A.   SORRY.

22   Q.   WHAT BOOK OR BOOKS DID YOU READ ABOUT POSTMODERNISM?

23   A.   WELL, I'VE READ LEO TOLSTOY, AND I THINK A LOT OF IT,

24   YOU KNOW, "WHAT IS ART," TALKING ABOUT ESSENCE OF ART, WHAT

25   MAKES ART, THINGS LIKE THAT.
```

```
 1    Q.    OKAY.  WHAT ELSE?

 2    A.    I READ ABOUT, AGAIN, MARCEL DUCHAMP; STUDIED HIM

 3    EXTENSIVELY.

 4    Q.    WHEN YOU SAY THAT, WHAT DO YOU MEAN "STUDIED HIM

 5    EXTENSIVELY"?

 6    A.    WELL, YOU KNOW, MARCEL DUCHAMP HAS A LOT OF OTHER

 7    WORKS, A LOT OF THE READY-MADE.

 8              THE COURT REPORTER:  I'M SORRY.  PLEASE SLOW DOWN.

 9              THE WITNESS:  HE HAS WHAT'S CALLED READY-MADES,

10    WHERE HE BUYS LIKE A BICYCLE WHEEL OR SOMETHING AND PUTS IT

11    IN A MUSEUM AND BECAUSE -- THE WHOLE IDEA IS, AS AN ARTIST,

12    YOU CREATE SOMETHING TO GET A REACTION; IT'S NOT ALWAYS

13    ABOUT WHAT YOU SEE ON THE SURFACE.

14    BY THE COURT:

15    Q.    SO YOU HAVE LOOKED AT OTHER CREATIONS BY THIS

16    INDIVIDUAL, DUCHAMP?

17    A.    I LOOKED AT THAT AND OTHER PEOPLE WRITING ABOUT HIM AND

18    THEIR OPINION OF HIS WORK.

19    Q.    ARE THOSE PEER-REVIEWED JOURNAL WRITINGS?

20    A.    WELL, MOSTLY, TO BE HONEST WITH YOU, YOU KNOW, THE

21    INTERNET.  I GO ON THE INTERNET, AND I RESEARCH IT, AND I

22    CAN GIVE LIKE AN EXAMPLE.  I CAN GO IN HERE AND SHOW YOU,

23    FOR EXAMPLE, A PROFESSOR TALKS ABOUT POSTMODERNISM AND SO

24    FORTH.

25              LET'S SEE IF I CAN GET THIS STUFF OUT.
```

**049**

1    Q.   LET ME ASK YOU THIS.

2    A.   SURE.

3    Q.   WHEN DID YOU START STUDYING POSTMODERNISM?  YOU DID IT

4    THROUGH THE INTERNET.  SO WHEN DID YOU START DOING THAT?

5    A.   I WOULD SAY, YOU KNOW, POSTMODERNISM REALLY HAS BEEN

6    SINCE ABOUT THE '90S, EVEN THOUGH IT REALLY STARTED IN 1917.

7    SHOCK ART, THINGS LIKE THAT HAS BEEN MORE FROM SINCE THE

8    '90S.  SINCE THE BRITISH -- LIKE WITH OPHELIA, AND THINGS

9    LIKE THAT.

10   Q.   IT WOULD BE HELPFUL IF YOU JUST LISTEN TO MY QUESTION

11   AND ANSWER IT BECAUSE, YOU KNOW, WE HAVE LIMITED TIME.  I

12   APPRECIATE YOUR TRYING TO DO THE BEST YOU CAN.  I DO.

13            BUT MY QUESTION TO YOU IS:  WHEN DID YOU START,

14   FIRST START TO STUDY POSTMODERNISM?

15   A.   PROBABLY IN THE MID TO LATE '90S.

16   Q.   AND YOU DID SO BY, AS YOU SAID, YOU READ TOLSTOY?

17   A.   YES, I READ "WHAT IS ART."

18   Q.   ABOUT HIS ART?

19   A.   WELL, HE HAS A BOOK CALLED "WHAT IS ART."

20   Q.   AND YOU READ OR YOU LOOKED AT NOT PUBLICATIONS BUT

21   ARTICLES ON THE INTERNET --

22   A.   YES.

23   Q.   -- ABOUT POST-MODERN ART.

24   A.   THAT AND, YOU KNOW, JUST TALKING ABOUT ART IN GENERAL

25   AND WHAT, YOU KNOW, ART MIGHT BE OR MIGHT NOT BE AND

**050**

```
 1    CRITICISM AND THINGS LIKE THAT.

 2    Q.    WHAT ELSE?

 3    A.    GO TO MUSEUMS, GO TO GALLERIES, HAVE FRIENDS AND WE

 4    HAVE DISCUSSIONS; WE MIGHT SIT DOWN AND WE MIGHT DISCUSS

 5    THINGS.  KIND OF LIKE WHEN YOU GO TO A MOVIE, THE FRIENDS

 6    THAT GO DISCUSS THE MOVIE.  SOME OF MY FRIENDS WOULD DISCUSS

 7    SOME VERY CLASSICAL MUSIC, AND THERE IS SOME POST-MODERN

 8    MUSIC WHERE -- THERE'S A POST-MODERN MUSIC PIECE WHERE THE

 9    CONDUCTOR GETS UP AND THERE'S THREE MINUTES OF SILENCE.

10    THERE'S NOTHING PLAYED.

11            SO I'VE STUDIED, YOU KNOW, A LOT OF DIFFERENT

12    THINGS.  POSTMODERNISM ISN'T ONLY FILMMAKING OR A SCULPTURE,

13    IT'S IN EVERYTHING.  BUT I TRY TO STUDY EVERYTHING TO KEEP

14    IT -- BUT AS AN ARTIST, I'D WANT TO BE INFORMED OF WHAT'S

15    HAPPENING AS MUCH AS I CAN.

16    Q.    I UNDERSTAND, BUT I DON'T WANT YOU TO BE GENERAL AND

17    SAY "I STUDIED A LOT OF THINGS."  THAT'S NOT VERY HELPFUL TO

18    ME.  I WANT YOU TO TELL ME WHAT EXACTLY YOU HAVE DONE THAT

19    WOULD QUALIFY YOU TO EVEN BE AN EXPERT TO GIVE ANY OPINION,

20    REGARDLESS OF YOUR METHODOLOGY.

21    A.    OKAY.

22    Q.    SO YOU'VE READ TOLSTOY; YOU'VE STUDIED DUCHAMP AND ART;

23    AND YOU'VE READ INTERNET DISCUSSIONS ABOUT POST-MODERN ART;

24    YOU HAVE BEEN TO GALLERIES THAT, IN YOUR MIND, DISPLAY

25    POST-MODERN ART?
```

1   A.   YES, SOME, YES.

2   Q.   AND YOU'VE HAD DISCUSSIONS WITH YOUR FRIENDS MUCH LIKE

3   HOW PEOPLE WOULD WATCH A MOVIE AND TALK ABOUT IT.

4   A.   YES, SOMETIMES, YES.

5   Q.   WHAT ELSE?  ANYTHING ELSE?

6   A.   LET ME THINK FOR A SECOND.

7        I THINK, YOU KNOW, AS FAR AS EXTERNAL THINGS, THAT

8   THAT'S PROBABLY IT.  BUT YOU KNOW, THERE'S A LOT OF THINGS

9   GOING ON IN SOMEONE'S HEAD THAT I THINK ARE IMPORTANT AS

10  WELL -- WHAT HE TAKES OUT OF THOSE EXTERNAL THINGS AND SHEDS

11  SOME LIGHT MAYBE IN A DIFFERENT WAY.

12       SOMETIMES, LIKE THE HISTORY WE'VE SEEN WHERE YOU

13  COULD HAVE -- I'M NOT SAYING I'M A GREAT ARTIST BECAUSE I'M

14  NOT.  BUT YOU COULD HAVE GREAT ARTISTS THAT HAVE NO

15  EDUCATION.  YOU KNOW, MY BEST EXAMPLE IS J.S. BACH.

16  J.S. BACH DIDN'T GO TO SCHOOL OR LECTURE OR DO ANY OF THOSE

17  THINGS.  IN HIS LIFETIME, HE WASN'T THAT FAMOUS.  HE WAS AN

18  OKAY ORGAN PLAYER AT A LOCAL CLUB, AND THEN FOR A WHILE

19  J.S. BACH WAS LOST UNTIL MENDELSSOHN CAME ALONG IN THE

20  1800'S AND REVIVED HIM.

21       SO I THINK NOT HAVING, LET'S SAY, A FORMAL

22  UNIVERSITY OUTLOOK DOESN'T NECESSARILY, I THINK -- BY DOING,

23  BY FILMMAKING, IT GIVES ME --

24  Q.   I'M NOT MAKING ANY JUDGMENTS ABOUT WHETHER YOU HAVE TO

25  ONE WAY OR THE OTHER.  I MAY BE A LITTLE BIT -- DON'T BE

**052**

```
 1   SELF-CONSCIOUS BECAUSE I'M NOT MAKING THAT STATEMENT.  SO
 2   THERE'S NOTHING TO REBUT.
 3   A.   I APOLOGIZE.
 4   Q.   OKAY.  I THINK AT BOTTOM I'M TRYING TO UNDERSTAND,
 5   GIVEN YOUR QUALIFICATIONS, WHAT PRINCIPLES, FACTORS,
 6   METHODOLOGY -- HOWEVER YOU WOULD DESCRIBE IT -- THAT WOULD
 7   ALLOW YOU AS AN EXPERT --
 8            YOU'RE PURPORTING TO BE AN EXPERT.
 9            -- TO BE ABLE TO LOOK AT ANY NUMBER OF THINGS AND
10   BE ABLE TO FORM AN OPINION AS TO ITS ARTISTIC VALUE OR LACK
11   THEREOF.
12            AND SO FAR, WHAT YOU'VE TOLD ME IS IF THIS OBJECT
13   OR DEPICTION OR WHATEVER IT IS -- FILM -- BECOMES THE
14   SUBJECT OF A LOT OF DISCUSSION, THEN IT'S SERIOUS; AND IF IT
15   IS NOT THE SUBJECT OF A LOT OF SERIOUS DISCUSSION, THEN IT'S
16   NOT SERIOUS.
17            I MEAN, IS THAT A FAIR STATEMENT?
18   A.   IT'S KIND OF.  I'M SAYING COULD BE, YOU KNOW.  WHAT I'M
19   SAYING TO YOU IS I THINK THE FACT THAT IT'S BEING DISCUSSED
20   AND IT'S BEING DEBATED IN A BIG WAY, I THINK, ELEVATES IT TO
21   SERIOUS ART EVEN IF IT WASN'T BEFORE.
22   Q.   SO THEN WHY DO WE NEED YOU TO TESTIFY AS AN EXPERT WHEN
23   ALL WE HAVE TO DO IS TO DETERMINE WHETHER OR NOT THERE'S
24   BEEN A LOT OF TALK?
25   A.   BECAUSE I'M HERE -- WELL, IF YOU COULD GET SOMEBODY TO
```

**053**

```
 1   DO ALL OF THOSE DETERMINATIONS, YOU WOULDN'T NEED ME, BUT
 2   I'M HERE TO DO THAT.
 3   Q.   WELL, NO.  IF THERE'S EVIDENCE --
 4   A.   THAT'S MY ROLE.
 5   Q.   -- ON THE INTERNET OF A LOT OF TALK, GOOD OR BAD,
 6   DOESN'T MATTER.
 7   A.   RIGHT.
 8   Q.   A LOT OF TALK ABOUT SOMETHING.
 9   A.   YEAH.
10   Q.   WHY DO WE NEED YOU THEN?
11   A.   BECAUSE I'M THE ONE WHO WOULD SHOW WHAT THE TALK IS.
12   Q.   WHY DO WE NEED YOU TO SHOW US THE TALK?
13   A.   YOU WOULD NEED -- YOU CAN GET -- ANOTHER ART EXPERT, I
14   THINK, WOULD CONCUR WITH ME AND MIGHT DO THE SAME THING.
15   Q.   WHY WOULD YOU NEED AN EXPERT OF ANY KIND?  WHY CAN'T
16   MR. DIAMOND, A VERY COMPETENT LAWYER, JUST INTRODUCE
17   EVIDENCE OF ALL OF THESE THINGS ON THE INTERNET?
18        IF THAT'S WHAT IT IS -- IF WHAT YOU'RE SAYING IS,
19   "JUST GO AND LOOK.  SEE HOW MUCH DISCUSSION THERE IS.
20   BECAUSE IF THERE'S LITTLE BIT OF DISCUSSIONS, IT'S NO GOOD;
21   BUT IF YOU'VE GOT A LOT OF DISCUSSION, YOU KNOW, THEN FOR
22   SURE IT BECOMES SERIOUS," THEN I DON'T UNDERSTAND WHY WE
23   NEED YOU.  I MEAN, AS AN EXPERT, OF COURSE.
24   A.   RIGHT.  RIGHT.  YOU NEED ME AS A DEFENDANT.
25                    (LAUGHTER.)
```

```
 1            THE WITNESS:  BECAUSE I'M READY TO GO IF YOU DON'T
 2   NEED ME.  I'M READY TO GO NOW.
 3   BY THE COURT:
 4   Q.   THAT'S VERY GOOD, MR. ISAACS.
 5   A.   I'M HERE -- WHAT THE JURY NEEDS --
 6            LOOK, TO BE HONEST, THESE MOVIES ARE VERY
 7   EMOTIONAL.  THEY'RE VERY EMOTIONAL.  AND THE FIRST REACTION
 8   PEOPLE ARE GOING TO HAVE ON THESE MOVIES IS IN THEIR GUT
 9   THAT THESE MOVIES ARE OBSCENE.  THAT'S WHAT THEY'RE GOING TO
10   GET OUT OF THAT WHEN THEY SEE THAT.
11            WHAT AN EXPERT DOES, WHETHER IT'S ME OR SOMEBODY
12   ELSE, IS TO EXPLAIN THAT EMOTION ISN'T THE WAY TO JUDGE ART.
13   NOW, THEY MIGHT COME TO A CONCLUSION AFTER TALKING THAT IT
14   ISN'T SERIOUS ART, BUT I NEED TO GET THE EMOTION AND TALK
15   ABOUT ART.  TALKING ABOUT PEOPLE DEBATING IT AND I'M --
16   PEOPLE DEBATING ON THE INTERNET.  I'M NOT TALKING ABOUT
17   PEOPLE SAYING, "WELL, DID YOU SEE -- "
18   Q.   WHOA, WHOA, WHOA.
19   A.   I'M SORRY.
20   Q.   YOU REALLY HAVE TO SLOW DOWN.
21   A.   IT'S THE NEW YORKER IN ME.
22   Q.   OKAY.  YOU HAVE TO SLOW DOWN.
23   A.   I'M NOT TALKING ABOUT PEOPLE ON THE INTERNET DEBATING
24   IT, SAYING --
25   Q.   SLOW DOWN.
```

```
 1    A.   -- YOU KNOW, LIKE, SOME MEANINGLESS THING.  IT'S

 2    MEANINGFUL DEBATE ABOUT WHAT ART IS, WHETHER IT SHOULD BE

 3    THIS AND THAT.

 4              AND I DON'T KNOW IF THE QUANTITY -- THE ONLY

 5    REASON THAT I ASK THAT IS BECAUSE YOU ASKED ME AND I NEVER

 6    THOUGHT ABOUT DOES QUANTITY MATTER.  I DON'T THINK IT REALLY

 7    DOES.

 8              I THINK SERIOUS ART STANDS FREE-STANDING, ALONE,

 9    NO MATTER WHAT THE CRITICS SAY, NO MATTER WHAT THIS GUY

10    SAYS, NO MATTER WHAT I SAY.

11              THE PROBLEM IS YOU DON'T KNOW NECESSARILY AT THE

12    TIME THAT YOU'RE TALKING ABOUT IT; ALL THE FACTS ARE NOT IN.

13              SOMETIMES, FOR EXAMPLE, A LOT OF YESTERDAY'S --

14    TODAY'S MASTERPIECES WERE YESTERDAY'S OBSCENITIES.  AND I

15    CAN GIVE YOU, YOU KNOW, MANY OF THOSE AND I'M SURE YOU KNOW

16    WHAT THOSE ARE.

17              SO I CAN'T SAY ANY PARTICULAR THING.  ALL I KNOW

18    IS I'D LIKE TO BRING THE JURY -- TO SHOW THEM SOME EXAMPLES

19    OF THINGS THAT ARE SIMILAR, TO LOOK AT IT NOT SO EMOTIONALLY

20    BECAUSE I THINK WHAT THE PROSECUTION WANTS TO DO IS JUST TO

21    GET THEIR EMOTION GOING AND THEN -- FORGETTING ABOUT

22    EVERYTHING ELSE.

23    Q.   SO YOU'RE ESSENTIALLY TELLING ME THAT YOUR EXPERT

24    TESTIMONY IS THERE TO DE-EMOTIONALIZE THE TOPIC.

25    A.   YEAH, I'D LIKE TO, YEAH, AND TALK ABOUT IT, YOU KNOW,
```

**056**

```
 1   LIKE IN A RATIONAL WAY.
 2   Q.   DO YOU HAVE EXPERTISE IN, FOR INSTANCE, ART HISTORY?
 3   A.   WHAT WOULD CONSTITUTE EXPERTISE?  A DOCTORATE?  A
 4   DEGREE?
 5   Q.   IN ANYTHING.  DO YOU HAVE ANY TRAINING?
 6   A.   YEAH, IN COLLEGE I TRAINED.  I DON'T THINK A B.A. IS
 7   THAT GREAT OF A DEAL.  SO I DON'T REALLY WANT TO SAY THAT.
 8   Q.   JUST A MINUTE.  DO YOU HAVE A DEGREE IN ART HISTORY?
 9   A.   NO.
10   Q.   HAVE YOU EVER STUDIED ART HISTORY?
11   A.   YES.
12   Q.   ON YOUR OWN?
13   A.   NO, IN SCHOOL.
14   Q.   OKAY.  YOU'VE TAKEN CLASSES?
15   A.   YEAH.
16   Q.   OKAY.  AND DO YOU HAVE A DEGREE OR ANY STUDIES IN
17   PSYCHOLOGY?
18   A.   NOT A DEGREE.
19   Q.   HAVE YOU STUDIED PSYCHOLOGY?
20   A.   YES, I HAVE, YES.  ACTUALLY, I STUDIED A LOT OF -- YES,
21   I HAVE.  ON MY OWN, READING, YES.  BUT NO, I DON'T HAVE A
22   DEGREE IN PSYCHOLOGY.
23   Q.   YOU'RE NOT PURPORTING TO BE AN EXPERT IN PSYCHOLOGY,
24   ARE YOU?
25   A.   NO.  NO.  BUT I DON'T THINK -- I THINK MOST PEOPLE
```

**057**

```
 1    WOULD AGREE THAT THESE MOVIES ARE GOING TO BRING A BIG
 2    EMOTIONAL RESPONSE TO PEOPLE.  THAT WAS THE -- YOU KNOW, THE
 3    SHOCK ART TENDS TO DO THAT.
 4    Q.   IS EVERYTHING SHOCKING ART?
 5    A.   IS EVERYTHING SHOCKING ART?
 6    Q.   YEAH.
 7    A.   NO.  EVERYTHING IS NOT SHOCKING ART.
 8    Q.   HOW DO YOU TELL, WHEN THERE'S A SHOCKING DEPICTION OF
 9    SOMETHING, WHETHER IT IS OR IS NOT ART?
10         I DON'T MEAN ART.  WHEN I SAY "ART," I MEAN OF
11    SERIOUS ARTISTIC VALUE.
12    A.   RIGHT.  I UNDERSTAND.  IS IT OKAY IF I GET A GLASS OF
13    WATER?
14    Q.   OF COURSE.
15    A.   I'M VERY DRY.  THESE ARE ALL SUCH GOOD QUESTIONS.
16         IS IT POSSIBLE TO GET THAT REPEATED?
17    Q.   HOW DO YOU TELL WHEN THERE IS A SHOCKING DEPICTION OF
18    SOMETHING WHETHER IT IS OF SERIOUS ARTISTIC VALUE?
19    A.   I DON'T THINK BECAUSE IT'S SHOCKING, IT MAKES IT
20    SERIOUS ARTISTIC VALUE.
21    Q.   SO HOW DO YOU TELL?
22    A.   WELL, I GUESS IT GOES BACK, AGAIN, TO WHAT'S THE, YOU
23    KNOW -- IS THE POINT OF ART, THE END-USER, THE VIEWER, WHAT
24    HE GETS OUT OF IT, OR IS IT THE CRITIC WHO GETS TO WRITE
25    ABOUT IT OR THE MUSEUM THAT GETS TO DISPLAY IT?
```

```
 1              I THINK THEY ALL HAVE VALID THINGS, BUT SOME CAN

 2     SHOCK YOU.  I CAN WATCH, YOU KNOW, THE MOST SHOCKING VIDEOS

 3     ON TV, AND THAT DOESN'T MEAN THEY HAVE ARTISTIC VALUE.

 4     Q.  SEE, YOU'RE GIVING ME YOUR OPINION, AND YOU'RE GOING

 5     AHEAD OF THE GAME.  BEFORE YOU GET TO TESTIFY AND GIVE YOUR

 6     OPINION, YOU HAVE TO TELL ME WHAT METHODOLOGY ARE YOU USING.

 7              THAT'S WHY I'M SAYING IS EVERY SHOCKING DEPICTION

 8     OF SERIOUS ARTISTIC VALUE, AND YOUR ANSWER IS "NO."

 9     A.  RIGHT.

10     Q.  OKAY.  SO NOW WHAT I'M SAYING IS WHAT METHODOLOGY DO

11     YOU COME TO DECIDING WHETHER SOMETHING SHOCKING IS OR IS NOT

12     OF SERIOUS ARTISTIC VALUE?

13     A.  I WOULD LOOK AT -- IF I SAW A PIECE AND I WOULD HAVE TO

14     EVALUATE IT --

15              THE COURT REPORTER:  I'M SORRY.  YOUR HONOR, CAN I

16     ASK THE WITNESS TO MOVE THE MIC A LITTLE BIT CLOSER?

17              THE COURT:  MOVE CLOSER TO THE MICROPHONE AND SLOW

18     DOWN, BUT NOT TOO CLOSE BECAUSE IT WILL DISTORT IT.

19              THE WITNESS:  OKAY.  AND NOT TOO SLOW BECAUSE

20     WE'LL NEVER LEAVE.

21              I THINK WHEN YOU LOOK AT A PIECE AND YOU SAY

22     OKAY, THIS IS SHOCKING, WHETHER IT HAS SERIOUS ARTISTIC

23     VALUE -- I THINK WHAT I WOULD DO AND THE METHODOLOGY I WOULD

24     USE, I WOULD SAY OKAY, IS THERE WRITING ABOUT IT.  AND THIS

25     ISN'T LIKE ACADEMIC IN A SERIOUS WAY.
```

```
 1            I THINK TO THE VIEWER, IT REALLY DOESN'T MATTER IF
 2   THERE IS SERIOUS ARTISTIC VALUE.  THEY'RE MORE INTERESTED IN
 3   ENTERTAINMENT.  DOES IT ENTERTAIN ME?  DOES IT PLEASE ME?  I
 4   THINK ALL THAT SERIOUS ARTISTIC VALUE ARE FOR BIGGER
 5   THINKERS AND CRITICS AND PEOPLE LIKE THAT.  I THINK THE
 6   VIEWER DOESN'T CARE ABOUT THAT.
 7            SO BEYOND THAT, BEYOND BEING THE VIEWER, DO I LOOK
 8   AT SOMETHING -- I WOULD PROBABLY, RATHER THAN JUST STAMP IT
 9   "IS IT SERIOUS," I MIGHT WANT TO LOOK AT PEER REVIEW.  HAVE
10   PEOPLE WRITTEN ARTICLES, HAVE CRITICS WRITTEN ARTICLES, WHAT
11   ABOUT THIS THING IS IT TRYING TO TALK ABOUT?
12            SO IF I JUMP OUT OF THE CLOSET AND I SHOCK YOU, I
13   DON'T THINK THAT'S SERIOUS ARTISTIC ART.  BUT IF I DO
14   SOMETHING THAT MAKES YOU DO PROFOUND THINKING ABOUT
15   SOMETHING IN A PROFOUND WAY OR IN A WAY YOU'VE NEVER THOUGHT
16   ABOUT THE SUBJECT BEFORE, I THINK THEN YOU START GETTING
17   INTO THE SERIOUS ARTISTIC BECAUSE YOU'RE MAKING A STATEMENT
18   THAT'S AN IMPORTANT STATEMENT.
19            SO IF THERE'S NO IMPORTANT STATEMENT TO IT, THEN I
20   PROBABLY WOULD SAY IT'S NOT SERIOUS ARTISTIC VALUE.  AND
21   PROBABLY THE EVIDENCE WOULD BE THERE'S PROBABLY NOT MUCH
22   PEER REVIEW OR PEOPLE WRITING ABOUT IT.  PEOPLE TEND NOT TO
23   WRITE ABOUT THE DOOR KNOB BEING BROKE.
24            BUT ON THE OTHER HAND, I THINK IF IT DOES HAVE IT,
25   SOMETIMES IT GETS THROUGH ALL THE MUCK AND MIRE, AND PEOPLE
```

```
 1   DO TALK ABOUT IT.  AND I THINK THE THREE CHARGED FILMS
 2   HAPPEN TO DO THAT BECAUSE OF THE VENUE AND A WHOLE LOT OF
 3   OTHER VARIABLES -- IT DOES DO THAT.  PEOPLE HAVE TALKED
 4   ABOUT IT.
 5           SO TO ANSWER YOUR QUESTION, I THINK I WOULD
 6   LOOK -- THE METHODOLOGY I WOULD LOOK AT, THINGS THAT ARE OUT
 7   THERE, THINGS THAT ARE COMPARABLE, WHAT IT'S TRYING TO SAY,
 8   AND HAVE A DIALOGUE IN MY HEAD OF WHAT IT'S TRYING TO SAY.
 9   AND IF IT'S TRYING TO SAY SOMETHING IMPORTANT, IT THEN
10   BECOMES WHAT COULD BE SERIOUS ARTISTIC VALUE.
11   BY THE COURT:
12   Q.   SO THEN YOU'RE CONCLUDING IF IT'S A SERIOUS DIALOGUE
13   VERSUS NO SERIOUS DIALOGUE AND THEN YOU COME BACK AND YOU
14   SAY IF I ALREADY CONCLUDED THAT THIS PROVOKES SERIOUS
15   DIALOGUE, THEN I WILL HAVE TO SAY THAT THIS IS OF SERIOUS
16   VALUE.
17   A.   THAT WOULD BE MY OPINION.
18           I HAVE NO OBJECTIVE WAY.  I COULDN'T, YOU KNOW --
19   I GUESS IF YOU GET AN AWARD, LIKE DUCHAMP GOT AN AWARD OF
20   ONE OF THE GREATEST ART PIECES, YOU KNOW, I GUESS THAT MAKES
21   IT BECAUSE A WHOLE BUNCH OF PEOPLE SAY IT.  THEN SO BE IT.
22           I PERSONALLY DON'T FEEL THAT YOU NEED THE JUDGES
23   AND THE CRITICS AND THE WHOLE THING.  I THINK ART IS ABOVE
24   ALL THAT.  I DON'T THINK WE NEED TO JUDGE ART, BUT WE'RE
25   HERE AND WE HAVE TO.
```

```
 1          HERE WE'RE TALKING ABOUT WHAT'S SERIOUS, AND WE'RE
 2   IN A POSITION THAT WE HAVE TO.  AND IT'S A LITTLE BIT
 3   AWKWARD FOR ME BECAUSE I'M NOT USED TO HAVING TO DEFEND
 4   SOMETHING, WHETHER IT'S SERIOUS OR NOT SERIOUS OR DEFEND ART
 5   IN ANY KIND OF WAY.  SO I THINK THE METHODOLOGY --
 6   Q.   HAVE YOU EVER BEEN CALLED UPON TO GIVE AN OPINION ABOUT
 7   WHETHER SOMETHING IS SERIOUS ART OR NOT, OR OF SERIOUS
 8   ARTISTIC VALUE?
 9   A.   YOU MEAN LIKE -- LIKE IN WHAT KIND OF SETTING?  I'VE
10   DONE LECTURES ON MARKETING AND ART, THINGS LIKE THAT, AND
11   TALKING ABOUT HOW ART CAN BE INTEGRATED.  BUT NO, I'VE NEVER
12   BEEN CALLED ON TO DO THAT BECAUSE I'M A FILMMAKER.  I'M NOT
13   A LECTURER OR A TEACHER.  I DON'T TRY TO DO THOSE.
14          YOU KNOW, MAYBE AFTER ALL THIS, MAYBE THEY WILL BE
15   CALLING ON ME.  BUT RIGHT NOW, I DON'T LOOK FOR THAT.  MY
16   JOB ISN'T TO BE AN EXPERT WITNESS.
17   Q.   YOU SAY SOMEBODY TAKES A PICTURE OF YOU JUMPING OUT OF
18   A CLOSET AND SURPRISING SOMEBODY.  THAT'S SHOCKING, BUT THAT
19   HAS NO SERIOUS ARTISTIC VALUE.
20   A.   IT MAY NOT HAVE SERIOUS ARTISTIC VALUE.
21   Q.   WELL, DOES IT OR DOESN'T IT?
22   A.   AGAIN, I WOULD HAVE TO LOOK AT THE PIECE, I WOULD HAVE
23   TO GO THINK WHAT'S HAPPENING HERE.
24   Q.   WELL, WHAT ABOUT THE PIECE THAT YOU'RE LOOKING AT TO
25   MAKE YOUR DETERMINATION AS TO WHETHER THAT KIND OF SHOCK HAS
```

```
1   NO SERIOUS ARTISTIC VALUE BUT YOUR KIND OF SHOCK DOES?
2   A.   WELL, I THINK, AGAIN, I PROBABLY WOULDN'T THINK MY
3   STUFF HAD SERIOUS ARTISTIC VALUE IF NOBODY IN ALL THE PRESS
4   AND THE MEDIA AND ALL THE OPINIONS BY CRITICS HAVEN'T TALKED
5   ABOUT IT.  HOW WHEN I LOOK AT BLOGS WHEN PEOPLE ARE
6   COMMENTING ON ARTICLES TALK ABOUT THE STUFF, AND A LOT OF IT
7   IS VERY NEGATIVE.
8        SOME OF IT'S GOOD, BUT THERE'S A LOT OF NEGATIVE.
9   AND I THINK THE FACT THAT I'VE GOTTEN THE DIALOGUE -- OR A
10  NEW SHOW IS DISCUSSING WHAT ART IS OR N.P.R. IS DISCUSSING
11  IT, AND THEY'RE USING MY STUFF AS THE EXAMPLE, I THINK I'VE
12  DONE THE BASIC THING OF SERIOUS ART, WHICH IS EXPAND SOME
13  DIALOGUE.
14       I THINK PEOPLE GET TOO HUNG UP IN THE CONTENT OF
15  WHAT THEY'RE LOOKING AT SOMETIMES AND THE EMOTION OF IT AND
16  DON'T SEE THAT; BUT I THINK IT'S PRETTY CLEAR THAT, IF YOU
17  REALLY THOUGHT ABOUT THE STUFF, IT WOULD BE SERIOUS ART EVEN
18  THOUGH IT MIGHT BE DISGUSTING TO MOST PEOPLE.
19  Q.   SO YOU'RE SAYING YOU'LL KNOW WHEN YOU SEE IT.
20  A.   NO.  NO.
21  Q.   WELL, I'M NOT UNDERSTANDING YOU.  I'M REALLY JUST
22  TRYING TO UNDERSTAND.  YOU'RE SAYING OKAY, THIS IS SERIOUS
23  ART.
24       WHAT IF THEY TOOK THAT PICTURE OF YOU JUMPING OUT
25  OF THE CLOSET AND SHOCKING MR. DIAMOND, FOR INSTANCE.
```

**063**

```
1   A.   OKAY.

2   Q.   AND THEY TOOK THAT PICTURE AND THEY BLEW IT UP, FRAMED

3   IT, AND PUT IT ON THE WALL OF A MUSEUM AND THEN PEOPLE

4   STARTED COMMENTING ON IT, OR LET'S SAY, THEY HAVE GOOD AND

5   BAD COMMENTS.  THEY SAY, "THIS IS A WONDERFUL PICTURE.  THIS

6   IS SO SHOCKING THAT IT CAUSES ME TO REALLY QUESTION MY

7   ASSUMPTIONS ABOUT THE STATUS QUO."

8   A.   YEAH.

9   Q.   OTHER PEOPLE SAY, "THIS IS RIDICULOUS.  IT'S SOME DUMB

10  PICTURE OF A GUY JUMPING OUT OF A CLOSET.  HOW TOTALLY

11  RIDICULOUS."

12       LET'S SAY THERE'S DISCUSSIONS ABOUT THAT.  THAT

13  THEN BECOMES SERIOUS ART?

14  A.   YES, JUST LIKE MARCEL DUCHAMP BROUGHT A URINAL, PUT IT

15  IN A SHOW, AND CALLED IT "FOUNTAIN" AND SIGNED IT.  IT

16  BECAME A SERIOUS PIECE OF ART.

17  Q.   SO, THEN, WHAT CANNOT BE SERIOUS?

18       IF THERE'S SOMEBODY WHO TALKS ABOUT IT AND PEOPLE

19  TALK ABOUT IT, WHETHER IT'S THEY SAY THIS IS SERIOUS ART --

20  OR MAYBE EVEN THE TALK IS NOT JUST POSITIVE/NEGATIVE.  THE

21  TALK MAY ITSELF BE WHETHER IT'S SERIOUS OR NOT SERIOUS ART.

22       THEN IT ALL BECOMES SERIOUS.  RIGHT?

23  A.   IN A SENSE.  IF IT GIVES A DEBATE OF WHAT IS SERIOUS

24  ART AND WE'RE TALKING ABOUT IT LIKE WE ARE NOW, YES, THIS

25  CONVERSATION HAS BEEN ELEVATED TO SERIOUS ART BECAUSE, AS
```

**064**

1    HUMANS, WE'RE TALKING ABOUT IT.  SO YES, I BELIEVE THAT.

2    Q.   ALL RIGHT.  SO YOUR METHODOLOGY IS THAT ANY TIME PEOPLE

3    TALK -- RIGHTLY OR WRONGLY, POSITIVELY, NEGATIVELY -- ON

4    ANYTHING, REGARDLESS OF WHETHER IT OTHERWISE MIGHT HAVE

5    SERIOUS ARTISTIC VALUE, IT NECESSARILY THEN BECOMES SERIOUS

6    ART.

7    A.   LET ME SAY THIS -- AND I LEARNED THIS AS AN UNDERGRAD

8    AT DEPAUL'S UNIVERSITY.  I CAN'T SAY EVERYTHING AND THAT

9    EVERYTHING -- MAKE A BLANKET STATEMENT THAT EVERYTHING.

10   EVERYTHING IS NOT ALL THINGS.  THAT'S A TRAP.  I CAN'T SAY

11   EVERYTHING IS ART.  A LOT, I THINK THOUGH --

12   Q.   I'M NOT TRYING TO TRAP YOU, BY THE WAY.

13   A.   NO, NO.  I'M NOT SAYING YOU ARE, BUT I CAN'T SAY --

14   IT'S NOT ALL PIECES THAT ARE SHOCKING ARE ART.  IT'S NOT ALL

15   THIS OR ALL THAT.  ONCE I HEAR "ALL," I CAN'T WIN ON THAT

16   ONE.

17   Q.   BUT I'M NOT TRYING TO WIN OR LOSE.

18   A.   NO, I UNDERSTAND.

19   Q.   THIS IS NOT THE POINT.

20   A.   BUT THIS IS VERY IMPORTANT TO ME, OBVIOUSLY, AND I'M

21   TRYING TO DO MY BEST.

22   Q.   I UNDERSTAND.

23        BUT WHAT I'M TRYING TO SAY IS IF IT IS NOT ALL

24   SHOCKING DEPICTIONS HAVE SERIOUS ARTISTIC VALUE --

25   A.   IT'S NOT ALL.

**065**

1    Q.    -- WHICH YOU SAY YOU AGREE WITH ME ON THAT.

2    A.    YES.

3    Q.    THEN I HAVE TO KNOW WHAT IS YOUR METHOD OF DETERMINING

4    WHETHER IT IS OR IS NOT.  AND WHAT YOU SAID TO ME SO FAR IS

5    IF THERE IS DISCUSSION, SERIOUS DISCUSSION ABOUT IT -- NO

6    MATTER WHETHER IT'S POSITIVE, NEGATIVE, WHATEVER -- THEN IT

7    IS OF SERIOUS ARTISTIC VALUE.

8    A.    YES, IT ELEVATES IT IF IT WASN'T BEFORE.

9    Q.    SO, THEN, LITERALLY IF THERE IS DISCUSSION ABOUT

10   ANYTHING, IT HAS TO NECESSARILY HAVE SERIOUS ARTISTIC VALUE.

11   A.    IF THE DISCUSSION IS ABOUT THE, LET'S SAY, FOR

12   EXAMPLE, PROFOUND KIND OF IDEAS.  SO IF IT'S ABOUT A DOOR

13   KNOB BREAKING, I DON'T KNOW IF IT HAS SERIOUS ARTISTIC

14   VALUE.  BUT IF THE SUBJECT MATTER IS OF PROFOUND NATURE,

15   WHAT THE NATURE OF ART IS OR WHAT IS A POLITICAL NATURE OR A

16   TABOO NATURE, THEN, YES, I THINK IT --

17             EVEN THOUGH IT MIGHT BE TERRIBLE LOOKING, I THINK

18   IT'S BEEN ELEVATED TO SERIOUS ARTISTIC BECAUSE I THINK

19   MOST ARTISTS' POINT IS TO GET THEIR STUFF DISSEMINATED SO

20   PEOPLE CAN TAKE IT WHATEVER WAY THEY TAKE IT.  MOST PEOPLE

21   WANT TO DO IT PLEASING.  SO, YES, I THINK IT IS SERIOUS ART.

22   Q.    AND HOW DO YOU DETERMINE ON A CASE-BY-CASE BASIS, AS AN

23   EXPERT, WHETHER SOMETHING IS PROFOUND OR NOT PROFOUND?

24   A.    YOU KNOW, THESE ARE TOUGH QUESTIONS BECAUSE I DON'T

25   KNOW WHAT THE --

```
1   Q.   I'M JUST TRYING TO UNDERSTAND.
2   A.   OKAY.  HOW DO YOU TAKE IT AS AN EXPERT.  I WOULD READ
3   ALL THE LITERATURE I COULD READ ON IT, AND OBVIOUSLY, I'VE
4   GOT TO USE MY -- I DON'T WANT TO SAY "COMMON SENSE" BECAUSE
5   IT'S NOT -- THIS STUFF IS NOT COMMON AT ALL.  BUT I USE MY
6   MIND AND MY INTELLECT TO TRY TO DISSECT THIS INFORMATION,
7   THINK ABOUT IT IN KIND OF A PHILOSOPHICAL WAY AND TRY TO
8   MAKE THINGS --
9        YOU KNOW, I COULD BE WRONG ON EVERYTHING.  THAT'S
10  ART IS STILL A SUBJECTIVE THING.  EVEN, IN FACT, TASTE IS,
11  BUT SO IS WHETHER SOMETHING IS SERIOUS OR NOT.
12       YOU KNOW, I CAN LISTEN TO A PIECE OF MUSIC -- I
13  KNEW THIS GIRL WHO LISTENED TO J.S. BACH, AND SHE WENT CRAZY
14  BECAUSE SHE THOUGHT IT WAS SO BAD, AND I THINK IT'S THE MOST
15  BEAUTIFUL MUSIC -- AND I THOUGHT IT WAS THE MOST BEAUTIFUL
16  MUSIC, YOU KNOW, J.S. BACH, EVER.  SO, YOU KNOW, SOME PEOPLE
17  THINK BACH, YOU KNOW.  SO A LOT OF IT IS OPINION IN ART.
18       AND MY OPINION, I THINK, IS VALID BECAUSE I HAVE
19  PRODUCED SO MANY OF THESE THINGS, AND LIKE IT OR NOT, I'M
20  PROBABLY ONE OF THE LEADING EXPERTS IN THE WORLD ON THESE
21  KIND OF MOVIES.  AND IF WE WERE TALKING, LET'S SAY, ABOUT
22  SOME OTHER ARTISTIC VENTURE, MAYBE THAT WOULDN'T BE THE
23  CASE.
24       BUT BECAUSE IT HAS THIS NARRATIVE OF THE
25  SCATOLOGY, FOR EXAMPLE, I AM AN EXPERT BECAUSE I'VE DONE
```

```
 1   MORE THAN ANYBODY ON THIS EARTH ON THIS STUFF AND I'VE

 2   THOUGHT ABOUT IT, AND I THINK I'M A RELATIVELY INTELLIGENT

 3   PERSON.  I DO LOOK AT THINGS, AND I THINK IT HAS THAT VALUE

 4   BECAUSE IT'S BEEN ELEVATED TO THAT IF IT DIDN'T HAVE IT.  IF

 5   IT WASN'T AS CLEAR AT THE BEGINNING, I THINK IT'S CLEAR NOW.

 6   AND JUST LIKE A LOT OF WORKS WERE CONSIDERED OBSCENE MANY,

 7   MANY YEARS AGO ARE NOW TODAY MASTERPIECES.

 8             I AM NOT SAYING MY STUFF'S A MASTERPIECE.  I'M NOT

 9   COMPARING MYSELF TO THESE PEOPLE.  I'M NOT.

10             THE COURT:  OKAY.

11             MR. GRANT.

12             MR. GRANT:  YES, SIR.

13             THE COURT:  THANK YOU FOR BEING PATIENT, BUT GO

14   AHEAD.

15             MR. GRANT:  YES, YOUR HONOR.

16                  CROSS-EXAMINATION (RESUMED)

17   BY MR. GRANT:

18   Q.   YOU'VE TALKED A BUNCH WITH THE JUDGE ABOUT PEOPLE

19   TALKING ABOUT YOUR DIFFERENT ART AND THE FILMS THAT HAVE

20   BEEN CHARGED IN THE CASE.

21             JUST SO WE'RE CLEAR, YOU HAVEN'T SHOWN ANY OF

22   THESE THREE FILMS IN A GALLERY, HAVE YOU?

23   A.   AS OF NOW, NO.

24   Q.   AND YOUR WORK OR DISCUSSIONS OF YOUR WORK HASN'T BEEN

25   PRINTED IN ANY MAJOR ART JOURNAL, HAS IT?
```

**068**

1    A.   YES, DISCUSSION HAS BEEN.

2    Q.   WHAT ART JOURNAL WOULD THAT BE?

3    A.   "FILMMAKER MAGAZINE."

4    Q.   WHO'S THE PUBLISHER OF THAT?

5    A.   I DON'T KNOW THE PUBLISHERS, BUT IT'S FAMOUS.  IT'S

6    CALLED "FILMMAKER MAGAZINE."  THEY WROTE AN ARTICLE ABOUT

7    ME, AND THEY DISCUSSED THE STUFF.

8    Q.   AND WAS THAT POST-INDICTMENT?  WAS IT AFTER YOU WERE

9    CHARGED IN THIS CASE?

10   A.   YEAH.  YES.

11        THE COURT:  DO YOU HAVE A COPY OF THAT ARTICLE?

12        THE WITNESS:  I COULD GET ONE.  I'M NOT SURE IF I

13   HAVE IT WITH ME.

14        THE COURT:  OKAY.

15        THE WITNESS:  BUT I HAVE ONE.  IT'S BASICALLY

16   TAKING THE JOSEPH K. -- YEAH, I THINK I DO HAVE IT.  IT'S

17   FROM THE "FILMMAKER" BLOG WHICH --

18        THE COURT:  I'M SORRY.  IT'S FROM A BLOG?

19        THE WITNESS:  WELL, IT'S "FILMMAKER MAGAZINE."

20   IT'S RIGHT HERE.  IT'S "FILMMAKER," AND THEY HAVE A

21   MAGAZINE, THEY HAVE A BLOG.

22             A LOT OF TIMES WHAT THEY DO IS THEY FIRST HAVE IT

23   ON THE INTERNET, THEY HAVE A BLOG, AND THEN IT GETS TO THE

24   MAGAZINE.

25        THE COURT:  YOU'RE MAKING A LOT OF NOISE FOR MY

**069**

```
 1   COURT REPORTER, PLEASE.
 2          THE WITNESS:  I'M SORRY.  I'M BREAKING THE PLACE.
 3          YEAH, SO.  SO YES, THEY WROTE ABOUT -- THEY WROTE
 4   ABOUT ME.
 5          THE COURT:  LET'S GO AHEAD AND MAKE A COPY OF
 6   THAT, AND WE'LL TAKE A LOOK AT IT.
 7          THE WITNESS:  OKAY, BOING, BOING.  AGAIN, IT'S --
 8          ARE YOU ONLY ASKING FOR LIKE ART-RELATED THINGS?
 9   BY MR. GRANT:
10   Q.   RIGHT, JOURNALS.  I MEAN, I KNOW YOU'RE TALKING ABOUT
11   BLOGS AND ON THE INTERNET.  IS THERE ANYTHING IN THE HARD --
12   LIKE AN ART --
13   A.   FROM WHAT I UNDERSTAND, "FILMMAKER MAGAZINE" HAD
14   PRINTED THIS AS WELL.
15   Q.   OKAY.  THANK YOU.
16          NOW, YOU'VE ALSO DISCUSSED ABOUT OTHER PIECES OF
17   WORK, AND I THINK WITH THE JUDGE, YOU DISCUSSED "THE
18   FOUNTAIN" AND YOU NAMED SOME OTHER PIECES.  I JUST WANT TO
19   SPEND A FEW MINUTES VERY QUICKLY ON THESE PIECES.
20          NOW, LET'S TALK ABOUT "THE FOUNTAIN" FOR JUST ONE
21   MOMENT.  THAT'S THE EXHIBIT OF THE URINAL?
22   A.   YES.
23   Q.   ALL RIGHT.  NOW, THAT WAS JUST THE ENTIRE EXHIBIT.  IT
24   WAS A URINAL?
25   A.   WELL, IT WAS THE ENTIRE EXHIBIT THAT WAS GOING TO BE IN
```

1  THE SHOW, BUT YEAH.

2  Q.  IT WASN'T A FILM?

3  A.  NO, NO, NO.  IT WAS A PHYSICAL URINAL.

4  Q.  AND THERE WASN'T ANYTHING ABOUT THAT EXHIBIT WHERE IT

5  DISPLAYED SEXUAL ACTS AT ALL?

6  A.  NO.  I DON'T THINK SO.

7  Q.  ALL RIGHT.  NOW, "NUDE DESCENDING A STAIRCASE," THAT

8  WAS A PAINTING AND NOT A FILM.  CORRECT?

9  A.  YES.

10  Q.  AND THAT PIECE DEPICTS THE MECHANICAL MOTION OF A NUDE

11  FEMALE BODY?

12  A.  I GUESS, YES.

13  Q.  IT'S NOT A REAL FEMALE?

14  A.  NO.

15  Q.  ALL RIGHT.  AND THAT PIECE OF WORK DID NOT INVOLVE ANY

16  WOMEN; IT DIDN'T SHOW HER DRINKING URINE DURING A SEX ACT?

17  A.  THE PAINTING?

18  Q.  RIGHT.

19  A.  NO.

20  Q.  IT DIDN'T DEPICT --

21  A.  IT HAD NOTHING TO DO WITH "FOUNTAIN."  IT'S JUST THE

22  SAME ARTIST.

23  Q.  RIGHT.  NO.  I'M TALKING ABOUT "NUDE DESCENDING A

24  STAIRCASE."

25  A.  "NUDE DESCENDING A STAIRCASE" WAS PAINTED BY

**071**

1   MARCEL DUCHAMP, WHO ALSO DID "FOUNTAIN," WHICH IS A

2   READY-MADE URINAL HE BOUGHT IN A STORE AND SIGNED IT AND

3   SENT IT IN TO THE SHOW FOR AN EXHIBIT.

4   Q.   YES, MR. ISAACS.  I UNDERSTAND.

5        BUT YOU MENTIONED THIS PIECE, I BELIEVE, IN YOUR

6   PLEADING, OR AT SOME POINT YOU MENTIONED "NUDE DESCENDING A

7   STAIRCASE."

8   A.   YES.

9   Q.   JUST TO BE CLEAR -- AND I JUST WANT TO MAKE SURE WE'RE

10  CLEAR FOR THE RECORD.  NOTHING ABOUT THAT PIECE OF WORK

11  SHOWS A SEX ACT --

12  A.   RIGHT.

13  Q.   -- LIKE IN THE FILMS THAT WE'VE CHARGED IN THIS CASE.

14  CORRECT?

15  A.   CORRECT.

16  Q.   OKAY.  NOW, I'LL PROBABLY BUTCHER THIS NAME, BUT IS IT

17  PIERO MANZONI?

18  A.   PIERO MANZONI, YES.

19  Q.   AND YOU DISCUSSED "THE CAN" EXHIBIT?

20  A.   YES.

21  Q.   NOW, THAT WAS A CAN THAT HAD A LABEL ON IT PURPORTING

22  TO HAVE FECES IN IT.  CORRECT?

23  A.   CORRECT.

24  Q.   ALL RIGHT.  AGAIN, THERE IS NO FILM COMPONENT TO THIS

25  EXHIBIT?

```
1    A.   NO FILM COMPONENT.

2    Q.   ALL RIGHT.  AND THERE IS NOTHING IN THE EXHIBIT THAT,

3    AGAIN, INVOLVED WOMEN DOING ANY SORT OF SEX ACT, LIKE

4    DRINKING URINE OR EATING FECES?

5    A.   IN THE MANZONI THING, NO.

6    Q.   RIGHT.  OKAY.  NO ORAL SEX WITH A HORSE?

7    A.   IN THE MANZONI, NO.

8    Q.   I'M JUST TRYING TO MAKE SURE YOU UNDERSTAND --

9    A.   NO, THE MANZONI WASN'T A FILM AND DIDN'T HAVE ANY SEX

10   WITH A HORSE IN THE MANZONI CAN.

11   Q.   NO SEX ACTS --

12   A.   I DON'T KNOW.  MAYBE INSIDE THE CAN HE HAD SOMETHING,

13   BUT OTHER THAN THAT, NO.

14   Q.   NO SEX ACTS AT ALL?

15   A.   NO SEX ACTS AT ALL.

16            THE COURT REPORTER:  EXCUSE ME, COUNSEL.

17            MR. GRANT:  YES, MA'AM.

18            THE COURT REPORTER:  OKAY.  THANK YOU.

19            MR. GRANT:  THANK YOU.

20   BY MR. GRANT:

21   Q.   AND YOU DISCUSSED "THE TRAIL," I THINK YOU CALLED IT?

22   A.   YES.

23   Q.   OKAY.  AND THAT WAS A SCULPTURE?

24   A.   CORRECT.

25   Q.   AND THAT'S A DEPICTION OF WHAT, IT'S LIKE FECES COMING
```

**073**

```
1    OUT OF THE REAR END OF THE SCULPTURE?

2    A.   OF A NUDE WOMAN ON ALL FOURS, YES.

3    Q.   OKAY.  NO SEX ACTS INVOLVED IN THAT.  CORRECT?

4    A.   NO.

5    Q.   I MEAN, THE WOMAN'S NOT SITTING THERE WITH URINE OR

6    FECES?

7    A.   NO.  RIGHT.  NO SEX ACTS.  JUST HER.

8    Q.   AND I GUESS, MR. ISAACS, YOU TALKED TO THE JUDGE ABOUT

9    A NUMBER OF EXHIBITS.

10            IS IT FAIR TO SAY THAT NONE OF THOSE EXHIBITS THAT

11   YOU TESTIFIED TO INCLUDED SEX ACTS LIKE THOSE CHARGED IN THE

12   FILMS IN THIS CASE?

13            THE WITNESS:  CAN I ASK THE JUDGE A QUESTION?

14            THE COURT:  WELL, YOU'RE NOT HERE TO ASK ME

15   QUESTIONS.  YOU'RE NOT HERE TO ASK ANY QUESTIONS.  IT'S ONLY

16   A MATTER OF ANSWERING THE QUESTIONS.

17            THE WITNESS:  OKAY.

18   BY MR. GRANT:

19   Q.   I BELIEVE IT MAY JUST BE A "YES" OR "NO."

20            IS THERE ANY EXHIBIT THAT, YOU KNOW, YOU'VE TALKED

21   ABOUT AS A COMPARABLE, AS AN EXHIBIT, ANYTHING --

22   A.   I HAVE TALKED ABOUT AN EXHIBIT IN THE PAST THAT DOES

23   HAVE A SEX ACT.  IT'S GOT -- IT'S IN A MAINSTREAM MOVIE.

24   Q.   I'M JUST TRYING TO FOCUS ON YOUR PLEADING --

25   A.   WELL --
```

**074**

1    Q.   -- AND WHAT YOU OFFERED TO THE JUDGE --

2    A.   -- AS FAR AS --

3    Q.   -- ON WHAT MAKES YOU AN EXPERT.

4    A.   -- ANY SEX ACTS --

5            THE COURT:  MR. ISAACS, YOU'VE GOT TO LISTEN TO ME

6    WHEN I SAY DO NOT TALK OVER EACH OTHER.  WE'RE NOT GOING TO

7    HAVE A GOOD RECORD.

8            NOW, IT IS IMPOSSIBLE FOR MY COURT REPORTER TO

9    WRITE DOWN WHEN BOTH PEOPLE ARE TALKING OVER EACH OTHER.

10           THE WITNESS:  I'M SORRY.

11           THE COURT:  MR. GRANT.

12           MR. GRANT:  YES, SIR.

13   BY MR. GRANT:

14   Q.   I GUESS WHAT I'M GETTING AT IS IN YOUR PLEADING AND

15   YOUR DISCUSSIONS WITH THE JUDGE -- I JUST WANT TO BE CLEAR.

16           YOU SAID THERE WERE SOME PIECES THAT YOU

17   CONSIDERED WHEN YOU GIVE YOUR EXPERT OPINION.  AND ALL I

18   WANTED TO GET FROM YOU IS WOULD YOU AGREE WITH ME THAT NONE

19   OF THOSE EXHIBITS HAVE ANY DEPICTION OF A SEX ACT INVOLVING

20   WOMEN OR MALES EATING FECES, DRINKING URINE WHILE THEY ARE

21   PERFORMING SEX ACTS?

22   A.   OF THE EXHIBITS THAT I PUT IN THIS PAPER, WHICH MAY OR

23   MAY NOT BE ALL THE EXHIBITS, THERE IS NONE.

24           BUT THERE IS AN EXHIBIT I WOULD LIKE TO PUT IN

25   THAT DOES HAVE THAT FROM A MAINSTREAM MOVIE, BUT I MIGHT NOT

**075**

```
1   PUT IT IN.

2           MR. GRANT:  ALL RIGHT.

3           THANK YOU VERY MUCH, YOUR HONOR.

4           THE COURT:  OKAY.  MR. DIAMOND.  ANYTHING?

5           MR. DIAMOND:  NOTHING, YOUR HONOR.

6           THE COURT:  ALL RIGHT.  MR. ISAACS, THANK YOU VERY

7   MUCH.  YOU MAY STEP DOWN.

8           ALL RIGHT.  ANY FURTHER TESTIMONY OR ANYTHING

9   REGARDING MR. ISAACS AS A POTENTIAL EXPERT WITNESS?

10          MR. DIAMOND:  I ASSUME, YOUR HONOR, THAT BECAUSE

11  WE STARTED WITH CROSS-EXAMINATION, THAT THE PLEADINGS WE

12  FILED HAVE ALREADY BEEN READ AND CONSIDERED BY THE COURT.

13          THE COURT:  OF COURSE.

14          MR. DIAMOND:  OKAY.  THEN WE HAVE NOTHING FURTHER.

15          THE COURT:  OKAY.  THEN I'LL HEAR ARGUMENT.

16          SINCE YOU'RE PROPOSING TO HAVE MR. ISAACS TESTIFY,

17  I'LL HEAR ARGUMENT FROM YOU, AND THEN I'LL HEAR ARGUMENT

18  FROM THE GOVERNMENT.  MR. DIAMOND.

19          MR. DIAMOND:  YES, YOUR HONOR.  MAY IT PLEASE THE

20  COURT --

21          THE COURT:  WHY DON'T YOU APPROACH THE LECTERN,

22  PLEASE.

23          MR. DIAMOND:  I CAN DO THAT.

24          THE COURT:  MR. DIAMOND, ALSO, I WOULD LIKE YOU TO

25  SUBMIT A COPY OF THAT BLOG ARTICLE THAT MR. ISAACS REFERRED
```

**076**

1    TO IN HIS TESTIMONY, IF YOU WOULD KINDLY DO THAT.

2            DON'T WALK ACROSS THE WELL OF THE COURT,

3    MR. ISAACS.

4            WOULD YOU KINDLY DO THAT AFTER THE PROCEEDINGS.

5        *(DEFENSE COUNSEL CONFERS WITH DEFENDANT SOTTO VOCE.)*

6            MR. DIAMOND:  YES, YOUR HONOR.

7            THE COURT:  ALL RIGHT.  VERY GOOD.  THANK YOU.

8            MAYBE I CAN FOCUS YOUR DISCUSSION.

9            MR. DIAMOND:  SURE.

10           THE COURT:  YOU KNOW, I'M NOT HERE TO JUDGE OR

11   DETERMINE WHETHER I AGREE OR DISAGREE WITH HIS CONCLUSION.

12   THAT'S NEITHER HERE NOR THERE.

13           I'M ONLY HERE TO DETERMINE, A, IS HE QUALIFIED; B,

14   DOES HE HAVE SOME SORT OF RELIABLE METHODOLOGY THAT COULD

15   LEAD TO WHATEVER CONCLUSION AND WHETHER THAT'S GOING TO BE

16   HELPFUL TO THE JURY SO THAT IT IS WHAT THEY CALL THE "FIT

17   REQUIREMENT."

18           SO IF YOU COULD ADDRESS THOSE, I'D APPRECIATE IT.

19           MR. DIAMOND:  YES.  I WANT TO BEGIN WITH AN

20   OBVIOUS STATEMENT, WHICH IS WE HAVE A UNIQUE SITUATION HERE

21   WHERE IT IS THE DEFENDANT WHO IS BEING OFFERED AS THE

22   EXPERT.  I'VE NEVER SEEN A CASE LIKE THIS BEFORE; BUT I

23   THINK IT MILITATES IN FAVOR OF ALLOWING HIS TESTIMONY,

24   ESPECIALLY BECAUSE THE COURT SEEMED TO SUGGEST THAT THERE IS

25   A LOT OF DISCRETION INVOLVED IN THE COURT DECIDING WHETHER

```
 1    TO ALLOW THE OPINION TO BE GIVEN BY THE PROFFERED EXPERT OR

 2    NOT.

 3              IN THE CASE OF STAGLIANO, WE DID NOT HAVE A

 4    DEFENDANT WHO IS BEING OFFERED AS THE EXPERT WITNESS.  WE

 5    JUST HAD AN ART EXPERT FROM THE UNIVERSITY OF CALIFORNIA AT

 6    SANTA BARBARA.

 7              THE COURT:  WHY WOULD THAT MAKE A DIFFERENCE?

 8              MR. DIAMOND:  I THINK BECAUSE THE SUBJECT MATTER

 9    HERE IS SUBJECT MATTER THAT LENDS ITSELF TO MORE SUBJECTIVE

10    ANALYSIS THAN, SAY, A SCIENTIFIC QUESTION OF WHETHER D.N.A.

11    IS VALID OR NOT OR WHETHER FINGERPRINTS ARE A LEGITIMATE

12    METHOD OF IDENTIFYING PEOPLE OR, AS IN THE DAUBERT CASE,

13    WHETHER THE DRUG IN QUESTION COULD CAUSE THE AILMENT THAT

14    WAS SUFFERED BY THE PLAINTIFF IN THAT CASE BECAUSE THAT,

15    AFTER ALL, WAS A PERSONAL INJURY CASE.

16              HERE, WE HAVE THE DEFENDANT WHO MADE THE MOVIE IN

17    QUESTION, AT LEAST ONE OF THE THREE.  SO I THINK IT WOULD BE

18    HELPFUL TO THE JURY TO UNDERSTAND, FROM THE DEFENDANT'S

19    PERSPECTIVE, WHAT WAS THE PURPOSE OF THE MOVIE, WHAT WAS THE

20    MOVIE ABOUT, DOES IT HAVE ANY VALUE.

21               AND I DON'T KNOW WHETHER IT'S POSSIBLE TO

22    SEPARATE THE DEFENDANT AS THE EXPERT FROM THE DEFENDANT AS

23    THE FILMMAKER, AND IT MAY NOT BE NECESSARY TO MAKE A

24    DISTINCTION.

25               I DON'T KNOW WHETHER, FOR EXAMPLE, RULE 701 WOULD
```

```
 1   ALLOW MR. ISAACS TO TESTIFY AS TO WHAT HE INTENDED IN THE
 2   MOVIE.  SO IT MAY BE THAT THIS WHOLE DAUBERT HEARING IS AN
 3   ACADEMIC EXERCISE THAT MAY NOT REALLY BE NECESSARY TO
 4   RESOLVE, GIVEN THE FACT THAT THIS IS NOT A CASE INVOLVING
 5   DRUGS OR SOME SCIENTIFIC MATTER.
 6          INHERENTLY, OUR SUBJECTIVE IS SOMETHING THAT DEALS
 7   WITH ART (SIC).  YOU'VE GOT THE PRODUCER OF THE MOVIE, YOU
 8   HAVE HIS OPINION.  HE'S TRYING TO CONVEY TO THE JURY WHAT HE
 9   INTENDED BY THE MOVIE.  I THINK IT WOULD BE MORE DIFFICULT
10   TO TRY TO BREAK UP HIS TESTIMONY AND ALLOW HIM TO SAY ONE
11   THING BUT NOT SOMETHING ELSE.
12          THE COURT:  I THINK YOU'RE MAKING CERTAIN
13   ASSUMPTIONS WHICH I THINK WE BETTER GET ON THE TABLE SO WE
14   CAN APPROACH IT HEAD-ON, AND THAT IS YOU'RE SAYING THAT HIS
15   SUBJECTIVE REASONS FOR MAKING THIS ONE MOVIE -- IT'S ONLY
16   ONE, NOT THE OTHER.  SO IF THAT'S WHAT YOU'RE SAYING, THEN
17   HE HAS NOTHING TO SAY ABOUT THE OTHER TWO WHICH HE ONLY
18   DISTRIBUTED.
19          BUT EVEN ASSUMING FOR THE MOMENT THAT WE'RE ONLY
20   TALKING ABOUT "H.S.A. NO. 7," WHICH HE PRODUCED AND DIRECTED
21   IN MAKING.  SO HE'S THE FILMMAKER OF THIS PARTICULAR CHARGED
22   FILM, THEN MY QUESTION IS:  WHAT AUTHORITY DO YOU HAVE THAT
23   SUGGESTS THAT THE SUBJECTIVE INTENT IS RELEVANT TO OUR
24   INQUIRY?
25          BECAUSE IF YOU LOOK AT THE MILLER TEST, IT DOES
```

**079**

```
 1   NOT SAY WHETHER THE DEFENDANT INTENDED TO MAKE SOMETHING
 2   WITH ARTISTIC VALUE OR SERIOUS ARTISTIC VALUE OR NOT.  IT
 3   SAYS WHETHER A REASONABLE PERSON -- WHICH IS AN OBJECTIVE
 4   STANDARD -- WHETHER A REASONABLE PERSON WOULD FIND THAT THIS
 5   HAD OR DID NOT HAVE SERIOUS ARTISTIC VALUE.
 6           SO MY SENSE IS I QUESTION WHETHER, EVEN AS A
 7   LAYPERSON, AS THE FILMMAKER, HE WILL BE PERMITTED TO TESTIFY
 8   AS TO HIS INTENTIONS.  BECAUSE INTENTION TO HAVE ARTISTIC
 9   VALUE OR NOT IS NOT AN ELEMENT, NOR DOES IT DEFEAT AN
10   ELEMENT OF THE OFFENSE.
11           MR. DIAMOND:  WE AGREE WITH THE COURT'S COMMENT
12   THAT ALONE, WHATEVER HIS SUBJECTIVE INTENT WAS, WOULD NOT BE
13   RELEVANT BY ITSELF.  BUT IN TERMS OF TESTIFYING IN THIS
14   CASE, IT SEEMS TO ME, THE JURY WOULD WANT TO KNOW, AT LEAST
15   TO SOME EXTENT, WHAT WAS THE PURPOSE OF THE MOVIE, WHAT WAS
16   THE PRODUCER OF THE MOVIE ATTEMPTING TO CONVEY TO THE
17   AUDIENCE, AND WHAT WOULD A REASONABLE AUDIENCE TAKE FROM THE
18   MOVIE.
19           I DON'T KNOW WHETHER YOU CAN SEPARATE THOSE TWO
20   CONCEPTS, BUT OBVIOUSLY, WE WILL NOT OFFER ANY EVIDENCE THAT
21   IS NOT ADMISSIBLE.
22           BUT IN TERMS OF WHETHER MR. ISAACS SHOULD BE ABLE
23   TO TESTIFY, THE FACT THAT HE IS THE ACTUAL PRODUCER OF AT
24   LEAST ONE THE THREE MOVIES AND THE DISTRIBUTOR OF THE OTHERS
25   WOULD MILITATE IN FAVOR OF ALLOWING THE COURT TO EXERCISE
```

```
 1    DISCRETION TO ALLOW THE TESTIMONY BECAUSE, IN EXERCISING

 2    DISCRETION, THE COURT IS TO CONSIDER FACTORS SUCH AS WOULD

 3    THE JURY BE CONFUSED BY HIS TESTIMONY OR MISLED IN SOME WAY,

 4    AND CLEARLY THAT WOULD NOT BE THE CASE.  THE JURY IS

 5    INTELLIGENT AND WOULD PRESUMABLY FOLLOW THE JURY

 6    INSTRUCTIONS.

 7          SO WE DON'T HAVE THE DANGER HERE OF SOMEBODY

 8    EXPLAINING D.N.A., AND I'VE READ SOME CASES ON D.N.A.  AND

 9    IT'S VERY DIFFICULT TO UNDERSTAND COMPLETELY.

10          SO IN THAT SITUATION, WHERE WE'RE BRINGING IN AN

11    EXPERT IN AN AREA THAT NOBODY REALLY HAS ANY KNOWLEDGE OF, I

12    THINK IT'S IMPORTANT TO MAKE SURE THAT THE SO-CALLED EXPERT

13    DOES NOT JUST GIVE JUNK SCIENCE AND TOTALLY MISLEADS THE

14    JURY.

15          BUT IN A CASE LIKE THIS, WHERE, IRONICALLY, THE

16    JURY IS IN A BETTER POSITION TO EVALUATE THE MOVIE --

17    ALTHOUGH, ARGUABLY, SOMEBODY COULD ARGUE THAT THAT MILITATES

18    AGAINST ALLOWING AN EXPERT BECAUSE WHY DOES THE JURY NEED AN

19    EXPERT IF THE JURY COULD DO IT ITSELF.

20          ON THE OTHER HAND, I BELIEVE THE ARGUMENT

21    MILITATES IN FAVOR OF ALLOWING THE EXPERT BECAUSE THERE'S NO

22    DANGER THAT THE JURY IS GOING TO BE TOTALLY SWEPT OFF ITS

23    FEET AND MISLED BY SOME KIND OF JUNK SCIENCE.

24          THE COURT:  BUT THAT'S NOT REALLY THE STANDARD.

25    THE STANDARD IS IT'S GOT TO BE OF ASSISTANCE TO THE JURY.
```

```
 1    IF YOU'RE SAYING IT'S NOT OF ASSISTANCE TO THE JURY, BUT

 2    CERTAINLY IT CAN'T BE OF ANY HARM, THAT'S LIKE PUTTING IT ON

 3    ITS HEAD, THE INQUIRY.

 4            MR. DIAMOND:  WE THINK THAT HIS TESTIMONY WOULD

 5    HAVE SOME VALUE.

 6            THE COURT:  WHAT IS THE VALUE?

 7            MR. DIAMOND:  THE VALUE IS IT WILL ALLOW THE JURY

 8    TO DETERMINE OR AT LEAST HELP THE JURY DECIDE WHETHER OR NOT

 9    THE MOVIES HAVE SERIOUS ARTISTIC VALUE.

10            THE COURT:  AND WHY WOULD WHAT HE SAYS, EVEN AS A

11    FILMMAKER ON ONE OF THEM, HELP THEM AT ALL TO DECIDE IT ON

12    AN OBJECTIVE BASIS?

13            MR. DIAMOND:  BECAUSE THE JURY NEEDS TO KNOW WHAT

14    MAKES SOMETHING ARTISTIC AND WHAT GIVES --

15            THE COURT:  THEY'RE LOOKING AT THE FILM?  THEY

16    SHOULD LOOK AT THE FILM; THEY SHOULD LOOK AT THE WAY THE

17    FILM WAS SHOT; THEY SHOULD LOOK AT THE LIGHTING; THEY SHOULD

18    LOOK AT ALL THE PRESENTATION -- THE WAY IT IS -- WHICH THEY

19    CAN SEE BY LOOKING AT THE MOVIE.

20            WHAT WAS IN THE MIND OF THE FILMMAKER BEHIND THE

21    LENS IS NOT SOMETHING THAT IS SHOWN ON THE MOVIE.

22            DO YOU HAVE ANY CASE LAW, ANY AUTHORITY WHATSOEVER

23    THAT SAYS UNDER THE THIRD PRONG OF THE MILLER TEST, WHICH ON

24    ITS FACE IS OBJECTIVE STANDARD, THAT SOMEHOW IT IS RELEVANT

25    FOR THE FILMMAKER TO TESTIFY ABOUT HIS INTENTIONS?
```

```
 1           MR. DIAMOND:  I HAVE NO CASE THAT I CAN CITE THAT
 2    SUPPORTS THAT EXACT PROPOSITION, BUT I BELIEVE THAT IS WHAT
 3    THE LAW IS.
 4           THE COURT:  WELL, WHAT DO YOU BASE THAT ON?
 5           MR. DIAMOND:  THE JURY IS BEING ASKED, UNDER THE
 6    MILLER VERSUS CALIFORNIA TEST AND ALSO APPLIED IN THE PARIS
 7    ADULT THEATER CASE TO MAKE A DETERMINATION ON A NUMBER OF
 8    ISSUES, ONE OF WHICH IS DOES THE MOVIE HAVE SERIOUS ARTISTIC
 9    VALUE.
10           THE COURT:  WHETHER A REASONABLE PERSON WOULD FIND
11    THAT IT HAS SERIOUS ARTISTIC VALUE.
12           MR. DIAMOND:  RIGHT.  NOW, SOMETIMES IN OTHER
13    OBSCENITY CASES, EITHER THE PROSECUTION OR THE DEFENSE WILL
14    TRY TO CALL AS A WITNESS SOMEBODY WHO HAS CONDUCTED A SURVEY
15    TO SEE WHAT THE COMMUNITY STANDARD IS.
16           THE COURT:  THAT'S A TOTALLY DIFFERENT --
17           MR. DIAMOND:  I UNDERSTAND THAT.
18           THE COURT:  WELL, YOU'RE MIXING APPLES AND
19    ORANGES.
20           MR. DIAMOND:  WE'RE NOT DOING THAT HERE.
21           THE COURT:  I KNOW, BUT THAT DOESN'T MATTER
22    BECAUSE THAT'S ON A DIFFERENT PRONG.
23           WE'RE TALKING ABOUT -- YOU'RE RIGHT.  YOU'RE NOT
24    DOING THAT.  HE'S NOT PURPORTING TO TESTIFY AS TO COMMUNITY
25    ACCEPTANCE, ALTHOUGH I HAVE SERIOUS CONCERN AS TO WHETHER OR
```

**083**

```
 1   NOT HE'S GETTING IN THROUGH THE BACK DOOR WHAT HE CAN'T GET

 2   IN THROUGH THE FRONT DOOR BY THIS SO-CALLED COMPARISON WITH

 3   THESE EXHIBITS.  BUT BE THAT AS IT MAY, LET'S LEAVE THAT FOR

 4   ANOTHER DISCUSSION.

 5          MY QUESTION TO YOU STILL IS -- I GUESS YOU

 6   ANSWERED THE QUESTION -- IS THAT YOU HAVE NO AUTHORITY TO

 7   SUPPORT THE PROPOSITION THAT, UNDER THE THIRD PRONG OF THE

 8   MILLER TEST, THAT THE FILMMAKER'S SUBJECTIVE INTENT HAS ANY

 9   BEARING ON ANYTHING.

10          MR. DIAMOND:  I HAVE NO CASE THAT SUPPORTS THAT,

11   AND I'M NOT SAYING THAT THAT WOULD BE THE BASIS UPON WHICH

12   WE WOULD ARGUE.  BUT IT IS POSSIBLE THAT THE JURY MIGHT WANT

13   TO KNOW THAT, BUT IT'S ALSO POSSIBLE THE JURY WOULD NOT BE

14   PERMITTED TO CONSIDER THAT IN A JURY INSTRUCTION, AND WE'RE

15   NOT BASING MR. ISAACS' TESTIMONY ON THAT CONCEPT.

16          WE SIMPLY WANTED TO POINT THAT OUT, THAT THE JURY

17   MIGHT WANT TO CONSIDER THAT, IT MIGHT AFFECT IT IN SOME WAY

18   BUT --

19          THE COURT:  THE JURY CAN ONLY CONSIDER THINGS

20   WHICH ARE PROPERLY FOR THEM TO CONSIDER THAT ARE RELEVANT.

21          YOU KNOW, AS A TRIAL LAWYER, JURORS ARE PROBABLY

22   CURIOUS ABOUT A LOT OF THINGS, AND YOU KNOW WE DON'T JUST

23   SAY, "WHY DON'T YOU JUST GO AHEAD AND LET US KNOW WHAT YOU

24   WOULD LIKE TO KNOW, AND WE'LL BE HAPPY TO ANSWER ANY AND ALL

25   QUESTIONS."
```

```
1              EVEN FOR THE -- IF YOU WANT TO CALL IT -- THE MORE

2    ENLIGHTENED VIEW OF JURY TRIALS, THERE'S STILL NOT A

3    WHOLESALE PERMISSION OF THE JURY TO, AT ANY TIME, RAISE

4    THEIR HAND AND ASK A QUESTION AND IT HAS TO BE ANSWERED.

5    ALL OF THAT IS FILTERED THROUGH THE JUDGE AS WELL AS THE

6    LAWYERS SO THAT, IF THEY ASK A RELEVANT QUESTION, THEY CAN

7    HAVE AN ANSWER, BUT IF THEY ASK AN IRRELEVANT QUESTION, THEY

8    DON'T GET THE ANSWER.

9              SO THE MERE FACT THAT THE JURY MAY OR MAY NOT WANT

10   TO HEAR IT CANNOT GUIDE OUR DETERMINATION.  OUR

11   DETERMINATION HAS TO BE GUIDED BY WHAT IS RELEVANT UNDER THE

12   LAW.

13             MR. DIAMOND:  RIGHT.  THE COURTS HAVE RULED OVER

14   AND OVER AGAIN THAT IT IS NOT A REQUIREMENT OF THE

15   GOVERNMENT THAT IT PUT ON AN EXPERT WITNESS ON ANY OF THE

16   ISSUES, BUT THAT DOES NOT MEAN THAT THE DEFENDANT CANNOT --

17             THE COURT:  I AGREE.  I AGREE.

18             MR. DIAMOND:  -- PUT ON AN EXPERT WITNESS.

19             THE COURT:  I AGREE.  BUT, MR. DIAMOND, YOU'RE

20   SORT OF, YOU KNOW, DANCING AROUND WITHOUT BEING ANALYTICALLY

21   RIGOROUS IN TERMS OF -- WITH ALL DUE RESPECT, IN TERMS OF

22   WHAT WE'RE DOING HERE.

23             I DON'T DISAGREE.  THAT THEY DON'T HAVE TO PUT IT

24   ON DOESN'T MEAN YOU CAN'T PUT IT ON.  THAT'S NOT THE POINT.

25             THE POINT IS WHY SHOULD YOU BE ABLE TO PUT IT ON.
```

**085**

```
 1   YOU HAVE TO MAKE THAT SHOWING TO ME.  AND YOU'RE MOVING YOUR
 2   THEORIES QUITE LOOSELY BECAUSE, AT THE ONE MOMENT, YOU'RE
 3   TELLING ME, WELL, THIS EXPERT DAUBERT HEARING MAY ALL BE
 4   IRRELEVANT ANYWAY BECAUSE HE COULD TESTIFY JUST AS A
 5   FILMMAKER, AS A LAYPERSON TO THIS, AS A DEFENDANT; BUT WHAT
 6   I'M DOING IS I'M CHALLENGING WHAT YOU'RE SAYING.
 7        I DON'T THINK, UNLESS YOU GIVE ME SOME AUTHORITY
 8   THAT SAYS A FILMMAKER'S SUBJECTIVE INTENT HAS SOME
 9   RELEVANCE -- IF YOU DO GIVE ME THAT AUTHORITY, THEN I MIGHT
10   SAY OKAY, IF THAT IS RELEVANT, THEN THE JURY SHOULD HEAR
11   ABOUT IT.  AND IF THE JURY IS GOING TO HEAR ABOUT THAT, DOES
12   IT REALLY MATTER WHETHER WE CALL HIM AN "EXPERT" OR JUST A
13   "FILMMAKER."  THEN THAT ARGUMENT HAS MORE FORCE.
14        BUT IT'S A NONSTARTER IF YOU CAN'T GET PAST THE
15   FUNDAMENTAL FIRST STEP, WHICH IS WHAT DIFFERENCE DOES IT
16   MAKE, LEGALLY, WHAT HIS INTENTIONS WERE IN CREATING THE WORK
17   WHICH HE CALLS TO HAVE SERIOUS ARTISTIC VALUE.  IT'S JUST,
18   YOU LOOK AT IT, AND YOU DECIDE ON AN OBJECTIVE BASIS.
19        MR. DIAMOND:  I SUBMIT THAT WE HAVE NO CASE
20   AUTHORITY TO SUPPORT THE PROPOSITION THAT I'VE ADVANCED, BUT
21   WE WANT TO MAKE SURE THAT THIS RECORD IS COMPLETE BY NOTING
22   THAT WE BELIEVE THAT WE OUGHT TO BE ABLE TO DO THAT EVEN
23   THOUGH WE UNDERSTAND THAT, IF THERE'S NO CASE THAT SUPPORTS
24   THAT PROPOSITION, WE'LL DO WITHOUT IT.
25        THE COURT:  YOU HAVE NO AUTHORITY, WHETHER IT'S A
```

**086**

```
1    CASE, STATUTE, POLICY, REASONS -- ANYTHING.

2             MR. DIAMOND:  WELL, I WOULD SAY THAT WE, FIRST OF

3    ALL, BELIEVE THAT THE STAGLIANO CASE IS NOT BINDING ON THIS

4    COURT.  IT'S A SINGLE DISTRICT JUDGE DECISION.

5             THE COURT:  I AGREE.

6             MR. DIAMOND:  AND I BELIEVE, FOR EXAMPLE, THE

7    RULING OF THE COURT THAT THE SANTA BARBARA ART EXPERT WAS

8    NOT EVEN ALLOWED BY THIS DISTRICT COURT OPINION TO TESTIFY,

9    I THINK THAT'S A SERIOUS PROBLEM WITH RESPECT TO THIS

10   DISTRICT COURT OPINION.

11            BUT I ATTEMPTED TO DISTINGUISH IT BY POINTING OUT

12   THAT WE DO HAVE A UNIQUE SITUATION HERE WHERE THE DEFENDANT

13   IS THE OFFERED EXPERT.

14            THE COURT:  BUT I GUESS THAT'S MY QUESTION.  WE'RE

15   GOING AROUND IN CIRCLES, AND I DON'T THINK WE'RE

16   ACCOMPLISHING ANYTHING, MR. DIAMOND.

17            MY QUESTION TO YOU IS THERE'S NO DOUBT THAT A

18   DEFENDANT HAS THE RIGHT TO PUT ON A DEFENSE.  THERE'S NO

19   DOUBT THAT THE DEFENDANT HAS A RIGHT TO TESTIFY IN HIS OWN

20   BEHALF.  GRANTED.  THOSE ARE ABSOLUTELY BEDROCK PRINCIPLES

21   WHICH WE ALL OBSERVE.  BUT JUST BECAUSE SOMEBODY IS A

22   DEFENDANT DOES NOT GIVE HIM LICENSE TO TALK ABOUT OR TESTIFY

23   ABOUT ANYTHING HE WANTS TO.

24            THE DEFENDANT, AS A WITNESS, IS AS CONSTRAINED BY

25   THE RULES OF EVIDENCE AND BY THE CONCEPT OF RELEVANCY AS
```

WELL AS ALL OTHER RULES OF EVIDENCE AS APPLICABLE TO ANY

WITNESS.  I'M SURE YOU'RE NOT PROPOSING THAT, BECAUSE

HE'S A DEFENDANT AND HE HAS A RIGHT TO TESTIFY ON HIS OWN

BEHALF, THAT HE CAN OTHERWISE THEN INTRODUCE ANYTHING THAT'S

NOT OTHERWISE ADMISSIBLE.

      MR. DIAMOND:  IF HE, FOR EXAMPLE, CAME TO THIS

COURT AND THE ISSUE WAS IDENTITY -- LET'S ASSUME IT'S A BANK

ROBBERY CASE.  THE ISSUE WAS IDENTITY.  I DO NOT BELIEVE HE

WOULD BE ABLE TO TESTIFY THAT THE FINGERPRINTS THAT WERE

TAKEN ARE OF NO VALUE BECAUSE FINGERPRINTS HAVE NO

SCIENTIFIC VALUE.  I DON'T BELIEVE HE'D BE ABLE TO TESTIFY

THAT THERE'S NO SUCH THING AS D.N.A.

      THE COURT:  SO YOU AGREE WITH ME THAT WHATEVER A

DEFENDANT WITNESS TESTIFIES ABOUT, HE OR SHE IS NEVERTHELESS

BOUND BY THE RULES OF EVIDENCE.

      MR. DIAMOND:  ABSOLUTELY, ABSOLUTELY.

      THE COURT:  OKAY.  SO HERE IS ALL I'M SAYING:  IF

THAT IS TRUE, THEN WHAT HE PURPORTS TO TESTIFY ABOUT -- THAT

IS, WHAT HIS INTENTIONS WERE IN MAKING THESE FILMS -- NOT

"THESE."  A FILM, ONE FILM, "H.S.A. NO. 7" -- THAT HAS TO

HAVE SOME RELEVANCE, AND THAT'S WHY WE'RE LOOKING AT DOES IT

HAVE ANY RELEVANCE TO THE OBJECTIVE INQUIRY.

      IF YOU HAVE ANY AUTHORITY THAT SUGGESTS THAT IT

IS, I'LL BE MORE THAN HAPPY TO THINK THAT THAT WOULD BE

FINE.  BUT IN THE ABSENCE OF SOME AUTHORITY WHICH APPEARS TO

 1    CONTRADICT WHAT THE LAW SAYS, WHICH IS AN OBJECTIVE

 2    STANDARD, THEN I'M NOT INCLINED TO ALLOW HIM TO TESTIFY TO

 3    THAT WHETHER YOU CALL HIM AN EXPERT OR YOU CALL HIM AS JUST

 4    A DEFENDANT BECAUSE HE'S STILL BOUND BY THE RULES OF

 5    EVIDENCE.

 6            MR. DIAMOND:  WELL, WE'LL CONCEDE, FOR PURPOSES OF

 7    DISCUSSION, THAT IT IS AN OBJECTIVE STANDARD AND DETERMINED,

 8    BASED UPON A REASONABLE PERSON'S STANDARD, IT HAS TO BE

 9    OBJECTIVE.  I BELIEVE THAT MR. ISAACS' TESTIMONY COVERED

10    THAT ADEQUATELY.  IN TERMS OF STRENGTH, OBVIOUSLY, WE DIDN'T

11    HIT A HOME RUN.  HE DIDN'T HIT A HUNDRED PERCENT, BUT I

12    THINK HE HIT 75, 80 PERCENT.

13            THE COURT:  IT'S NOT STRENGTH.  I'M NOT HERE TO

14    JUDGE THE CREDIBILITY, THE BELIEVABILITY OF HIS CONCLUSION.

15    I WANT TO MAKE IT VERY CLEAR.  IT'S NOT WHETHER I BELIEVE

16    HIM.  IF IT WERE A COURT TRIAL, IT WOULD BE DIFFERENT.  IT'S

17    NOT A COURT TRIAL.  THIS IS NOT EVEN A TRIAL.  THIS IS ONLY

18    A DAUBERT HEARING.  PERCENTAGE OF HOW HE DID, THAT'S GOT

19    NOTHING TO DO WITH IT.  IT'S GOT EVERYTHING TO DO WITH

20    METHODOLOGY.

21            BUT BEFORE WE GET ON TO THE SECOND TOPIC OF

22    METHODOLOGY, EVEN BY YOUR OWN ARGUMENT THAT SOMEHOW, AS THE

23    FILMMAKER, HE HAS SOME UNIQUE PERSPECTIVE, WHY WOULD HE BE

24    ABLE TO SAY ANYTHING ABOUT THE OTHER TWO COUNTS?  HE'S NOT

25    THE FILMMAKER.  HE'S ONLY A DISTRIBUTOR MUCH LIKE A

**089**

```
 1   SALESPERSON.

 2          MR. DIAMOND:  THE ARGUMENT WITH RESPECT TO THE

 3   OTHER TWO MOVIES WOULD BE A WEAKER ARGUMENT.  WE HAVE A

 4   STRONGER ARGUMENT, OBVIOUSLY, WITH RESPECT TO THE MOVIE THAT

 5   HE MADE.

 6          THE COURT:  OKAY.

 7          MR. DIAMOND:  AND SO I WOULD CONCEDE THAT OUR

 8   ARGUMENT WOULD BE MORE DIFFICULT TO MAKE WITH RESPECT TO

 9   THE OTHER TWO MOVIES, BUT WE WOULD STILL MAKE IT.  I THINK

10   WE WOULD STILL SURVIVE, BUT IT WOULD BE MORE DIFFICULT.

11          BUT CLEARLY MR. ISAACS' TESTIMONY -- PROPOSED

12   TESTIMONY WOULD MEET THE MINIMUM THRESHOLD THAT WOULD BE

13   REQUIRED UNDER THE DAUBERT CASE FOR PURPOSES OF TESTIMONY

14   WITH RESPECT TO WHETHER A MOVIE HAS SERIOUS ARTISTIC VALUE.

15          THE COURT:  OKAY.  LET'S TALK SPECIFICALLY ABOUT

16   THAT.

17          WHAT ARE HIS QUALIFICATIONS TO DO THIS?

18          MR. DIAMOND:  WELL, WE START WITH HIS EDUCATION.

19   HE WENT TO THE STATE UNIVERSITY OF NEW YORK, AND HE HAS A

20   DEGREE IN COMMUNICATION ARTS, I BELIEVE, IS WHAT HE

21   TESTIFIED TO.  SO WE START WITH THE EDUCATION.

22          AND ACCORDING TO RULE 702 -- AND WE HAVE TO BE

23   GOVERNED BY RULES HERE -- RULE 702 SAYS:

24       "IF A SPECIALIZED KNOWLEDGE WILL ASSIST THE TRIER OF

25        FACT TO UNDERSTAND THE EVIDENCE OR TO DETERMINE A FACT
```

```
 1          IN ISSUE, A WITNESS, QUALIFIED AS AN EXPERT BY

 2          EDUCATION, MAY TESTIFY THERETO IN THE FORM OF AN

 3          OPINION OR OTHERWISE."

 4              SO HE HAS EDUCATION.

 5              BUT BEYOND THAT, HE'S BEEN A FILMMAKER FOR 25

 6  YEARS.  HE'S BEEN DOING THIS SORT OF THING.  HE HAS THE

 7  EXPERIENCE, ESPECIALLY WITH THE PARTICULAR SPECIALIZED

 8  SUBJECT MATTER HERE, WHICH IS SCATOLOGY, AS OPPOSED TO OTHER

 9  TYPES OF MOVIES.

10              SO IT'S NOT JUST EDUCATION FROM THE UNIVERSITY OF

11  NEW YORK, BUT ALSO HE'S GOT THE EXPERIENCE.  HE'S GOT THE

12  KNOWLEDGE.

13              THE COURT:  SO ISN'T THIS A LITTLE BIT OF A

14  SELF-FULFILLING PROPHECY?  I DEAL IN SCATOLOGY; THEREFORE,

15  I'M AN EXPERT IN DETERMINING WHETHER OR NOT IT HAS ANY

16  ARTISTIC VALUE.

17              MR. DIAMOND:  HE HAS EXPERIENCE WITH THE SPECIFIC

18  SUBJECT MATTER, WHICH IS CERTAIN TYPES OF MOVIES OF A

19  CERTAIN NATURE.  HE HAS THE EXPERIENCE.

20              THE COURT:  SO WOULD YOU SAY, THEN, THAT ANYBODY

21  WHO MAKES A FILM THAT IS CHARGED WITH OBSCENITY IS

22  AUTOMATICALLY AN EXPERT?

23              MR. DIAMOND:  NOT AUTOMATIC.  I THINK THERE ARE

24  CERTAIN MINIMUM THINGS THAT HAVE TO BE ESTABLISHED, AND I

25  THINK THAT MR. ISAACS HAS DEMONSTRATED THAT IN HIS
```

**091**

1    TESTIMONY.

2         HE DOES ARTWORK.  HE DOES THE COUPONS FOR THE

3    PIZZA PLACE AND THE LAUNDROMAT AND SOME OF THE OTHER THINGS.

4    SO WE KNOW HE'S NOT JUST MAKING THIS UP.  SO HE HAS ARTISTIC

5    ABILITY; HE'S GOT TRAINING; HE'S GOT EXPERIENCE; HE'S READ

6    ABOUT POSTMODERNISM; HE'S APPLYING THAT TO HIS MOVIES, AND

7    HE'S ATTEMPTING TO ASSIST THE JURY IN AN AREA THAT THE JURY

8    MAY NEED SOME ASSISTANCE IN.

9         THE COURT:  WHY DOES THE JURY NEED ASSISTANCE?  HE

10   SAYS HE THINKS THAT HE'S DOING IT SO THAT HE CAN DISABUSE

11   THE JURY OF THEIR MISTAKEN NOTION ABOUT WHETHER THEY ARE

12   GOING TO BE TURNED OFF BY THIS.  THAT WASN'T HIS PHRASE; BUT

13   IT WAS MORE MY PHRASE.

14        IS THAT THE PROPER OFFICE OF AN EXPERT IN THIS

15   INSTANCE?  I MEAN, HE'S NOT A PSYCHOLOGIST.  SO IS HE TRYING

16   TO ENSURE THAT THEY'RE NOT MISTAKEN PSYCHOLOGICALLY ABOUT

17   THEIR FEELINGS ABOUT THIS SUBJECT MATTER BECAUSE THEIR FIRST

18   REACTION IS GOING TO BE NEGATIVE?  IS THAT WHAT HE'S REALLY

19   TESTIFYING ABOUT?

20        MR. DIAMOND:  NO.  HE'S TESTIFYING AS TO WHETHER

21   OR NOT A REASONABLE, OBJECTIVE PERSON APPLYING AN OBJECTIVE

22   STANDARD COULD CONCLUDE THAT THE MOVIE HAS SERIOUS ARTISTIC

23   VALUE.

24        THE COURT:  OKAY.

25        MR. DIAMOND:  AND THE JURY MAY NOT UNDERSTAND HOW

**092**

```
1    ARTISTS OPERATE, HOW THEY THINK, HOW THEY WORK.  AND
2    MR. ISAACS, AS AN ARTIST AND AS SOMEBODY WHO'S EXPERIENCED
3    IN THIS AREA, IS GIVING THE JURY A UNIQUE PERSPECTIVE,
4    SOMETHING THE JURY MAY NOT KNOW OR HAVE IN ITS POSSESSION.
5    NONE OF THE PROSPECTIVE JURY PANEL MEMBERS OR NONE OF THE
6    JURY MEMBERS MIGHT HAVE ANY EXPERIENCE AT ALL IN THE ART
7    WORLD.
8             AND SO MR. ISAACS, BECAUSE OF HIS EXPERIENCE, CAN
9    CONVEY THAT TO THE JURY IN A WAY THAT I CAN'T DO IT IF,
10   WITHOUT THE EXPERT, I'M LIMITED TO MAKING CLOSING ARGUMENT
11   BECAUSE I'M CONCERNED THAT, IF MR. ISAACS IS NOT PERMITTED
12   TO TESTIFY, ALL WE'LL HAVE LEFT IS LITTLE OLD ME DOING
13   CLOSING ARGUMENT WHERE THE GOVERNMENT IS GOING TO SAY,
14   "WELL, MR. DIAMOND CAN'T MAKE THAT ARGUMENT BECAUSE THERE'S
15   NO EVIDENCE IN THE RECORD TO SUPPORT HIS STATEMENT."  SO --
16            THE COURT:  I DON'T EVEN KNOW WHAT YOUR ARGUMENT
17   IS.  AND TO ME, WHY SHOULDN'T YOU BE ABLE TO MAKE AN
18   ARGUMENT AS TO WHETHER OR NOT A REASONABLE PERSON -- BECAUSE
19   YOU CAN MAKE ARGUMENTS ABOUT WHAT YOU THINK A REASONABLE
20   PERSON WOULD THINK.
21            MR. DIAMOND:  WHY NOT HAVE AN EXPERT WHO KNOWS
22   MORE THAN I TESTIFY AS TO WHAT --
23            THE COURT:  BUT HE'S NOT AN EXPERT REASONABLE
24   PERSON.
25            ARE YOU TRYING TO SUGGEST TO ME THAT HE'S AN
```

**093**

```
 1    EXPERT REASONABLE PERSON?

 2              MR. DIAMOND:  NO, I'M SAYING --

 3              THE COURT:  WELL, SO WHAT THEN?  BECAUSE THE

 4    QUESTION IS NOT WHETHER AN ARTIST OR FILMMAKER THINKS IT HAS

 5    SERIOUS ARTISTIC VALUE.  THE QUESTION IS WHETHER A

 6    REASONABLE PERSON WOULD THINK SO.

 7              SO IF YOU'RE PROFFERING HIM, I SUPPOSE, AS A

 8    REASONABLE PERSON EXPERT -- WHICH I WOULD THINK WOULD BE

 9    HIGHLY IRREGULAR AND VERY, VERY QUESTIONABLE -- THEN AT

10    LEAST YOU CAN LINE UP THE FIT.

11              BUT HERE -- OR IF THE INQUIRY WERE WOULD AN

12    ARTIST, TRAINED ARTIST, THINK THAT IT IS OF SERIOUS ARTISTIC

13    VALUE, THEN YOU'RE RIGHT.  THESE PEOPLE, CHANCES ARE, IN THE

14    JURY BOX -- THEY'RE NOT GOING TO BE ANY KIND OF AN ARTIST.

15    MAYBE SOME OF THEM MIGHT HAVE SOME ART BACKGROUND, BUT

16    THEY'RE NOT EXPERTS.

17              SO YOU HAVE AN EXPERT WHO IS AN ARTIST, ASSUMING

18    HE'S AN EXPERT, ASSUMING HE HAS QUALIFICATIONS, FINE.  THEN

19    AT LEAST YOU HAVE YOU A FIT.

20              HERE, UNLESS YOU'RE PROFFERING HIM AS A REASONABLE

21    PERSON EXPERT, WHERE'S THE FIT?

22              MR. DIAMOND:  WE'RE PROFFERING HIM AS AN EXPERT ON

23    WHETHER OR NOT THE MOVIE IN QUESTION HAS SERIOUS ARTISTIC

24    VALUE.

25              THE COURT:  OKAY.  I UNDERSTAND WHAT YOU'RE
```

**094**

```
 1    PROFFERING HIM FOR.  I'M JUST --

 2              MR. DIAMOND:  I UNDERSTAND.

 3              THE COURT:  LET ME MOVE ON THEN.

 4              WHAT ABOUT HIS METHODOLOGY?  THAT'S THE LAST AREA

 5    THAT WE CAN TALK ABOUT BEFORE I GIVE MR. GRANT AN

 6    OPPORTUNITY ALSO.

 7              WHAT ABOUT THE METHODOLOGY?  WHAT METHODOLOGY WERE

 8    YOU ABLE TO GLEAN AND PERHAPS ARTICULATE FOR ME FROM YOUR

 9    CLIENT'S TESTIMONY AS TO HOW IT IS THAT HE WOULD GO ABOUT

10    DECIDING WHETHER THIS DEPICTION IS OF SERIOUS VALUE OR

11    WHETHER THIS DEPICTION IS OF SERIOUS VALUE OR NOT.

12              MR. DIAMOND:  WELL, HE TESTIFIED -- AND THE COURT

13    OBVIOUSLY HEARD HIS TESTIMONY -- THAT THE QUESTION OF

14    WHETHER THE MOVIE HAS SERIOUS ARTISTIC VALUE DEPENDS, TO

15    SOME EXTENT, ON WHETHER OR NOT PEOPLE ARE HAVING A

16    DISCUSSION, WHETHER IT PROVOKES PEOPLE TO HAVE THOUGHTFUL

17    DISCUSSION AND ANALYSIS OF THE MOVIES IN QUESTION.  AND SO

18    THAT IS PART OF HIS METHODOLOGY.  THAT'S NOT THE ONLY PART,

19    BUT THAT WAS ONE PART.

20              THE COURT:  WHAT ELSE?  THAT'S THE ONLY PART I

21    HEARD.  WE WENT AROUND AND AROUND AND AROUND A LOT, AND

22    MR. ISAACS, I THINK WAS VERY FORTHRIGHT, ACTUALLY.  I THINK

23    WHAT HE DID SAY WAS VERY FORTHRIGHT BECAUSE HE WAS TRYING TO

24    ANSWER THE QUESTION THE BEST HE CAN.  I SUGGEST THAT HE WAS

25    HAVING SOME DIFFICULTY, NOT BECAUSE HE WAS TRYING TO BE LESS
```

**095**

```
1   THAN FORTHRIGHT WITH ME, NOT AT ALL.  I DON'T THINK HE'S
2   THAT WAY AT ALL.  I JUST THINK THERE'S A SERIOUS QUESTION AS
3   TO WHETHER OR NOT THERE IS ANY METHODOLOGY AT ALL TO THIS
4   OTHER THAN THE CONCLUSION.
5        MR. DIAMOND:  WELL, I THINK THAT THE CONCEPT OF
6   METHODOLOGY DIFFERS FROM SUBJECT MATTER TO SUBJECT MATTER.
7        THE COURT:  I AGREE WITH THAT, TOO.
8        MR. DIAMOND:  SO, I MEAN, TO DETERMINE
9   ASTRONOMICAL ISSUES OR TO DETERMINE PHYSICS ISSUES OR
10  CHEMISTRY ISSUES OR MATHEMATICS, WE HAVE DIFFERENT TYPES OF
11  METHODOLOGY.  BUT FOR SOMETHING LIKE WHETHER MATERIAL HAS
12  ARTISTIC VALUE, I DON'T KNOW WHETHER OR NOT THE METHODOLOGY
13  CONCEPT EVEN REALLY APPLIES TO THIS SITUATION.
14       I SUPPOSE YOU COULD ARGUE OR SUGGEST THAT HE HAS
15  TO TAKE A SURVEY OF PEOPLE AND ASK A THOUSAND PEOPLE WHAT IS
16  THEIR OPINION ABOUT WHETHER SOMETHING HAS SERIOUS ARTISTIC
17  VALUE, BUT I DON'T THINK THAT'S THE ONLY WAY TO ESTABLISH
18  THE POINT.
19       I THINK YOU CAN DO IT IN OTHER METHODS, AND THIS
20  WAS THE METHOD THAT MR. ISAACS OFFERED THE COURT.
21       THE COURT:  OKAY.
22       MR. DIAMOND:  WE'RE NOT, AGAIN, DEALING WITH
23  SCIENCE OR MATHEMATICS OR PHYSICS OR CHEMISTRY.
24       THE COURT:  MR. DIAMOND, I ABSOLUTELY AGREE WITH
25  THAT STATEMENT, AS FAR AS IT GOES.  IT'S A FLEXIBLE CONCEPT,
```

**096**

```
 1    DAUBERT IS A VERY FLEXIBLE FRAMEWORK FOR ME TO PERFORM MY

 2    DUTY AS A GATEKEEPER.  I UNDERSTAND THAT.  NOBODY IS

 3    SUGGESTING -- AND I TOLD MR. ISAACS WHEN HE WAS ON THE

 4    STAND.  I'M NOT LOOKING FOR THE KIND OF RIGOROUS SCIENCE

 5    THAT ONE WOULD EXPECT FROM HARD SCIENCE SUBJECTS --

 6    MATHEMATICS, PHYSICS, CHEMISTRY, WHATEVER.

 7             I UNDERSTAND FROM KUMHO VERSUS CARMICHAEL THAT YOU

 8    HAVE TO ADJUST THE LEVEL OF INQUIRY TO THE SUBJECT OF THE

 9    EXPERT OPINION BEING PROFFERED.  I UNDERSTAND THAT.

10             SO IF YOU'RE TALKING ABOUT PSYCHIATRY, YOU'RE

11    TALKING ABOUT INTERNAL MEDICINE, DIAGNOSTIC TECHNIQUES OF

12    DOCTORS, YOU TALK ABOUT ENGINEERING, OR YOU TALK ABOUT HARD

13    SCIENCE -- IT'S ALL GOING TO BE VARIABLE AND FLEXIBLE TO

14    SUIT THE PROPER CIRCUMSTANCES.  I DON'T DISAGREE WITH THAT.

15             BUT I DO DISAGREE TO THE EXTENT THAT YOU MAY

16    SUGGEST THAT SOMEHOW METHODOLOGY IS WAIVED IN TERMS OF

17    DISCUSSION OF THE KIND THAT WE'RE HAVING.  I DON'T BELIEVE

18    THAT'S SUPPORTED BY ANY LAW.

19             I BELIEVE THAT THE CASE LAW IS TO THE CONTRARY,

20    THAT IT IS REQUIRED, A CERTAIN LEVEL OF RELIABILITY OF SOME

21    METHODOLOGY IS REQUIRED FOR ANY KIND OF EXPERT.  OTHERWISE,

22    THEN, IT'S JUST SORT OF LIKE A BLACK BOX SYNDROME.

23             YOU KNOW, I JUST SAY, "I'M GOING TO SAY THIS IS

24    THAT.  I'M GOING TO SAY THAT IS THAT.  I'M GOING TO SAY THAT

25    IS THAT," AND THAT'S IT.  YOU KNOW, I'M AN EXPERT; I CAN SAY
```

**097**

```
 1    IT.  THAT'S NOT THE LAW.

 2           SO IN ANY EVENT.  OKAY.  LET ME GIVE MR. GRANT AN

 3    OPPORTUNITY, AND IF YOU HAVE SOME CONCLUDING REMARKS,

 4    BRIEFLY, I'LL LET YOU DO THAT AFTER HE HAS A CHANCE.

 5           MR. DIAMOND:  THANK YOU, YOUR HONOR.

 6           THE COURT:  THANK YOU VERY MUCH.

 7           MR. GRANT:  THANK YOU, YOUR HONOR.

 8           THE COURT:  WELL, LET ME FIRST ASK YOU, MR. GRANT,

 9    DO YOU AGREE WITH MR. DIAMOND THAT, EVEN IF MR. ISAACS WERE

10    NOT TESTIFYING AS AN EXPERT BUT HE WERE CALLED AS A  LAY

11    WITNESS/DEFENDANT WHO HAPPENED TO BE THE FILMMAKER, THAT HE

12    SHOULD BE ABLE TO, AS JUST A DEFENDANT/WITNESS, TESTIFY AS

13    TO WHAT HE WAS TRYING TO ACHIEVE FROM HIS MAKING OF AT LEAST

14    THIS ONE FILM, BECAUSE HE DIDN'T MAKE THE OTHERS -- BUT THIS

15    ONE FILM, "H.S.A. NO. 7"?

16           MR. GRANT:  NO, YOUR HONOR, NOT AT ALL.

17           ACTUALLY, THE INTENT OF MR. ISAACS IS OF NO

18    CONSEQUENCE TO THIS ISSUE.  IT'S AN OBJECTIVE STANDARD UNDER

19    THE THIRD PRONG OF MILLER, AND SO WHETHER OR NOT HE

20    TESTIFIES UNDER THE GUISE OF AN EXPERT, UNDER 702, OR THE

21    GUISE OF A LAY WITNESS, UNDER 701, IT'S NOT RELEVANT.

22    THERE'S ABSOLUTELY NO PROBATIVE VALUE TO THAT UNDER 403, AND

23    IT WOULD NOT HELP THE JURY IN ANY WAY COME TO THE CONCLUSION

24    OF WHETHER OR NOT THESE FILMS ARE OBSCENE.

25           THE COURT:  ALL RIGHT.  WHY DON'T YOU ALSO ADDRESS
```

1   HIS QUALIFICATIONS AND YOUR VIEW ON IT IN LIGHT OF THE

2   TESTIMONY, HIS METHODOLOGY -- YOUR VIEW OF IT IN LIGHT OF

3   HIS TESTIMONY AND WHATEVER RELEVANCE OR FIT THAT YOU SEE MAY

4   OR MAY NOT BE THERE.

5            MR. GRANT:  THANK YOU, YOUR HONOR.  I'LL DO JUST

6   THAT, AND I'LL START WITH THE QUALIFICATIONS, IF IT PLEASES

7   THE COURT.

8            THE COURT:  YES.

9            MR. GRANT:  I DON'T BELIEVE THAT THE DEFENSE HAS

10  MET THEIR BURDEN IN ANY WAY TO SHOW EVEN INITIALLY THAT

11  MR. ISAACS IS QUALIFIED TO TESTIFY TO THE THIRD PRONG OF THE

12  MILLER TEST, WHETHER OR NOT THERE'S SERIOUS ARTISTIC VALUE

13  TO THE CHARGED FILMS.

14           MR. DIAMOND BRIEFLY SPOKE ABOUT THE DEFENDANT'S

15  EDUCATION, AND I JUST POINT OUT TO THE COURT, THE ONLY

16  EVIDENCE THAT IS IN FRONT OF THIS COURT IS THAT MR. ISAACS

17  RECEIVED A DEGREE IN 1977 ON COMMUNICATIONS ART.

18           THE QUESTION, I BELIEVE, WAS ASKED BY THE COURT ON

19  WHETHER OR NOT HE HAD A DEGREE IN ART HISTORY.  THE ANSWER

20  WAS NO.  THERE'S REALLY NO SUBSTANCE TO WHAT SORT OF COURSES

21  HE TOOK OR THE FOCUS OF THE PROGRAM THAT HE WAS INVOLVED IN.

22           SO I THINK IN REGARDS TO EDUCATION, THERE'S REALLY

23  NOTHING THAT'S BEEN PROVIDED TO THIS COURT THAT WOULD ASSIST

24  THE COURT IN DECIDING WHETHER OR NOT MR. ISAACS IS QUALIFIED

25  TO GIVE AN OPINION IN THIS AREA.

```
 1              REGARDING ANY SORT OF SPECIALIZED TRAINING, AGAIN,
 2    I THINK THE QUESTION WAS ASKED OF MR. ISAACS, AND THERE
 3    REALLY IS NO SPECIALIZED TRAINING.  IT SEEMS FROM, AT LEAST
 4    THE EVIDENCE IN FRONT OF THIS COURT, THAT MR. ISAACS HAS
 5    READ A BOOK OR TWO, HE'S GONE ONLINE AND READ SOME BLOGS,
 6    AND KIND OF RESEARCHED THE HISTORY OF ART, AT LEAST SOME
 7    ASPECT OF THE HISTORY OF ART.
 8              BUT THERE'S NOTHING THAT'S BEEN PROVIDED THAT
 9    WOULD SUGGEST THAT HE'S FOCUSED ANY TRAINING THAT HE MAY
10    HAVE RECEIVED ON HOW TO EVALUATE SERIOUS ARTISTIC VALUE IN
11    SOMETHING THAT MAY BE DETERMINED TO BE A PIECE OF ART OR AN
12    EXHIBIT OF SOME SORT.  SO I DON'T EVEN THINK THAT THERE'S
13    ANY IDEA THAT THERE'S SPECIALIZED TRAINING.
14              I THINK WHERE THE DEFENSE IS TRYING TO HANG THEIR
15    HAT IS ON MR. ISAACS' EXPERIENCE, AND THE QUESTIONS THAT I
16    PUT FORTH ON EXAMINATION WERE TRYING TO SHOW HOW THAT SORT
17    OF PROFFER IS NOT EXACTLY FITTING TO WHAT THE TESTIMONY IS
18    GOING TO BE.
19              I'D LIKE TO FOCUS, FOR EXAMPLE, ON THE ADVERTISING
20    AGENCY.  I THINK YOU'LL SEE FROM THE EXHIBITS THAT THE
21    GOVERNMENT PUT FORWARD, SIR, THAT WHAT WE'RE TALKING ABOUT
22    HERE IS MAYBE 20-PLUS YEARS OF ADVERTISING EXPERIENCE WHERE
23    HE BUILT FLYERS OR SOME SORT OF MARKETING TOOL TO HELP
24    BUSINESSES GENERATE REVENUE.  WE'RE TALKING ABOUT COUPONS.
25              IF YOU'RE GOING TO LOOK AT COMPARABLES THERE,
```

**100**

1    THERE'S REALLY NOTHING COMPARABLE, AT LEAST THAT'S BEEN

2    PRESENTED ON THE RECORD, THAT WOULD SUGGEST THAT THAT'S

3    COMPARABLE TO BEING ABLE TO LOOK AT A FILM THAT HAS

4    SCATOLOGICAL, YOU KNOW, UNDERTONES OR, YOU KNOW, WE'RE

5    TALKING DIRECTLY ABOUT SEX ACTS WITH WOMEN INVOLVING FECES,

6    ET CETERA.

7         THERE'S NOTHING ABOUT THAT ADVERTISING AGENCY THAT

8    WOULD SUGGEST OR LEND ITSELF TO HELPING MR. ISAACS COME TO A

9    CONCLUSION ON WHETHER OR NOT THERE'S SERIOUS ARTISTIC VALUE.

10   SO I WOULD JUST OFFER THAT IT'S REALLY IRRELEVANT TO THIS

11   ISSUE AT HAND.

12        NOW, THERE WAS ALSO THIS DISCUSSION ABOUT THE

13   VIDEOS AND THE FACT THAT MR. ISAACS HAS SPENT TEN YEARS IN

14   THIS SCATOLOGICAL ARENA, MAKING THESE 39 OR MAYBE MORE

15   VIDEOS.

16        AGAIN, I THINK THE ONLY THING THAT THAT TENDS TO

17   PROVE IS THAT HE MAY HAVE SOME EXPERIENCE IN HOW TO MAKE A

18   VIDEO THAT HE CAN PUT ON THE INTERNET AND SELL.  I MEAN,

19   THAT'S REALLY WHAT IT COMES DOWN TO.

20        I THINK IT'S SORT OF CIRCULAR TO SAY, "OH, WELL,

21   BECAUSE I MAKE THE VIDEOS, WELL, THEN, I'M DE FACTO AN

22   EXPERT ON WHETHER OR NOT THIS HAS SERIOUS ARTISTIC VALUE."

23        I MEAN, THERE'S BEEN NO EVIDENCE, YOUR HONOR,

24   PRESENTED THAT, WHEN MR. ISAACS MADE THESE FILMS, HIS

25   INTENT WAS TO GO OUT THERE AND GENERATE AND SAY, YOU KNOW,

**101**

```
 1   PART OF WHAT HE LOOKS AT IS IF PEOPLE ENGAGE HIS WORK.  I

 2   MEAN, THERE'S JUST NO EVIDENCE OF THAT.

 3            THE LITTLE BIT OF EVIDENCE OF THAT THAT'S COME OUT

 4   IN TESTIMONY WAS ACTUALLY THAT POST-INDICTMENT THERE'S BEEN

 5   SOME DISCUSSIONS ABOUT THE CASE.

 6            SO I THINK THAT IT'S SORT OF CONCLUSORY THAT

 7   THERE'S REALLY -- JUST THE FACT THAT HE MAKES THE VIDEOS IN

 8   AND OF THEMSELVES JUST DOES NOT, IN ANY WAY, MAKE HIM AN

 9   EXPERT OR GIVE HIM THE QUALIFICATIONS TO TESTIFY IN THIS

10   ARENA.

11            I'D ALSO JUST LIKE TO BRIEFLY POINT OUT, YOUR

12   HONOR, THAT I THINK IT'S IMPORTANT TO AT LEAST NOTE THAT,

13   YOU KNOW, MR. ISAACS ISN'T RECOGNIZED IN ANY AREA AS AN

14   EXPERT.  AND I KNOW THAT'S NOT DETERMINATIVE, BUT I THINK IT

15   DOES AT LEAST GO TO THE IDEA THAT -- I MEAN, WE'RE TALKING

16   ABOUT A CASE WHERE HE SITS AS A DEFENDANT AS THE FIRST CASE

17   AND THE ONLY CASE WHERE HE'S TRIED OR EVEN ATTEMPTED TO

18   QUALIFY AS A EXPERT IN ANY AREA.  I'D JUST LIKE TO BRING

19   THAT TO THE COURT'S ATTENTION.

20            THEN, KNOWLEDGE.  I MEAN, I'M SOMEWHAT CONFUSED ON

21   THAT.  BUT IT SEEMS AS IF THE KNOWLEDGE BASE IS LOOKING AT

22   THESE COMPARABLES AND SORT OF HIS GOING ONLINE AND READING

23   BOOKS ABOUT SORT OF THE HISTORY OF ART IN GENERAL.  AND I

24   WOULD POINT OUT, YOUR HONOR, THAT IT'S THE GOVERNMENT'S

25   POSITION THAT THIS IS AN ATTEMPT BY THE DEFENSE TO SORT OF
```

**102**

1    SMUGGLE IN THESE COMPARABLES -- WHAT THEY CALL

2    "COMPARABLES," AND NOT MEET THE WOMACK TEST WHICH HAS BEEN

3    ADOPTED IN THIS CIRCUIT THROUGH PINKUS.

4            I MEAN, INITIALLY, WHAT WE HAVE TO SHOW AS FAR AS

5    COMPARABLES GO IS THAT THERE ARE MATTERS THAT ARE SIMILAR IN

6    NATURE.

7            AND I THINK THAT THE QUESTIONS THAT I ENDED WITH,

8    YOUR HONOR, MADE IT VERY CLEAR THAT THESE PIECES OF ART,

9    ALTHOUGH THERE MAY HAVE BEEN IN HISTORY SOME DISCUSSION

10   ABOUT THEIR VALUE, THEY'RE JUST NOT AT ALL COMPARABLE TO

11   WHAT WE'RE DEALING WITH IN THIS ARENA, IN THESE CHARGED

12   FILMS.  IT'S JUST NOT.  I MEAN, IT'S REALLY JUST APPLES AND

13   ORANGES.

14           THE COURT:  BUT ARE YOU SAYING THAT IT SHOULD NOT

15   BE ADMITTED AS COMPARABLE FOR PURPOSES OF THE SECOND PRONG,

16   WHICH I WOULD AGREE WITH YOU, AND PREVIOUSLY, BEFORE YOU

17   CAME INTO THE CASE, I HAD EXCLUDED CERTAIN ATTEMPTS TO

18   INTRODUCE SO-CALLED COMPARABLES BECAUSE IT DID NOT MEET THE

19   NINTH CIRCUIT TEST AS LAST FORMULATED OR ARTICULATED IN

20   PINKUS.

21           I GUESS, IN THIS INSTANCE, WHAT HE'S PURPORTING TO

22   SAY IS NOT THAT THESE ARE COMPARABLE SO THAT IT TENDS TO

23   SHOW COMMUNITY ACCEPTANCE, OR MORE PRECISELY, THE FLIPSIDE

24   OF THAT, THAT THE STANDARD OF THE RELEVANT COMMUNITY WOULD

25   NOT REGARD THIS AS A DEPICTION THAT IS PATENTLY OFFENSIVE.

**103**

```
 1            I GUESS THE NOTION IS IF IT'S ACCEPTABLE TO THE

 2   COMMUNITY -- NOT JUST AVAILABLE BUT ACCEPTABLE TO THE

 3   COMMUNITY, THEN THE COMMUNITY IS NOT GOING TO VIEW IT AS

 4   PATENTLY OFFENSIVE.

 5            BUT WE'RE NOT TALKING ABOUT THAT ELEMENT.  WE'RE

 6   TALKING ABOUT THE THIRD ELEMENT OF MILLER, AS TO WHETHER OR

 7   NOT THAT HAS ANY SERIOUS ARTISTIC VALUE.

 8            WOULD MR. DIAMOND, REGARDLESS OF THIS TESTIMONY BY

 9   MR. ISAACS AS A PURPORTED EXPERT, NEVERTHELESS BE ABLE TO

10   INDEPENDENTLY INTRODUCE THAT SO THAT A JURY, IN ASSESSING A

11   REASONABLE PERSON'S FINDING AS TO WHETHER THIS IS OF SERIOUS

12   ARTISTIC VALUE, CAN LOOK AT IT AND SAY, "OKAY, HERE ARE

13   OTHER THINGS THAT EVIDENTLY HAVE HAD SOME ARTISTIC VALUE"?

14            I MEAN, MAYBE THE PAINTING, MAYBE THE SCULPTURE,

15   MAYBE THIS CAN OF ARTIST FECES THAT SUPPOSEDLY HAS GONE NOT

16   ONLY IN THE MUSEUM BUT HAS GONE UP IN PRICE AND THERE'S

17   SOME -- WHATEVER IT IS.  WOULD HE NOT BE ABLE TO DO THAT

18   INDEPENDENT OF ANY TESTIMONY?

19            MR. GRANT:  WELL, YOUR HONOR, I THINK THAT IT

20   WOULD DEPEND ON THE WORK OF ART OR THE EXHIBIT BECAUSE I

21   THINK THAT IT WOULD HAVE TO, AT A MINIMUM, SHOW THAT THERE'S

22   SOME PROBATIVE VALUE TO PROVIDING THIS EVIDENCE TO THE JURY.

23            I MEAN, IF THEY'RE NOT AT ALL SIMILAR AND,

24   THEREFORE, NOT RELEVANT, I MEAN, I THINK IT WOULD JUST BE A

25   BASIC 403 ARGUMENT.  RIGHT.  THERE'S NO PROBATIVE VALUE.  I
```

**104**

```
 1   MEAN, THE PREJUDICE -- ACTUALLY, IT'S NOT EVEN A

 2   PREJUDICE ARGUMENT, YOUR HONOR.  IT'S BASICALLY CONFUSING

 3   THE ISSUES.

 4          I MEAN, IF I WAS TO JUST DRAW A LINE ON THE PAPER

 5   OR MR. DIAMOND SAID, "LOOK, THIS IS SOMETHING THAT HAS

 6   SERIOUS ARTISTIC VALUE," I MEAN, I DON'T KNOW.  IT WOULD BE

 7   CONFUSING TO ME AS A JUROR TO SAY, WELL, HOW DOES THIS AT

 8   ALL RELATE TO A FILM WHERE --

 9          THE COURT:  SLOW DOWN.

10          MR. GRANT:  I'M SORRY.  PARDON ME.

11          HOW DOES IT RELATE TO A FILM WHERE A FEMALE IS,

12   YOU KNOW, ORALLY COPULATING A HORSE?  I MEAN, IT JUST SEEMS

13   LIKE IT WOULD BE A WASTE OF TIME AND CONFUSING.

14          AND THAT'S WHAT I WAS TRYING TO GET AT WITH MY

15   QUESTIONS, YOUR HONOR.  EVEN THOUGH WE'RE NOT TALKING ABOUT

16   THE SECOND PRONG, THERE STILL NEEDS TO BE, JUST UNDER THE

17   BASIC RELEVANCY 403 ARGUMENT, THAT THEY HAVE TO BE

18   COMPARABLE IN SOME WAY, JUST SOMETHING AT ALL.

19          I MEAN, FOR EXAMPLE, "THE FOUNTAIN," JUST AS AN

20   EXAMPLE.  I MEAN, LOOK, I'M CERTAINLY NOT GOING TO DEBATE

21   MR. ISAACS ON THE HISTORY OF THAT PIECE, DUCHAMP.  I'M NOT

22   GOING TO, YOU KNOW, AND THE EXHIBIT.  I WON'T DO THAT.

23          BUT I THINK IT'S VERY CLEAR, WHEN YOU LOOK AT THE

24   QUESTIONS I ASKED AND THEN WHAT WAS PROVIDED IN THE

25   PLEADING -- AND WE'RE TALKING ABOUT APPLES AND ORANGES.
```

**105**

```
 1              WE'RE TALKING ABOUT A URINAL THAT JUST SITS THERE,

 2    A WHITE URINAL WITH A SIGNATURE ON IT, AND THEN WE'RE

 3    TALKING ABOUT THESE VIDEOS.  I MEAN, I JUST DON'T SEE ANY

 4    RELEVANCE TO THAT.

 5              SO TO ANSWER YOUR QUESTION, IF MR. DIAMOND CAN

 6    SHOW SOMETHING THAT HE CHOOSES TO OFFER, IF HE CAN LAY A

 7    FOUNDATION THAT THIS IS RELEVANT AND WOULD ASSIST THE JURY

 8    IN MAKING ITS DETERMINATION UNDER THE OBJECTIVE, REASONABLE

 9    PERSON PRONG, THE THIRD PRONG OF MILLER, THEN IT WOULD BE

10    TOTALLY ACCEPTABLE.

11              THE COURT:  WELL, WHAT ABOUT "THE TRAIL"?

12              MR. GRANT:  YES, SIR.

13              I MEAN, AGAIN, I THINK "THE TRAIL" IS ALSO -- I

14    THINK IF YOU JUST LOOK AT IT JUST VERY QUICKLY, YOU KNOW,

15    YOU'VE GOT A SCULPTURE OF A WOMAN, A WOMAN'S BODY ON ALL

16    FOURS AND THIS, YOU KNOW, FECES COMING OUT.  I ALSO DON'T

17    BELIEVE THAT THAT'S SIMILAR.  IF YOU REALLY GET INTO IT,

18    IT'S NOT SIMILAR.

19              THE COURT:  HOW SIMILAR DOES IT HAVE TO BE BEFORE

20    MR. DIAMOND CAN PUT THAT ON AS EVIDENCE SO THAT HE CAN ARGUE

21    THAT, LOOK, IF THIS THING IS IN A MUSEUM AND IT'S LOOKED

22    UPON AS A WORK OF ART, THAT THESE THREE FILMS YOU SHOULD

23    FIND, AS REASONABLE PEOPLE, ALSO TO HAVE SERIOUS ARTISTIC

24    VALUE?

25              MR. GRANT:  GOOD QUESTION, YOUR HONOR.
```

**106**

```
 1              I THINK AND, YOU KNOW, OFF THE TOP OF MY HEAD, THE
 2    FIRST THING THAT POPS INTO MY HEAD IS THAT, YOU KNOW, WE'RE
 3    DEALING WITH FILMS.  WE'RE NOT TALKING ABOUT THE FACT THAT
 4    THIS IS FILM, YOU KNOW -- FOR EXAMPLE, "H.S.A. NO. 7."
 5    WE'RE NOT HERE TODAY BECAUSE THIS FILM HAS FECES IN IT.
 6              WE'RE HERE TODAY BECAUSE WE HAVE A PATENTLY
 7    OFFENSIVE SEXUAL ACT.  OKAY.  AND THAT'S THE COMBINATION OF
 8    THE URINE AND THE FECES AND THE SEXUAL --
 9              THE COURT:  WOULD WE BE HERE IF URINE AND FECES
10    WERE NOT INVOLVED IN "H.S.A. NO. 7"?
11              MR. GRANT:  I DON'T KNOW IF I CAN ANSWER THAT.
12    I'M NOT SURE ABOUT THAT, SIR.
13              I MEAN, THE FIRST THING I THINK IS THAT, YOU KNOW,
14    AGAIN, UNDER THE MILLER TEST WE HAVE TO PROVE THAT IT'S A
15    PATENTLY OFFENSIVE SEXUAL ACT.
16              THE COURT:  BUT DON'T YOU THINK IT'S INHERENTLY
17    PART OF THE -- IT'S AS A WHOLE.  WE'RE NOT DISSECTING IT.
18    WE HAVE TO LOOK AT THE FILM AS A WHOLE.
19              MR. GRANT:  YES, SIR.
20              THE COURT:  SO IT SEEMS TO ME THAT IF IT WERE --
21    AND I DON'T REMEMBER EXACTLY.  I KNOW YOU HAVE BEEN HELPFUL
22    IN YOUR FILINGS IN TERMS OF AT LEAST DESCRIBING THE GENERAL
23    SCENES OF THESE FILMS.  BUT ASSUMING IT HAD SHOWED SCENES OF
24    ORAL COPULATION OF A WOMAN WITH A MALE PERSON'S PENIS, BUT
25    IF IT WERE NOT SOMETHING WHERE URINE OR FECES OR VOMIT WERE
```

**107**

```
1   INVOLVED, DO YOU THINK THAT THERE WOULD EVEN BE A CASE HERE?
2           MR. GRANT:  SIR, I TRULY CANNOT ANSWER THAT
3   ENTIRELY.
4           I THINK THAT WHAT SHOCKS, YOU KNOW, WHAT MAKES IT
5   PATENTLY OFFENSIVE, AT LEAST IN MY OPINION, WOULD BE THAT
6   WE'RE DEALING WITH A COMBINATION OF ALL OF THESE THINGS.
7   WE'RE TAKING A SEXUAL ACT WITH THE --
8           THE COURT:  I THINK THAT'S RIGHT.
9           MR. GRANT:  YES, SIR.
10          THE COURT:  THAT'S RIGHT.  SO WE CAN'T SAY THAT
11  THE PRESENCE OF URINE, FECES, OR VOMIT DOESN'T MAKE ANY
12  DIFFERENCE.
13          MR. GRANT:  THAT'S RIGHT.  YES, YOUR HONOR.
14          THE COURT:  AND SO DO WE HAVE TO HAVE ALL OF THAT
15  COMBINATION?
16          IN OTHER WORDS, IN ORDER TO BE COMPARABLE, DO WE
17  NOT ONLY HAVE TO HAVE THE SUBJECT OF FECES AND THE PRESENCE
18  OF FECES AND URINE, BUT ALSO A SEX ACT OF SOME SORT BEFORE
19  YOU THINK THAT THERE IS SOME SUFFICIENT COMPARABILITY FOR
20  PURPOSES OF THE THIRD PRONG -- FORGET FOR PURPOSES OF THE
21  SECOND PRONG BECAUSE THAT'S NOT GOING TO COME IN, BUT FOR
22  PURPOSES OF THIRD PRONG?
23          MR. GRANT:  I BELIEVE SO.  YES, YOUR HONOR.
24          THE COURT:  NOTHING SHORT OF ALL OF THE ELEMENTS
25  WOULD BE SUFFICIENT TO COMPARE FOR PURPOSES OF DETERMINING
```

**108**

```
 1   WHETHER OR NOT THIS IS OR IS NOT OF ANY SERIOUS ARTISTIC

 2   VALUE.

 3          MR. GRANT:  WELL, YOUR HONOR, I CAN'T THINK OF

 4   ANYTHING RIGHT OFF THE TOP OF MY HEAD, BUT I THINK THAT IF

 5   WE'RE GOING TO TALK ABOUT COMPARABLES AND THE MATTERS ARE

 6   SIMILAR, THEN WE NEED TO HAVE THOSE SIMILAR ELEMENTS.

 7          BUT YOU KNOW, YOUR HONOR, I DON'T THINK WE EVEN

 8   GET THERE IN REGARDS TO -- I MEAN, I DON'T EVEN THINK IT'S A

 9   CLOSE CALL IN REGARDS TO WHAT THE DEFENDANT HAS OFFERED IN

10   HIS PLEADING AND DISCUSSED ON THE STAND TODAY.  I MEAN,

11   THERE WAS NOT ONE OF THOSE WHAT HE CALLS "COMPARABLES" THAT

12   DEALT WITH ANY SEX ACT, THAT DEALT WITH ANYTHING --

13          I MEAN, YES, WE HAD "THE CAN" AND "THE TRAIL" THAT

14   HAD FECES IN IT.  BUT BESIDES THAT, THERE'S JUST ABSOLUTELY

15   NOTHING THAT WOULD BE COMPARABLE TO THE FILMS WE'RE DEALING

16   WITH.  WE'RE NOT EVEN TO THE POINT WHERE THERE'S AT LEAST A

17   SEX ACT.  YOU KNOW, WE'RE NOT EVEN AT THAT CLOSE LINE,

18   YOUR HONOR.

19          AND THAT WAS THE PURPOSE OF THE QUESTIONS THAT I

20   ASKED MR. ISAACS AT THE END WAS JUST TO SHOW THAT, ALTHOUGH

21   THAT'S AN INTERESTING ART HISTORY LESSON ABOUT WHAT MIGHT BE

22   POST-MODERN ART AND THE EVOLUTION OF IT, IT REALLY DOESN'T

23   OFFER ANY -- IT HAS NO SIGNIFICANCE TO US IN THIS TRIAL

24   BECAUSE IT HAS NO CONNECTION TO THE SCATOLOGICAL MOVIES

25   WE'RE TALKING ABOUT OR THE BESTIALITY FILM.
```

**109**

```
1              THE COURT:  OKAY.  WHAT ABOUT METHODOLOGY THEN?
2    WHY DON'T YOU ADDRESS THAT, AND THEN WE'LL HAVE MR. DIAMOND
3    RESPOND, IF HE HAS ANYTHING.
4              MR. GRANT:  YOU KNOW, YOUR HONOR, I THOUGHT I HAD
5    AN ARGUMENT FOR THIS PRIOR TO TODAY, AND THEN IT GOT A
6    LITTLE EVEN MORE CONFUSING FOR ME AS I SAT HERE LISTENING TO
7    THE TESTIMONY.
8              REALLY, WHAT IT SEEMS FROM THE TESTIMONY THAT WAS
9    PRESENTED TODAY IS THAT THERE WOULD BE ABSOLUTELY NO
10   RELEVANCE TO MR. ISAACS' TESTIMONY BECAUSE WE REALLY DON'T
11   EVEN GET TO METHODOLOGY BECAUSE THE OPINION THAT HE'S
12   OFFERING IS WHAT HIS INTENT WAS WHEN HE MADE THE FILM.
13             SO I JUST WANTED TO POINT THAT OUT BECAUSE, AS I
14   STARTED TO SORT OF TRY TO ARTICULATE THIS METHODOLOGY
15   ARGUMENT, I'M TRYING TO THINK TO MYSELF WHAT METHOD DOES HE
16   HAVE TO GET TO THE OPINION OF SERIOUS ARTISTIC VALUE, AND WE
17   REALLY DON'T EVEN GET THERE.
18             I THINK THOSE ARE QUESTIONS THAT THE COURT DREW
19   OUT, AND MR. ISAACS WAS FORTHRIGHT AND SAID, "YOU KNOW, I'M
20   HERE TO" -- I THINK HE SAID SOMETHING TO THE EXTENT OF TAKE
21   THE MISTAKEN NOTION OF EMOTION OUT OF THIS.  AND HE
22   SPECIFICALLY SAID THAT "WHAT ART IS IS SUBJECTIVE."  HE
23   SAID IF SOMETHING IS SERIOUS, IF IT HAD SERIOUS ARTISTIC
24   VALUE, IT'S SUBJECTIVE.
25             AND SO BECAUSE WE KNOW THAT THE THIRD ELEMENT GOES
```

**110**

```
 1   TO AN OBJECTIVE, REASONABLE PERSON STANDARD, IF WE CAN EVEN

 2   FIND THE METHODOLOGY IN THERE, I DON'T THINK WE EVEN GET TO

 3   THE APPROPRIATE OPINION.  BUT IN REGARDS TO METHODOLOGY, I

 4   THINK THAT GOT CONFUSING ALONG THE WAY BECAUSE I DON'T

 5   BELIEVE THERE IS ANY OBJECTIVE, MEANINGFUL LINE THAT

 6   MR. ISAACS TESTIFIED TO, TO BE ABLE TO DETERMINE IF

 7   SOMETHING HAS SERIOUS ARTISTIC VALUE.

 8            IT WAS VERY CIRCULAR.  I MEAN, FIRST IT WAS "ART

 9   IS WHAT ARTISTS DO" AND "ALL ART HAS SOME SERIOUS ARTISTIC

10   VALUE."

11            THEN AS WE PROBED INTO THAT, IT BECAME MORE ABOUT

12   WHETHER OR NOT THE ART WAS DISCUSSED.  AND THEN, YOU KNOW,

13   THAT INITIALLY STARTED WITH, WELL, IT DEPENDS ON THE NUMBER

14   OF PEOPLE THAT DISCUSS IT.

15            AND THEN IT TURNED INTO WHETHER IT'S A MEANINGFUL

16   DISCUSSION, WHICH -- BY THE WAY, THAT'S ALL SUBJECTIVE.

17   THERE'S NO OBJECTIVE TEST FOR MR. ISAACS TO DETERMINE

18   WHETHER SOMETHING -- OR AT LEAST HE DIDN'T OFFER THAT

19   TESTIMONY ABOUT WHETHER SOMETHING IS A PROFOUND DISCUSSION.

20            THE COURT:  WELL, MERELY BECAUSE SOMETHING IS

21   SUBJECTIVE DOES NOT MEAN IT CANNOT MEET THE METHODOLOGY

22   TEST.

23            A MEDICAL DOCTOR LOOKING AT SOMEBODY CAN EXERCISE

24   SOME LEVEL OF SUBJECTIVE JUDGMENT, BUT THAT DOESN'T MEAN

25   THAT AN INTERNAL MEDICINE SPECIALIST CAN'T TALK ABOUT HIS
```

**111**

```
 1   DIAGNOSIS.  EVEN IF HIS DIAGNOSIS IS NOT RELATED, LET'S SAY,

 2   STRICTLY TO A BLOOD TEST OR AN X-RAY OR AN M.R.I. OR ANY

 3   OTHER FORM OF OBJECTIVELY VERIFIABLE RESULT.  RIGHT?

 4             MR. GRANT:  YES, SIR.

 5             THE COURT:  SO JUST BECAUSE IT'S SUBJECTIVE IS

 6   NOT, IN AND OF ITSELF, DETERMINATIVE.

 7             MR. GRANT:  I THINK I'D BE MORE CORRECT IF I

 8   STATED THAT HIS OPINION HAS NO BASIS FOR IT.  I GUESS THAT'S

 9   WHAT I'M GETTING AT.

10             IT'S HARD TO REALLY ARTICULATE BECAUSE I NEVER

11   REALLY FOUND THROUGH EITHER THE PLEADING OR THROUGH THE

12   TESTIMONY IF THERE WAS ACTUALLY A METHODOLOGY USED.  YOU

13   KNOW, IT'S MORE LIKE THE ADVISORY -- I THINK IN 2000, THERE

14   WAS AN ADVISORY COMMITTEE NOTE FOR 702 THAT SAYS THE

15   GATEKEEPING FUNCTION REQUIRES MORE THAN JUST TAKING THE

16   WITNESS'S WORD FOR IT.

17             AND THAT'S WHAT I FELT LIKE FROM THE TESTIMONY.

18   IT WAS LIKE, LOOK, I'VE DONE THIS FOR A NUMBER OF YEARS;

19   I'VE MADE THESE FILMS, AND THERE WAS NO EVIDENCE THAT

20   INITIALLY THAT HE MADE THESE FILMS TO ENGAGE ANYONE.

21             BUT, YOU KNOW, AFTER HIS INDICTMENT, THEN THERE'S

22   THIS DISCUSSION BY PEOPLE AND BLOGS ON THE INTERNET, AND

23   SO TAKE MY WORD FOR IT THAT BECAUSE OF THAT -- NO BASIS

24   FOR WHY THAT IS THE RELEVANT STANDARD OR WHY THAT'S EVEN AN

25   APPROPRIATE METHODOLOGY.  JUST TAKE MY WORD FOR IT THAT, IF
```

**112**

```
 1   PEOPLE ARE OUT THERE AND THEY ARE TALKING ABOUT IT, THEN IT

 2   HAS SERIOUS ARTISTIC VALUE.

 3        AND YOU KNOW, YOUR HONOR, NOTHING HAS BEEN

 4   PRESENTED TO THIS COURT THAT WOULD SUGGEST THAT ANYBODY ELSE

 5   HAS EVER EVEN ATTEMPTED TO USE THAT TYPE OF METHODOLOGY.

 6        YOU KNOW, THERE'S NO TESTIMONY AT ALL THAT THERE'S

 7   ANYTHING ABOUT -- AND THAT'S WHERE THE SUBJECTIVE PART COMES

 8   IN.  THERE WAS NO TESTIMONY AT ALL OR ANY EVIDENCE PRESENTED

 9   THAT IT'S MORE THAN JUST ME SAYING IT.  "ME" BEING

10   MR. ISAACS.  YOU KNOW, I'M SAYING THAT BECAUSE PEOPLE GO ON

11   THE INTERNET AND TALK ABOUT ME AND TALK ABOUT MY CHARGES AND

12   TALK ABOUT THE FILMS THAT I PRODUCED THAT LED TO THESE

13   CHARGES, WELL, THEREFORE, THEN IT HAS TO HAVE SERIOUS

14   ARTISTIC VALUE.

15        YOUR HONOR, HE TESTIFIED THAT THAT'S ALL

16   SUBJECTIVE, AND I GUESS THAT'S THE SUBJECTIVE PART IS

17   THAT --

18        I MEAN, WHAT I'M GETTING IS HE TESTIFIED THAT, YOU

19   KNOW, OTHER PEOPLE COULD COME TO THE SAME CONCLUSION OR A

20   DIFFERENT CONCLUSION AND I THINK THAT GOES --

21        THE COURT:  I SUPPOSE WHAT YOU'RE SAYING IS THAT

22   EVEN SUBJECTIVITY HAS TO BE SOMEWHAT TETHERED TO SOME

23   UNDERLYING BASIS THAT CAN SOMEHOW BE INQUIRED INTO FOR US TO

24   DETERMINE WHETHER OR NOT IT COULD LEAD TO A CERTAIN -- IT

25   COULD REASONABLY LEAD TO A CERTAIN CONCLUSION.
```

**113**

```
 1          SO A DOCTOR'S SUBJECTIVE OBSERVATION IS BASED UPON
 2   TRAINING, BASED UPON EXPERIENCE, BASED UPON WHAT HE KNOWS
 3   THAT, IF YOU WERE TO RESPOND A CERTAIN WAY, THAT HE CAN DRAW
 4   CERTAIN CONCLUSIONS WHICH HE CAN TALK ABOUT AS OPPOSED TO A
 5   DOCTOR COMING IN AND SAYING, "JUST TAKE MY WORD FOR IT.
 6   THIS GUY IS SICK."
 7          MR. GRANT:  THAT'S WHAT I WAS TRYING TO
 8   ARTICULATE, YES, YOUR HONOR, EXACTLY THAT.
 9          I MEAN, WHEN YOU HAVE A DAUBERT HEARING AND A
10   MEDICAL EXPERT COMES IN, THEY'RE GOING TO SIT THERE AND TELL
11   YOU WHAT JOURNALS THEY READ, WHAT PEER REVIEW MATERIAL, AND
12   THEN THEY'RE GOING TO GIVE YOU -- MAY GIVE YOU A SUBJECTIVE
13   OPINION, BUT IT'S GOING TO BE BASED IN SOMETHING.
14          AND I DIDN'T SEE ANY TESTIMONY OR ANYTHING IN THE
15   PLEADING THAT WOULD SUGGEST IT'S MORE THAN JUST SORT OF LIKE
16   A SMELL TEST; JUST TAKE MY WORD FOR IT.
17          I THINK THAT GOES TO THE -- IF I MAY, YOUR HONOR,
18   IT GOES TO SORT OF THE FIT REQUIREMENT.  IT'S THE
19   GOVERNMENT'S POSITION THAT, BASED ON WHAT WE JUST DISCUSSED,
20   THIS JUST CANNOT BE USEFUL AT ALL TO THE JURY.
21          I MEAN, AGAIN, IT GOES TO THE FACT THAT, REALLY,
22   THE OPINION THAT MR. ISAACS WANTS TO PRESENT IS "MY INTENT
23   WHEN I MADE THESE FILMS WAS TO HAVE IT OUT THERE IN THE
24   ARTISTIC WORLD TO BE DEBATED."
25          HIS OTHER THING THAT HE SAID HE WANTED TO TESTIFY
```

**114**

```
 1    TO WAS, LOOK, I WANT THE JURY TO UNDERSTAND THAT IT'S NOT

 2    ALL ABOUT EMOTION.

 3              YOUR HONOR, THOSE THINGS ARE NOT RELEVANT TO WHAT

 4    THE GOVERNMENT HAS TO PROVE OR TO DISPROVE ANY OF THE

 5    ELEMENTS THAT THE GOVERNMENT HAS TO PROVE IN THIS CASE.  IT

 6    JUST WON'T ASSIST THE JURY.  IT WON'T ASSIST THEM.  I MEAN,

 7    IT GOES BACK TO THE PARIS THEATER CASE.  AND, YOU KNOW, THAT

 8    COURT WAS CLEAR THAT THE FILMS ARE THE BEST EVIDENCE OF WHAT

 9    THEY REPRESENT.

10              NOW, THE COURT DIDN'T SAY, YOU KNOW, THAT AN

11    EXPERT SHOULD NEVER BE ALLOWED IN THIS AREA WHEN WE'RE

12    DEALING WITH OBSCENITY, BUT THE COURT DID SAY THAT JUDGING

13    WHETHER A PARTICULAR FILM IS OBSCENE IS NOT A SUBJECT THAT

14    LENDS ITSELF TO THE TRADITIONAL USE OF EXPERT TESTIMONY.

15              AND I THINK THAT THIS HEARING IS ACTUALLY A

16    PERFECT EXAMPLE OF WHY THAT IS.  WE'RE REALLY NOT OFFERING

17    ANYTHING TO THEM EXCEPT FOR THIS OPINION THAT IS NOT ROOTED

18    IN ANYTHING OTHER THAN SORT OF MR. ISAACS'S, YOU KNOW, GOING

19    OUT INTO THE INTERNET AND KIND OF LOOKING AROUND AND READING

20    ABOUT HISTORY AND ALL THE THINGS WE'VE DISCUSSED.

21              THE JURY CAN LOOK AT THAT.  THE JURY CAN MAKE A

22    DETERMINATION OF WHETHER, TO A REASONABLE PERSON, THIS WOULD

23    HAVE SERIOUS ARTISTIC VALUE.

24              MR. DIAMOND MENTIONED THE STAGLIANO CASE, AND OF

25    COURSE, THAT'S PERSUASIVE PRECEDENT, YOUR HONOR.  BUT I
```

**115**

```
 1   THINK IT'S VERY MUCH ON POINT WITH THE CASE THAT WE HAVE

 2   HERE.

 3        VERY BRIEFLY, IF I MAY.  THIS IS A CASE WHERE THE

 4   DEFENDANT WAS CHARGED WITH DISTRIBUTING OBSCENE FILMS, AND

 5   THE DEFENSE ATTEMPTED TO PUT UP A PROFESSOR OF ART FROM U.C.

 6   SANTA BARBARA TO DISCUSS WHETHER OR NOT THESE FILMS HAD

 7   SERIOUS ARTISTIC VALUE.

 8        AND THE COURT IN THAT CASE RULED FROM THE BENCH

 9   THAT THE PROFESSOR WOULD NOT BE ABLE TO TESTIFY, AND THE

10   REASONING WAS THAT THE OPINION WAS NOT ROOTED IN RELIABLE

11   PRINCIPLES, WHICH IS WHAT I BELIEVE WE'VE ESTABLISHED

12   HERE -- THE METHODOLOGY WAS NEBULOUS, SUBJECTIVE, AND

13   LACKING IN RIGOR AND DETAIL.

14        REALLY, I DON'T THINK THAT THE METHODOLOGY WAS

15   EVEN THOUGHT OF OR ARTICULATED UNTIL IT WAS KIND OF EXPLORED

16   HERE IN COURT.  BUT IT'S THE GOVERNMENT'S POSITION THAT

17   THERE REALLY IS NO METHODOLOGY, AND IT WAS NOT A HELPFUL

18   GUIDE TO THE JURY.

19        I MEAN, THIS IS A PERSON THAT, YOU KNOW, HAS AT

20   LEAST SOME QUALIFICATIONS IN THE ART WORLD, AND THE JUDGE

21   WAS CLEAR THAT IT'S NOT ABOUT THE QUALIFICATIONS BUT IT'S

22   JUST -- IT JUST ISN'T GOING TO ASSIST AND THE OPINION YOU'RE

23   GOING TO GIVE IS JUST NOT BASED ON RELIABLE METHODOLOGY.

24        I THINK THAT THIS CASE THAT WE'RE SITTING HERE

25   TODAY WITH, SIR, FITS DIRECTLY ON POINT WITH THAT CASE.
```

**116**

```
 1              THE COURT:  HAS THERE BEEN AN APPELLATE

 2   DISPOSITION OF THAT STAGLIANO CASE?

 3              MR. GRANT:  NO, YOUR HONOR.

 4              THE COURT:  IS IT PENDING?

 5              MR. GRANT:  I'M NOT SURE ON THAT.  I HAVEN'T SEEN

 6   ANYTHING ON THE LEXIS THAT WOULD SUGGEST THAT.

 7              THE COURT:  OKAY.

 8              MR. GRANT:  YOUR HONOR, UNLESS YOU HAVE ANY

 9   QUESTIONS FOR ME, I BELIEVE THAT I HAVE COMPLETED.

10              THE COURT:  RIGHT.  THANK YOU VERY MUCH.

11              MR. DIAMOND, IF YOU'LL JUST TAKE A FEW MINUTES TO

12   CONCLUDE.

13              MR. DIAMOND:  MY UNDERSTANDING IS THAT THE CASE

14   WAS DISMISSED ON OTHER GROUNDS AFTER THE COURT MADE ITS

15   RULING THAT IT MADE.

16              THE COURT:  SO THERE WILL BE NO APPELLATE

17   DISPOSITION?

18              MR. DIAMOND:  THAT'S MY UNDERSTANDING.  THERE'S

19   NO -- AND MAYBE I CAN, IF I'M CORRECT, I THINK THE

20   GOVERNMENT IS AGREEING WITH ME.

21              MR. GRANT:  YES.

22              MR. DIAMOND:  SO MAYBE THIS WILL BE THE APPELLATE

23   CASE.  WE NEVER KNOW.

24              THE COURT:  WHY NOT?

25              MR. DIAMOND:  I WOULD SUBMIT THAT THE METHODOLOGY
```

**117**

```
 1   USED BY MR. ISAACS IS SUFFICIENT TO WITHSTAND AN ATTACK

 2   BASED UPON DAUBERT.  I THINK THAT THERE IS ENOUGH IN THE

 3   RECORD TO ESTABLISH THAT MR. ISAACS USED A METHOD BY WHICH

 4   HE CAME TO HIS CONCLUSION THAT THE MOVIE -- OR ALL THREE,

 5   ACTUALLY, HAVE SERIOUS ARTISTIC VALUE.

 6           TO SOME EXTENT, WHEN THE SUPREME COURT DECIDED ON

 7   A 5-TO-4 BASIS WITH CHIEF JUSTICE BURGER WRITING FOR THE

 8   MAJORITY IN THE PARIS ADULT THEATER CASE, I DON'T THINK THE

 9   COURT WAS FOCUSING ON THIS PARTICULAR ISSUE.

10           TO SOME EXTENT, THE TWO CONCEPTS DON'T REALLY

11   MESH -- THE QUESTION OF WHETHER OR NOT A MOVIE HAS SERIOUS

12   ARTISTIC VALUE ON THE ONE HAND AND THE RULE 702

13   JURISPRUDENCE ON THE OTHER --

14           TO THE EXTENT THAT THEY DON'T MESH, I WOULD SUBMIT

15   THAT THE FIRST AMENDMENT TO THE U. S. CONSTITUTION WOULD

16   REQUIRE THAT THE DEFENSE BE PERMITTED TO EXPLAIN TO THE JURY

17   THROUGH A WITNESS, AN EXPERT WITNESS, WHY THE MOVIE HAS

18   SERIOUS ARTISTIC VALUE.

19           THE JURY, OBVIOUSLY, IS FREE TO DISREGARD ANY

20   OPINION THE EXPERT OFFERS; AND IF IT'S THAT OBVIOUS TO THE

21   GOVERNMENT THAT THE MOVIE IS CLEARLY OBSCENE, THE GOVERNMENT

22   SHOULD HAVE NO FEAR IF MR. ISAACS IS PERMITTED TO TESTIFY IN

23   THIS LIMITED AREA.

24           WE ALSO AGREE WITH THE COURT THAT WE'RE NOT TRYING

25   TO GET THROUGH THE BACK DOOR EVIDENCE WE COULD NOT GET IN
```

**118**

1    THE FRONT DOOR.  WE HAVE NO INTENTION OF TRYING TO ARGUE

2    COMPARABLE MATERIAL ON THE COMMUNITY STANDARD ISSUE.  WE

3    WOULD BE SANCTIONED -- I WOULD BE SANCTIONED IF I TRIED TO

4    MAKE THAT ARGUMENT.  WE HAVE NO PLAN TO DO THAT.

5         BUT I THINK ON THE ISSUE OF ARTISTIC VALUE, IT IS

6    HELPFUL TO KNOW -- AND THE JURY SHOULD KNOW -- THAT THERE

7    ARE OTHER ARTISTIC RENDERINGS OUT THERE IN THE REAL WORLD

8    THAT DEAL WITH THE SUBJECT SO THAT --

9         THE COURT:  WHAT'S THE SUBJECT?  IS THE SUBJECT

10   DIVORCEABLE FROM THE PRESENCE OF SEXUAL ACTS?  BECAUSE IF IT

11   WERE, I'M NOT EVEN SURE THAT IT WOULD QUALIFY AS AN OBSCENE

12   FILM -- RIGHT? -- BECAUSE DOESN'T IT HAVE TO BE SOMETHING AS

13   APPEALING TO THE PRURIENT INTEREST IN SEXUAL ACTS?  IT'S NOT

14   JUST ANY PRURIENT INTEREST.

15        I THINK WHEN YOU READ <u>MILLER</u> AND YOU READ <u>PARIS</u>

16   <u>ADULT THEATER</u>, ALTHOUGH THAT PART DOESN'T NECESSARILY GET

17   CARRIED FORTH IN ALL THE ITERATIONS OF THE <u>MILLER</u> TEST, IT

18   CLEARLY WAS DISCUSSED BY THE SUPREME COURT TO BE IN THAT

19   CONTEXT.

20        MR. DIAMOND:  WELL, I DON'T BELIEVE THE COURT HAS

21   LIMITED OBSCENITY TO SEX ACTS.  I THINK THAT DEALING WITH

22   DEFECATION AND URINATION, WHICH ARE NOT SEX ACTS, WOULD ALSO

23   ARGUABLY ALLOW A JURY TO CONCLUDE THE MATERIALS ARE OBSCENE

24   WITHOUT SHOWING SEX.

25        THE COURT:  THAT'S SORT OF LIKE THE FLIPSIDE OF

**119**

```
 1   WHAT WE REALLY OUGHT TO BE LOOKING AT.  WE'RE NOT LOOKING AT

 2   WHETHER OR NOT THOSE OTHER EXHIBITS LIKE "THE URINAL" OR

 3   "THE TRAIL" SHOULD BE DECLARED OBSCENE.  WE ARE ONLY LOOKING

 4   AT WHETHER OR NOT THEY HAVE ANYTHING TO SAY ABOUT WHETHER

 5   THESE FILMS, WHICH DO INVOLVE SEX ACTS, AND IN COMBINATION,

 6   THE ENTIRE SUBJECT MATTER THAT MAY ALSO INCLUDE FECES, IS OF

 7   ANY RELEVANCE TO DETERMINING ARTISTIC VALUE.

 8           SO WHEN YOU SAY "THE SUBJECT MATTER," HOW DO YOU

 9   DEFINE THE SUBJECT MATTER?

10           MR. DIAMOND:  I THINK THAT CLEARLY THOSE MATERIALS

11   THE COURT JUST DESCRIBED ARE RELEVANT TO THE ISSUE OF

12   ARTISTIC VALUE.  THEY ARE NOT RELEVANT, ARGUABLY, TO THE

13   ISSUE OF COMMUNITY STANDARD IF THEY ARE NOT COMPARABLE UNDER

14   THE WOMACK CASE AND OTHER CASES.  BUT MR. ISAACS REFERRED TO

15   THEM IN THE CONTEXT OF PERSUADING THE JURY THAT MATERIALS OR

16   MOVIES THAT DEAL WITH THESE KINDS OF SUBJECT MATTER CAN

17   STILL BE CONSIDERED SERIOUS.

18           THE COURT:  WELL, WHAT'S THE SUBJECT MATTER?  THE

19   SUBJECT MATTER OF THE URINAL IS SO FAR DIFFERENT FROM THE

20   SUBJECT MATTER OF THESE FILMS.

21           MR. DIAMOND:  WELL, YOU CAN RELATE THE TWO.  THEY

22   DO ARGUABLY HAVE SOME COMMON THEME CONNECTING THE TWO IN

23   TERMS OF URINE OR DEFECATION OR BODY WASTE, THAT SORT OF

24   THING.

25           SO THE REAL QUESTION IS WILL THE JURY BE MISLED IF
```

**120**

```
 1   WE DON'T PUT ON MR. ISAACS INTO BELIEVING THAT ANYTHING THAT
 2   DEALS WITH DEFECATION OR URINATION OR SEX MUST AUTOMATICALLY
 3   NOT HAVE OR COULD NEVER HAVE SERIOUS ARTISTIC VALUE.  SO I
 4   THINK IT'S IMPORTANT TO KNOW AND I THINK IT'S IMPORTANT FOR
 5   THE JURY TO KNOW THAT --
 6          THE COURT:  NOBODY IS GOING TO MAKE THAT ARGUMENT.
 7   NOBODY CAN MAKE THAT ARGUMENT BECAUSE IT WOULD BE CONTRARY
 8   TO LAW.  YOU HAVE TO LOOK AT THE WORK AS A WHOLE.
 9          SO MR. GRANT'S NOT GOING TO GET UP -- OR HE'S NOT
10   GOING TO BE PERMITTED TO GET UP HERE AND SAY, "IT INVOLVES
11   SEX, THEREFORE, NO ARTISTIC VALUE."
12          IF HE DID THAT, HE WOULD HAVE NO CREDIBILITY AT
13   ALL BECAUSE EVERYBODY KNOWS THE CONTRARY, THAT YOU CAN'T
14   JUST FOCUS ON ONE THING.  SO, I MEAN, HE'S NOT GOING TO SAY
15   THAT.  HE'S GOING TO HAVE TO ARGUE WHAT THE LAW SAYS, WHICH
16   IS YOU TAKE THE THING AS A WHOLE.
17          MR. DIAMOND:  BUT THERE IS A DANGER THAT, WITHOUT
18   THE EXPERT TESTIMONY THAT WE'RE SEEKING TO ELICIT FROM
19   MR. ISAACS, THAT ONE OR MORE MEMBERS OF THE JURY COULD
20   ERRONEOUSLY CONCLUDE THAT THE SUBJECT MATTER ITSELF WOULD
21   DISQUALIFY THE MATERIAL FROM BEING CONSIDERED AS HAVING
22   SERIOUS ARTISTIC VALUE.
23          THE COURT:  THAT'S A VOIR DIRE QUESTION, NOT FOR
24   EXPERT TESTIMONY.
25          IF YOU'RE WORRIED ABOUT THESE PEOPLE HAVING
```

```
 1   PRECONCEIVED NOTIONS THAT, IF IT INVOLVES SEX, THAT'S IT;

 2   IT'S GOT TO BE OBSCENE, ANYTHING THAT'S OPENLY SEXUAL HAS

 3   GOT TO BE OBSCENE, ANYTHING HAVING TO DO WITH ORAL

 4   COPULATION, AUTOMATICALLY OBSCENE.

 5         THOSE MAY BE QUESTIONS THAT WE MIGHT POSE TO MAKE

 6   SURE THAT THEY ARE ABLE TO FOLLOW THE LAW AS OPPOSED TO

 7   HAVING PRECONCEIVED NOTIONS.  THAT'S CONTRARY TO LAW.

 8         MR. DIAMOND:  I THINK THERE IS SOME OVERLAP,

 9   THOUGH.  I THINK THERE'S STILL -- I THINK IT'S STILL

10   HELPFUL.  IN ADDITION TO ALL THE OTHER REASONS FOR OFFERING

11   THE EXPERT AND FOR ARGUING THAT MR. ISAACS IS QUALIFIED, IN

12   ADDITION TO ALL THE ARGUMENTS, I THINK IT'S NOT TOTALLY

13   IRRELEVANT TO ALSO CONSIDER IN DECIDING WHETHER TO EXERCISE

14   DISCRETION TO ALLOW THE WITNESS TO TESTIFY AS AN EXPERT,

15   THAT THERE'S AT LEAST SOME DANGER THAT ONE OR MORE MEMBERS

16   OF THE JURY COULD DISREGARD A JURY INSTRUCTION THAT TELLS

17   THEM THAT SEX ITSELF IS NOT TO BE EQUATED WITH OBSCENITY AND

18   THERE HAS TO BE SOMETHING MORE.

19         THERE'S ALWAYS THAT DANGER AND THEREFORE --

20         THE COURT:  WELL, I'M NOT SURE THAT -- LET'S BE

21   CAREFUL.  I'M NOT CERTAIN THAT THAT'S GOING TO BE A JURY

22   INSTRUCTION FRAMED JUST LIKE WHAT YOU SAID.

23         MR. DIAMOND:  WELL, I'M JUST SAYING, IN MAKING

24   SURE THE JURY FOLLOWS THE LAW AND IS NOT MISLED, IT WOULD BE

25   HELPFUL FOR MR. ISAACS' TESTIMONY TO BE OFFERED TO THE JURY
```

**122**

```
 1    FOR ITS CONSIDERATION.  AND IF, AS THE GOVERNMENT SAYS, THE

 2    TESTIMONY IS NOT RELIABLE OR MR. ISAACS LACKS THE EXPERIENCE

 3    OR TRAINING OR KNOWLEDGE TO OFFER THE OPINION, THAT'S AN

 4    ARGUMENT THAT THE GOVERNMENT CAN MAKE TO THE JURY, AND THE

 5    JURY CAN DISREGARD MR. ISAACS' TESTIMONY.

 6              BUT WE DO NEED HIS TESTIMONY UNDER THE FIRST

 7    AMENDMENT TO PROTECT HIS RIGHTS TO A FAIR TRIAL AND TO GET A

 8    JURY TO DETERMINE WHETHER OR NOT, AMONG OTHER THINGS, THE

 9    MOVIES DO OR DO NOT LACK SERIOUS ARTISTIC MERIT.

10              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

11              WOULD YOU PLEASE FILE THAT ADDITIONAL DOCUMENT

12    ABOUT THE BLOG ARTICLE, MR. DIAMOND?

13              MR. DIAMOND:  I'M NOT SURE IF MR. ISAACS HAS EXTRA

14    COPIES NOW.

15              THE COURT:  NO, NO.  HE DOESN'T HAVE TO DO IT NOW.

16              MR. DIAMOND:  OH, NOT TODAY.  OKAY.

17              THE COURT:  JUST FILE IT, LET'S SAY, BEFORE THE

18    END OF THE WEEK.

19              MR. DIAMOND:  SURE.

20              THE COURT:  IF THAT'S OKAY WITH YOU.

21              MR. DIAMOND:  ABSOLUTELY.

22              THE COURT:  OKAY.  SO MAKE SURE COUNSEL RECEIVES A

23     COPY OF IT.

24      (DEFENSE COUNSEL CONFERS WITH DEFENDANT SOTTO VOCE.)

25              MR. DIAMOND:  THERE MAY BE MORE THAN ONE.  CAN WE
```

**123**

```
 1    PROVIDE THE COURT WITH ALL THE BLOGS AND ARTICLES?  I THINK
 2    THAT HE WAS ASKED ABOUT ONE, BUT THERE'S MORE THAN ONE.
 3              THE COURT:  THAT'S FINE.
 4              DO YOU HAVE AN OBJECTION TO THAT?
 5              MR. GRANT:  WE JUST WOULD LIKE THE OPPORTUNITY TO
 6    REPLY IN SUBSTANCE.
 7              THE COURT:  OKAY.  SO WHY DON'T YOU DO THAT.  JUST
 8    FILE WHATEVER IT IS, THE NUMBER OF COPIES OF DIFFERENT
 9    ARTICLES THAT HE HAS.  MAKE SURE COUNSEL HAS A COPY OF IT,
10    AND CAN YOU DO THAT ALL BY, LET'S SAY, NEXT MONDAY?
11              MR. DIAMOND:  I'M SURE WE COULD.
12              THE COURT:  OKAY.  SO WHY DON'T YOU DO THAT BY
13    NEXT MONDAY, AND THEN I'LL GIVE YOU UNTIL THE MONDAY
14    THEREAFTER, WITH FIVE PAGES OR LESS, JUST TO COMMENT ON THAT
15    EVIDENCE WHATSOEVER.
16              AND THEN WE'LL TAKE THE MATTER UNDER SUBMISSION
17    THEREAFTER, AND I'LL THINK ABOUT IT, AND I'LL MAKE MY
18    RULING.
19              MR. DIAMOND:  THAT WILL BE FINE.  I'M HOPING TO
20    STILL HAVE MY SECRETARY.  HER DAUGHTER IS PREGNANT, AND THE
21    GRANDSON IS DUE ANY DAY NOW.  SO I MAY BE SHORT-HANDED AT MY
22    OFFICE.
23              THE COURT:  DO YOU NEED MORE TIME TO DO THAT?
24              MR. DIAMOND:  WELL, THE BABY IS DUE BY THE 31ST OF
25    JANUARY.  SO IF MY SECRETARY IS OUT FOR A WEEK OR TWO.  SHE
```

**124**

```
 1   WANTS TO TAKE GRANDMOTHERLY LEAVE.

 2          THE COURT:  I DON'T NEED TO KNOW --

 3          MR. DIAMOND:  OKAY.

 4          THE COURT:  -- THE VERY INTERESTING HISTORY AND

 5   BIOGRAPHY HERE.

 6          I'M JUST ASKING YOU HOW MUCH TIME DO YOU

 7   REASONABLY NEED?  I'M WILLING TO BE FLEXIBLE.

 8          MR. DIAMOND:  THE LONGER THE BETTER, WHATEVER TIME

 9   WE CAN GET.

10          THE COURT:  WELL, YOU TELL ME.

11          MR. DIAMOND:  I WOULD SAY THREE WEEKS WOULD BE

12   FINE.

13          THE DEFENDANT:  WE COULD GET IT AND DO IT.

14          THE COURT:  FINE.  THREE WEEKS, FILE IT, SERVE IT

15   ON THEM.

16          AND THE WEEK THEREAFTER, GIVE ME NO MORE THAN FIVE

17   PAGES AND COMMENT ONLY ON WHAT THE FILING IS.

18          AND THEN I'LL TAKE IT UNDER SUBMISSION, AND I'LL

19   ISSUE MY RULING.

20          MR. DIAMOND:  SO WHAT THE DEFENSE IS FILING IS THE

21   DOCUMENT ITSELF, NOT COMMENT, AND THE GOVERNMENT FILES

22   COMMENTS IN RESPONSE.

23          THE COURT:  WELL, IF YOU WANT TO FILE -- I'LL TELL

24   YOU THIS:  YOU CAN FILE THE DOCUMENT, AND I'LL LET YOU HAVE

25   FIVE PAGES OR LESS TO TELL ME WHAT'S THE SIGNIFICANCE OF IT,
```

**125**

```
 1    AND HE CAN HAVE FIVE PAGES TO SAY WHY IT'S NOT.  THAT WAY,

 2    IT'S FAIR.  BOTH SIDES HAVE AT LEAST AN ABILITY TO COMMENT

 3    ON IT.  OKAY?

 4              MR. DIAMOND:  THANK YOU VERY MUCH, YOUR HONOR.

 5              MR. GRANT:  THANK YOU, YOUR HONOR.

 6              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

 7    COUNSEL.  I APPRECIATE IT.

 8              THE CLERK:  THIS COURT NOW STANDS IN RECESS.

 9              (PROCEEDINGS CONCLUDED AT 5:00 P.M.)

10                        --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                CERTIFICATE

 2

 3           I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 4    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

 5    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

 6    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

 7    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

 8    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 9

10    DATED THIS 26TH DAY OF JULY, 2011.

11

12                      /S/ MARY RIORDAN RICKEY
                        MARY RIORDAN RICKEY
13                      OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25
```

**127**

E-Filed

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| Case No. | CR 07-732-GHK | | Date | March 2, 2011 |
|---|---|---|---|---|

Present: The Honorable **GEORGE H. KING, UNITED STATES DISTRICT JUDGE**

| Interpreter | N/A |
|---|---|

| Beatrice Herrera | Mary Riordan Rickey | Brent D. Ward |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape* | *United States Department of Justice* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Ira Isaacs | | √ | | Roger Diamond | | | √ |

**Proceedings:**  *Daubert* **Motions**

This matter is before the Court on Defendant Ira Isaacs's ("Defendant") Motion to Designate himself as an expert and the Government's Motion to Preclude Expert Testimony of Defendant Ira Isaacs.[1] The Court held a *Daubert* hearing on January 19, 2011, at which Defendant testified. The Parties each filed supplements to their original papers, which the Court has reviewed. Having reviewed all filings and testimony in support of and in opposition to the Motions, we hereby rule as follows.

## I. Background

Defendant faces three criminal charges for his involvement with allegedly obscene videos. Defendant has asserted his intention to raise a defense that the videos at issue have serious artistic value. Defendant lists several qualifications. Defendant graduated from the State University of New York in 1977, where he received a B.A. in Communications arts. He has directed over sixty films, some of which do not involve nude images. Defendant claims that his film-making experience gives him insight into the three charged films' artistic value. He also claims that he is presently working on a gallery installation art exhibit featuring the audience's reaction to one of the charged films. Defendant also asserts that he has been in the traditional art world for more than 25 years, including producing marketing campaigns featuring fine art imagery in a commercial art setting. He and his company have produced over a 100 hand-painted works to be used in a variety of commercial applications.

Defendant proposes to testify on the distinction between postmodernism (characterized as the use of disturbing imagery) versus modernism (aesthetically pleasing images) and the value of both. Defendant

---

[1]Defendant earlier had indicated that he intended to call other expert witnesses. His *Daubert* motion, however, only proposed to call himself as an expert witness. (Dkt. No. 133.) He also reiterated this intent during the January 19, 2011 hearing. The Government had earlier indicated that it too planned to solicit expert testimony, specifically to respond to any argument that the videos have scientific value. However, in response to Defendant's filings, the Government has dropped any such request. Thus, the only *Daubert* issue before the Court is whether Defendant can testify as an expert.

**CRIMINAL MINUTES - GENERAL**  **128**

E-Filed

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

explains that when most people think of art, they think of a beautiful painting in a museum or a sculpture in an art gallery. However, he explains that art does not have to be beautiful; rather it can utilize disturbing imagery and ideas (such as war and taboos). If qualified as an expert, Defendant will testify that the work has artistic value because it has shock value and works that have shock value also have artistic value because they provoke people who witness them. Defendant will testify that much of postmodern art relies on a gut emotional reaction -- to shock the viewer into thinking and questioning what they are looking at. Defendant also proposes to testify about how part of what characterizes his works as art is the response they have received and the emotions they have evoked.

Defendant proposes to discuss works by other artists that help to explain his own work. Among these are "The Fountain", a famous piece of art by Marcel Duchamp, "Nude Descending a Staircase", also by Duchamp, a work by Piero Mannzoni, a work by Kiki Smith entitled "Trail", a work by Chris Ofili entitled "Madonna", and Robert Rauschenberg's "White Painting". Some of these works involve feces, although none involve the precise combination of images that are present in the videos at issue in this case.

In his filings and during his testimony at the *Daubert* hearing, Defendant offered several theories on what makes something art and why his works qualify. These include: "Art is created by the artist and should be free from definitions, categories and pre-conceived ideas," "the venue is more important than the art work itself," and "the point of art [is] to get people to think, question and discuss."

## II. Legal standards

A work is obscene if the jury determines (1) "that the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest"; (2) that the average person applying contemporary community standards would find that "the work depicts or describes, in a patently offensive way, sexual conduct"; and (3) that a reasonable person would find that "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 25 (1973). "[S]ex and obscenity are not synonymous. . . . The portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." *Kois v. Wisconsin*, 408 U.S. 229, 231 (1972) (quoting *Roth v. United States*, 354 U.S. 476, 487 (1957)). "A reviewing court must, of necessity, look at the context of the material, as well as its content." *Id.*

Because films "are the best evidence of what they represent," the Supreme Court has noted that the task of judging whether a particular film is obscene "is not a subject that lends itself to the traditional use of expert testimony. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56 (1973). "Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand, . . . [n]o such assistance is needed by jurors in obscenity cases . . . . The materials are sufficient in themselves for the determination of the [obscenity] question." *Id.* (internal quotation marks omitted). Expert testimony is not per se inadmissible in all obscenity cases, as the Supreme Court made clear that the "defense should be free to introduce appropriate expert testimony." *Kaplan v. California*, 413 U.S. 115, 121 (1973).

Trial courts have "wide discretion in [their] determination to admit [or] exclude evidence, and this is particularly true in the case of expert testimony." *Hamling v. United States*, 418 U.S. 87, 108 (1974). Federal Rule of Evidence 702 provides that:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, established a framework to guide trial courts in performing their "gatekeeping" function. 509 U.S. 579 (1993). Under *Daubert*, if a party proffers expert testimony that is scientific in nature, it is admissible only if the trial court concludes: (1) that the reasoning or methodology underlying the testimony is scientifically valid, and (2) that the reasoning or methodology will assist the trier of fact to understand or determine a fact in issue. *Id.* at 592-93. The focus is "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. The *Daubert* framework applies equally to any testimony that is based on technical or specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999). In *Perry v. Schwarzenegger*, 704 F. Supp. 2d 931 (N.D. Cal. 2010), the district court provided a good summary of the factors relevant to an expert's reliability:

> (1) whether [a method] can be (and has been) tested; (2) whether the [method] has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the [method's] operation; (5) a degree of acceptance of the method within a relevant community, (6) whether the expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, (8) whether the expert has adequately accounted for obvious alternative explanations, (9) whether the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field, and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Id.* at 947 (internal quotation marks and citations omitted).

**III. Defendant's Proposed Expert Testimony**

Defendant proposes to provide expert testimony concluding that these videos have serious artistic value. Admittedly, deciding who is qualified as an expert in art is a difficult task. An expert in art (for example, a world-recognized artist) may not have the formal training that an expert in another field would likely possess. Distinguishing art from obscenity also does not lend itself to a definitive test like those that experts in other fields may employ.

Here, Defendant's proposed testimony does not meet the required standards for expert testimony. First, the Court is concerned that Defendant could provide no methodology in determining whether something qualifies as art or has serious artistic value. Instead, Defendant only provided vague and self-serving (and at times circular) descriptions, such as art is what an artist does. He also describes that a work may become art when it is commented on or receives the attention of art critics. By this logic a work that did not start as art may later crystallize into art. However, Defendant provides no explanation for how one can determine that a

E-Filed

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

work has transformed from obscenity into art. Defendant also points to the articles that have been written about the prosecution of him as evidence that his work has received the requisite amount of attention to distinguish it as art. (Exh. No. 137). This cannot be a proper methodology because prosecution for obscenity cannot have the legal affect of shielding the work from prosecution for the offense. Finally, Defendant does not provide any examples of what is obscene or characteristics that would make some images obscene (short of some film director declaring his own work obscene).

Moreover, to the extent Defendant offers a methodology, he provides insufficient qualifications to support his testimony. A methodology from any layperson is irrelevant -- the methodology needs to be backed by expertise or qualifications for it to be considered "expert" testimony. Defendant declares that he knows about art, but does not demonstrate sufficient expertise to qualify as an expert. An individual can read a book about the human heart but that does not make him or her an expert in the methods of heart surgeries. Defendant does not possess sufficient qualifications to show that he has the type of expertise necessary to make his methodology reliable, and not just an ad hoc opinion about what constitutes art.

A district court in the District of Colombia recently faced a similar situation in deciding whether to certify a professor of film studies at the University of California, Santa Barbara as an expert. *United States v. Stagliano*, 729 F. Supp. 2d 222 (D.D.C. 2010). Although that decision is not binding on this court, it is informative. That court ruled that although the professor possessed impressive credentials to discuss film studies, those credentials were not directly relevant to the task of distinguishing art from obscenity, and she had never written or lectured on the topic. *Id.* at 229. The professor in that case possessed much stronger credentials than Defendant. More importantly, the district court, similarly to our situation, relied upon the absence of methodology to determine if a work has serious artistic value. For example, "[w]hen asked again whether she had ever seen pornography that she would not consider to be art, the most she would say is: 'I certainly have seen some films that weren't to my taste.' She went on to explain that '[a]rt as a practice, a creative practice, . . . is a matter of taste.'" *Id.* The court concluded that "the defendants failed to meet their burden of demonstrating that the methodology underlying her opinion was reliable and would truly assist the jury in evaluating the serious artistic value of the charged works." *Id.* at 230.

Based on the defects in Defendant's proposed expert testimony as set forth above, we conclude that Defendant may not testify as an expert about the alleged artistic value of the videos.

### IV. Layperson testimony

Even if he cannot testify as an expert, Defendant may still be able to testify as a lay witness about his films. The Supreme Court has explained, "it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). The right stems from several provisions of the Constitution, including the Fourteenth Amendment's Due Process Clause, the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's privilege against self-incrimination. *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999). However, the Ninth Circuit has also ruled that a defendant's proposed testimony must be relevant. *United States v. Moreno*, 102 F.3d 994, 998 (9th Cir. 1996). If testifying as a nonexpert, Defendant would purportedly testify about his intentions in creating the video. The applicable legal standard here is whether a reasonable person, applying a nationwide standard, would think the work has serious artistic value. Thus, the Court must decide whether Defendant's testimony would be relevant given the objective standard to be applied by the jury for determining

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

what has serious artistic value.

Although the standard is objective, one of the considerations a reasonable person might want to take into account is the intent of the creator in making the work. The reasonable person, in assessing the nature of a work of art, might find the intent of its creator highly relevant. In this respect, art is unique. Given its inherent subjectivity, and the vast range of considerations a viewer of art might consider determinative in assessing a work of art, testimony concerning the artist's goals, inspirations, and intended meaning is at least relevant. Of course, this rationale does not extend to any videos which Defendant did not play a role in creating. For these, Defendant's opinion of the artistic nature of the work is irrelevant.

**V. Conclusion**

For the foregoing reasons, Defendant's proposed expert testimony is hereby deemed **INADMISSIBLE**. As to any of the videos that he created, Defendant may testify about what he aimed to achieve in creating the works.

Within **thirty (30) days** hereof, the Parties shall meet and confer regarding any motions in limine and shall file any such motions in a single fully integrated joint brief. To the extent the Parties still dispute the definition of the relevant community they shall include this issue in this joint brief. The joint brief shall then be calendared for hearing at the final pre-trial conference to be held on **May 2, 2011 at 3:30 p.m.** The matter is hereby **set for trial on May 17, 2011 at 9:30 a.m.** Prior to trial, the Parties shall meet and confer and in a joint brief, to be filed **thirty (30) days before trial**, propose a jury questionnaire. In this joint brief, the Parties shall list each proposed question and then whether the Parties stipulate to it or, if there are objections, the grounds for those objections. The Parties shall file separate proposed voir dire questions no later than **fourteen (14) days before trial**. No later than **ten (10) days before trial** the Parties shall file a joint proposed statement of the case.

**IT IS SO ORDERED.**

|  | -- | : | -- |
| Initials of Deputy Clerk | | Bea | |

MICHAEL W. GRANT
michael.grant@usdoj.gov
Trial Attorney
United States Department of Justice
1400 New York Avenue, NW, Suite 6000
Washington, D.C. 20005


UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          vs.<br><br>IRA ISAACS,<br><br>          Defendant. | **CR-07-732-GHK**<br><br>**PARTIES JOINT CONSOLIDATED BRIEF** |

    Pursuant to the Court's Order, dated June 13, 2011,
Plaintiff United States of America, through the undersigned
counsel, and the Defendant, Ira Isaacs, by and through his
counsel of record, Roger Jon Diamond, submit the following joint
consolidated brief relating to expert witnesses and pretrial
motions.

**133**

## **EXPERT WITNESSES**

During the status conference on June 13, 2011, defense counsel requested additional time from the Court to determine what expert witnesses, if any, would be required by the defense at trial. The Court granted the defense request and ordered "[d]efendant shall designate and disclose any and all expert witnesses to government within 60 days." *See* Criminal Minutes at Docket 166. On August 22, 2011, the parties met and conferred. The defense informed the government that they would not be calling any experts at trial. At a second meet and confer session on September 29, 2011, the defense again stated that no expert witnesses were anticipated.

## **PRE-TRIAL MOTIONS**

During the status conference on June 13, 2011, the Court further ordered "within 60 days [after disclosure of expert witnesses], counsel shall meet and confer on any and all pre-trial motions,… and file a fully integrated joint brief containing all such motions." *See id.* On September 29, 2011, the parties met to discuss pre-trial motions. The defense indicated that they did not have any pre-trial motions to file. The government informed the defense of its intent to file a motion to preclude the defense from mentioning that government attorneys work out of Washington D.C. and to preclude any attempt to offer evidence, testimony, or argument regarding any

**134**

suspected political motivation for indicting the defendant on the charged offenses.  The defense stated a motion would be unnecessary and agreed not to mention that government counsel were from Washington D.C. nor to offer any evidence, testimony, or argument regarding any suspected political motivation for indicting the defendant on the charged offenses.  Based on this representation, the government does not have any pre-trial motions to offer at this time.

## STIPULATIONS OF FACT

Following the June 13, 2011 status conference, the parties agreed to three stipulations of fact that would reduce the number of witnesses required to testify in person at trial and calls for the pre-admission of certain documentary and video evidence.  *See* Stipulations at Exhibits 1-3.

## PRE-TRIAL STATUS CONFERENCE

The parties respectfully request that the Court inquire into the stipulations and allow the parties to pre-admit the stipulated to evidence at the next status conference. Defense counsel will be out of the country for the last two weeks of October.  The defense has requested that the next pre-trial status conference take place on November 28, 2011.  The government is prepared to appear at any date set by the Court.

**135**

The parties further request that a trial date be set at the next status conference.

**EXCLUDABLE TIME UNDER SPEEDY TRIAL ACT**

Pursuant to 18 U.S.C. § 3161(h)(1)(D) and 18 U.S.C. § 3161(h)(7)(A), the parties agree that all time from October 12, 2011 to November 28, 2011, or the date set by the Court for the next pre-trial status conference, is excludable time for purposes of the Speedy Trial Act.

Respectfully Submitted,


_____/s/_____
ROGER JON DIAMOND
Attorney for Defendant
IRA ISAACS


_____/s/_____
DAMON A. KING
U.S. Department of Justice
Deputy Chief
Child Exploitation and
Obscenity Section
1400 New York Avenue, NW
Sixth Floor
Washington, DC 20530
(202) 514-6715 (phone)
(202) 514-1793 (fax)
damon.king@usdoj.gov

**136**

```
                              _____/s/_____
                              MICHAEL W. GRANT
                              U.S. Department of Justice
                              Trial Attorney
                              Child Exploitation and
                              Obscenity Section
                              1400 New York Avenue, NW
                              Sixth Floor
                              Washington, DC 20530
                              (202)307-1982 (phone)
                              (202)514-1793 (fax)
                              Michael.Grant@usdoj.gov
```

**137**

## CERTIFICATE OF SERVICE

I, Michael W. Grant, Trial Attorney with the United States Department of Justice, Criminal Division, hereby certify that the foregoing Parties Joint Consolidated Brief Regarding Expert Witnesses and Pre-Trial Motions was filed on October 11, 2011 by CM/ECF which will send electronic copies to counsel for the defendant, Roger Jon Diamond, 2115 Main Street, Santa Monica, California 90405. Also, on October 11, 2011, the Government mailed a paper copy to the counsel of defendant, Roger Jon Diamond, at 2115 Main Street, Santa Monica, California 90405.

```
_____/s/_____
MICHAEL W. GRANT
U.S. Department of Justice
Trial Attorney,
Child Exploitation and
Obscenity Section
1400 New York Avenue, NW
Sixth Floor
Washington, DC 20530
(202) 514-6715 (phone)
(202) 514-1793 (fax)
michael.grant@usdoj.gov
```

**138**

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4    THE HONORABLE GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE

5

6    UNITED STATES OF AMERICA,      )
                                    )
7                PLAINTIFF,         )
                                    )
8          VS.                      )    NO. CR 07-732(A)-GHK
                                    )
9    IRA ISAACS,                    )        VOLUME 1
                                    )
10              DEFENDANT.          )    SEALED TRANSCRIPT
     _____)

11

12

13       REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

14            LOS ANGELES, CALIFORNIA

15            MONDAY, APRIL 23, 2012

16       TRIAL DAY 1; 8:47 A.M. - 6:43 P.M.

17               JURY SELECTION

18       PAGES 1 THROUGH 147, INCLUSIVE

19

20

21

22

23                              MARY RIORDAN RICKEY
                                OFFICIAL COURT REPORTER
24                              255 EAST TEMPLE STREET
                                ROOM 181-G
25                              LOS ANGELES, CA  90012
                                MARY.USDC@YAHOO.COM

1          THEREAFTER, MY STAFF WILL PASS OUT THIS

2   QUESTIONNAIRE FOR YOU TO FILL OUT.  AFTER YOU FILL OUT AND

3   SIGN THE QUESTIONNAIRE, YOU WILL BE EXCUSED FOR THE DAY.

4          YOU WILL HAVE TO COME BACK TOMORROW MORNING AT

5   8:00 O'CLOCK TO COMPLETE THE VOIR DIRE PROCESS.  AND THOSE

6   OF YOU WHO ARE ON THE JURY WILL THEN PROCEED TO TRIAL

7   TOMORROW IMMEDIATELY AFTER JURY SELECTION.

8          NOW, AS WE BEGIN THE QUESTIONING, PLEASE RAISE

9   YOUR HAND IF YOU HAVE ANYTHING TO FOLLOW UP ON.

10          DEPENDING ON THE QUESTION -- AND I WILL DO THE

11   SAME THING I DID PREVIOUSLY, AND THAT IS I WILL START WITH

12   MY RIGHT-HAND SIDE, THE CENTER, AND THEN THE LEFT-HAND SIDE

13   OF THE COURTROOM.  THEN I WILL FOLLOW UP WITH ANYBODY WHO

14   HAS HIS OR HER HAND UP, AND WE'LL FOLLOW THAT PROCESS

15   THROUGHOUT.

16          IF I DON'T SAY YOUR NAME CORRECTLY, PLEASE STATE

17   YOUR NAME FOR THE RECORD SO THAT MY COURT REPORTER WILL BE

18   SURE TO BE ABLE TO RECORD THE CORRECT COMMENTS TO THE

19   CORRECT INDIVIDUAL.

20          ALL RIGHT.  NOW, BEFORE WE BEGIN, LET ME SEE

21   COUNSEL AT SIDEBAR FOR A BRIEF MOMENT.

22       *(FOLLOWING HELD OUTSIDE HEARING OF PROSPECTIVE JURORS:)*

23          **THE COURT:**  COUNSEL, MY SUGGESTION IS THAT WE GO

24   AHEAD AND EXCUSE THESE THREE WITH THE TIME CONSTRAINTS OR

25   OTHER PROBLEMS BECAUSE MS. BAKVA SEEMS LIKE SHE HAS A PRETTY

```
 1   GOOD EXCUSE ESPECIALLY WITH HER NEPHEW BEING IN A COMA.

 2             I THINK SHE'D HAVE SOME DIFFICULTY CONCENTRATING

 3   ON THIS WHEN SOMETHING AS SERIOUS AS THAT IS WEIGHING ON HER

 4   MIND, NOT TO MENTION THE FACT SHE ALSO HAS SOME WORK

 5   PROBLEMS.

 6             AND MS. BROOKS-THOMAS SEEMS TO HAVE A GOOD EXCUSE,

 7   NOT BEING ABLE TO TRAVEL NOT ONLY THE 70 MILES, BUT TO SIT

 8   HERE FOR LONG PERIODS OF TIME BECAUSE OF HER BACK ISSUE.

 9             AND MS. SORIANO HAS A FAMILY COURT HEARING

10   TOMORROW AT 8:30.  I DON'T KNOW WHAT THAT IS.  I DON'T WANT

11   TO BE NOSY AND GET INTO IT.  BUT IT SEEMS LIKE THAT WOULD BE

12   SOMETHING THAT WOULD INTERFERE WITH HER ABILITY TO CONTINUE

13   WITH EVEN THE JURY SELECTION PROCESS, AND I CERTAINLY DON'T

14   WANT TO INTERFERE WITH HER FAMILY COURT APPOINTMENT, AND I

15   ASSUME THAT'S OF IMPORTANCE TO HER.

16             ANY OBJECTION AT THIS POINT BEFORE WE EVEN START

17   TO EXCUSING THESE PEOPLE BECAUSE I DON'T WANT PEOPLE TO FILL

18   OUT A FORM UNNECESSARILY AND TAKE UP THEIR TIME.

19             MR. GRANT OR MR. KING?

20        MR. GRANT:  NO OBJECTIONS, YOUR HONOR.

21        THE COURT:  MR. DIAMOND?

22        MR. DIAMOND:  NO OBJECTION, YOUR HONOR.

23        THE COURT:  I'LL HAVE THESE PEOPLE LEAVE, THEN,

24   AND I'LL GET RIGHT INTO IT.

25        MR. DIAMOND:  AS LONG AS WE'RE HERE, I WANT TO
```

```
 1   MAKE SOME VERY BRIEF POINTS.

 2           ONE AREA IS THE REITERATION OF MY POSITION THAT

 3   THE GOVERNMENT MAY NOT USE EXTRA MEANS SUCH AS COMPUTER

 4   SEARCHES FOR THE JURY SELECTION PROCESS.  I KNOW THE COURT

 5   TOUCHED UPON THAT IN THE LAST TRIAL IN TERMS OF WHETHER THE

 6   GOVERNMENT CAN USE --

 7           THE COURT:  WHY ARE YOU RAISING THIS NOW?  WHY

 8   DIDN'T YOU RAISE THIS BEFORE?  THAT'S WHY WE WERE GATHERING

 9   AT 8:30 THIS MORNING.

10           MR. DIAMOND:  BECAUSE THE COURT INDICATED AT THE

11   LAST TRIAL IT WAS OKAY TO DO THAT.  I DIDN'T THINK THE COURT

12   WOULD GRANT MY REQUEST, BUT I'M JUST PRESERVING IT FOR THE

13   RECORD.

14           WE DON'T BELIEVE THE GOVERNMENT SHOULD BE ABLE TO

15   USE A COMPUTER DATABASE TO HELP VOIR DIRE, AND THAT THE

16   F.B.I. AGENT, JAMES MYRICK, IS SITTING AT COUNSEL TABLE WITH

17   THE ATTORNEYS.  THERE'S NO REASON FOR THE F.B.I. TO BE

18   INVOLVED IN THE JURY SELECTION PROCESS.

19           SO WE OBJECT TO THAT ALSO.

20           THE COURT:  THE OBJECTION AS TO THE F.B.I. AGENT

21   REMAINING IS OVERRULED.

22           THAT IS THE CASE AGENT, AND THE CASE AGENT MAY

23   REMAIN AT COUNSEL TABLE TO ASSIST GOVERNMENT COUNSEL IN

24   EVERY ASPECT OF THIS CASE INCLUDING JURY SELECTION.

25           SECONDLY, WITH RESPECT TO COMPUTER DATABASES, ARE
```

1   YOU FOLKS BASICALLY DOING WHATEVER SEARCHES ARE PUBLICLY

2   AVAILABLE?

3          **MR. GRANT:**  YES, YOUR HONOR.  IT'S PUBLICLY

4   AVAILABLE.

5          **THE COURT:**  THAT OBJECTION IS OVERRULED.

6      *(FOLLOWING HELD IN HEARING OF PROSPECTIVE JURORS:)*

7          **THE COURT:**  LADIES AND GENTLEMEN, HAVING CONFERRED

8   WITH COUNSEL, MS. BACA, MS. BROOKS-THOMAS, AND, MS. SORIANO,

9   YOU ARE EXCUSED TO RETURN TO THE JURY COMMISSIONER FOR

10  FURTHER ASSIGNMENT AND FURTHER INSTRUCTIONS.

11          THANK YOU VERY MUCH.  YOU MAY BE EXCUSED AT THIS

12  TIME.

13      *(PROSPECTIVE JURORS EXIT COURTROOM.)*

14          **THE COURT:**  ALL RIGHT.  NOW LET'S BEGIN.

15          CAN EACH OF YOU READ, WRITE, SPEAK, AND UNDERSTAND

16  THE ENGLISH LANGUAGE?  CAN YOU ALL DO THAT?  ALL RIGHT.

17          DO ANY OF YOU HAVE ANY KIND OF A HEARING OR SEEING

18  PROBLEM, A SIGHT PROBLEM, OR A HEARING PROBLEM?  ANYBODY?

19          THAT WOULD BE MR. KNISS.  ALL RIGHT.

20          MR. KNISS.

21          **PROSPECTIVE JUROR:**  I CANNOT HEAR IN MY RIGHT EAR.

22          **THE COURT:**  CAN YOU HEAR IN THE OTHER EAR?

23          **PROSPECTIVE JUROR:**  YES.

24          **THE COURT:**  GENERALLY, HAVE YOU HAD ANY DIFFICULTY

25  HEARING WHAT I'M SAYING?

1    "'MAKO'S FIRST TIME SCAT' IS A VIDEO

2    APPROXIMATELY TWO HOURS IN LENGTH.  IT INCLUDES

3    VARIOUS SCENES OF A FEMALE VOMITING, DRINKING

4    URINE AND VOMIT, AND EATING FECES DURING SEX ACTS;

5    "'HOLLYWOOD SCAT AMATEURS NUMBER 7' IS A VIDEO

6    APPROXIMATELY ONE HOUR AND 20 MINUTES IN LENGTH.

7    IT INCLUDES VARIOUS SCENES OF A MALE INSTRUCTING A

8    FEMALE TO ENGAGE IN VARIOUS ACTS INCLUDING ORAL

9    SEX ON THE MALE'S PENIS THAT HAD BEEN SMEARED IN

10   FECES, URINATION; DRINKING URINE; AND PLACING

11   FECES ON HER FACE AND BODY; AND INGESTING FECES;

12   "'HOLLYWOOD SCAT AMATEUR NUMBER 10' IS A VIDEO

13   APPROXIMATELY ONE HOUR AND 35 MINUTES IN LENGTH.

14   IT INCLUDES THE USE AND INGESTION OF FECES DURING

15   VARIOUS SEX ACTS AMONG TWO FEMALES AND A MALE WHO

16   IS FILMING THE VIDEO;

17   "'JAPANESE DOGGIE 3 WAY' IS APPROXIMATELY ONE

18   HOUR AND 37 MINUTES IN LENGTH.  IT INCLUDES

19   VARIOUS SCENES OF A FEMALE ENGAGED IN ORAL, ANAL,

20   AND VAGINAL SEX WITH TWO FULL-SIZED DOGS, ONE OF

21   WHICH ALSO EJACULATES INTO THE FEMALE'S MOUTH."

22                  (END QUOTED MATERIAL.)

23        **THE COURT:**  THE DEFENDANT HAS PLEADED NOT GUILTY

24   TO THESE CHARGES.  THE DEFENDANT IS PRESUMED INNOCENT UNLESS

25   AND UNTIL THE GOVERNMENT PROVES THE DEFENDANT'S GUILT BEYOND

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4   THE HONORABLE GEORGE H. KING, U.S. CHIEF DISTRICT JUDGE

5

6   UNITED STATES OF AMERICA,     )
                                  )
7                 PLAINTIFF,      )
                                  )
8           VS.                   )      NO. CR 07-732(A)-GHK
                                  )
9   IRA ISAACS,                   )      VOLUME II - PART 2
                                  )
10                DEFENDANT.      )
    _____)

11

12

13       REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

14            LOS ANGELES, CALIFORNIA

15   TUESDAY, APRIL 24, 2012; 10:55 A.M. - 1:25 P.M.

16             TRIAL DAY 2, PART 2

17         PAGES 1 THROUGH 106, INCLUSIVE

18

19

20

21

22

23                          MARY RIORDAN RICKEY
                            OFFICIAL COURT REPORTER
24                          255 EAST TEMPLE STREET
                            ROOM 181-G
25                          LOS ANGELES, CA  90012
                            MARY.USDC@YAHOO.COM

```
 1    THE FOLLOWING STIPULATIONS:

 2              THE UNITED STATES OF AMERICA AND THE

 3         DEFENDANT, IRA ISAACS, HEREBY AGREE AND

 4         STIPULATE TO THE FOLLOWING FACTS:

 5              1.  ON OR ABOUT JUNE 11, 1999, THE

 6         DEFENDANT, IRA ISAACS, FILED A FICTITIOUS

 7         BUSINESS NAME STATEMENT, GOVERNMENT

 8         EXHIBIT 1, WITH THE OFFICE OF THE COUNTY

 9         CLERK IN LOS ANGELES, CALIFORNIA.  THE

10         FICTITIOUS BUSINESS NAME STATEMENT

11         PROVIDED NOTICE OF THE DEFENDANT'S INTENT

12         TO CONDUCT BUSINESS UNDER THE FICTITIOUS

13         NAME 'L.A. MEDIA.'

14              2.  ON OR ABOUT JUNE 22ND, 1999, THE

15         DEFENDANT, IRA ISAACS, DOING BUSINESS AS

16         L.A. MEDIA AND STOLEN CAR FILMS,

17         REGISTERED THE DOMAIN NAME

18         'SCATMOVIES.COM' WITH THE COMPANY NETWORK

19         SOLUTIONS.  NETWORK SOLUTIONS PROVIDES A

20         VARIETY OF INTERNET-BASED SERVICES, MOST

21         OF WHICH ORIGINATE FROM ITS HEADQUARTERS

22         IN HERNDON, VIRGINIA.  ONE OF THE

23         INTERNET-BASED SERVICES THAT NETWORK

24         SOLUTIONS PROVIDES EXCLUSIVELY FROM ITS

25         VIRGINIA FACILITIES IS THE REGISTRATION
```

```
 1              OF SECOND-LEVEL DOMAIN NAMES TO CONSUMERS
 2              INTERESTED IN THE DOMAIN NAME.
 3                 THE DEFENDANT, IRA ISAACS, PURCHASED
 4              THE EXCLUSIVE RIGHTS TO CONTROL, ACCESS,
 5              AND CREATIVE USE OF THE DOMAIN NAME
 6              'SCATMOVIES.COM.'  THE DEFENDANT USED ONE
 7              OF HIS PERSONAL CREDIT CARDS TO PURCHASE
 8              THE LICENSE ON BEHALF OF L.A. MEDIA.  ON
 9              OR ABOUT JUNE 22ND, 1999, NETWORK
10              SOLUTIONS REGISTERED THE DOMAIN NAME
11              'SCATMOVIES.COM' TO L.A. MEDIA LOCATED IN
12              LOS ANGELES, CALIFORNIA.
13                 THE DEFENDANT, DOING BUSINESS AS
14              L.A. MEDIA, HAS CONTINUED TO PAY RENEWAL
15              FEES AND HAS BEEN THE SOLE AND EXCLUSIVE
16              REGISTERED OWNER AND OPERATOR OF THE
17              DOMAIN NAME 'SCATMOVIES.COM' FROM
18              JUNE 22ND, 1999, TO THE PRESENT TO
19              INCLUDE ALL OF THE RELEVANT DATES CHARGED
20              IN THE PRESENT INDICTMENT AGAINST THE
21              DEFENDANT.
22                 NETWORK SOLUTIONS, IN ITS REGULAR
23              COURSE OF BUSINESS, HAS MAINTAINED
24              BUSINESS RECORDS RELATING TO THE PURCHASE
25              AND USE BY DEFENDANT, DOING BUSINESS AS
```

```
 1              L.A. MEDIA, OF THE DOMAIN NAME
 2         'SCATMOVIES.COM,' GOVERNMENT EXHIBIT 2.
 3              3.  ON OR ABOUT APRIL 29, 2003, THE
 4         DEFENDANT, IRA ISAACS, DOING BUSINESS AS
 5         L.A. MEDIA AND STOLEN CAR FILMS,
 6         REGISTERED THE DOMAIN NAME
 7         'SCATCINEMAX.COM' WITH THE COMPANY
 8         INTERCOSMOS MEDIA GROUP, INC., HEREIN
 9         AFTER 'INTERCOSMOS.'  INTERCOSMOS
10         PROVIDES INTERNET DOMAIN NAME REGISTERING
11         SERVICES ORIGINATING FROM ITS
12         HEADQUARTERS IN NEW ORLEANS, LOUISIANA.
13              THE DEFENDANT, IRA ISAACS, PURCHASED
14         THE EXCLUSIVE RIGHTS OF CONTROL, ACCESS,
15         AND CREATIVE USE OF THE DOMAIN NAME
16         'SCATCINEMAX.COM.' THE DEFENDANT USED ONE
17         OF HIS PERSONAL CREDIT CARDS TO PURCHASE
18         THE LICENSE ON BEHALF OF L.A. MEDIA.  ON
19         OR ABOUT APRIL 29, 2003, INTERCOSMOS
20         REGISTERED THE DOMAIN NAME 'SCATCINEMAX'
21         TO L.A. MEDIA LOCATED IN LOS ANGELES,
22         CALIFORNIA.
23              THE DEFENDANT, DOING BUSINESS AS
24         L.A. MEDIA, HAS CONTINUED TO PAY RENEWAL
25         FEES AND HAS BEEN THE SOLE AND EXCLUSIVE
```

```
 1          REGISTERED OWNER AND OPERATOR OF THE
 2          DOMAIN NAME 'SCATCINEMAX.COM' FROM
 3          APRIL 29, 2003, TO THE PRESENT TO INCLUDE
 4          ALL THE RELEVANT DATES CHARGED IN THE
 5          PRESENT INDICTMENT AGAINST THE DEFENDANT.
 6          INTERCOSMOS, IN ITS REGULAR COURSE OF
 7          BUSINESS, HAS MAINTAINED BUSINESS RECORDS
 8          RELATING TO THE PURCHASE AND THE USE BY
 9          DEFENDANT, DOING BUSINESS AS L.A. MEDIA,
10          OF THE DOMAIN NAME 'SCATCINEMAX.COM,'
11          GOVERNMENT EXHIBIT 3.
12              4.  ON OR ABOUT FEBRUARY 11, 2004, THE
13          DEFENDANT, IRA ISAACS, DOING BUSINESS AS
14          L.A. MEDIA AND STOLEN CAR FILMS,
15          REGISTERED THE DOMAIN NAME
16          'STOLENCARFILMS.COM' WITH THE COMPANY
17          WILD WEST DOMAINS.  WILD WEST DOMAINS
18          PROVIDES A VARIETY OF THE INTERNET-BASED
19          SERVICES, MOST OF WHICH ORIGINATE FROM
20          ITS HEADQUARTERS IN SCOTTSDALE, ARIZONA.
21          ONE OF THE INTERNET-BASED SERVICES THAT
22          WILD WEST DOMAINS PROVIDES IS THE
23          REGISTRATION OF SECOND-LEVEL DOMAIN NAMES
24          TO CONSUMERS INTERESTED IN DOMAIN NAMES
25          WHERE WILD WEST DOMAINS IS THE REGISTRAR.
```

```
 1              THE DEFENDANT, IRA ISAACS, PURCHASED

 2         THE EXCLUSIVE RIGHTS OF CONTROL, ACCESS,

 3         AND CREATIVE USE OF THE DOMAIN NAME

 4         'STOLENCARFILMS.COM.' THE DEFENDANT USED

 5         ONE OF HIS PERSONAL CREDIT CARDS TO

 6         PURCHASE THE LICENSE ON BEHALF OF

 7         L.A. MEDIA AND STOLEN CAR FILMS.  ON OR

 8         ABOUT FEBRUARY 11, 2004, WILD WEST

 9         DOMAINS REGISTERED THE DOMAIN NAME

10         'STOLENCARFILMS' TO L.A. MEDIA, LOCATED

11         IN LOS ANGELES, CALIFORNIA.

12              THE DEFENDANT, DOING BUSINESS AS

13         L.A. MEDIA AND STOLEN CAR FILMS, HAS

14         CONTINUED TO PAY RENEWAL FEES AND HAS

15         BEEN THE SOLE AND EXCLUSIVE REGISTERED

16         OWNER AND OPERATOR OF THE DOMAIN NAME

17         'STOLENCARFILMS' FROM FEBRUARY 11, 2004,

18         TO THE PRESENT TO INCLUDE ALL THE

19         RELEVANT DATES CHARGED IN THE PRESENT

20         INDICTMENT AGAINST THE DEFENDANT.  WILD

21         WEST DOMAINS, IN ITS REGULAR COURSE OF

22         BUSINESS, HAS MAINTAINED BUSINESS RECORDS

23         RELATING TO THE PURCHASE AND USE BY

24         DEFENDANT DOING BUSINESS AS LOS ANGELES

25         MEDIA OF THE DOMAIN NAME
```

1    'STOLENCARFILMS.COM,' GOVERNMENT

2    EXHIBIT 4.

3        THE DEFENDANT, IRA ISAACS, ALSO FILED

4    A FICTITIOUS BUSINESS NAME STATEMENT,

5    GOVERNMENT EXHIBIT 6, WITH THE OFFICE OF

6    THE COUNTY CLERK IN LOS ANGELES,

7    CALIFORNIA ON OR ABOUT OCTOBER 6, 2006.

8    THE FICTITIOUS BUSINESS NAME STATEMENT

9    PROVIDED NOTICE OF THE DEFENDANT'S INTENT

10   TO CONDUCT BUSINESS UNDER THE FICTITIOUS

11   NAME 'STOLEN CAR FILMS.'

12       5.  ON OR ABOUT JULY 21ST, 2006,

13   F.B.I. SPECIAL AGENT WILLIAM MCDERMOTT,

14   USING AN INTERACTIVE COMPUTER SERVICE IN

15   VIRGINIA, ACCESSED THE INTERNET IN ORDER

16   TO MAKE AN ONLINE ORDER FROM THE INTERNET

17   WEBSITE WWW.SCATMOVIES.COM.  SPECIAL

18   AGENT MCDERMOTT USED A CREDIT CARD IN THE

19   UNDERCOVER NAME AND ADDRESS OF WILLIAM

20   KELLY AT 412 OLIVE STREET, NUMBER 475,

21   HUNTINGTON BEACH, CALIFORNIA 92645-5142;

22   AND HE ORDERED/PURCHASED FOUR D.V.D.'S,

23   ONE OF WHICH WAS 'MAKO'S FIRST TIME

24   SCAT,' GOVERNMENT EXHIBIT 9, FROM THE

25   WEBSITE WWW.SCATMOVIES.COM, WHICH IS A

```
1              WEBSITE THAT AT THE TIME OF THE PURCHASE

2              WAS SOLELY OWNED AND MAINTAINED BY THE

3              DEFENDANT, IRA ISAACS, AND HIS

4              CALIFORNIA-BASED BUSINESS L.A. MEDIA.

5                  6.  BETWEEN JULY 21ST, 2006, AND

6              AUGUST 3RD, 2006, THE DEFENDANT,

7              IRA ISAACS, THROUGH HIS COMPANY

8              L.A. MEDIA IN LOS ANGELES COUNTY IN THE

9              CENTRAL DISTRICT OF CALIFORNIA, RECEIVED

10             VIA THE INTERNET SPECIAL

11             AGENT MCDERMOTT'S PURCHASE ORDER FOR THE

12             FOUR D.V.D.'S.

13                 THEREAFTER, THE DEFENDANT, THROUGH HIS

14             COMPANY L.A. MEDIA, SHIPPED VIA U.P.S.

15             THE FOUR ORDERED D.V.D.'S, ONE OF WHICH

16             WAS 'MAKO'S FIRST TIME SCAT' TO SPECIAL

17             AGENT MCDERMOTT AT THE UNDERCOVER ADDRESS

18             412 OLIVE AVENUE, NUMBER 475, HUNTINGTON

19             BEACH, CALIFORNIA 92645-5142.

20                 7.  ON OR ABOUT AUGUST 3RD, 2006,

21             F.B.I. SPECIAL AGENT NORMA BALLARD

22             OBTAINED THE FOUR D.V.D. VIDEOS,

23             INCLUDING THE VIDEO 'MAKO'S FIRST TIME

24             SCAT,' GOVERNMENT EXHIBIT 9, FROM THE

25             UNDERCOVER ADDRESS AT 412 OLIVE AVE.,
```

1               *NUMBER 475, HUNTINGTON BEACH, CALIFORNIA*

2               *92645-5142.*

3                   *THESE VIDEOS ALONG WITH A D.V.D. BOX*

4               *WITH THE TITLE 'STOLEN CAR FILMS' WERE IN*

5               *A BROWN ENVELOPE, GOVERNMENT EXHIBIT 10,*

6               *WHICH HAD BEEN SHIPPED FROM THE DEFENDANT*

7               *THROUGH L.A. MEDIA IN LOS ANGELES,*

8               *CALIFORNIA BY U.P.S., A COMMON CARRIER.*

9               *AGENT BALLARD EVENTUALLY GAVE THESE*

10              *VIDEOS, INCLUDING THE VIDEO 'MAKO'S FIRST*

11              *TIME SCAT,' GOVERNMENT EXHIBIT 9, TO*

12              *F.B.I. JAMES MYRICK, WHO RECEIVED THEM IN*

13              *FALLS CHURCH, VIRGINIA, ON OR ABOUT*

14              *SEPTEMBER 19, 2006.  THE JAPANESE*

15              *LANGUAGE OF 'MAKO'S FIRST TIME SCAT' WAS*

16              *SUBSEQUENTLY TRANSLATED INTO ENGLISH AND*

17              *A WRITTEN TRANSCRIPT WAS PREPARED,*

18              *GOVERNMENT EXHIBIT 12.  THE VIDEOS HAVE*

19              *SINCE BEEN IN THE CUSTODY, CONTINUOUS*

20              *CUSTODY, AND CONTROL OF LAW ENFORCEMENT.*

21                  *8.  THE DEFENDANT, IRA ISAACS, HAS*

22              *USED THE WEB HOSTING SERVICE, 'THE*

23              *PLANET,' TO MAINTAIN, STORE, AND HOST*

24              *INFORMATION RELATING TO THE DOMAIN NAMES*

25              *'SCATMOVIES.COM,' 'SCATCINEMAX.COM,' AND*

```
 1                'STOLENCARFILMS.COM' FROM ON OR ABOUT

 2                NOVEMBER 14, 2003, TO THE PRESENT.  A WEB

 3                HOSTING SERVICE IS A TYPE OF INTERNET

 4                SERVICE THAT ALLOWS INDIVIDUALS AND

 5                ORGANIZATIONS TO MAKE THEIR OWN WEBSITES

 6                ACCESSIBLE VIA THE WORLDWIDE WEB, THEREBY

 7                MAKING IT VIEWABLE BY OTHER USERS ON THE

 8                INTERNET.

 9                   WHEN THE SPECIAL AGENTS IDENTIFIED

10                ABOVE ACCESSED THE INTERNET AND THE

11                WEBSITES WWW.SCATMOVIES.COM,

12                WWW.SCATCINEMAX.COM, AND

13                WWW.STOLENCARFILMS.COM, THEY WERE

14                ACCESSING AND VIEWING THE DEFENDANT'S

15                WEBSITES AND THE MATERIALS ASSOCIATED

16                WITH THE WEBSITES THAT WERE STORED AND

17                HOSTED ON COMPUTER SERVERS MAINTAINED BY

18                THE PLANET IN TEXAS.  THE PLANET, IN ITS

19                REGULAR COURSE OF BUSINESS, HAS

20                MAINTAINED BUSINESS RECORDS RELATING TO

21                THE WEB HOSTING SERVICES IT PROVIDES THE

22                DEFENDANT FOR SCATMOVIES.COM,

23                SCATCINEMAX.COM, STOLENCARFILMS.COM,

24                GOVERNMENT EXHIBIT 5."

25         "SIGNED BY IRA ISAACS, ROGER DIAMOND, DAMON KING,
```

```
1        AND MICHAEL GRANT."

2                    (END QUOTED MATERIAL.)

3        THE COURT:  ALL RIGHT.  IS THAT SO STIPULATED ON

4   BEHALF OF YOURSELF AND YOUR CLIENT, MR. DIAMOND?

5        MR. DIAMOND:  YES, YOUR HONOR.

6        THE COURT:  ALL RIGHT.  THE COURT WILL RECEIVE

7   THAT STIPULATION.

8    (STIPULATION OF FACT NUMBER 1 RECEIVED IN EVIDENCE.)

9        THE COURT:  LADIES AND GENTLEMEN, YOU ARE TO DEEM

10  THOSE STATEMENTS AND THE STIPULATION TO HAVE BEEN PROVEN AND

11  TO BE TRUE.

12        ALL RIGHT.  MR. GRANT.

13        MR. GRANT:  YES, YOUR HONOR.  AT THIS TIME, THE

14  GOVERNMENT WOULD CALL F.B.I. SPECIAL AGENT JAMES MYRICK TO

15  THE STAND.

16        THE CLERK:  PLEASE COME FORWARD, WAIT BEHIND OUR

17  COURT REPORTER, AND RAISE YOUR RIGHT HAND TO BE SWORN.

18                    JAMES MYRICK,

19     GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS:

20        THE CLERK:  DO YOU SOLEMNLY SWEAR THAT THE

21  TESTIMONY YOU SHALL GIVE IN THE CAUSE NOW PENDING BEFORE

22  THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING

23  BUT THE TRUTH, SO HELP YOU GOD?

24        THE WITNESS:  I DO.

25        THE CLERK:  THANK YOU.  PLEASE BE SEATED.
```

```
 1            PLEASE STATE YOUR FULL NAME FOR THE RECORD, AND

 2    SPELL YOUR FIRST AND LAST NAMES.

 3            THE WITNESS:  MY NAME IS JAMES MYRICK.  JAMES,

 4    J-A-M-E-S; MYRICK, M-Y-R-I-C-K.

 5            THE COURT:  ALL RIGHT.  MR. GRANT.

 6            MR. GRANT:  THANK YOU, YOUR HONOR.

 7                       DIRECT EXAMINATION

 8    BY MR. GRANT:

 9    Q.   GOOD AFTERNOON, SPECIAL AGENT MYRICK.

10    A.   GOOD AFTERNOON.

11    Q.   IF YOU COULD, PLEASE, LET THE JURY KNOW WHERE YOU'RE

12    CURRENTLY EMPLOYED.

13    A.   I'M CURRENTLY A SPECIAL AGENT WITH THE F.B.I. OUT OF

14    THE ST. LOUIS DIVISION.

15    Q.   IF YOU COULD, PLEASE TELL THE JURY, HOW LONG HAVE YOU

16    BEEN A SPECIAL AGENT WITH THE F.B.I.

17    A.   A LITTLE OVER NINE YEARS.

18    Q.   AND IF YOU COULD, COULD YOU BRIEFLY DESCRIBE THE

19    TRAINING YOU COMPLETED IN ORDER TO BECOME AN F.B.I. AGENT?

20    A.   WHEN I STARTED IN 2003, I WENT TO QUANTICO, HAD

21    17 WEEKS OF VARIOUS INVESTIGATIVE TRAINING, INCLUDING

22    INTERVIEW, SEARCHES, CRIME SCENES, FIREARMS, DEFENSIVE

23    TACTICS, OTHER INVESTIGATIVE TECHNIQUES.

24    Q.   AND WHAT IS YOUR CURRENT ASSIGNMENT WITH THE F.B.I.?

25    A.   MY CURRENT ASSIGNMENT IS I'M A CYBER INVESTIGATOR FOR
```

1    THE ST. LOUIS DIVISION.

2    Q.   HOW LONG HAVE YOU BEEN WORKING AT THAT CURRENT

3    ASSIGNMENT?

4    A.   SINCE JULY OF 2011.  SO ABOUT NINE MONTHS.

5    Q.   IF YOU COULD, JUST DESCRIBE FOR THE JURY SOME OF YOUR

6    OTHER ASSIGNMENTS THAT YOU PREVIOUSLY HELD PRIOR TO THIS

7    ASSIGNMENT.

8    A.   I STARTED OUT IN THE CLEVELAND DIVISION FOR THREE YEARS

9    AS A GENERAL INVESTIGATOR INVESTIGATING ANYTHING FROM BANK

10   ROBBERIES TO HEALTHCARE FRAUD.

11        I THEN TRANSFERRED IN 2006 TO THE WASHINGTON FIELD

12   OFFICE, WHERE I WAS ASSIGNED TO THE VIOLENT CRIMES SECTION.

13   I STARTED OFF INVESTIGATING OBSCENITY LAWS AND THEN MOVED

14   OVER TO THE BANK ROBBERY AND FUGITIVE SQUAD.

15        I THEN GOT PROMOTED IN 2010 TO HEADQUARTERS AS A

16   SUPERVISOR ON THE WEAPONS OF MASS DESTRUCTION OPERATIONS

17   UNIT.  AND THEN I TOOK THE TRANSFER AS THE SENIOR CRIMINAL

18   CYBER INVESTIGATOR IN SAINT LOUIS.

19   Q.   THANK YOU, AGENT MYRICK.

20        I WANT TO DRAW YOUR ATTENTION TO 2006.  WHAT WAS

21   YOUR ASSIGNMENT AT THAT TIME?

22   A.   I WAS ASSIGNED TO THE WASHINGTON FIELD OFFICE IN 2006

23   AS AN INVESTIGATOR ON THE ADULT OBSCENITY SQUAD AT W.F.O.

24   Q.   AND WHEN YOU SAY W.F.O., WHAT DOES THAT --

25   A.   THE WASHINGTON FIELD OFFICE.

1    Q.   HOW LONG WERE YOU WITH THAT PARTICULAR UNIT?

2    A.   A LITTLE BIT OVER A YEAR.

3    Q.   WHERE WAS YOUR OFFICE LOCATED WHEN YOU WORKED IN THAT

4    UNIT?

5    A.   FALLS CHURCH, VIRGINIA.

6    Q.   PLEASE TELL THE JURY, WHAT WERE SOME OF YOUR GENERAL

7    DUTIES WHEN YOU WERE ASSIGNED TO THE OBSCENITY UNIT.

8    A.   THE SQUAD WAS REQUIRED TO INVESTIGATE POSSIBLE

9    VIOLATIONS IN OBSCENITY STATUTES.  THIS WOULD INCLUDE

10   SEARCHING FOR CONTENT THAT WOULD VIOLATE THE STATUTES,

11   PURCHASING THE CONTENT, REVIEWING THE CONTENT, AND THEN IF

12   IT MEETS THE STATUTES' DEFINITIONS, CONTINUING THE

13   INVESTIGATION, IDENTIFYING THE INDIVIDUALS THAT WERE SELLING

14   IT, THE COMPANIES THAT WERE SELLING IT.

15   Q.   AND, AGENT MYRICK, OTHER THAN THE INDIVIDUALS THAT

16   WORKED WITH YOU IN WASHINGTON, D.C., WERE THERE OTHER LAW

17   ENFORCEMENT AGENCIES INVOLVED IN THIS UNIT?

18   A.   YES.  WE WORKED WITH L.A.P.D. HERE IN LOS ANGELES, AND

19   ALSO WITH THE LOS ANGELES FIELD OFFICE F.B.I.

20   Q.   DURING THE TIME THAT YOU WERE WORKING ON THIS UNIT, DID

21   YOU AND OTHER AGENTS HAVE AN OPPORTUNITY TO COME ACROSS

22   SOMEONE THAT WAS KNOWN TO YOU AS "IRA ISAACS"?

23   A.   YES.

24   Q.   HOW ABOUT THE COMPANY, L.A. MEDIA?

25   A.   YES.

1   Q.   HOW DID THEY FIRST COME TO YOUR ATTENTION?

2   A.   WELL, THE CASE WAS ALREADY OPEN WHEN I TRANSFERRED IN

3   IN 2006.  IT WAS REASSIGNED TO ME AS THE PRIMARY

4   INVESTIGATOR.  SO BY TALKING TO THE PREVIOUS INVESTIGATOR

5   AND REVIEWING THE FILE WAS HOW I WAS INITIALLY NOTIFIED

6   ABOUT IRA ISAACS AND L.A. MEDIA.

7   Q.   ONCE YOU RECEIVED THAT FILE, DID YOU CONTINUE THE

8   INVESTIGATION THAT INVOLVED IRA ISAACS AND THE COMPANY,

9   L.A. MEDIA?

10  A.   YES.

11  Q.   AND DURING YOUR INVESTIGATION OF THE DEFENDANT, DID YOU

12  HAVE AN OPPORTUNITY TO ACTUALLY MEET HIM IN PERSON?

13  A.   YES.

14  Q.   SPECIAL AGENT MYRICK, DO YOU SEE IRA ISAACS IN THE

15  COURTROOM TODAY?

16  A.   HE'S THE GENTLEMAN STANDING UP.

17       **MR. GRANT:**  MAY THE RECORD REFLECT PROPER

18  IDENTIFICATION OF THE DEFENDANT?

19       **THE COURT:**  YES, IT MAY.

20  **BY MR. GRANT:**

21  Q.   NOW, WHAT DID YOUR INVESTIGATION REVEAL, IF ANYTHING,

22  REGARDING THE RELATIONSHIP BETWEEN IRA ISAACS AND THE

23  COMPANY L.A. MEDIA?

24  A.   IRA ISAACS OWNED, OPERATED AND CONTROLLED L.A. MEDIA.

25  Q.   DID YOUR INVESTIGATION REVEAL WHERE HE OPERATED THIS

```
1    BUSINESS OUT OF?

2    A.   LOS ANGELES, CALIFORNIA.

3    Q.   SPECIAL AGENT MYRICK, YOU HAVE IN FRONT OF YOU A BINDER

4    OF GOVERNMENT EXHIBITS.  IF I COULD GET YOU TO PLEASE TURN

5    TO GOVERNMENT EXHIBIT 1.  AND I'M GOING TO PLACE A COPY OF

6    THAT ON THE OVERHEAD PROJECTOR.

7         THESE EXHIBITS WILL BE MADE AVAILABLE TO THE JURY,

8    BUT I JUST WANT TO TAKE A MOMENT.  DO YOU RECOGNIZE THIS

9    DOCUMENT?

10   A.   YES.

11   Q.   WHAT IS THIS DOCUMENT?

12   A.   THIS IS THE FICTITIOUS BUSINESS NAME STATEMENT THAT YOU

13   REFERRED TO IN THE STIPULATION OF THE FACTS.  I'M SHOWING

14   THAT IRA ISAACS REGISTERED L.A. MEDIA WITH THE LOS ANGELES

15   RECORDER'S OFFICE ON JUNE 11, 1999.

16   Q.   DID YOU HAVE THIS INFORMATION IN YOUR FILE WHEN YOU

17   WERE GOING THROUGH YOUR INVESTIGATION?

18   A.   YES.

19   Q.   DID YOU ALSO HAVE AN OPPORTUNITY TO REVIEW A NUMBER OF

20   WEBSITES THAT YOU DETERMINED WERE ASSOCIATED WITH L.A. MEDIA

21   AND THE DEFENDANT?

22   A.   YES.

23   Q.   APPROXIMATELY HOW MANY WEBSITES DID YOU VISIT?

24   A.   A LITTLE BIT OVER 20.

25   Q.   WHAT WERE SOME OF THE NAMES THAT YOU RECALL OF THE
```

```
1    WEBSITES THAT YOU VISITED THAT WERE ASSOCIATED WITH THE

2    DEFENDANT?

3    A.   STOLENCARFILMS, SCATCINEMAX, SCATMOVIES.  THERE WAS

4    OTHER ONES, TOO.

5    Q.   SPECIAL AGENT MYRICK, BASED ON YOUR INVESTIGATION, DID

6    YOU HAVE AN OPPORTUNITY TO LEARN WHAT TYPE OF VIDEOS WERE

7    BEING SOLD BY THE DEFENDANT ON THESE WEBSITES?

8    A.   YES.

9    Q.   WHAT TYPE OF VIDEOS WERE THEY?

10   A.   THEY WERE PORNOGRAPHIC VIDEOS RANGING FROM VOYEUR

11   VIDEOS, ALL THE WAY TO SCAT AND BESTIALITY VIDEOS.

12   Q.   NOW, YOU MENTIONED SCAT VIDEOS.  IF YOU COULD, JUST

13   GIVE A BRIEF DEFINITION BASED ON YOUR EXPERIENCE OF WHAT A

14   SCAT VIDEO IS.

15   A.   IT'S PORNOGRAPHY VIDEOS THAT HAVE TO DO WITH FECES,

16   CONSUMPTION OF FECES, HAVING FECES RUBBED ON THE INDIVIDUALS

17   THAT ARE ENGAGING IN SEX.

18   Q.   AND YOU MENTIONED ALSO --

19        ONE OF THE OTHER THINGS YOU MENTIONED WERE

20   BESTIALITY VIDEOS.  IF YOU COULD, JUST A BRIEF DESCRIPTION

21   FOR THE JURY OF WHAT THAT IS.

22   A.   IT'S VIDEOS OF HAVING SEXUAL RELATIONSHIPS WITH

23   ANIMALS.

24   Q.   SPECIAL AGENT MYRICK, YOU WERE IN THE COURTROOM TODAY

25   WHEN I JUST READ THE STIPULATION OF FACT.  IS THAT CORRECT?
```

```
1    A.   YES.

2    Q.   AND IN THERE I REFERENCED GOVERNMENT EXHIBIT 2, WHICH

3    WERE DOCUMENTS THAT RELATED TO THE DEFENDANT AND THE

4    COMPANY, NETWORK SOLUTIONS.

5         WE'RE NOT GOING TO GO THROUGH THESE PAGE BY PAGE.

6    THE JURY WILL HAVE THAT IN THE DELIBERATION ROOM, BUT IF YOU

7    COULD JUST TAKE A MOMENT AND LOOK AT GOVERNMENT EXHIBIT 2.

8    A.   OKAY.

9    Q.   DO YOU RECOGNIZE THOSE DOCUMENTS?

10   A.   YES.

11   Q.   IF YOU COULD BRIEFLY SUMMARIZE FOR THE JURY WHAT THEY

12   WOULD BE LOOKING AT WHEN THEY LOOK AT THESE DOCUMENTS FROM

13   NETWORK SOLUTIONS.

14   A.   THESE ARE BILLING RECORDS SHOWING THAT L.A. MEDIA,

15   IRA ISAACS, REGISTERED FOR PARTICULAR DOMAIN NAMES THAT THEY

16   WERE USING TO HOST THEIR VIDEO CONTENT, LIKE SCATMOVIES.COM.

17   Q.   DOES THIS SHOW THE HISTORY OF THE DEFENDANT'S USE OF

18   THAT WEBSITE?

19   A.   YES.

20   Q.   IF I COULD GET YOU JUST BRIEFLY TO TURN TO GOVERNMENT

21   EXHIBIT 3, WHICH ARE THE DOCUMENTS RELATING TO INTERCOSMOS.

22        SPECIAL AGENT MYRICK, ARE THOSE THE DOCUMENTS THAT

23   I REFERENCED IN THE STIPULATION OF FACT THAT I JUST READ TO

24   THE JURY?

25   A.   THEY ARE.
```

```
 1   Q.   IF YOU COULD JUST VERY BRIEFLY, WHAT DO THESE RECORDS
 2   REFLECT?
 3   A.   AGAIN, THESE ARE RECORDS SHOWING IRA ISAACS,
 4   L.A. MEDIA, REGISTERING DOMAIN NAMES THAT HOST THE WEBSITES
 5   THAT WOULD SELL HIS WARES, HIS PRODUCTS.
 6   Q.   DOES THAT INCLUDE SHOWING REFERENCE TO THE SITE
 7   SCATCINEMAX.COM?
 8   A.   YES.
 9   Q.   AND WE'LL DO THE SAME THING VERY QUICKLY FOR GOVERNMENT
10   EXHIBIT 4.  THOSE ARE THE WILD WEST DOMAIN DOCUMENTS.
11        SPECIAL AGENT MYRICK, ARE THOSE THE DOCUMENTS THAT
12   I REFERENCED IN THE STIPULATION OF FACT THAT I READ TO THE
13   JURY JUST MOMENTS AGO?
14   A.   YES, THEY ARE.
15   Q.   DO THOSE RECORDS SHOW -- WHAT DO THEY SHOW, ACTUALLY?
16   A.   THEY AGAIN SHOW ACCOUNTING RECORDS SHOWING THAT
17   IRA ISAACS AND L.A. MEDIA REGISTERED VARIOUS WEBSITES TO
18   SELL HIS WARES.  THIS ONE IS WITH STOLENCARFILMS.COM WAS ONE
19   OF THE PARTICULAR WEBSITES THAT WAS REGISTERED.
20   Q.   AND, SPECIAL AGENT MYRICK, IF I COULD GET YOU BRIEFLY
21   TO LOOK AT THE RECORDS AT GOVERNMENT EXHIBIT 5, WHICH ARE
22   DOCUMENTS FROM "THE PLANET," A COMPANY CALLED "THE PLANET."
23        DO YOU RECOGNIZE THOSE DOCUMENTS?
24   A.   YES.
25   Q.   COULD YOU JUST VERY BRIEFLY GIVE A DESCRIPTION OF WHAT
```

APRIL 24, 2012
TRIAL DAY 2 - PART 2

**163**

| 1 | THE JURY WILL BE LOOKING AT WHEN THEY LOOK AT THOSE |
| 2 | DOCUMENTS? |
| 3 | A.   AGAIN, THIS IS BILLING AND REGISTRATION AND ACCOUNT |
| 4 | INFORMATION FOR WEB SERVERS THAT ACTUALLY HOSTED THE |
| 5 | CONTENT, SO I BELIEVE THIS WAS OUT OF TEXAS. |
| 6 | Q.   SPECIAL AGENT MYRICK, EARLIER THERE WAS MENTION OF A |
| 7 | COMPANY "STOLEN CAR" -- WELL, IT'S BEEN A NUMBER OF TIMES |
| 8 | WE'VE MENTIONED THE COMPANY "STOLEN CAR FILMS." |
| 9 |      DID YOU HAVE AN OPPORTUNITY IN YOUR INVESTIGATION |
| 10 | TO DETERMINE INFORMATION RELATING TO THAT BUSINESS? |
| 11 | A.   YES. |
| 12 | Q.   WHAT DID YOU LEARN IN YOUR INVESTIGATION IN RELATION TO |
| 13 | STOLEN CAR FILMS AND THE DEFENDANT, IRA ISAACS? |
| 14 | A.   IT'S IRA ISAACS' PRODUCTION COMPANY, SO HE USES STOLEN |
| 15 | CAR FILMS TO PRODUCE, DISTRIBUTE, HIS MOVIES THAT HE MAKES |
| 16 | HIMSELF.  SO HIS SCAT MOVIES, "HOLLYWOOD AMATEURS SCAT" |
| 17 | SERIES IS THE LINE OF VIDEOS THAT HE PRODUCES HIMSELF. |
| 18 | Q.   DOES THAT INCLUDE AS PART OF THAT PRODUCTION THE TWO |
| 19 | VIDEOS, "HOLLYWOOD SCAT AMATEURS 7" AND "HOLLYWOOD SCAT |
| 20 | AMATEURS 10"? |
| 21 | A.   YES. |
| 22 | Q.   IF I COULD GET YOU, PLEASE, TO DRAW YOUR ATTENTION VERY |
| 23 | QUICKLY TO GOVERNMENT EXHIBIT 6. |
| 24 | A.   OKAY. |
| 25 | Q.   SPECIAL AGENT MYRICK, DO YOU RECOGNIZE THIS DOCUMENT? |

```
1    A.   YES, I DO.

2    Q.   PLEASE TELL THE JURY, WHAT IS GOVERNMENT EXHIBIT 6?

3    A.   AGAIN, THIS IS ANOTHER DOCUMENT THAT YOU STIPULATED TO.

4    IT IS A FICTITIOUS BUSINESS NAME STATEMENT REGISTERING

5    STOLEN CAR FILMS BY IRA ISAACS, M.L.A., ON 10/06 OF '06.

6    Q.   AND DOES IT SHOW THE INTENT OF THE DEFENDANT TO OPERATE

7    UNDER THIS NAME, "STOLEN CAR FILMS"?

8    A.   YES.

9    Q.   SPECIAL AGENT MYRICK, DURING YOUR INVESTIGATION, YOU

10   TESTIFIED EARLIER THAT THERE WERE AGENTS, OTHER AGENTS

11   INVOLVED IN THE INVESTIGATION OF THE DEFENDANT AND HIS

12   BUSINESS, L.A. MEDIA.  IS THAT CORRECT?

13   A.   YES.

14   Q.   ARE YOU FAMILIAR WITH THE INVESTIGATION THAT HAPPENED

15   BOTH PRIOR TO YOUR INVOLVEMENT AND THEN AFTER YOU GOT

16   INVOLVED?

17   A.   YES.

18   Q.   NOW, YOU HEARD TESTIMONY IN THE STIPULATION OF FACT

19   REGARDING AN UNDERCOVER PURCHASE THAT WAS MADE BY AN F.B.I.

20   SPECIAL AGENT, WILLIAM MCDERMOTT, IN JULY OF 2006.  DO YOU

21   RECALL THAT TESTIMONY FROM THE STIPULATION?

22   A.   YES, I DO.

23   Q.   AND ARE YOU FAMILIAR WITH THAT PURCHASE THAT SPECIAL

24   AGENT MCDERMOTT MADE ON THAT DATE?

25   A.   YES, I AM.
```

```
 1   Q.   AND DID YOU HAVE AN OPPORTUNITY DURING THE

 2   INVESTIGATION TO REVIEW THE VIDEOS THAT WERE PURCHASED BY

 3   SPECIAL AGENT MCDERMOTT?

 4   A.   I DID.

 5   Q.   AND DID THAT INCLUDE THE VIDEO, "MAKO'S FIRST TIME

 6   SCAT"?

 7   A.   YES.

 8   Q.   IF I COULD GET YOU, PLEASE, TO TURN IN YOUR BINDER

 9   TO -- AGAIN, THESE ARE JUST COPIES.  THE ORIGINALS WILL BE

10   MADE AVAILABLE TO THE JURY.  IF I COULD GET YOU TO TURN TO

11   GOVERNMENT EXHIBIT 10, PLEASE.  TAKE A MOMENT TO LOOK THAT

12   OVER.

13   A.   YES.

14   Q.   DO YOU RECOGNIZE THIS EXHIBIT?

15   A.   YES, I DO.

16   Q.   IF YOU COULD PLEASE TELL THE JURY, WHAT IS THIS

17   EXHIBIT?

18   A.   THIS IS THE U.P.S. PACKAGING THAT THE MOVIE "MAKO'S

19   FIRST TIME SCAT" ARRIVED IN AND EVENTUALLY GOT SHIPPED TO

20   THE WASHINGTON FIELD OFFICE AND I RECEIVED.

21   Q.   SPECIAL AGENT MYRICK, HOW IS IT THAT YOU KNOW THAT THIS

22   IS THE ACTUAL PACKAGING MATERIAL THAT WAS RECEIVED FROM THE

23   UNDERCOVER PURCHASE IN 2006, IN JULY OF 2006?

24   A.   I KNOW THAT WILLIAM MCDERMOTT USED WILLIAM KELLY AS HIS

25   UNDERCOVER NAME.  I KNOW THE ADDRESS TO BE THE UNDERCOVER
```

```
 1  ADDRESS.  IT ALSO, IN THE RIGHT-HAND CORNER, SHOWS THAT IT

 2  WAS DATE STAMPED 7/24/2006.  AND THE TRACKING NUMBER WOULD

 3  PROBABLY BE THE SAME TRACKING NUMBER ALSO.

 4  Q.  I THINK IT'S OBVIOUS FROM THE SCREEN, BUT JUST SO WE

 5  HAVE IT FOR THE RECORD, DOES THIS PACKAGING INDICATE HOW THE

 6  VIDEOS WERE SHIPPED FROM THE DEFENDANT TO AGENT MCDERMOTT?

 7  A.  YES.  U.P.S. GROUND.

 8  Q.  THANK YOU.  I ALSO NOTICE ON THIS EXHIBIT THAT THERE IS

 9  A RETURN ADDRESS.  IF YOU COULD, WHAT IS THE RETURN ADDRESS

10  ON THIS ENVELOPE?

11  A.  IT SAYS SARAH JAMES, (212)583-5141, L.A. MEDIA,

12  1768 WEEKS AVENUE, BRONX, NEW YORK 10453.

13  Q.  NOW, SPECIAL AGENT MYRICK, I UNDERSTAND THAT YOU, IN

14  YOUR INVESTIGATION, MADE SOME -- AND WE'LL GET TO THIS IN A

15  MOMENT.  BUT YOU MADE SOME OF YOUR OWN UNDERCOVER PURCHASES.

16  IS THAT CORRECT?

17  A.  CORRECT.

18  Q.  DID YOU HAVE AN OPPORTUNITY IN YOUR INVESTIGATION TO

19  ACTUALLY INVESTIGATE THE ADDRESS THAT THE DEFENDANT USED AS

20  HIS RETURN ADDRESS ON THESE ENVELOPES?

21  A.  YES.

22  Q.  AND WHAT DID YOU DETERMINE IN REGARDS TO WHETHER OR NOT

23  THE DEFENDANT WAS OPERATING HIS BUSINESS AT ALL FROM THIS

24  ADDRESS?

25  A.  HE WAS NOT OPERATING THE BUSINESS FROM THAT ADDRESS.
```

```
 1   Q.   IN YOUR INVESTIGATION, DID YOU LEARN WHETHER OR NOT HE

 2   WAS OPERATING HIS BUSINESS ANYWHERE IN THE STATE OF

 3   NEW YORK?

 4   A.   NO.   THERE WAS NO OPERATION OUT OF NEW YORK.

 5         MR. GRANT:   YOUR HONOR, IF I MAY, COULD WE HAVE A

 6   QUICK SIDEBAR?

 7         THE COURT:   YES.

 8         (FOLLOWING HELD OUTSIDE HEARING OF JURORS:)

 9         MR. GRANT:   THANK YOU, YOUR HONOR.

10         FIRST OF ALL, LET ME APOLOGIZE FOR CALLING YOU A

11   MILITARY JUDGE IN MY OPENING STATEMENT.   I APOLOGIZE.

12         THE COURT:   THAT'S OKAY.   I'M TOLD WE FEDERAL

13   JUDGES ACTUALLY HAVE AN EQUIVALENT MILITARY GRADE, AND I'M A

14   TWO-STAR GENERAL.   SO YOU MAY CALL ME "GENERAL."

15                     (LAUGHTER.)

16         MR. GRANT:   I UNDERSTAND.   IN REGARD TO PLAYING

17   THE VIDEO AT THIS POINT, WE HAVE AN HOUR AND 15 MINUTES

18   UNTIL THE CLOSE OF COURT.   THAT'S NOT LONG ENOUGH TO PLAY

19   EITHER VIDEO IF WE WERE TO DO ANYTHING.

20         THE COURT:   IS THERE SOMETHING ELSE YOU CAN PUT

21   ON?   IS HE GOING TO HAVE MORE TESTIMONY?

22         MR. GRANT:   I COULD DEFINITELY GO THROUGH THE

23   PREDICATE FOR EVERYTHING WE DID, AND WE'LL MAKE IT CLEAR AND

24   COME BACK TO THE VIDEOS THEN TOMORROW.

25         THE COURT:   I THINK THAT'S FINE.
```

```
 1           MR. DIAMOND:  I HATE TO WASTE TIME.  WE CAN'T
 2   SQUEEZE IN A MOVIE?
 3           MR. KING:  I THINK THE TESTIMONY IS GOING TO TAKE
 4   ABOUT -- ALL OF HIS ENTIRE TESTIMONY AND THEN THAT MAY BE
 5   1:20, MAYBE EVEN 1:30.
 6           THE COURT:  ANY REASON WHY HE CAN'T CROSS-EXAMINE
 7   HIM BEFORE THE MOVIE?  YOU'RE NOT GOING TO CROSS-EXAMINE THE
 8   MOVIE.
 9           MR. DIAMOND:  I DON'T MIND IT IF THE MOVIE STOPS
10   AND THEN RESUMES.
11           THE COURT:  LET'S NOT DO THAT.
12           GO AHEAD AND GO THROUGH THE REST OF IT, AND I'LL
13   LET YOU CROSS-EXAMINE HIM.  AND BY THAT TIME, IT WILL BE
14   VERY CLOSE TO 2:00 O'CLOCK.  THEN TOMORROW WE'LL PLAY THE
15   MOVIE.
16           (FOLLOWING HELD IN PRESENCE OF JURORS:)
17           MR. GRANT:  MAY IT PLEASE THE COURT.
18           THE COURT:  YES.
19   BY MR. GRANT:
20   Q.  SPECIAL AGENT MYRICK, LOOKING AT THE TIME HERE, WE'RE
21   NOT GOING TO GO INTO THE ACTUAL PLAYING OF "MAKO'S FIRST
22   TIME SCAT," BUT I'D LIKE TO FAST-FORWARD A LITTLE BIT.  WE
23   WILL GET TO THAT VIDEO, BUT I WOULD LIKE TO FAST-FORWARD A
24   LITTLE BIT IN YOUR INVESTIGATION.
25           AND I'D LIKE TO DRAW YOUR ATTENTION TO
```

1  OCTOBER 20TH, 2006.  AT THAT TIME, WERE YOU ACTIVELY WORKING

2  THE IRA ISAACS/L.A. MEDIA INVESTIGATION?

3  A.   YES.  I WAS THE PRIMARY INVESTIGATOR.

4  Q.   AND I WANT TO DRAW YOUR ATTENTION TO THAT DATE.  WHAT,

5  IF ANYTHING, DID YOU DO IN RELATION TO THE INVESTIGATION?

6  A.   I LOGGED ON TO AN UNDERCOVER COMPUTER IN FALLS CHURCH,

7  VIRGINIA.  I LOGGED ON TO STOLENCARFILMS.COM.  I PURCHASED

8  FIVE VIDEOS OFF THE WEBSITE USING AN UNDERCOVER I.D. AND

9  CREDIT CARD.

10 Q.   AND WHEN YOU MADE THIS PURCHASE, DID YOU --

11          YOU MENTIONED AN UNDERCOVER CREDIT CARD AND I.D.

12 DID YOU USE AN UNDERCOVER ADDRESS ALSO?

13 A.   YES.

14 Q.   AND THAT WAS AN ADDRESS IN?

15 A.   ALEXANDRIA, VIRGINIA.

16 Q.   IF I COULD GET YOU, PLEASE, TO TURN TO GOVERNMENT

17 EXHIBIT 14.  IF I COULD GET YOU TO FOCUS ON THE FIRST PAGE.

18          SPECIAL AGENT MYRICK, DO YOU RECOGNIZE THIS

19 EXHIBIT?

20 A.   YES.  THIS IS A SCREEN CAPTURE THAT I TOOK ON THAT DAY.

21 THIS WOULD HAVE BEEN FOR "HOLLYWOOD SCAT AMATEURS NUMBER 7."

22 THIS IS THE WEBSITE THAT I WOULD HAVE USED TO PURCHASE THE

23 D.V.D.

24 Q.   NOW, YOU JUST MENTIONED THAT YOU WENT TO STOLENCARFILMS

25 TO ACCESS THE SITE.  IS THIS WHAT YOU SAW ON THE 20TH OF

1    OCTOBER 2006 WHEN YOU WENT TO THAT WEBSITE?

2    A.   YES, THIS IS A SCREEN CAPTURE OF THE DAY THAT I WAS

3    THERE.

4    Q.   SPECIAL AGENT MYRICK, WHAT WAS IT ABOUT THIS MOVIE THAT

5    DREW YOUR ATTENTION OF ALL THE MOVIES THAT WERE ON THE

6    WEBSITE?  WHAT BROUGHT YOU TO THIS TYPE OF MOVIE OR TO THIS

7    MOVIE, I GUESS, IN PARTICULAR?

8    A.   WELL, IT WAS, I MEAN, THE DESCRIPTION, THE DEPICTION ON

9    THE -- OF THE CONTENT ON THE IMAGE.  I MEAN, IT LOOKS TO ME

10   THAT A FEMALE IS BEING FED FECES, THERE'S SEXUAL ACTIVITY IN

11   THE PICTURE, AND THEN YOU CAN ALSO READ THE DESCRIPTION.

12   THAT'S HOW I PICKED THIS PARTICULAR CONTENT.

13   Q.   I WON'T ASK YOU TO READ THE DESCRIPTION BECAUSE THAT

14   WILL BE IN EVIDENCE.

15          BUT HAVING VIEWED THE VIDEO AND READ THAT

16   DESCRIPTION, IS THAT A FAIRLY ACCURATE DESCRIPTION OF WHAT

17   YOU GOT WHEN YOU ACTUALLY PURCHASED THE VIDEO?

18   A.   YES.

19   Q.   I NOTICE TOWARD THE BOTTOM THERE, AND IT'S IN TWO

20   PLACES.  THERE'S A LINK THAT SAYS "BUY MOVIE NOW."

21          WAS THAT A LINK THAT YOU CLICKED ON IN ORDER TO

22   ORDER THE VIDEOS?

23   A.   YES, IT WAS.

24   Q.   ALL RIGHT.  IF I COULD GET YOU TO TURN TO PAGE 2 OF THE

25   EXHIBIT, PLEASE.

APRIL 24, 2012
TRIAL DAY 2 - PART 2

**171**

1    A.    YES.

2    Q.    AND, SPECIAL AGENT MYRICK, DO YOU RECOGNIZE THIS PAGE?

3    A.    YES.  THIS IS A SCREEN CAPTURE THAT I TOOK OF THE ORDER

4    PAGE RIGHT BEFORE I PURCHASED ALL THE VIDEOS.

5    Q.    SO WOULD THIS HAVE BEEN AFTER YOU CLICKED ON THE "BUY

6    MOVIE NOW" LINK?

7    A.    CORRECT.

8    Q.    AND I KNOW THAT YOU TESTIFIED EARLIER THAT YOU

9    PURCHASED FIVE VIDEOS.  DOES THIS EXHIBIT SHOW THE FIVE

10   VIDEOS THAT YOU ACTUALLY PURCHASED?

11   A.    YES.

12   Q.    AND I NOTICE THERE ARE NUMBERS THERE IN THE COLUMNS ON

13   THE LEFT.  DID ONE OF THOSE NUMBERS REPRESENT "HOLLYWOOD

14   SCAT AMATEURS NUMBER 7"?

15   A.    YES, IT DOES.

16   Q.    DOES THIS ALSO SHOW HOW MUCH YOU PAID FOR EACH VIDEO?

17   A.    YES.  $49 APIECE.

18   Q.    I NOTICE FURTHER DOWN, ABOUT HALFWAY DOWN THE PAGE,

19   THERE IS A NAME AND AN ADDRESS.  AND I SEE THE NAME IS FIRST

20   NAME JAMES, LAST NAME KIRK.  HOW IS THAT NAME SIGNIFICANT?

21   A.    THAT'S THE UNDERCOVER NAME THAT I USED.

22   Q.    AND THERE'S AN ADDRESS THERE FOR DUKE STREET IN

23   ALEXANDRIA, VIRGINIA.  IS THAT THE UNDERCOVER ADDRESS THAT

24   YOU USED?

25   A.    YES, IT IS.

1    Q.   I'D ASK YOU IF YOU COULD, PLEASE, JUST TURN TO PAGE 3.

2    JUST VERY BRIEFLY, IS THIS A CONTINUATION PAGE OF PAGE 2?

3    A.   YES, IT IS.

4    Q.   AND AT THE TOP OF THIS PAGE, I NOTICE THAT THERE IS A

5    CREDIT CARD NUMBER.  WHAT IS THIS CREDIT CARD NUMBER?

6    A.   THAT'S THE CREDIT CARD NUMBER THAT I USED.  IT'S THE

7    UNDERCOVER CREDIT CARD.

8    Q.   AND TOWARDS THE BOTTOM I NOTICE THAT THERE IS A "PLACE

9    ORDER" BUTTON.  IS THAT A BUTTON YOU CAN PUSH TO ACTUALLY

10   PLACE THE ORDER?

11   A.   THAT IS THE BUTTON I PUSHED TO PLACE THE ORDER.

12   Q.   AND I NOTICE THAT IT'S VERY SMALL -- AND AGAIN, THE

13   JURY WILL HAVE THIS AND IT WILL BE MUCH EASIER FOR THEM TO

14   READ WHEN THEY HAVE IT.

15        BUT THERE'S A BUTTON, IT SAYS, "IF YOU DO NOT

16   RECEIVE AN EMAIL CONFIRMATION WITHIN 24 HOURS, NOTIFY US AT

17   WEBMASTER@STOLENCAR.COM."  DO YOU SEE THAT?

18   A.   I DO.

19   Q.   IF I COULD GET YOU THEN TO --

20        WELL, LET ME ASK YOU, DID YOU PLACE THE ORDER?

21   A.   YES, I DID.

22   Q.   AND WAS YOUR CREDIT CARD CHARGED?

23   A.   YES, IT WAS.

24   Q.   AND WHAT I WOULD LIKE YOU TO DO NOW IS TURN YOUR

25   ATTENTION TO GOVERNMENT EXHIBIT 15 IF I COULD.  AND DO YOU

1  RECOGNIZE GOVERNMENT EXHIBIT 15?

2  A.  YES.  THIS IS THE EMAIL CONFIRMATION THAT I RECEIVED

3  FROM STOLENCAR OR THE WEBMASTER@STOLENCAR, INDICATING THAT

4  MY ORDER WILL BE PROCESSED AND WILL BE SHIPPED TO ME.

5  Q.  AND AT THE HEADER OF THE EMAIL, DOES IT SHOW THE DATE

6  THAT THE EMAIL WAS SENT?

7  A.  YES.  IT WAS 10/20/2006, THE DAY THAT I PURCHASED.

8  Q.  THE VIDEOS?

9  A.  YEAH, THE DAY I PURCHASED THE D.V.D.'S.

10  Q.  AND IT'S FROM WEBMASTER@STOLENCAR.COM.  IS THAT

11  CORRECT?

12  A.  YES.

13  Q.  I NOTICE IT SHOWS FIVE MOVIES ORDERED.

14       WERE THOSE THE MOVIES THAT YOU ORDERED, THAT WE

15  SAW ON THE PREVIOUS EXHIBIT?

16  A.  YES.

17  Q.  SPECIAL AGENT MYRICK, DID YOU RECEIVE THESE VIDEOS?

18  A.  YES, I DID.

19  Q.  DID YOU RECEIVE IT AT THAT BILLING ADDRESS FOR JAMES

20  KIRK THAT'S INDICATED IN THE EMAIL?

21  A.  YES.

22  Q.  DOES THIS EMAIL INDICATE OR TELL YOU HOW YOUR VIDEOS

23  ARE GOING TO BE SHIPPED?

24  A.  YES, GROUND U.P.S.

25  Q.  DOES THIS ALSO TELL YOU HOW YOUR CREDIT CARD WILL BE

1    BILLED ONCE THEY ACTUALLY PLACE THE ORDER?

2    A.   YES.  IT SAYS, "YOUR CREDIT CARD WILL BE BILLED

3    L.A. MEDIA OR SOFTWARE CAFE."

4    Q.   AND ALSO ON THIS EXHIBIT, DOES IT SHOW WHO YOU WERE

5    CORRESPONDING WITH FROM L.A. MEDIA OR, IN THIS CASE, STOLEN

6    CAR?

7    A.   AT THE VERY BOTTOM IT SAYS "SARAH."

8    Q.   SPECIAL AGENT MYRICK, AFTER YOU -- ONE MOMENT, PLEASE.

9         AFTER YOU PAID FOR THE SHIPPING, YOU TESTIFIED

10   THAT YOU ACTUALLY RECEIVED THE ORDER.  IS THAT CORRECT?

11   A.   YES, I DID.

12   Q.   AND WAS IT SHIPPED TO YOU IN ALEXANDRIA, VIRGINIA?

13   A.   YES, IT WAS.

14   Q.   DID YOU RECEIVE IT VIA U.P.S.?

15   A.   YES, I DID.

16   Q.   DO YOU RECALL WHEN YOU RECEIVED THE ORDER?

17   A.   OCTOBER 23RD, 2006.

18   Q.   IF I COULD GET YOU, PLEASE, TO TAKE A LOOK AT

19   GOVERNMENT EXHIBIT 16.

20        DO YOU RECOGNIZE THIS EXHIBIT?

21   A.   IT'S THE PACKAGE THAT THE ITEMS WERE SHIPPED TO ME.

22   Q.   HOW DO YOU KNOW THAT THIS IS THE SPECIFIC PACKAGE THAT

23   YOU RECEIVED THE VIDEOS IN?

24   A.   OH, IT'S GOT MY UNDERCOVER NAME, THE UNDERCOVER

25   ADDRESS, AND THEN IT ALSO HAS THE TRACKING NUMBER THAT WAS

```
 1   SENT TO ME IN AN EMAIL.

 2   Q.   AND DOES THAT TRACKING NUMBER MIRROR THE TRACKING

 3   NUMBER THAT YOU RECEIVED IN THE EMAIL?

 4   A.   YES.

 5   Q.   I NOTICE THAT THERE'S A RETURN ADDRESS ON THIS

 6   ENVELOPE, AND IT'S THE 1768 WEEKS AVENUE, BRONX, NEW YORK

 7   ADDRESS.  IS THAT CORRECT?

 8   A.   THAT'S CORRECT.

 9   Q.   NOW, WHEN YOU SAW THE PACKAGE HAD A NEW YORK RETURN

10   ADDRESS, WHAT, IF ANYTHING, DID THAT HAVE YOU DO?  I MEAN,

11   WHAT WAS THE SIGNIFICANCE WHEN YOU SAW THAT?

12   A.   OBVIOUSLY I BELIEVED THAT IT WAS BEING SHIPPED FROM

13   CALIFORNIA.  SO I RAN THE TRACKING REPORT AND VERIFIED THAT.

14   I VERIFIED THAT THERE WAS, AS FAR AS I COULD TELL, NO

15   OPERATION OUT OF NEW YORK FOR L.A. MEDIA.

16   Q.   NOW, SPECIAL AGENT MYRICK, YOU SAID THAT YOU RAN A

17   TRACKING REPORT.  ACTUALLY I'M GOING TO PUT BACK ON THE

18   SCREEN GOVERNMENT EXHIBIT 16.  IN THE CENTER OF THAT

19   ENVELOPE THERE IS A TRACKING NUMBER.  IS THAT WHAT YOU MEANT

20   BY YOU RAN THE TRACKING NUMBER?

21   A.   YES.

22   Q.   ALL RIGHT.  IF I COULD GET YOU TO TURN TO GOVERNMENT

23   EXHIBIT 18, PLEASE.

24        SPECIAL AGENT MYRICK, DO YOU RECOGNIZE GOVERNMENT

25   EXHIBIT 18?
```

```
1    A.    YES, I DO.

2    Q.    AND WHAT IS GOVERNMENT EXHIBIT 18?

3    A.    THIS IS THE TRACKING REPORT FOR THE PACKAGE THAT I RAN.

4    Q.    DOES THE TRACKING NUMBER AT THE TOP OF THIS EXHIBIT

5    MATCH THE TRACKING NUMBER ON THE ENVELOPE THAT YOU RECEIVED

6    ON THE 23RD OF OCTOBER 2006?

7    A.    IT DOES.

8    Q.    DOES THIS EXHIBIT INDICATE WHERE THE PACKAGE ORIGINATED

9    FROM FOR SHIPPING?

10   A.    IT ORIGINATED FROM LOS ANGELES, CALIFORNIA.

11   Q.    DOES IT TELL THE DATE THAT IT WAS PICKED UP FOR

12   DELIVERY?

13   A.    10/20/2006.

14   Q.    WAS THAT THE DATE THAT YOU PLACED THE ORDER?

15   A.    YES.

16   Q.    DOES THIS EXHIBIT SHOW WHERE THE VIDEOS WERE

17   TRANSPORTED TO?

18   A.    YES.  IT WAS TRANSPORTED TO ALEXANDRIA, VIRGINIA ON

19   10/23/2006.

20   Q.    THANK YOU, AGENT MYRICK.  SO YOU RECEIVED THE PACKAGE

21   ON THE 23RD OF OCTOBER 2006.  I'M ASSUMING YOU OPENED THE

22   PACKAGE?

23   A.    I DID.

24   Q.    AND WHAT WAS IN THE PACKAGE THAT YOU RECEIVED FROM THE

25   DEFENDANT?
```

1    A.    THE FIVE D.V.D.'S THAT I PURCHASED, A TRAILER D.V.D.

2    ADVERTISING OTHER MOVIES, AND A PAPER PAMPHLET.

3    Q.    OKAY.  IF I COULD GET YOU TO TURN YOUR ATTENTION TO

4    GOVERNMENT EXHIBIT 17.

5          SPECIAL AGENT MYRICK, DO YOU RECOGNIZE GOVERNMENT

6    EXHIBIT 17?

7    A.    YES, I DO.

8    Q.    WHAT IS GOVERNMENT EXHIBIT 17?

9    A.    IT'S A PAPER PAMPHLET THAT I RECEIVED IN THE ENVELOPE

10   ADVERTISING, "YOU WANT TO SEE ALL YOUR FAVORITE SCAT SLUTS

11   FROM SCATMOVIES.COM."

12         IT INDICATES THAT FOR ONLY 39.95 A MONTH YOU GET

13   ALL -- ACCESS TO ALL THESE VARIOUS WEBSITES THAT ALLOWS YOU

14   TO GET THE MOVIES, AND YOU CAN ALSO RECEIVE A FREE MOVIE ON

15   YOUR NEXT ORDER IF YOU USE THIS PARTICULAR COUPON CODE.

16   Q.    SPECIAL AGENT MYRICK, YOU MAY HAVE JUST TESTIFIED TO

17   IT, BUT THIS IS WHAT WAS RECEIVED IN THE PACKAGE WITH THE

18   VIDEOS?

19   A.    YES.

20   Q.    NOW, IF I COULD GET YOU TO TURN TO GOVERNMENT

21   EXHIBIT 11, PLEASE.

22         SPECIAL AGENT MYRICK, DO YOU RECOGNIZE THIS

23   EXHIBIT?

24   A.    YES, I DO.

25   Q.    WOULD YOU PLEASE TELL THE JURY, WHAT IS GOVERNMENT

1    EXHIBIT 11?

2    A.   IT'S A SCREEN CAPTURE OF CINEMASCAT.COM THAT WE

3    CONDUCTED TO MAKE SURE THAT WE HAD A RECORD OF THE WEBSITE

4    IN CASE MR. ISAACS TOOK IT OFF THE INTERNET.

5    Q.   SO IN ORDER TO GET THIS SCREEN SHOT, DID YOU HAVE TO

6    ACCESS THE WEBSITE, CINEMASCAT.COM?

7    A.   YES.

8    Q.   AND IS THIS WHAT YOU WOULD HAVE VIEWED WHEN YOU

9    ACTUALLY WENT TO THE "MAKO'S FIRST TIME SCAT" LINK TO

10   PURCHASE THE VIDEO?

11   A.   YES.

12   Q.   NOW, WE ARE GOING TO SHOW THE VIDEO AT SOME POINT, BUT

13   YOU'VE SEEN IT ALREADY, SPECIAL AGENT MYRICK?

14   A.   I HAVE.

15   Q.   AND YOU'VE HAD AN OPPORTUNITY TO LOOK AT THESE PICTURES

16   AND THE DESCRIPTION ON THE LEFT.  IS THAT CORRECT?

17   A.   CORRECT.

18   Q.   AND DO THOSE PICTURES AND THE DESCRIPTION ACCURATELY

19   DEPICT WHAT'S IN THE VIDEO?

20   A.   THEY DO.

21   Q.   AND I NOTICE ON THE LEFT HERE THERE'S AN OPPORTUNITY TO

22   DOWNLOAD THE MOVIE OR TO ORDER THE MOVIE.  IS THAT CORRECT?

23   A.   YES.

24   Q.   DID YOU HAVE AN OPPORTUNITY TO SEE IF THAT WAS -- THOSE

25   LINKS -- THAT YOU WERE ABLE TO DO THAT, TO PLACE AN ORDER IF

1  YOU HAD CHOSE TO?

2  A.   YES.  I OBVIOUSLY DID NOT PLACE AN ORDER FOR THIS ONE

3  SINCE WE HAD ALREADY PURCHASED IT, BUT THEY WERE ACTIVE AT

4  THE TIME.

5  Q.   IF I COULD GET YOU TO TURN TO GOVERNMENT EXHIBIT 13 IN

6  YOUR BINDER, PLEASE.

7        SPECIAL AGENT MYRICK, IF YOU COULD JUST BRIEFLY,

8  WHAT IS GOVERNMENT EXHIBIT 13?

9  A.   AGAIN, THIS IS AN ARCHIVE OF CINEMASCAT.COM.  I THINK

10 THIS -- SPECIFICALLY A SCREEN CAPTURE OF THE "HOLLYWOOD SCAT

11 AMATEURS NUMBER 7," AND IS A REPRESENTATION OF WHAT YOU

12 WOULD SEE WHEN YOU LOGGED ON TO THE WEBSITE THAT DAY.

13 Q.   SPECIAL AGENT MYRICK, IS THIS THE VIDEO THAT YOU

14 PURCHASED -- ONE OF THE FIVE VIDEOS THAT YOU PURCHASED ON

15 OCTOBER 20TH, 2006?

16 A.   YES.

17 Q.   NOW, SPECIAL AGENT MYRICK, I WANT TO TURN YOUR

18 ATTENTION TO JANUARY 17, 2007, WHICH WOULD BE A DATE AFTER

19 YOU PURCHASED THE FIVE VIDEOS.  IS THAT CORRECT?

20 A.   YES.

21 Q.   AND THAT WOULD BE AFTER THE DATE THAT AGENT MCDERMOTT

22 ALSO PURCHASED "MAKO'S FIRST TIME SCAT"?

23 A.   YES.

24 Q.   DID YOU AND OTHER AGENTS EXECUTE A SEARCH WARRANT ON

25 THAT PARTICULAR DATE?

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                     WESTERN DIVISION

4      THE HONORABLE GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE

5

6   UNITED STATES OF AMERICA,     )
                                  )
7                 PLAINTIFF,      )
                                  )
8            VS.                  )    NO. CR 07-732(A)-GHK
                                  )
9   IRA ISAACS,                   )       VOLUME III
                                  )
10               DEFENDANT.       )
    _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

15             LOS ANGELES, CALIFORNIA

16     WEDNESDAY, APRIL 25, 2012; 8:05 A.M. - 2:00 P.M.

17                  TRIAL DAY 3

18          PAGES 1 THROUGH 99, INCLUSIVE

19

20

21

22

23                         MARY RIORDAN RICKEY
                           OFFICIAL COURT REPORTER
24                         255 EAST TEMPLE STREET
                           ROOM 181-G
25                         LOS ANGELES, CA  90012
                           MARY.USDC@YAHOO.COM

```
 1    A.   YES.

 2    Q.   AND IS THAT BECAUSE THIS IS FIRST-CLASS MAIL AND THERE

 3    MUST BE A RETURN ADDRESS?

 4    A.   I DON'T KNOW THE PROTOCOL, BUT I THINK THAT IS CORRECT.

 5    Q.   I NOTICE HERE THAT THE ADDRESS IS D.V.D. PRICEBUSTERS,

 6    7119 WEST SUNSET BOULEVARD, LOS ANGELES, CALIFORNIA.

 7         NOW, YOU HAD ALREADY TESTIFIED THAT YOU HAD

 8    IDENTIFIED THAT ADDRESS AS BEING ASSOCIATED WITH MR. ISAACS.

 9    IS THAT CORRECT?

10    A.   YES.

11    Q.   AND HOW DID YOU KNOW THAT THAT ADDRESS WAS ASSOCIATED

12    WITH MR. ISAACS?

13    A.   THROUGH HIS DRIVER'S LICENSE, AND IT'S ALSO THE SAME

14    ADDRESS ON HIS WEBSITE.

15    Q.   WE'LL COME BACK TO GOVERNMENT EXHIBIT 32.  WELL, LET ME

16    JUST FINISH.  I NOTICE AT THE TOP THAT IT SAYS -- THAT THE

17    COMPANY IS D.V.D. PRICEBUSTERS.

18    A.   YES.

19    Q.   DID YOU HAVE AN OPPORTUNITY TO INVESTIGATE THAT NAME OR

20    COMPANY?

21    A.   YES, I DID.

22    Q.   WHAT DID YOU LEARN IN YOUR INVESTIGATION?

23    A.   THAT IT WAS ANOTHER BUSINESS ASSOCIATED WITH IRA ISAACS

24    AND L.A. MEDIA.

25    Q.   DETECTIVE LEWISON, I'M GOING TO SHOW YOU NOW WHAT'S
```

1    BEEN MARKED AS GOVERNMENT EXHIBIT 34.

2          DO YOU RECOGNIZE THIS EXHIBIT?

3    A.   YES, I DO.

4    Q.   PLEASE TELL THE JURY WHAT IS GOVERNMENT EXHIBIT 34?

5    A.   THIS IS A COPY OF MR. ISAACS' DRIVER'S LICENSE.

6    Q.   WHAT IS THE ADDRESS THAT'S ASSOCIATED -- WELL, IS THE

7    ADDRESS THE SAME ADDRESS FROM THE PACKAGING?

8    A.   YES, IT IS.

9    Q.   DETECTIVE LEWISON, WHAT DID YOU DO IN FURTHERANCE OF

10   THE INVESTIGATION IN MARCH OF 2011?

11   A.   I CONDUCTED A SECOND UNDERCOVER BUY.

12   Q.   DO YOU RECALL WHAT WEBSITE YOU WENT TO IN MARCH 2011 TO

13   MAKE THAT PURCHASE?

14   A.   YES, SCATMOVIES.COM.

15   Q.   AND WHAT VIDEOS DID YOU PURCHASE AT THAT TIME?

16   A.   "JAPANESE DOGGIE 3 WAY" AND "HOLLYWOOD SCAT AMATEURS

17   NUMBER 10."

18   Q.   AND, DETECTIVE LEWISON, EARLIER YOU TESTIFIED TO A

19   PROCESS YOU TOOK TO ORDER THOSE VIDEOS, AND WE WENT THROUGH

20   THAT IN GOVERNMENT EXHIBIT 30.

21          DID YOU FOLLOW THAT SAME PROCESS IN MARCH AS YOU

22   DID IN JANUARY?

23   A.   YES, I DID.

24   Q.   AND AFTER YOU PLACED YOUR ORDER FOR THE MARCH VIDEOS,

25   DID YOU, IN FACT, RECEIVE THOSE VIDEOS?

```
 1   A.   YES.

 2   Q.   DETECTIVE LEWISON, I WANT TO SHOW YOU GOVERNMENT

 3   EXHIBIT 35.  I'LL PUT THIS ON THE SCREEN.

 4            DO YOU RECOGNIZE THIS EXHIBIT?

 5   A.   YES.

 6   Q.   IS THIS A CONFIRMATION ORDER FORM TO SHOW THE PURCHASE

 7   FROM MARCH OF 2011?

 8   A.   YES, IT IS.

 9   Q.   DETECTIVE LEWISON, AT THE TOP OF THIS EXHIBIT DOES IT

10   TELL YOU HOW YOUR CREDIT CARD WILL BE CHARGED?

11   A.   YES.

12   Q.   WHAT COMPANY COULD YOU EXPECT TO RECEIVE A CHARGE ON

13   YOUR CREDIT CARDS FOR?

14   A.   L.A. MEDIA OR D.V.D. PRICEBUSTERS.

15   Q.   DID YOU RECOGNIZE THIS D.V.D. PRICEBUSTERS FROM THE

16   LAST PACKAGING WHEN YOU RECEIVED THAT ALSO?

17   A.   YES, I DID.

18   Q.   DOES IT SHOW HOW MUCH -- DOES IT SHOW THE TWO VIDEOS

19   THAT YOU PURCHASED IN MARCH OF 2011?

20   A.   YES, IT DOES.

21   Q.   AND I ALSO NOTICE THAT IT HAS --

22            DOES IT, IN FACT, HAVE YOUR UNDERCOVER NAME AND

23   ADDRESS ON THERE ALSO?

24   A.   YES.

25   Q.   AND, NOW, AT THE VERY BOTTOM OF THIS ORDER FORM, THERE
```

```
 1   IS A LINK TO WWW.THUNDERROADBV.COM.  DID YOU HAVE AN

 2   OPPORTUNITY TO INVESTIGATE THIS NAME OR THIS LINK OR

 3   COMPANY?

 4   A.   YES.

 5   Q.   WHAT DID YOU LEARN?

 6   A.   IT RETURNED BACK TO L.A. MEDIA'S WEBSITE.

 7   Q.   OKAY.  THANK YOU, DETECTIVE LEWISON.

 8        NOW, I WANT TO SHOW YOU GOVERNMENT EXHIBIT 22.

 9   DETECTIVE LEWISON, DO YOU RECOGNIZE THIS EXHIBIT?

10   A.   YES.

11   Q.   IS THIS THE LINK THAT YOU WOULD HAVE CLICKED ON IN

12   MARCH TO ORDER THE VIDEO "HOLLYWOOD SCAT AMATEURS

13   NUMBER 10"?

14   A.   YES.

15   Q.   DETECTIVE LEWISON, I'LL SHOW YOU GOVERNMENT EXHIBIT 21.

16   AND I'LL ASK YOU IS THIS, IN FACT, THE LINK THAT YOU CLICKED

17   ON TO ORDER "JAPANESE DOGGIE 3 WAY"?

18   A.   YES, IT IS.

19   Q.   DETECTIVE LEWISON, I'M GOING TO ALSO DRAW YOUR

20   ATTENTION TO GOVERNMENT EXHIBIT 36.  DO YOU RECOGNIZE THIS

21   PACKAGE HERE?

22   A.   YES, I DO.

23   Q.   WHAT IS THIS PACKAGE?

24   A.   THIS IS ANOTHER GRAY BUBBLE-WRAP MAILER THAT I RECEIVED

25   THOSE MOVIES THAT I HAD PURCHASED.
```

```
 1   Q.   AND IS THIS THE VIDEOS THAT YOU HAD PURCHASED IN MARCH

 2   OF 2011?

 3   A.   YES.

 4   Q.   AND IS THERE A RETURN ADDRESS ON THIS PACKAGING?

 5   A.   NO.

 6   Q.   WERE YOU ABLE TO FOLLOW THE SAME PROCESS BY CALLING THE

 7   UNITED STATES POSTAL SERVICE TO DETERMINE WHO SENT IT?

 8   A.   WELL, IT WAS THE EXACT SAME NUMBER ON THE METER, POSTAL

 9   METER.

10   Q.   AND THAT NUMBER ASSOCIATES BACK TO SUNSET BOULEVARD

11   MAILBOXES?

12   A.   YES.

13   Q.   AND THEN THERE, IT GOES BACK TO IRA ISAACS?

14   A.   YES.  WELL, IT'S NOT REGISTERED TO ISAACS, BUT IT'S THE

15   SAME POSTAL COMPANY.

16   Q.   RIGHT.

17   A.   THE METER IS REGISTERED TO THE POSTAL OFFICE ITSELF

18   THERE.

19   Q.   AND MR. ISAACS HAS AN ADDRESS -- A BOX THERE?

20   A.   CORRECT.

21   Q.   MY APOLOGIES.

22        AND, DETECTIVE LEWISON, IS IT TRUE THAT THIS

23   PACKAGE IN MARCH OF 2011 WAS ALSO SHIPPED TO YOU VIA THE

24   UNITED STATES MAIL?

25   A.   YES, IT WAS.
```

```
 1           MR. GRANT:  YOUR HONOR, AT THIS TIME, I BELIEVE --

 2      CAN I HAVE ONE MOMENT?

 3           THE COURT:  YES.

 4           (COUNSEL CONFERRED OFF THE RECORD.)

 5           MR. GRANT:  AT THIS TIME, IT MIGHT BE AN

 6      OPPORTUNITY TO STOP.  THE NEXT THING I HAD IN PLACE WAS TO

 7      PLAY THE TWO MOVIES THAT WE JUST DISCUSSED.

 8           THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN OF

 9      THE JURY, WE'LL TAKE OUR EVENING RECESS AT THIS TIME.

10           PLEASE KEEP IN MIND THE ADMONITION OF THE COURT

11      NOT TO DISCUSS THIS MATTER AMONG YOURSELVES OR WITH ANYBODY

12      ELSE UNTIL IT IS FINALLY GIVEN TO YOU FOR YOUR

13      DELIBERATIONS.

14           I WANT TO AGAIN EMPHASIZE THAT PLEASE DO NOT GO ON

15      ANY WEBSITES, DO NOT DO ANY INTERNET SEARCHES, DO NOT LOOK

16      AT ANY COMMENTARY OR STATEMENTS OR BLOG STATEMENTS --

17      WHATEVER IT IS -- ON THE INTERNET.  AND CERTAINLY DO NOT GO

18      ON SOCIAL MEDIA SITES TO DISCUSS OR POST ANYTHING ABOUT THIS

19      CASE.

20           I REALLY APPRECIATE THAT ALL OF YOU WERE HERE ON A

21      TIMELY BASIS THIS MORNING, AND I HOPE YOU'LL BE HERE AGAIN

22      TIMELY TOMORROW.  WE'LL BEGIN PROMPTLY AT 8:00 O'CLOCK.

23           THANK YOU FOR YOUR ATTENTION.  YOU ARE NOW

24      EXCUSED.

25           WE'LL STAY IN SESSION.
```

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4    THE HONORABLE GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE

5

6    UNITED STATES OF AMERICA,      )
                                    )
7                  PLAINTIFF,       )
                                    )
8            VS.                    )    NO. CR 07-732(A)-GHK
                                    )
9    IRA ISAACS,                    )         VOLUME IV
                                    )
10                 DEFENDANT.       )
     _____)

11

12

13        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

14              LOS ANGELES, CALIFORNIA

15            THURSDAY, APRIL 26, 2012

16         TRIAL DAY 4; 8:07 A.M. - 1:55 P.M.

17           PAGES 1 THROUGH 111, INCLUSIVE

18

19

20

21

22

                              MARY RIORDAN RICKEY
23                            OFFICIAL COURT REPORTER
                              255 EAST TEMPLE STREET
24                            ROOM 181-G
                              LOS ANGELES, CA  90012
25                            MARY.USDC@YAHOO.COM

```
 1          THE CLERK:  DO YOU SOLEMNLY SWEAR [VERBATIM] THAT

 2   THE TESTIMONY YOU SHALL GIVE IN THE CAUSE NOW PENDING BEFORE

 3   THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING

 4   BUT THE TRUTH, SO HELP YOU GOD?

 5          THE WITNESS:  YES.

 6          THE CLERK:  I'M SO SORRY -- WAS AFFIRMED.

 7          THE WITNESS:  THAT'S OKAY.

 8          THE CLERK:  PLEASE STATE YOUR NAME FOR THE RECORD

 9   AND SPELL YOUR FIRST AND YOUR LAST NAME FOR THE RECORD.

10          THE WITNESS:  MY NAME IS IRA ISAACS, I-R-A,

11   I-S-A-A-C-S.

12                     DIRECT EXAMINATION

13   BY MR. DIAMOND:

14   Q.   MR. ISAACS, WHERE WERE YOU BORN?

15   A.   I WAS BORN IN NEW YORK CITY IN THE BRONX.

16   Q.   AND WHERE DID YOU GO TO SCHOOL?

17   A.   MY FIRST WAS A PUBLIC SCHOOL IN NEW YORK, AND I WENT TO

18   HIGH SCHOOL THERE.  I QUIT HIGH SCHOOL AND WORKED A LITTLE

19   BIT, AND THEN I TOOK A G.E.D., WHICH IS AN EQUIVALENCY

20   DIPLOMA, AND WENT TO THE UNIVERSITY, GOT IN AND GRADUATED

21   WITH A BACHELOR'S DEGREE.

22   Q.   WHAT UNIVERSITY DID YOU ATTEND?

23   A.   STATE UNIVERSITY OF NEW YORK IN NEW PALTZ, NEW YORK.

24   Q.   WHAT DEGREE DID YOU RECEIVE?

25   A.   I RECEIVED A BACHELOR'S OF COMMUNICATION ARTS.
```

1   Q.   THAT WAS YOUR MAJOR IN COLLEGE?

2   A.   THAT WAS MY MAJOR, AND THEN MY MINOR WAS ART.

3   Q.   AND I SUPPOSE SOMETIME AFTER YOU GRADUATED FROM COLLEGE

4   IN NEW YORK, YOU MADE YOUR WAY TO LOS ANGELES?

5   A.   YEAH, IN 1978.

6        I GRADUATED IN 1977, AND MY MOTHER DIED.  AND I

7   FIGURED THIS WAS A GOOD TIME TO MAKE A NEW VENTURE OUT

8   THERE, AND I CAME TO CALIFORNIA IN '78, TO LOS ANGELES TO

9   KIND OF MAKE MY STAKE IN LIFE.

10  Q.   AND COULD YOU GIVE US A BRIEF BACKGROUND IN TERMS OF

11  WHAT BUSINESSES OR JOBS YOU HAD, JUST THE MOST RECENT ONES,

12  BEFORE YOU GOT INVOLVED WITH THE MOVIES THAT ARE THE SUBJECT

13  OF THIS CASE?

14  A.   WHEN I FIRST GOT TO CALIFORNIA, I GOT A LOT OF

15  ADVERTISING JOBS, LIKE NEWSPAPERS, SELLING ADVERTISING LIKE

16  THE L.A. WEEKLY AND LOCAL NEWSPAPERS.  AND I LEARNED THE

17  ADVERTISING BUSINESS.

18       I GOT FIRED A LOT BECAUSE I WASN'T A VERY GOOD

19  SALESMAN, AND I COULDN'T REALLY CONVINCE PEOPLE TO BUY THOSE

20  ADS.  BUT I DID LEARN ENOUGH TO TRY TO DO A VERY NEW

21  CREATIVE THING IN ADVERTISING, AND SO I STARTED MY OWN

22  COMPANY APPROXIMATELY IN 1987.

23  Q.   WHAT KINDS OF PRODUCTS DID YOU MAKE FOR THAT PARTICULAR

24  ADVERTISING COMPANY?

25  A.   WELL, BACK IN '87, COUPONS WERE VERY BIG, LIKE VALPAK,

```
1   THOSE KINDS OF THINGS, COUPONS YOU GET IN THE MAIL.  AND I

2   HAD A DIFFERENT KIND OF IDEA TO GIVE FULL COLOR

3   ADVERTISEMENTS AT A VERY LOW PRICE AND GIVE PEOPLE IN A

4   COMMERCIAL DIRECT MAIL.  BASICALLY IT WAS MAIL COUPONS, A

5   WHOLE BUNCH OF PEOPLE FOR DRY CLEANERS AND RESTAURANTS, AND

6   A CUSTOMER WOULD GRAB THE COUPON AND BRING IT IN.

7        WE TRIED TO DO SOMETHING -- I TRIED TO DO

8   SOMETHING A LITTLE BIT DIFFERENT, A LITTLE MORE FINE ARTSY,

9   AND SOMETHING THAT IS VERY STAND-AWAY FROM EVERYTHING THAT

10  HAS BEEN DONE PREVIOUSLY.  AND I HAVE SOME EXHIBITS OF THAT,

11  AS WELL.

12  Q.   COULD YOU MENTION TO THE JURY, WHAT ARE THE EXHIBIT

13  NUMBERS OF THE EXHIBITS YOU BROUGHT, AND HAVE YOU SHOWN ALL

14  THESE EXHIBITS TO THE GOVERNMENT?

15  A.   YES.  THE GOVERNMENT HAS A COPY OF THE EXHIBITS.

16  Q.   SO COULD YOU REFER US TO THE ONES THAT YOU ARE TALKING

17  ABOUT NOW WITH THE COUPONS?

18        JUST USE THE NUMBER, AND THEN I'LL PUT THEM ON THE

19  ELMO HERE WITH THE COURT'S PERMISSION.

20  A.   THE FIRST ONE IS EXHIBIT 111.

21  Q.   AND WHAT DOES THAT SHOW?

22  A.   I HAVE A COPY IN MY HAND, AS WELL (INDICATING).

23        EXHIBIT 111 IS ONE OF THE COUPON MAILERS.

24  BASICALLY, AS YOU CAN SEE -- NOW IT'S 2012.  SO IT'S NOT AS

25  INNOVATIVE AS IT WAS IN 1988.  BUT BASICALLY WHAT IT IS IS
```

```
 1   FINE ART.  IT'S LIKE THIS LITTLE -- THIS IS FOR LIKE A FAST

 2   FOOD CHICKEN KIND OF PLACE.  AND WHAT WE DID WAS DRAW UP THE

 3   CHICKEN FAMILY AND THE FULL MENU AND COUPONS.

 4          AND FOR THAT TIME, THIS WAS VERY DIFFERENT.

 5   NOBODY ACTUALLY EVER PUT PEOPLE IN A COUPON.  IT WAS A

 6   COUPON WITH A NUMBER OR MAYBE SOME PEOPLE OUT.  BUT WE TRIED

 7   TO DO SOMETHING A LITTLE BIT DIFFERENT BY USING A LITTLE BIT

 8   MORE BRIGHT COLORS TO ATTRACT PEOPLE.

 9          AND THIS IS AN EXAMPLE OF AN ACTUAL MAILER THAT WE

10   SENT OUT.

11   Q.   DO YOU HAVE ANY OTHER EXAMPLES OF THE COUPONS YOU MADE

12   DURING YOUR ADVERTISING DAYS?

13   A.   YES, I DO (INDICATING).

14   Q.   WHAT IS THAT?

15          REFER TO THE EXHIBIT NUMBER.

16   A.   EXHIBIT 100.

17   Q.   OKAY.  I'M LOOKING FOR THAT.  I'M TECHNOLOGICALLY

18   CHALLENGED.

19          THE COURT:  MR. GRANT, I THINK ONE OF THE ITEMS

20   HAS TO BE TURNED OFF SO THAT IT WILL WORK.

21          MR. GRANT:  CERTAINLY, I'LL TAKE CARE OF THAT,

22   YOUR HONOR.

23          MR. DIAMOND:  THANK YOU.

24          (MR. GRANT ADJUST ELMO EQUIPMENT.)

25          MR. GRANT:  NO PROBLEM.
```

```
 1            THE WITNESS:  IF YOU COULD KIND OF FLIP IT SO IT'S

 2   RIGHT-SIDE UP.  IT WOULD PROBABLY BE EASIER.  THERE YOU GO.

 3   BY MR. DIAMOND:

 4   Q.   SO THAT'S THE EXHIBIT?

 5   A.   YEAH.

 6   Q.   CAN YOU TELL THE JURY WHAT THAT IS?

 7   A.   WELL, THIS IS ONE OF THE COUPON MAILINGS, AND WHAT I

 8   WANT TO SHOW HERE IS WE ACTUALLY DID HAND PAINTINGS WITH A

 9   BRUSH, NOT COMPUTER-GENERATED.

10            AND WHAT YOU GOT HERE IS A WHOLE BUNCH OF -- THIS

11   IS FOR A DENTIST.  AND ALL THESE ANIMALS ARE COMING OUT OF

12   NOAH'S ARK INTO THE DESERT, I GUESS, AFTER THE FLOOD.

13            AND THEY ALL HAVE TOOTHBRUSHES AND COUPONS, AND

14   YOU HAVE ELEPHANTS AND TIGERS.  AND YOU KIND OF GOT ALL THE

15   THINGS OF THE THING [VERBATIM].

16            AND THE IDEA WAS TO DO SOMETHING THAT -- MORE

17   ARTISTIC THAN WHAT WAS HAPPENING, JUST A REGULAR COUPON.

18   AND BY PRODUCING HAND PAINTINGS, WE WERE PROBABLY THE ONLY

19   ONE DOING THAT KIND OF STUFF BECAUSE WE FELT IF WE GAVE

20   PEOPLE AN ARTISTIC APPROACH TO THIS, THAT THE CONSUMER WOULD

21   BE MORE FAVORABLE TO THAT PARTICULAR RETAILER.

22            AND THIS IS THE ACTUAL PAINTING THAT IS

23   REPRESENTED BY THAT, AND AS YOU CAN SEE, IT'S A HAND

24   PAINTING, AND IT'S BY A BRUSH.  THE OLD-FASHIONED WAY.

25   Q.   HAVE YOU BROUGHT ANY OTHER EXAMPLES WITH YOU?
```

```
1    A.   YES.

2    Q.   COULD YOU TELL THE JURY THE EXHIBIT NUMBER AND THEN

3    SHOW US, AND I'LL PUT THE COPY ON THE SCREEN HERE.

4    A.   EXHIBIT 108 (INDICATING).

5         THIS IS THE SAME KIND OF IDEA.  THIS IS AN

6    ALLIGATOR FAMILY.  THE FATHER'S WEARING A HAWAIIAN SHIRT,

7    AND HE'S BY THE BEACH, AND HE HAS HIS KID WITH HIM.

8         BUT AGAIN, THE IDEA IS WE PRODUCED THIS BY HAND,

9    WITH A VERY ARTISTIC TYPE OF FEELING TO IT SO WE COULD

10   HOPEFULLY GIVE OUR CUSTOMERS, OUR ADVERTISERS, AN

11   ADVERTISING PIECE THAT TENDS TO BE MUCH MORE EFFECTIVE AND

12   MUCH MORE -- AND VERY DIFFERENT THAN MAYBE WHAT THEY'VE

13   GOTTEN, AND THIS IS JUST ANOTHER EXAMPLE OF OUR HAND ARTWORK

14   THAT WE DID.

15   Q.   DO YOU HAVE ANY OTHER EXAMPLES?

16   A.   YES, ONE OR TWO MORE.

17   Q.   AND THEY WOULD BE WHAT NUMBERS?

18   A.   109 (INDICATING).

19   Q.   THANK YOU.

20   A.   109, AGAIN, THESE ARE EXAMPLES OF MORE COUPONS.  THESE

21   ARE THE ACTUAL MAILERS, AND IT'S FOR A PIZZA CHAIN CALLED

22   "RUSTY'S" IN SANTA BARBARA.

23         AND WHAT THIS IS IS JUST DIFFERENT COUPONS WHERE

24   WE MADE A PIZZA, KIND OF ANTHROPOMORPHIZED IT, AND MADE IT A

25   PERSON.  WE HAVE A SKATEBOARDER, A GUY IN A CAR DELIVERING,
```

1   AND SUPER HERO PIZZA.

2        AND THE IDEA AGAIN WAS TO TAKE AN ARTISTIC

3   APPROACH TO A COMMERCIAL MEDIUM LIKE COUPONING.  I TRIED TO

4   UPSCALE IT AND MAKE IT SOMETHING THAT HAS A HIGHER ARTISTIC

5   VALUE AS FAR AS WHAT OTHER THINGS WERE OUT THERE AT THE

6   TIME.

7   Q.   OKAY.  IS THAT THE END OF THE EXAMPLES OF THE COUPONS

8   YOU WERE MAKING IN YOUR EARLY ADVERTISING DAYS, OR DO YOU

9   HAVE ANY MORE?

10  A.   I STILL HAVE THE ADVERTISING COMPANY.  I'VE HAD IT

11  SINCE 1987.

12       **THE COURT:**  I'M SORRY.  I DON'T THINK YOU

13  UNDERSTOOD HIS QUESTION.

14  **BY MR. DIAMOND:**

15  Q.   DO YOU HAVE ANY MORE EXAMPLES?

16  A.   NO.

17  Q.   OKAY.  SO NOW AFTER THIS OR WHILE THIS WAS GOING ON,

18  YOU ADDED ANOTHER BUSINESS TO WHAT YOU WERE DOING TO MAKE A

19  LIVING?

20  A.   YES.

21       WELL, IN 1999 -- YOU KNOW, ONE OF THE THINGS ABOUT

22  DOING ALL THIS KIND OF ART THAT I'VE SHOWN YOU, IT'S VERY

23  ESTHETICALLY PLEASING TO SOME; IT'S KIND OF CUTE.  I THINK

24  THE PHYSICAL CRAFT, THE TECHNICAL CRAFT, THE PAINTING IS

25  PRETTY MAINSTREAM STUFF.  I THINK MOST PEOPLE WOULD LOOK AT

```
 1   THIS AND SAY "OH, THIS IS KIND OF CUTE, CUTE ALLIGATORS,
 2   CUTE THIS, CUTE THAT."
 3           BY 1999, I'M GETTING VERY TIRED OF THIS.  I'M AN
 4   ARTIST, AND I WANT TO DO NEW THINGS.  I'M TIRED OF DOING THE
 5   SAME CUTE THINGS FOR 20 YEARS.  AND I WANT TO DO SOMETHING
 6   IN MORE OF THE FINE ART.  SO I FELT THAT -- TO EXAMINE NEW
 7   AREAS.
 8           AND WITH THE INTERNET, I WAS ABLE TO DO CERTAIN
 9   THINGS AND ALSO WITH THE TECHNOLOGY OF CAMERAS AND THINGS
10   LIKE THAT IN 1999, I WASN'T ABLE TO DO THOSE KINDS OF THINGS
11   IN THE 80'S OR 70'S BECAUSE YOU DIDN'T HAVE DIGITAL CAMERAS.
12   YOU DIDN'T HAVE THOSE KIND OF THINGS THAT WE HAVE.
13           SO IN 1999, I HAD SOME ADVERTISING IDEAS I WANTED
14   TO DO.  ONE WAS CALLED "YES, L.A."
15           AND WHAT "YES, L.A." WAS WAS KIND OF LIKE -- BACK
16   THEN, IT WAS KIND OF NEW.  BUT IT WAS BASICALLY A RESOURCE
17   THAT YOU COULD GO TO, SAY IN LOS ANGELES, AND PUT YOUR
18   ZIP CODE IN.  AND YOU CAN FIND WHAT RESTAURANT YOU MIGHT
19   WANT TO GO TO AND GET A COUPON, OR A DRY CLEANER, OR ANY OF
20   THOSE THINGS.
21           SO TO DO THAT, SINCE THE INTERNET -- AND I WAS
22   KIND OF NEW AT IT, I DECIDED TO DO SOMETHING EASIER BECAUSE
23   MY ART IS PRETTY COMPLEX, AND I DIDN'T HAVE ENOUGH KNOWLEDGE
24   AS A WEBMASTER TO DO THAT.
25           SO I DECIDED TO TAKE SOME MOVIES THAT I HAD
```

1    ACQUIRED OVER THE YEARS FROM NEW YORK CITY AND THINGS LIKE

2    THAT AND PRACTICE AND PUT A WEBSITE UP SELLING THESE MOVIES,

3    THINKING I'D GET TWO THINGS OUT OF IT:  ONE, I'D LEARN HOW

4    TO MAKE WEB DESIGNS AND THINGS LIKE THAT; AND TWO, HOPEFULLY

5    I COULD MAKE A LITTLE BIT OF MONEY BECAUSE EVEN THOUGH I DID

6    ALL THIS, I WAS STILL KIND OF A STARVING ARTIST AT THE TIME

7    BECAUSE IT'S A VERY COMPETITIVE -- COMMERCIAL ART'S VERY,

8    VERY COMPETITIVE.  SO IS FINE ART, AS WELL.

9    Q.   SO HOW DID YOU GET INTO THE X-RATED MOVIE BUSINESS?

10   A.   AS I SAID, I WAS TRYING TO PRACTICE HOW TO BE A

11   WEBMASTER AND LEARN THE TECHNIQUES HOW TO DO IT, AND AN

12   ADULT SITE WAS A LOT EASIER TO DO.

13         AND I HAD THESE MOVIES.  SO I BASICALLY LEARNED,

14   AND I PUT THEM UP, THINKING IF I COULD MAKE A COUPLE HUNDRED

15   BUCKS A MONTH FROM RESELLING THESE MOVIES THAT I WOULD GET

16   FROM NEW YORK, I WOULD BE HAPPY.

17         TURNED OUT I MADE A LITTLE MORE MONEY THAN THAT,

18   BUT THAT WAS THE INITIAL REASON TO DO IT.

19   Q.   SO YOU WERE SELLING -- YOU WERE BASICALLY RESELLING

20   MOVIES THAT YOU HAD ALREADY ACQUIRED?

21   A.   YES.  I PURCHASED MOVIES USUALLY IN NEW YORK CITY.  AND

22   AT THIS POINT, SOME FROM EUROPE, AND I RESOLD THEM.  I

23   BOUGHT COPIES OR WHATEVER, AND I RESOLD THEM ON THE

24   INTERNET.

25   Q.   NOW, WITH RESPECT TO THE MOVIES THAT ARE THE SUBJECT OF

```
 1   THIS CASE, THAT YOU APPARENTLY PERSONALLY PRODUCED, COULD
 2   YOU PLEASE TELL THE JURY HOW YOU GOT STARTED IN THAT AREA?
 3   A.   WELL, I WAS DOING -- YOU KNOW, THIS IS SUCH A LONG TIME
 4   AGO.  IT'S 11, 10 YEARS AGO.  SO HOPEFULLY I CAN HAVE THE
 5   DATES KIND OF RIGHT.
 6        BUT AFTER SELLING MOVIES, I REALIZED THAT, YOU
 7   KNOW, IT WAS MAKING ME A DECENT -- IT WAS PAYING MY RENT.
 8   WHERE BEFORE I WAS STRUGGLING TO MAKE MY RENT, NOW I GOT A
 9   COUPLE OF THOUSAND A MONTH FROM THESE TO PAY MY RENT.  AND I
10   DECIDED -- I'VE ALWAYS WANTED TO MAKE MOVIES, AND I
11   NEEDED -- I NEEDED A SUBJECT MATTER THAT WOULD MAKE ME
12   UNIQUE.
13        WHAT WAS HAPPENING IN ART AT THE TIME WAS SHOCK
14   ART.  STILL, FOR EXAMPLE, 1997, IT WAS A VERY POPULAR THING
15   AT THE TATE MUSEUM IN ENGLAND THAT HAD A LOT OF SHOCK ART,
16   EVERYTHING FROM DISEMBODIED COWS AND THE CRAZIEST STUFF YOU
17   COULD IMAGINE.  AND WHAT'S HAPPENING THEN IS STILL -- SHOCK
18   ART IS A VERY POPULAR THING IN TODAY'S MODERN -- IN THE
19   ARTISTIC COMMUNITY.  SO I WANTED TO GET INVOLVED.
20        I HAD SEEN THESE SCATOLOGICAL MOVIES IN NEW YORK
21   IN THE 80'S.  AND I'LL TELL YOU, I WAS SO BLOWN AWAY WHEN I
22   SAW THEM, AND I COULDN'T BELIEVE WHAT I WAS WATCHING.  IT
23   WAS SO DIFFERENT, SO INTENSE THAT I SAW IT AS A NARRATIVE,
24   AS A SUBJECT MATTER THAT COULD MAYBE SET ME ASIDE IN A FINE
25   ART WAY.
```

```
1              SO I DECIDED TO EXPLORE THAT NARRATIVE, THAT

2    DARKER SIDE OF THE HUMAN CONDITION.

3              NOW YOU GOT TO REMEMBER, ALL THESE MOVIES, PEOPLE

4    DO THESE KINDS OF THINGS.  THIS IS NOT SOMETHING I INVENTED

5    OR SOMETHING THAT'S UNIQUE TO ME.  PEOPLE DO THESE KIND OF

6    THINGS.  THEY'RE PRETTY COMMON.  I WANTED TO EXPLORE THE

7    DARKER SIDE OF THE HUMAN CONDITION.

8              YOU GOT TO REMEMBER, MOST PAINTERS, MOST ARTISTS

9    DO THINGS THAT ARE ARTISTICALLY ESTHETICALLY PLEASING LIKE A

10   BEAUTIFUL PAINTING, WHATEVER, AND THAT IS ART.  GO TO A

11   MUSEUM, AND THERE'S SO MUCH OF THAT.  BUT I WANTED TO DO

12   SOMETHING --
```

13              **MR. KING:**  OBJECTION, YOUR HONOR.

14              **THE COURT:**  JUST A MINUTE.

```
15              MR. DIAMOND, THIS IS GETTING TO BE AN UNDOABLE

16   NARRATIVE.  WE'RE GOING TO ASK QUESTIONS, AND THEN WE'LL

17   HAVE ANSWERS.

18              MR. ISAACS, YOU'RE NOT HERE TO GIVE A LECTURE.
```

19              **THE WITNESS:**  OKAY.

```
20              THE COURT:  YOU ARE HERE TO SIMPLY ANSWER THE

21   QUESTIONS THAT ARE POSED TO YOU.  SO PLEASE, DO NOT CONTINUE

22   WITH A NARRATIVE.
```

23              **THE WITNESS:**  OKAY.

```
24              THE COURT:  LISTEN TO THE QUESTION SO THAT YOU

25   KNOW EXACTLY WHAT IS BEING ASKED OF YOU, AND ANSWER THOSE
```

```
1    QUESTIONS; NO MORE, NO LESS.

2              THE WITNESS:  OKAY.

3              THE COURT:  THANK YOU.

4              MR. DIAMOND:  THANK YOU, YOUR HONOR.

5    BY MR. DIAMOND:

6    Q.   MR. ISAACS, NOW FOCUSING ON THE TWO MOVIES THAT YOU

7    PRODUCED, NOT THE JAPANESE LANGUAGE MOVIES THAT YOU DID NOT

8    PRODUCE.  JUST LIMITING YOUR TESTIMONY TO THE TWO THAT YOU

9    DID PRODUCE, "HOLLYWOOD SCAT AMATEURS 7" AND "10," I

10   BELIEVE.

11   A.   YES.

12   Q.   KEEPING THOSE TWO MOVIES IN MIND -- AND YOU CAN TREAT

13   THEM SEPARATELY OR LUMP THEM TOGETHER FOR SAKE OF SPEEDING

14   UP THIS TRIAL -- WHAT WERE YOUR GOALS, INSPIRATIONS, AND

15   INTENDED MEANING WITH RESPECT TO THOSE MOVIES?

16             WHAT DID YOU AIM TO ACHIEVE?

17             THAT'S THE GENERAL QUESTION I'M ASKING YOU.  AND

18   YOU CAN BREAK THAT DOWN INTO PARTS TO LET THE JURY KNOW WHAT

19   YOU WERE DOING WITH RESPECT TO THOSE MOVIES.

20             SO AGAIN FOCUSING ON YOUR GOALS, INSPIRATIONS,

21   INTENDED MEANING, AND WHAT DID YOU AIM TO ACHIEVE.  DO YOU

22   HAVE THAT SORT OF COMPOSITE QUESTION IN MIND?

23   A.   YES, I DO.

24             AS AN ARTIST, I WANT TO -- ONE OF MY GOALS IS

25   HOPEFULLY TO TRY TO DO SOMETHING UNIQUE AND DIFFERENT.  AND
```

```
 1    THE MOVIE, I WANTED TO -- I ALSO SEE MYSELF AS KIND OF AN

 2    ICONOCLAST, SOMEONE WHO FIGHTS AND BREAKS WITH TRADITIONAL

 3    THINGS.

 4            SO THE MOVIE, BECAUSE OF ITS SUBJECT MATTER,

 5    BECAUSE OF ITS CONTENT, IT'S SO EXTREME, IT TENDS, I

 6    THINK -- AND WHAT I TRY TO DO IS HOPEFULLY THE VIEWER WOULD

 7    QUESTION THE BASIC ESSENCE OF WHAT ART IS.

 8            CAN THIS BE ART?  CAN A SCATOLOGICAL MOVIE BE ART?

 9    CAN PEOPLE PUTTING WHATEVER ON THEIR BODY OR DOING THIS OR

10    THAT, CAN THAT BE ART?  OR ONLY CAN ART BE SOMETHING THAT'S

11    PLEASING.

12            SO I WANTED TO QUESTION ARTISTICALLY THE BASIC

13    NATURE OF WHAT ART IS.

14    Q.   IS THERE A TERM THAT IS APPLIED TO THIS PARTICULAR

15    CONCEPT THAT YOU'VE DESCRIBED?

16    A.   YES.

17    Q.   WHAT IS THAT?

18    A.   IT'S CALLED "POSTMODERNISM."  AND POSTMODERNISM IS

19    AFTER --

20            MR. KING:  OBJECTION, YOUR HONOR.

21            THE COURT:  SUSTAINED.

22    BY MR. DIAMOND:

23    Q.   DID YOU INTEND BY THESE MOVIES TO DISTURB THE AUDIENCE

24    THAT MIGHT WANT TO WATCH THEM AND PROVOKE THEM INTO FURTHER

25    THOUGHT AND CRITICAL ANALYSIS?
```

```
1   A.   YES, SOME OF THEM.

2        YOU KNOW, SOME PEOPLE DON'T GET PROVOKED, AND THEY

3   MAYBE JUST USE IT FOR THEIR OWN PLEASURE.  BUT YES, MY

4   INTENT WAS TO GIVE SOMETHING UNIQUE, SOMETHING THAT WOULD

5   EVOKE THEM TO THINK ABOUT THINGS IN A DIFFERENT WAY, A NEW

6   WAY, TO SHOW THEM A PART OF LIFE THAT MAYBE THEY NEVER

7   CONSIDERED, THAT THEY NEVER EVER HEARD OF.  AND NOW THEY'RE

8   EXPOSED TO IT, AND IT MAKES YOU THINK, WHY DO PEOPLE DO

9   THESE KIND OF THINGS.

10  Q.   WERE YOU INSPIRED BY ANY PARTICULAR WORKS OF ART THAT

11  WERE GENERATED BY ARTISTS, OTHER ARTISTS?

12  A.   YES, I HAVE.

13       I ALSO WANT TO SAY THAT THERE ARE POLITICAL

14  REASONS, AS WELL, AS PART OF MY INTENT, NOT JUST ARTISTIC

15  REASONS.

16  Q.   AND WHAT WERE YOUR POLITICAL REASONS?

17  A.   WELL, WHEN YOU'RE A SO-CALLED "ICONOCLAST," YOU WANT TO

18  BREAK THE NORMS AND THE TABOOS AND QUESTION THINGS.  AND I

19  FELT THAT RIGHT FROM THE BEGINNING THAT I WOULD BE --

20       YOU KNOW, I USED "JOSEF K" FROM "THE TRIAL" AS MY

21  DIRECTOR'S CREDIT.  I KIND OF PREDICTED WHERE I'D BE RIGHT

22  NOW WITH THIS.  I ALWAYS KNEW THAT I'D HAVE TO DEFEND THIS

23  STUFF SOMEWHERE IN MY BRAIN.

24       AND THE POLITICAL POINT IS IS THE PROMISE OF

25  AMERICA OF FREEDOM OF SPEECH AND, I THINK, THE HYPOCRISY AND
```

```
 1   THE REALITY THAT WE DON'T HAVE IT.  AND I WANTED THESE
 2   MOVIES AND OTHER MOVIES I MADE -- BECAUSE THESE ARE NOT THE
 3   ONLY MOVIES I MADE -- TO HAVE THE VIEWER QUESTION THAT.
 4   Q.   AND YOU SAID YOU USED THE NAME "JOSEF K."  WHERE DID
 5   YOU GET THAT NAME?
 6   A.   JOSEF K. IS A CHARACTER FROM A FAMOUS BOOK CALLED "THE
 7   TRIAL" THAT WAS WRITTEN PROBABLY, I THINK ABOUT 1918, 1919
 8   FROM A FAMOUS AUTHOR NAMED FRANZ KAFKA, WHO'S PROBABLY
 9   CONSIDERED ONE OF THE GREATEST AUTHORS OF ALL TIMES,
10   SPECIFICALLY THE 20TH CENTURY, IF NOT OF ALL TIME.
11          AND HE WAS A CHARACTER.  JUST A QUICK SYNOPSIS IS
12   HE FINDS HIMSELF ONE DAY -- IT'S 1920'S.  IT'S BEFORE
13   HITLER, GERMANY.  IT'S ALL DEMOCRACY.  IT'S NOT A FASCIST.
14   THERE'S NO COMMUNISM YET.
15          AND HE FINDS HIMSELF IN KIND OF A DEMOCRATIC -- HE
16   FINDS HIMSELF ARRESTED.  HE DOESN'T KNOW WHAT HE'S ARRESTED
17   FOR AND THEY DON'T TELL HIM, AND HE SPENDS THE REST OF THE
18   BOOK TRYING TO PROVE HIS INNOCENCE.
19          AND THIS CHARACTER, I HAVE IDENTIFIED SINCE I WAS
20   A LITTLE KID -- SINCE I WAS 18 AND READ THE BOOK, AND I
21   ALWAYS KIND OF FANTASIZED ABOUT BEING JOSEF K., AND NOW I
22   AM.
23          SO I USED THE DIRECTOR'S CREDIT FOR THAT REASON,
24   AND SINCE KAFKA -- I FELT -- I REALLY FELT THAT THIS WAS
25   SOMETHING THAT WAS IMPORTANT TO THE MOVIE TO GIVE IT A
```

```
1    LITTLE TWIST.

2    Q.   AND THE NAME JOSEF K. IS NOT THE NAME K-A-Y, BUT JUST

3    THE LETTER "K?"

4    A.   YES, IT'S JUST THE LETTER "K."  SO IT'S

5    JOSEF, J-O-S-E-F, AND THE LETTER "K."  THAT WAS THE

6    CHARACTER'S NAME.

7    Q.   AND YOU WERE NOT DOING THIS FOR ANY KIND OF ILLICIT

8    PURPOSE IN IDENTIFYING YOURSELF AS THE CHARACTER IN THE BOOK

9    "THE TRIAL" BY FRANZ KAFKA?

10   A.   I DON'T REALLY UNDERSTAND THAT QUESTION.

11   Q.   THERE WAS SOME SUGGESTION THAT YOU WERE TRYING TO

12   CONCEAL YOUR IDENTITY BY USING A REFERENCE TO JOSEF K.

13          IS THAT RIGHT?

14   A.   NO, IT ISN'T.  A LOT OF PEOPLE USE ALIASES AND PEN

15   NAMES AND -- YOU KNOW, MARK TWAIN, A LOT OF PEOPLE USE

16   DIFFERENT NAMES.  "IRA ISAACS" IS NOT THE MOST CATCHY NAME.

17   Q.   SO THAT'S WHY YOU PICKED JOSEF --

18   A.   WELL, JOSEF K. IN "THE TRIAL" IS THE MOST INFLUENTIAL

19   THING OF MY LIFE, AND THAT BOOK IS -- AND WHY I DO MY MOVIES

20   OR WHY I DO ANYTHING IN LIFE BASICALLY COMES FROM A STORY IN

21   THAT BOOK THAT GUIDES ME -- EVERYTHING I DO.

22          AND THE MOVIES ARE DIRECTLY -- COME FROM THOSE

23   IDEAS FROM THE BOOK "THE TRIAL" AND A LITTLE PASSAGE, A

24   THREE-MINUTE LITTLE STORY THAT'S IN THE BOOK.

25   Q.   AND WHAT IS THAT STORY?
```

```
1    A.    WELL, THE STORY'S CALLED "BEFORE THE LAW."  AND

2    BASICALLY THIS CHARACTER, JOSEF K., TOWARDS THE END OF THE

3    BOOK, FINDS HIMSELF --

4          REMEMBER, HE'S A CHARACTER WHO'S TRYING TO PROVE

5    HIS INNOCENCE THROUGH THE WHOLE BOOK, AND HE'S NOT HAVING

6    THAT GREAT LUCK THROUGH IT BECAUSE, FOR WHATEVER REASON.

7          MAYBE SOME OF YOU HEARD, YOU KNOW, "IT'S A

8    KAFKAESQUE SITUATION" GOING FROM HALLWAY TO HALLWAY TO

9    OFFICE TO OFFICE.

10         SO IN THIS IS A LITTLE STORY.  AND WHERE THE STORY

11   GOES, IT'S CALLED "BEFORE THE LAW."

12         NOW, THE LAW DOESN'T HAVE TO BE PHYSICAL -- YOU

13   KNOW, REALLY THE LAW.  IT'S A METAPHOR.  IT COULD BE ABOUT

14   ANYTHING ABOUT YOUR LIFE THAT CHALLENGES YOU, THINGS ABOUT

15   YOUR LIFE THAT YOU MIGHT BE AFRAID OF DOING.

16         I MEAN, I KNOW ME, IN MY PERSONAL LIFE, I MIGHT BE

17   AFRAID OF DOING THIS 'CAUSE -- JUST AFRAID OF DOING IT,

18   TAKING RISKS GOING ON.

19         AND FOR EXAMPLE, MY CAREER IT COULD BE ABOUT; IT

20   COULD BE ABOUT YOUR EDUCATION; IT COULD BE ABOUT

21   RELATIONSHIPS.  IT'S A METAPHOR, "THE LAW," FOR ANYTHING

22   THAT YOU REALLY WANT, BUT YOU HAVE FEARS IN GETTING IT.

23         AND THE WAY THE STORY GOES -- AND THIS IS THE

24   STORY.  A PRIEST IS TELLING JOSEF K. SO HE CAN UNDERSTAND

25   MORE ABOUT HIS SITUATION.  AND THE WAY THE STORY GOES IS
```

```
 1    "BEFORE THE LAW" -- AND AGAIN, THE LAW COULD BE ANYTHING,

 2    BUT THIS IS WHAT THE BOOK'S ABOUT.  SO THEY HAD TO DO

 3    SOMETHING.  SO IT'S THE LAW.

 4            "BEFORE THE LAW" THERE STANDS A DOOR AND A MAN

 5    FROM THE COUNTRY WHO WANTS TO GET ADMITTANCE TO THE LAW, HE

 6    COMES IN THERE, AND HE WANTS TO GET INTO THE LAW.  AND SO HE

 7    NOTICES, AND HE COMES TO THIS DOOR.  AND THE DOOR'S ALWAYS

 8    OPEN, BUT THERE IS A DOORKEEPER THERE.

 9            AND THE DOORKEEPER SAYS -- HE ASKS, "CAN I GO IN

10    NOW?"  "CAN I GET INTO THE -- TO SEEK ADMITTANCE?"

11            AND THE DOORKEEPER SAYS, "NO, NOT AT THIS TIME."

12            THE MAN SAYS, "WELL, IS IT POSSIBLE IN THE

13    FUTURE?"

14            AND THE DOORKEEPER SAYS, "YES.  IT IS POSSIBLE IN

15    THE FUTURE."

16            THE MAN LOOKS THROUGH THE DOOR, AND THERE'S MANY

17    DOORS.  IT'S NOT THE ONLY DOOR.  HE'S THE FIRST DOORKEEPER.

18            AND THE DOORKEEPER SAYS TO HIM AS HE LOOKS AND

19    PEERS THROUGH, HE SAYS, "I AM A VERY POWERFUL DOORKEEPER,

20    BUT I'M THE LEAST POWERFUL.  I'M ONLY THE FIRST DOORKEEPER

21    OF MANY."

22            AND EVEN THE DOORKEEPER SAYS HE CAN'T EVEN BEAR

23    THE SIGHT OF THE FOURTH DOORKEEPER BECAUSE HE'S SO POWERFUL.

24            SO THE MAN FIGURES, I BETTER WAIT NOW, NOT JUST

25    RUN IN.  HE PEERS IN, BUT HE DECIDES -- AND THE DOORKEEPER
```

```
1    GIVES HIM A STOOL, AND HE SITS THERE.

2           THE MAN BRIBES HIM.  HE TRIES TO CONVINCE HIM.

3    BUT EVERY TIME HE ASKS "CAN I GET ADMITTANCE NOW?" THE

4    DOORKEEPER SAYS "NO.  NOT AT THIS TIME."

5           WELL, THE MAN SITS THERE AND YEARS GO BY.  HIS

6    WHOLE LIFE GOES BY.  AND HE'S ASKED THE DOORKEEPER

7    QUESTIONS.  HE'S GIVEN EVERYTHING HE'S OWNED TO THE

8    DOORKEEPER TO BRIBE HIM TO LET HIM IN.

9           AND THE DOORKEEPER ONLY TAKES IT AND SAYS, "I'M

10   ONLY TAKING THIS SO YOU FEEL YOU HAVE LEFT NOTHING UNDONE."

11          BUT AFTER EVERY TIME, THE DOORKEEPER SAYS, "YOU

12   CANNOT GO AT THIS MOMENT.  I CANNOT LET YOU IN."

13          THE MAN'S LIFE GOES BY.  NOW HE'S VERY OLD, AND

14   HE'S ABOUT TO DIE.

15          AND ONE QUESTION COMES TO THE MAN THAT HE NEVER

16   THOUGHT OF IN ALL THESE YEARS.  AND HE'S ABOUT TO DIE, AND

17   THE DOORKEEPER IS STILL VERY ENERGETIC, AND THE DOORKEEPER

18   GOES DOWN AND LISTENS TO HIM.

19          AND HE SAYS, "WHAT IS THE QUESTION?"

20          HE SAYS, "EVEN THOUGH MANY MEN SEEK TO GET

21   ADMITTANCE TO THE DOOR TO COME TO -- TO SEEK ADMITTANCE TO

22   THE LAW, HOW COME IN ALL THESE YEARS THERE SEEMS TO BE NO

23   ONE ELSE HAS EVER COME TO THIS DOOR TO SEEK ADMITTANCE?"

24   ONLY -- ONLY HE DID.

25          AND THEN THE DOORKEEPER SAYS TO HIM, KNOWING THE
```

```
1    MAN'S GOING TO DIE AND THE MAN'S HARD OF HEARING, HE LOOKS
2    DOWN.  HE GETS VERY CLOSE TO THE MAN.
3            AND HE KIND OF YELLS AT HIM, AND HE SAYS, "NO ONE
4    ELSE.  ONLY YOU THE DOOR WAS MEANT FOR.  NO ONE ELSE COULD
5    ENTER THIS ROOM, ONLY -- " EXCUSE ME.  "NO ONE ELSE COULD
6    ENTER THIS DOOR.  THIS DOOR ONLY WAS INTENDED FOR YOU, AND
7    NOW I'M GOING TO SHUT IT."
8            AND WHAT THIS MEANS TO ME IS THAT WE HAVE FEARS IN
9    OUR LIVES, AND IT COULD BE FEARS ABOUT ANYTHING AND WE'RE
10   AFRAID.  WE HAVE THESE DOORKEEPERS SAYING "DON'T DO IT.  YOU
11   CAN'T DO IT."
12           AND WE JUST SIT, AND WE WASTE OUR LIVES.  AND WE
13   FIND OURSELVES NOT DOING THE THINGS WE WANTED BECAUSE
14   JOSEF -- THE MAN FROM THE COUNTRY COULD HAVE WALKED IN; WE
15   DON'T KNOW WHAT WAS GOING TO HAPPEN TO HIM.  AND THAT'S THE
16   WAY I FEEL.
17           WHEN I DO MY ART, I FEEL -- I DON'T WANT TO BE
18   RESTRICTED BY ALL THESE RULES.  ART SHOULDN'T BE RESTRICTED
19   BY RULES.
20           SO I FELT THAT DOING THIS, IF I DIDN'T DO IT AND I
21   DIDN'T TAKE IT, I, LIKE THE DOORKEEPER, MIGHT FIND MYSELF AN
22   OLD MAN AND SAYING I WISH I DID THESE KIND OF THINGS BECAUSE
23   FOR ART, I THINK, IT -- ART IS ABOUT TAKING RISKS AND
24   CHANCES AND TRYING TO GET TO THE EDGE, AND THAT'S WHAT I TRY
25   TO DO IS GET TO THE EDGE.
```

```
1    Q.   HAVE YOU BROUGHT WITH YOU PHOTOGRAPHS OF EXAMPLES OF

2    OTHER ARTWORK THAT HAVE BEEN DONE BY OTHER ARTISTS?

3    A.   YES.

4    Q.   COULD YOU PLEASE TELL THE JURY WHAT THOSE PHOTOGRAPHS

5    ARE?  AND GIVE US THE EXHIBIT NUMBER SO WE CAN FOLLOW.

6    A.   THIS IS NUMBER 105 (INDICATING).

7    Q.   AND THAT WOULD BE?

8         WHAT DOES THIS DEPICT?  AND HOW DID THIS

9    INSPIRE -- OR HOW DOES IT RELATE TO YOUR GOAL AND ASPIRATION

10   AND INTENDED MEANING OF THE "HOLLYWOOD SCAT AMATEUR

11   NUMBER 7" AND THE "HOLLYWOOD SCAT AMATEUR NUMBER 10"?

12   A.   OKAY.  THIS IS PROBABLY ONE OF THE FIRST SHOCK ART

13   PIECES.

14        FORTUNATELY, FOR ME, I LIVE IN A TIME WHERE

15   THERE'S A LOT OF MEDIA, AND I CAN READ THINGS AND FIND OUT

16   ABOUT THINGS.  AND THIS PIECE HAS BEEN A VERY IMPORTANT

17   PIECE.

18        WHAT THIS IS IS A URINAL.  A URINAL THAT THIS

19   ARTIST WENT TO A STORE IN 1917 AND BOUGHT.  HE CAN'T SCULPT

20   THE URINAL.  HE DIDN'T PAINT IT.  ALL HE DID WAS WRITE A

21   NAME "R. MUTT 1917."

22        NOW, THE STORY OF "THE URINAL" -- THERE WAS A SHOW

23   IN NEW YORK IN 1917 CALLED "THE BIG SHOW" AND WHAT IT WAS IT

24   WAS AN ART --

25             MR. KING:  OBJECTION, YOUR HONOR.
```

```
 1            THE COURT:  SUSTAINED.

 2            I THINK YOU BETTER MAKE SURE THE QUESTION IS

 3   ANSWERED THE WAY YOU POSED IT.

 4   BY MR. DIAMOND:

 5   Q.  MR. ISAACS, WITH RESPECT TO EXHIBIT 105, "THE URINAL,"

 6   COULD YOU PLEASE EXPLAIN TO THE COURT AND TO THE JURY HOW

 7   THIS PARTICULAR WORK OF ART EITHER REFLECTS YOUR GOALS,

 8   INSPIRATIONS OR INTENDED MEANING OF HOLLYWOOD SCAT AMATEUR

 9   NUMBER 7 AND 10?

10   A.   IT REFLECTS MY GOAL BECAUSE IT'S SHOCK ART.  IT TAUGHT

11   ME THAT SHOCK ART IS A VALID PIECE OF ART AND THAT SOMETHING

12   IN 1917 IS MORE SHOCKING THAN -- URINALS IN 1917 IS WAY MORE

13   SHOCKING THAN MY STUFF IN 2012, AND THIS TAUGHT ME AND

14   INSPIRED ME TO DO SOMETHING UNIQUE.

15            I CAN'T DO A URINAL BECAUSE MARCEL DUCHAMP, WHO

16   DID THIS, ALREADY DID THAT.  SO I WANTED TO COME UP --

17   KNOWING ABOUT THIS, I WANTED TO COME UP WITH A NEW VERSION.

18   SOMETHING ALSO OVER-THE-TOP LIKE MARCEL DUCHAMP.

19   Q.   AND SAME QUESTION -- WHO IS MARCEL DUCHAMP?

20   A.   MARCEL DUCHAMP IS A FAMOUS 20TH CENTURY FRENCH ARTIST.

21            LET ME SHOW YOU ANOTHER -- REFERRING TO 107

22   (INDICATING).

23   Q.   PLEASE TELL THE COURT AND JURY WHAT 107 IS.

24   A.   THAT IS A PAINTING BY MARCEL DUCHAMP CALLED "NUDE

25   DESCENDING A STAIRCASE."  AND AS YOU CAN SEE, IT'S NOT A
```

```
1    REALISTIC PAINTING.

2              IT'S SUPPOSED TO GET A LOT OF EMOTION, BUT IT'S

3    CLEARLY NOT A REALISTIC PAINTING.  YOU KNOW, IT WAS DONE

4    IN -- THIS WAS DONE IN THE EARLY 1900'S, AND THIS WAS VERY

5    CONTROVERSIAL KIND OF STUFF, LIKE PICASSO STUFF OR WHATEVER.

6              AND SO DUCHAMP IS THE ARTIST WHO DID THIS.  AND HE

7    SAID THAT "ART IS WHAT ARTISTS DO," AND I BELIEVE THAT.  AND

8    I'M AN ARTIST, AND MY STUFF IS ART BECAUSE I SAY IT IS

9    BECAUSE THAT'S THE EASIEST --

10             MR. KING:  OBJECTION, YOUR HONOR.

11             THE COURT:  WELL, HE CAN TESTIFY TO THAT BECAUSE

12   IT GOES TO WHAT WAS IN HIS STATE OF MIND, HIS INTENTIONS.

13             OVERRULED.

14   BY MR. DIAMOND:

15   Q.   THANK YOU, YOUR HONOR.

16             YOU MAY PROCEED, MR. ISAACS.

17   A.   ART IS WHAT ARTISTS DO.  IT'S A SIMPLE DEFINITION THAT

18   I GO BY, AND DUCHAMP TAUGHT ME THAT I AM AN ARTIST.  I THINK

19   THE EVIDENCE -- THE PAINTINGS, EVERYTHING -- IT'S JUST THAT

20   MY ART IS A LITTLE MORE CONTROVERSY THAN PUPPIES AND CLOWNS

21   AND PAINTING ON A WALL.

22             BUT I BELIEVE WHAT HE TAUGHT ME WAS TO DO

23   SOMETHING THAT HAS TO BE NEW, HAS TO BE UNIQUE.  AND "THE

24   FOUNTAIN" IN 1917, A URINAL, WAS UNIQUE.  AND IN 2012, DOING

25   A MOVIE LIKE I DO IS UNIQUE -- NOT REALLY THAT UNIQUE, BUT
```

```
 1    IT IS IN THE SAME VEIN, AND HE INSPIRED ME.

 2              AND THAT'S WHY WHEN I DID THESE KIND OF MOVIES,

 3    MARCEL DUCHAMP, WHICH I STUDIED IN SCHOOL, WAS ONE OF THE

 4    PRIMARY REASONS TO TRY TO DO THAT AS AN ARTIST, TO FIND A

 5    NEW NARRATIVE SO I CAN STAND OUT, AND NOT ONLY PAINT CLOWNS

 6    AND BEAUTIFUL LITTLE ANIMALS AND ALLIGATORS.

 7              THAT'S ALL NICE AND GOOD, BUT I WANTED TO DO

 8    SOMETHING A LITTLE BIT MORE OUTRAGEOUS SO I COULD CONTRIBUTE

 9    TO SOMETHING IN THE ART WORLD THAT IS UNIQUE AND NOT WHAT

10    EVERYBODY DOES, AND DUCHAMP HELPED ME WITH THAT.

11    Q.  HAVE YOU BROUGHT PHOTOGRAPHS OF OTHER WORKS OF ART THAT

12    INSPIRED YOU OR EXPLAINED YOUR GOAL OR INTENDED MEANING OF

13    THE HOLLYWOOD SCAT AMATEURS 7 AND 10?

14    A.  WELL, YES.  AND WHAT STARTED HAPPENING IN ART IN THE

15    80'S AND AFTER --

16              MR. KING:  OBJECTION, YOUR HONOR.

17              THE COURT:  SUSTAINED.

18              MR. ISAACS, I THINK YOU NEED TO CONFINE YOUR

19    ANSWERS TO THE QUESTIONS, NOT TO GIVE LECTURES.

20              THE WITNESS:  OKAY.  I WAS INFLUENCED BY SEVERAL

21    ARTISTS THAT ARE CONTEMPORARY ARTISTS.

22              MR. KING:  OBJECTION, YOUR HONOR.

23              THE COURT:  OVERRULED.

24              THE WITNESS:  I WAS INFLUENCED BY SEVERAL

25    CONTEMPORARY ARTISTS WHO INSPIRED ME LIKE DUCHAMP, BUT
```

```
 1   INSPIRED ME IN THIS GENRE THAT I PRODUCED MOVIES AND

 2   DIRECTED MOVIES.

 3   BY MR. DIAMOND:

 4   Q.   AND WHO WOULD THOSE ARTISTS HAVE BEEN, AND DO YOU HAVE

 5   EXAMPLES OF THEIR ART?

 6   A.   YES, I DO.

 7   Q.   WHAT IS THE NAME OF THE ARTIST AND WHAT IS THE EXHIBIT

 8   NUMBER?

 9   A.   EXHIBIT 106.

10   Q.   COULD YOU PLEASE TELL THE COURT AND JURY WHAT

11   EXHIBIT 106 DEPICTS?

12   A.   THIS IS A SCULPTURE BY AN ARTIST NAMED KIKI SMITH.  AND

13   THIS WAS ORIGINALLY, I THINK, IN THE WHITNEY MUSEUM AND

14   OTHER MUSEUMS.

15        AND WHAT IT IS IS A WOMAN SQUATTING DOWN, AND THIS

16   HAPPENED TO BE REPRESENTATIVE OF URINE.  AND IT'S A WOMAN

17   WITH A -- TAKING A PISS, BASICALLY, DONE IN SCULPTURE

18   MEDIUM.  SO OBVIOUSLY IT DOESN'T FLOW IN THE SENSE OF IT

19   BEING REAL, BUT THAT'S WHAT ALL THIS REPRESENTS.

20        WHEN I SAW THIS THING, A COUPLE THINGS I REALIZED.

21   ONE, THAT THIS SUBJECT MATTER OF FECES AND URINE AND ALL

22   THESE THINGS ARE VERY POPULAR THESE DAYS.  THEY'RE IN

23   MUSEUMS AND GALLERIES.

24        AND I WAS THINKING -- BECAUSE I KNEW ABOUT THIS

25   WAY BEFORE I DID ANY MOVIES -- HOW CAN I BE CURRENT AND HOW
```

```
 1   CAN I DO WHAT'S HAPPENING IN ART.  AND THIS IS ONE OF HER

 2   PIECES, AND IT'S IN A MUSEUM, AS I SAY, IN THE WHITNEY

 3   MUSEUM IN NEW YORK.

 4            LET ME SHOW YOU ANOTHER PIECE, IF THAT'S OKAY,

 5   FROM THE SAME ARTIST.

 6   Q.    WHICH ONE IS THAT?

 7   A.    106.

 8   Q.    THAT WAS 106.

 9            WHAT IS THE NEXT ONE?

10   A.    I'M SORRY.  103.

11   Q.    COULD YOU PLEASE TELL THE COURT AND THE JURY WHAT 103

12   IS.

13   A.    THIS, AGAIN, IS THE SAME SCULPTOR, KIKI SMITH.  THIS

14   PIECE IS CALLED "TRAIL."  AND WHAT WE SEE IS A WOMAN ON ALL

15   FOURS AND A 15- OR 20-FOOT TURD COMING OUT OF HER ANUS, AND

16   AGAIN, IT'S IN A MUSEUM.  IT'S A WOMAN WITH A TURD COMING

17   OUT.

18            AGAIN, THIS INSPIRED ME AND TOLD ME AND GUIDED ME

19   IN A WAY THAT I REALIZED THAT THIS IS WHAT WAS HAPPENING IN

20   ART PRESENTLY, AND I WANTED TO BE A PART OF THIS NEW WAVE.

21            JUST LIKE IN MUSIC, YOU ALWAYS WANT TO BE CURRENT.

22   THAT'S WHY PEOPLE DON'T WRITE BAROQUE MUSIC ANYMORE BECAUSE

23   IT'S BEEN DONE.

24            I WANTED TO DO SOMETHING NEW.  I COULD SIT -- AND

25   I DID PAINTINGS.  I DID BEAUTIFUL THINGS.  BUT IT'S BEEN
```

```
 1    DONE.  I WANTED TO TRY SOMETHING NEW, AND THAT'S WHAT I DID

 2    WITH MY MOVIES WITH THE INSPIRATIONS OF THESE PEOPLE WHO

 3    GAVE ME THE BASIC IDEAS.

 4    Q.   AND DO YOU HAVE EXAMPLES STILL WITH YOU THAT WE HAVE

 5    NOT YET SEEN?

 6    A.   SAY THAT ONE MORE TIME.

 7    Q.   DO YOU HAVE EXAMPLES OF OTHER ARTWORK THAT INSPIRED YOU

 8    OR WOULD EXPLAIN YOUR GOAL OR INSPIRED YOU?

 9    A.   YES.

10    Q.   WHICH ONE IS THAT?

11    A.   101.

12    Q.   AND COULD YOU PLEASE TELL THE COURT AND JURY WHAT 101

13    IS?

14    A.   101 IS FROM AN ARTIST CALLED CHRIS OFILI, AND MANY

15    YEARS AGO, I THINK IT WAS IN THE 90'S -- EXCUSE ME -- THIS

16    WAS IN THE BROOKLYN MUSEUM.  THIS IS A FAMOUS PAINTING, AND

17    WHAT THIS IS IS A PICTURE OF THE MADONNA WITH ELEPHANT DUNG

18    THROWN ON IT.

19         AND GIULIANI, THE MAYOR, WAS UPSET AND WANTED TO

20    GET IT.  BUT THE IDEA HERE WAS, AGAIN, AN ICONOCLAST.  HE

21    USES THE IMAGES OF -- SACRED RELIGIOUS IMAGES, THEN HE

22    THROWS FECES ON IT.

23         AND THE IDEA, AGAIN, WAS TO EVOKE PEOPLE'S

24    OPINION, EVEN BAD OPINION IS GOOD.  AND THIS SHOWED ME THAT,

25    ONE, FECES IS A RESPECTABLE THING IN THE ART WORLD AND, TWO,
```

```
1   THAT OFFENDING PEOPLE, CHALLENGING PEOPLE, IS ONLY A GOOD
2   THING BECAUSE THEY THINK ABOUT MY ART.
3           I CAN WALK BY AND SEE A PAINTING AND THINK IT WAS
4   BEAUTIFUL.  THE PAINTINGS I DO, THE EARLIER ONES I SHOWED
5   YOU OF THE ALLIGATORS, YOU DON'T THINK ABOUT IT.  WELL, IT
6   IT'S PRETTY, YOU DON'T THINK ABOUT IT.
7           BUT WHEN YOU SEE THINGS LIKE THIS OR HOLLYWOOD
8   SCAT AMATEURS 10 AND 7, IT THINKS IS THIS REAL, IS THIS --
9   PEOPLE DO THIS?  HOW DOES HE DO IT?
10          IT MAKES YOU THINK "IS IT ART; IS IT NOT ART."  IT
11  MAKES A LOT OF QUESTIONS BECAUSE IT'S SO EXTREME, IT'S SO
12  INTENSE, IT BEGS YOU TO QUESTION IT.  AND THAT WAS THE
13  PURPOSE, AND THAT WAS THE PURPOSE OF HIM, TOO.
14  Q.   HAVE YOU BROUGHT ANY OTHER EXAMPLES THAT INSPIRED YOU
15  OR WOULD EXPLAIN YOUR GOAL WITH RESPECT TO THE MOVIES?
16  A.   YES, NUMBER 102.
17  Q.   COULD YOU PLEASE TELL THE COURT AND JURY WHAT
18  EXHIBIT 102 REFLECTS?
19  A.   THIS IS ANOTHER PIECE OF ART THAT INSPIRED ME.  THIS IS
20  THE SAME KIND OF EMOTION BECAUSE IT IS FECES.
21          WHAT THIS IS, IN 1963, AN ARTIST NAME
22  PIERO MANZONI, WHAT HE DID -- HE WAS AN ESTABLISHED ARTIST.
23  HE SHIT IN 64 OF THESE CANS, HIS OWN SHIT, AND LABELED THEM
24  IN DIFFERENT LANGUAGES.  BUT BASICALLY IT SAYS "ARTIST'S
25  SHIT."  AND HE SOLD THEM FOR THE PRICE OF GOLD AT THE TIME.
```

```
 1    HE SIGNED THEM, TOO.  SO HE SIGNED THEM AND SOLD THEM FOR
 2    THE PRICE OF GOLD.
 3            AND AGAIN, THIS WAS VERY RADICAL.  WHO WOULD CAN
 4    IT AND BUY IT?  AND HOW DO YOU THINK ABOUT THAT ONCE YOU DO
 5    THOSE KIND OF THINGS.
 6            SEE, MOST OF THE ART I DID ORIGINALLY, LIKE THE
 7    ALLIGATORS, IT'S PHYSICAL CRAFT, IT'S TECHNICAL.  IT'S A
 8    CRAFT LIKE MAKING SOMETHING.  YOU DO IT WELL OR YOU DON'T DO
 9    IT WELL.
10            THIS KIND OF STUFF -- DUCHAMP, MANZONI, OFILI --
11    IS NOT PHYSICAL CRAFT, BUT IT'S MORE INTELLECTUAL
12    INTERPRETATION OF THE PIECE; WHAT DOES THE PIECE MAKE YOU
13    THINK ABOUT.
14            THAT'S WHAT I TRY TO DO IN MY MOVIES.  IT'S NOT
15    ABOUT A GIRL SMEARING FECES OR NOT.  IT'S ABOUT WHAT THE
16    VIEWER GETS OUT OF MY PIECE, WHAT THE VIEWER THINKS, WHAT'S
17    THE REACTION OF THE VIEWER.
18            AND THAT'S WHAT THIS GUY DID, AND THAT'S WHAT
19    OFILI DID, AND THAT'S WHAT I'M TRYING TO DO IS TO SAY TO THE
20    VIEWER, "LOOK AT THINGS DIFFERENTLY," "LOOK AT IT IN A WAY
21    YOU NEVER HAVE, AND GIVE THEM A NEW THOUGHT MAYBE."
22            TAKING FECES THAT NORMALLY HAS A VERY FUNCTION
23    [VERBATIM] IN THIS WORLD AND TAKE IT OUT OF ITS FUNCTION OF,
24    YOU KNOW, WASTE OF A HUMAN AND ELEVATING IT BY PUTTING IT IN
25    A MOVIE LIKE THIS AND SMEARING IT OR WHATEVER, IT ELEVATES
```

```
 1   IT TO A WHOLE NEW LEVEL.

 2        IT TAKES THE FUNCTIONAL, CEASES TO DO AWAY WITH

 3   THE FUNCTION, AND PUTS IT UP AND ELEVATES IT TO ART.

 4   Q.   FINALLY, I THINK YOU BROUGHT ONE MORE PHOTOGRAPH OR

 5   EXHIBIT --

 6   A.   YES.

 7   Q.   -- FOR THIS?

 8   A.   YES, I DID.

 9   Q.   AND THAT WOULD BE?

10   A.   104.

11   Q.   PLEASE TELL THE COURT AND THE JURY WHAT EXHIBIT 104 IS.

12   A.   THIS IS PROBABLY ONE OF MY MOST FAVORITE OF ALL.  THIS

13   IS THE ARTIST, YOU SEE THE ARTIST SITTING THERE.  HIS NAME

14   IS ROBERT RAUSCHENBERG.  HE'S A VERY FAMOUS ARTIST.

15        AND WHAT YOU SEE BEHIND HIM IS "WHITE PAINTING."

16   IT'S JUST WHITE.  THERE'S NO PICTURES OF ANYTHING; THERE'S

17   NO NARRATIVE; THERE'S NO PAINT.  IT'S JUST A "WHITE

18   PAINTING."

19        SO -- AND THIS "WHITE PAINTING" WAS IN THE MUSEUM

20   OF MODERN ART, AMONGST OTHER THINGS.

21        SO THE QUESTION IS WHAT DOES THIS HAVE TO DO WITH,

22   YOU KNOW, WHAT I'M DOING?  WHY IS THIS IMPORTANT TO ME?  WHY

23   HAS THIS INFLUENCED ME?

24        A WHITE PAINTING IN HIS ROOM IS JUST A BLANK

25   CANVAS; IT'S JUST A WHITE PAINTING.  IT'S MEANINGLESS.
```

```
 1              BUT ONCE YOU PUT IT IN A MUSEUM AND PEOPLE SEE IT,

 2    PEOPLE REACT TO IT, AND THE BASIC REACTION IS "THERE'S

 3    NOTHING ON THE THING.  IT'S BLANK, HOW COULD THAT BE OF

 4    VALUE?  MY KID COULD DO IT."

 5              THE THING IS THE KID DIDN'T DO IT; HE DID IT.  AND

 6    THE IDEA IS INTELLECTUAL INTERPRETATION -- HOW CAN A WHITE

 7    CANVAS BE ART.  AND I'M DOING THE SAME THING.

 8              I TRY TO GET BELOW THE SURFACE IMAGES OF THE

 9    GIRLS, OR WHATEVER, AND BRING YOU TO THINK WHAT IS HAPPENING

10    BELOW THE SURFACE.

11              AND SO IS HE.  WHAT'S HAPPENING BELOW THE SURFACE.

12              IT'S NOT ABOUT A WHITE CANVAS, AND MINE IS NOT

13    ABOUT TWO GIRLS SMEARING WHATEVER ON THEMSELVES.

14              IT'S ABOUT WHAT IT MAKES YOU THINK AS THE VIEWER,

15    AND MY ART IS TRYING TO CHALLENGE YOU, THE VIEWER, TO THINK

16    BEYOND -- INTELLECTUALLY INTERPRET THE ART MORE THAN SAYING

17    "OH, IT'S A BEAUTIFUL PIECE.  I LIKE IT."

18    Q.  NOW, IN ADDITION TO THESE EXHIBITS THAT WE JUST LOOKED

19    AT, DO YOU HAVE ANY OTHER SOURCES OF INSPIRATION THAT WERE

20    NOT REFLECTED IN THE EXHIBITS THAT YOU CAN SHARE WITH US?

21    ANY OTHER ARTIST WHO'S DONE WORK THAT YOU MIGHT HAVE IN

22    MIND?

23    A.  YOU KNOW, WHEN YOU'RE AN ARTIST, YOU HAVE A LOT.

24              FOR EXAMPLE, UHM, JUST TO USE AN ANALOGY -- AND

25    HOPEFULLY THIS IS OKAY.
```

```
1    Q.  WELL, IF YOU HAVE A DOUBT AS TO WHETHER IT'S OKAY --

2    A.  WELL, ONE OF MY BIGGEST INSPIRATIONS, BIGGER THAN

3    JOSEF K., BIGGER THAN KAFKA, IS J.S. BACH, THE CLASSICAL

4    MUSICIAN.

5         AND J.S. BACH IS THE GREATEST GENIUS, I THINK, IN

6    MUSIC.  BUT IF J.S. BACH MAYBE HEARD BEETHOVEN, WHICH IS MY

7    SECOND FAVORITE, HE MIGHT SAY "THIS DOESN'T MAKE SENSE TO

8    ME" BECAUSE IT'S A HUNDRED YEARS IN THE FUTURE.

9         AND SOMETIMES YESTERDAY'S -- LET'S SAY, IT COULD

10   BE YESTERDAY'S, YOU KNOW, JUNK COULD BE TODAY'S GREAT WORK.

11        NOW I'M NOT SAYING MY WORK IS GREAT.  IT'S NOT.

12   AND TO A LOT OF PEOPLE IT'S VERY DISGUSTING.  A LOT OF

13   PEOPLE, THEY HATE IT.

14        BUT JUST BECAUSE YOU HATE SOMETHING, I THINK,

15   DOESN'T MAKE IT -- FOR ME, IT STILL HAS THE ARTISTIC THING

16   FOR ME BECAUSE I CREATED IT AS AN ART PIECE.  EVEN THOUGH I

17   MADE SOME MONEY DOING THESE THINGS, I DON'T SEE A PROBLEM

18   WITH THAT.  JUST LIKE OTHER ARTISTS MAKE A LOT OF MONEY.

19   Q.  NOW, SHIFTING THE SUBJECT FROM WHAT INSPIRED YOU, WHAT

20   YOUR GOALS WERE, AND SO FORTH WITH RESPECT TO THE MOVIES IN

21   QUESTION, COULD YOU PLEASE BRING US TO JANUARY 17, 2007, A

22   DAY WHICH WILL LIVE IN INFAMY FOR YOU.

23        WHAT HAPPENED?

24   A.  THAT'S RIGHT, FOR ME.  RIGHT AFTER MARTIN LUTHER KING'S

25   BIRTHDAY.  I REMEMBER IT VERY WELL.
```

```
1   Q.   WHAT HAPPENED?

2   A.   WELL, IT WAS VERY FUNNY BECAUSE THE DAY STARTS IT WAS A

3   BEAUTIFUL LOS ANGELES DAY.  I GET TO MY OFFICE.  I TAKE THE

4   ELEVATOR.  I REMEMBER SEEING SOMEBODY IN THE THING.  AND IT

5   WAS KIND OF FUNNY, IT WAS SUCH A WARM DAY.  AND HE GETS OUT

6   OF HIS CAR IN THE GARAGE WITH ME, AND I REMEMBER THINKING,

7   WHY IS THE GUY PUTTING ON HIS JACKET.  HE GOT HERE.

8            AND KIND OF LIKE A VERY FRIENDLY MOOD, I'M TALKING

9   TO THE GUY.  I GET UP TO THE TWELFTH FLOOR, THE DOORS OPEN.

10           WHAT I SEE ARE TWO GUYS, THEY LOOK LIKE BIKERS,

11  THEY GOT LONG HAIR, THEY'RE BIG GUYS.

12           AND THEY GO, "ARE YOU MR. ISAACS?"

13           AND I GO, "YEAH."

14           AND THEY GO, "WOULD YOU PLEASE COME WITH ME."

15           AND I GO WHAT IS THIS ALL ABOUT?  I HAD NO CLUE.

16           I HAD A FRIEND A COUPLE OF DAYS IN THE BUILDING

17  SMOKING MEDICAL MARIJUANA.  SO I'M THINKING ARE THEY COMING

18  HERE TO BUST US FOR SMOKING MEDICAL MARIJUANA IN THE

19  OFFICE -- MY FRIEND?

20           AS I'M WALKING DOWN THIS LONG HALLWAY, I SEE ALL

21  THESE F.B.I.  I SAW ALL THESE PEOPLE.  THEY HAVE THE F.B.I.

22  JACKETS.

23           I GO "THIS CAN'T BE FOR THIS."  AND THEN IT DAWNS

24  ON ME WHEN I SEE MY DOOR OPEN, AND THEN I SEE MAYBE 15 OR

25  MORE POLICE, F.B.I. AGENTS, AND ALL THOSE PEOPLE.  AND I'M
```

```
 1   PRETTY -- YOU KNOW, WHAT IS THIS ABOUT?  IT WAS KIND OF

 2   FUNNY.

 3          AND ACTUALLY MY EMPLOYEES WERE SITTING AROUND, AND

 4   I THINK SPECIAL AGENT MYRICK WAS MAYBE TALKING ALREADY TO

 5   ONE OF MY EMPLOYEES BECAUSE I GOT IN LIKE 11:00 O'CLOCK THAT

 6   DAY.  SO I THINK THEY WERE ALREADY THERE.  AND SO I WAITED A

 7   LITTLE BIT, AND THEN DETECTIVE MYRICK INTERVIEWED ME.

 8   Q.   YOU HAVE TO CALL HIM "SPECIAL AGENT."

 9   A.   SPECIAL AGENT, EXCUSE ME.

10          NOT DETECTIVE, SPECIAL AGENT.

11   Q.   AND YOU COOPERATED WITH HIM?

12   A.   YES.  HE ASKED ME -- HE SAID, "DO YOU WANT A LAWYER OR

13   ANYTHING LIKE THAT?"

14          AND I SAID, "NO, I DON'T NEED A LAWYER."

15          AND HE SAID, "ARE YOU SURE?"

16          HE WAS VERY NICE.  THEY WERE VERY PLEASANT.  I

17   GUESS IF YOU HAVE TO BE BUSTED, THIS IS THE GUY TO BUST YOU

18   BECAUSE HE WAS VERY NICE TO ME.

19          AND I ASKED HIM IF I WAS GOING TO BE ARRESTED, AND

20   HE SAID, "NO."

21          AND I'M THINKING OF MARTHA STEWART, AND I'M

22   THINKING -- THIS IS '07 WHEN MARTHA STEWART WENT TO JAIL FOR

23   SUPPOSEDLY NOT --

24          MR. KING:  OBJECTION.

25          THE COURT:  MR. ISAACS.  MR. ISAACS.  I HAVE TO
```

```
 1   CAUTION YOU, AGAIN, THAT YOU ARE HERE TO ANSWER QUESTIONS,

 2   NOT TO REMINISCE ABOUT THIS.

 3              THE WITNESS:  ALL RIGHT.

 4              MR. DIAMOND:  THANK YOU, YOUR HONOR.

 5   BY MR. DIAMOND:

 6   Q.   MR. ISAACS, SO YOU WERE QUESTIONED BY

 7   SPECIAL AGENT JAMES MYRICK?

 8   A.   YES.

 9   Q.   HE WAS VERY POLITE AND COOPERATIVE?

10   A.   YES.

11   Q.   YOU HAD A VERY NICE CIVIL CONVERSATION?

12   A.   YES.  FOR A COUPLE HOURS HE ASKED ME QUESTIONS, AND I

13   ANSWERED THEM.

14   Q.   AND YOU ANSWERED ALL OF HIS QUESTIONS?

15   A.   ABSOLUTELY.

16   Q.   AND HE WAS LOOKING FOR RECORDS AND DOCUMENTS?

17   A.   WELL, HE TOLD ME THAT THEY WANTED TO MAKE SURE THAT ALL

18   THE MODELS I USED WERE NOT UNDERAGED.

19   Q.   AND YOU ASSURED HIM THAT THEY WERE ALL --

20   A.   THAT THEY WERE ALL ABOVE AGE, AND HE WANTED TO KNOW IF

21   I HAD MODEL RELEASES AND I.D.'S TO PROVE THAT, WHICH I DID.

22   Q.   YOU GAVE THEM TO HIM?

23   A.   WELL, I THINK I MIGHT HAVE POINTED IT OUT.  I THINK

24   THAT THEY DECIDED TO OPEN THE FILE CABINETS AND TAKE IT, BUT

25   I THINK HE -- IT'S A LONG TIME AGO, BUT I THINK HE MIGHT
```

```
1   HAVE ASKED WHERE ARE THESE RECORDS AND THINGS LIKE THAT.

2   Q.   AND THESE WOULD BE RECORDS --

3   A.   IT WASN'T HIM PERSONALLY WHO PULLED THE RECORDS OUT.

4   HE HAD A LOT OF PEOPLE THERE TO DO THAT.

5   Q.   AND THESE WERE THE RECORDS REQUIRED BY FEDERAL LAW TO

6   MAKE SURE THAT ACTRESSES AND ACTORS IN ADULT MOVIES ARE OF

7   THE RIGHT AGE?

8   A.   ABSOLUTELY.  THEY ARE MODEL RELEASES SAYING THAT THEY

9   KNOW HOW MUCH MONEY THEY'RE GETTING AND THEIR I.D. TO SHOW

10  THAT THEY'RE OVER 18.

11  Q.   AND THEY HAVE THEIR PHONE NUMBERS AND ADDRESSES?

12  A.   THEY HAVE THEIR ADDRESSES.  I THINK MOST OF THEM HAD

13  THEIR PHONE NUMBERS.  I REALLY CAN'T REMEMBER.  THERE WAS A

14  PLACE FOR PHONE NUMBERS.  SO I GUESS THEY --

15  Q.   THE BOTTOM LINE IS YOU COOPERATED?

16  A.   ABSOLUTELY, EVERYTHING THEY ASKED, NO REASON NOT TO.

17  Q.   AND YOU ACKNOWLEDGED THAT YOU HAD SHIPPED OR MAILED

18  WHATEVER MOVIES THEY WERE INVESTIGATING?

19  A.   YES.  AND I ALSO ACKNOWLEDGED THAT I WAS FULLY

20  RESPONSIBLE FOR IT, THAT MY EMPLOYEES HAD NOTHING TO DO WITH

21  IT EXCEPT FOLLOWING MY DIRECTION, AND THAT I AM THE ONLY ONE

22  WHO IS RESPONSIBLE FOR THESE MOVIES, PERIOD.

23  Q.   YOU MADE THAT VERY CLEAR TO AGENT --

24  A.   MADE IT VERY CLEAR.

25          IN FACT, I REMEMBER SAYING IT ALOUD IN FRONT OF MY
```

```
 1   EMPLOYEES AND IN FRONT OF EVERYONE BECAUSE I WANTED A COUPLE
 2   THINGS.  ONE, YOU KNOW, I AM RESPONSIBLE.  I'M THE ONE.  IT
 3   WAS MY COMPANY.  I'M THE ONE, AND I DON'T WANT THESE PEOPLE
 4   TO GET IN TROUBLE FOR SOMETHING I DID.  I DON'T WANT THEM TO
 5   BE INDICTED OR HAVE ANY PROBLEMS.  SO I SAID THAT IN FRONT
 6   OF EVERYONE.
 7   Q.   WITH RESPECT TO THE ISSUE OF USE OF NAME, YOU'VE
 8   ALREADY EXPLAINED THE JOSEF K.
 9        THERE WAS SOME REFERENCE TO "MICHAEL."  WHAT IS
10   THE REASON FOR USING THE NAME MICHAEL?
11   A.   OKAY.  I USED "MIKE," NOT "MICHAEL."
12   Q.   SORRY.
13   A.   BUT I OWNED AN ADVERTISING COMPANY, I STILL DO, BUT AT
14   THE TIME I DID, AND I ALSO STARTED THIS ADULT BUSINESS.
15        WELL, WHEN YOU HAVE DIFFERENT BUSINESSES, YOU GET
16   DIFFERENT PHONE CALLS.  YOU WANT TO KIND OF SORT THEM OUT.
17        SO WHAT I TOLD ONE OF THE PEOPLE WHO ANSWER THE
18   PHONE, I SAID, "IF THEY CALL ABOUT THE ADULT BUSINESS, NO
19   MATTER WHAT IT IS, I'M 'MIKE,' AND IF THEY CALL ABOUT
20   ANYTHING ELSE LIKE ADVERTISING OR PERSONAL OR ANY OTHER
21   BUSINESSES THAT -- I'M 'IRA,'" BECAUSE I DIDN'T WANT TO
22   CONFUSE THE SITUATION.
23        IN OTHER WORDS, IF SOMEONE CALLS ABOUT
24   ADVERTISING, I DON'T WANT TO TALK TO THEM ABOUT ADULT.
25        SO IT WAS A FUNCTION TO KEEP THE TWO SEPARATE
```

```
1   BUSINESSES THAT SHARED THE SAME PHONE LINE SEPARATE IN MY

2   MIND WHEN I TALKED TO PEOPLE.  SO THAT'S WHY I USED "MIKE."

3   Q.   AND THERE'S BEEN SOME --

4   A.   PLUS ONE MORE THING.  "IRA" IS A HARD NAME FOR PEOPLE

5   TO REMEMBER.  SO THAT WAS ANOTHER REASON.

6   Q.   THERE WAS SOME SUGGESTION THAT YOU WERE EARNING MONEY

7   FROM THE SALE OF MOVIES.  IS THAT CORRECT?

8   A.   YES, I WAS.

9   Q.   AND ARE YOU AWARE OF ANY PROHIBITION ON ANYBODY, SAY AN

10  ARTIST, A LAWYER, A DOCTOR, ANYBODY -- ARE YOU AWARE OF ANY

11  RULE OR LAW THAT SAYS A PERSON CANNOT EARN INCOME FROM THEIR

12  PROFESSION OR OCCUPATION?

13  A.   NO, I'M NOT AWARE OF ANYTHING LIKE THAT.

14  Q.   SO DID YOU THINK IT WAS WRONG TO SELL THE MOVIES AS

15  OPPOSED TO GIVE THEM AWAY?

16  A.   NO.  I THINK LIKE MANY ARTISTS, MUSICIANS, THEY SELL

17  THINGS AND MAKE A LIVING.  ARTISTS NEED TO MAKE A LIVING,

18  TOO, BY THEIR ART.  I DON'T HAVE TO BE A STARVING ARTIST TO

19  BE AN ARTIST.  ALL I NEED TO DO IS TO DO ART.

20  Q.   THERE'S BEEN A SUGGESTION THAT YOU WERE USING A RETURN

21  ADDRESS FOR THE BRONX.

22  A.   RIGHT.

23  Q.   DID YOU EVER THINK THAT ANYBODY WOULD NOT BE ABLE TO

24  FIND YOU IF THEY REALLY WANTED TO FIND YOU?

25  A.   WELL, I THINK IF THE POLICE WANTED TO FIND ME, THEY
```

```
 1   COULD.  I DON'T KNOW IF AN INDIVIDUAL, DEPENDING HOW
 2   SOPHISTICATED THEY ARE WITH RECORDS AND THINGS LIKE THAT.
 3   SO I DON'T KNOW, BUT THAT'S NOT WHY I DID IT, TO HIDE
 4   ANYTHING FROM THE F.B.I. OR THE POLICE.
 5   Q.   YOU HAD A CLEAR PAPER TRAIL WITH CERTIFICATES OF
 6   FICTITIOUS BUSINESS --
 7   A.   ABSOLUTELY.
 8   Q.   -- RECORDS, ALL KINDS OF THINGS.
 9        SO IF ANYBODY WANTED TO FIND YOU, IT WOULD BE VERY
10   EASY?
11   A.   RIGHT.  IT'S REQUIRED BY LAW TO GET A FICTITIOUS
12   BUSINESS STATEMENT IF YOU'RE OPERATING, AND THAT'S THE WAY
13   THE LAW WORKS.
14        FICTITIOUS DOESN'T MEAN I'M MAKING SOMETHING UP TO
15   LOOK LIKE I'M HIDING SOMETHING.  YOU'RE SUPPOSED TO DO THAT
16   IF YOU'RE GOING TO DO BUSINESS UNDER THE NAME, TO GO THERE,
17   PROPERLY REGISTER, SHOW YOUR I.D., AND I DID THAT.  SO
18   OBVIOUSLY I WASN'T HIDING ANYTHING, OR I WOULDN'T HAVE DONE
19   IT.
20   Q.   THE COUNTY REGISTRAR REQUIRES FICTITIOUS NAME
21   STATEMENTS TO BE FILED WHEN YOU'RE DOING BUSINESS UNDER A
22   COMPANY NAME?
23   A.   YES.
24   Q.   SO THERE'S NOTHING WRONG WITH THAT?
25   A.   NO.  IT'S REQUIRED, AND YOU HAVE TO DO --
```

```
1    Q.   AND YOU FOLLOWED THAT?

2    A.   YES.

3    Q.   SO YOU DID EVERYTHING REQUIRED BY LAW.  YOU HAD THE

4    MODEL/ACTRESS RELEASES THERE WITH THE RECORDS?

5    A.   YES.

6    Q.   YOU HAD THE FICTITIOUS NAME FILING, YOU HAD EVERYTHING

7    DONE CORRECT.  IS THAT RIGHT?

8    A.   YES.  YES.  THAT IS CORRECT.

9    Q.   NOW, WITH RESPECT TO RETURN ADDRESSES, IF ANY CUSTOMER

10   EVER NOTIFIED YOU THAT THEY DID NOT GET THE SHIPMENT THEY

11   ORDERED, WOULD YOU SEND ANOTHER REPLACEMENT?

12   A.   YES, I DID.

13        ACTUALLY, THAT'S WHAT HAPPENED KIND OF WITH

14   DETECTIVE LEWISON, HE EMAILED ME AND SAID ONE OF THE MOVIES

15   WERE, YOU KNOW, NOT GOOD, THEY WERE DEFECTIVE.  SO I SENT

16   HIM ANOTHER MOVIE.

17   Q.   YOU DIDN'T CHARGE HIM EXTRA FOR THAT, DID YOU?

18   A.   NO.  I GAVE HIM A FREE MOVIE, AS WELL, BECAUSE I FELT

19   BAD.

20        SO NOT ONLY DID I REPLACE IT, I OFFERED HIM A FREE

21   MOVIE.  HE'D ORDERED, YOU KNOW, AND I SENT HIM A FREE MOVIE.

22   Q.   SO THE USE OF THE BRONX ADDRESS WAS NOT DESIGNED TO

23   HIDE YOU IN ANY WAY?

24   A.   WELL, IT WAS, BUT NOT FROM THE AUTHORITIES.

25   Q.   WHAT WAS THE PURPOSE?
```

```
 1   A.   WELL, YOU KNOW, IF YOU GO BACK TO '7, IT'S A LITTLE BIT
 2   DIFFERENT THAN '11.  SO IN '7, WHEN I DID THIS -- OR IN '11,
 3   YOU KNOW, WAS THERE TOO, IT'S A LITTLE BIT DIFFERENT
 4   MOTIVATION.
 5         IN '6 AND '5 -- OH, I'M TALKING ABOUT THE YEARS --
 6   I WAS VERY CONCERNED ABOUT THE SAFETY OF MY EMPLOYEES AND
 7   MYSELF BECAUSE, YOU KNOW, YOU WATCH A LARRY FLYNT MOVIE, HE
 8   GETS SHOT, HIS LAWYER GETS SHOT.  I'M A LITTLE CONCERNED
 9   THAT --
10   Q.   THE LAWYER GOT SHOT, TOO?
11   A.   YES, HIS LAWYER GOT SHOT, TOO (LAUGHING).
12   Q.   ALL RIGHT.
13   A.   YEAH, AND LARRY FLYNT GOT SHOT.  I'M A LITTLE CONCERNED
14   THAT IF I PUT MY REAL ADDRESS ON THESE ORDERS --
15   Q.   WHEN WAS HE SHOT?
16         MR. KING:  OBJECTION, YOUR HONOR.
17         THE COURT:  SUSTAINED.
18         THE WITNESS:  I DON'T KNOW.
19   BY MR. DIAMOND:
20   Q.   GO AHEAD.
21   A.   I WAS AFRAID IF I PUT MY REAL ADDRESS -- ALSO AT THE
22   TIME, THERE WOULD BE PEOPLE, CUSTOMERS, OTHER PEOPLE WHO'D
23   CALL ON THE PHONE AND I'D GET IT AND THEY'D ASK IF THE
24   MODELS WERE THERE.
25         A LOT OF PEOPLE THINK IN AN ADULT BUSINESS OR A
```

```
1    BUSINESS THAT FEATURES THINGS I DO THAT THERE ARE NUDE
2    MODELS RUNNING AROUND, AND IT'S LIKE A CRAZY -- IT'S LIKE A
3    MOVIE, AND IT'S NOT THE CASE.
4         BUT THEY DIDN'T KNOW THAT.  SO THEY'D CALL UP AND
5    EITHER SOMETIMES ASK THE GIRLS FOR DATES OR CAN THEY DO THIS
6    OR THAT, AND I WAS A LITTLE CONCERNED ABOUT THEIR SAFETY AND
7    MY SAFETY.
8         THEN I SAID, WHY DON'T I JUST GIVE THEM THE P.O.
9    BOX ACROSS THE STREET, WHICH I USED TO GET ORDERS, LIKE JUST
10   PAC BELL -- PAC BELL, THAT'S HOW OLD I AM -- JUST LIKE THE
11   PHONE COMPANY MIGHT USE A P.O. BOX TO GET THEIR ORDERS.  SO
12   I DID THAT.
13        BUT THEN I SAID WHAT HAPPENS IF SOMEBODY CRAZY
14   GOES AND KILLS THE PEOPLE AT THE P.O. BOX?  THAT'S NOT GOING
15   TO BE GOOD.
16        THEN I SAID, WELL, WHY DON'T I JUST MAKE UP AN
17   ADDRESS.  AND THAT WAY -- THEN I SAID WELL, IF I MAKE UP THE
18   ADDRESS, AND GOD FORBID I MAKE UP A REAL ADDRESS AND IT'S A
19   HOUSE AND THEY GO AND KILL THE PEOPLE IN THE HOUSE, THEN
20   WHAT.
21        SO I DECIDED -- I KNEW MY ADDRESS IN THE BRONX, IN
22   THE SOUTH BRONX IN A TENEMENT THAT HAD NO APARTMENT NUMBER.
23   IT'S A FIVE-STORY WALKUP IN THE SOUTH BRONX.  NO CRAZY'S
24   GOING THERE TO LOOK FOR PEOPLE BECAUSE IT'S THAT DANGEROUS
25   OF A NEIGHBORHOOD.
```

```
 1          SO I FELT THAT WOULD BE SAFE AND KEEP MY EMPLOYEES
 2   AND MYSELF AND EVERYBODY SAFE BECAUSE THERE ARE PEOPLE OUT
 3   THERE -- NOW, IN 2011, I'M ALREADY ON THE NAZI SITES, AND
 4   THE NAZI SITES ARE TALKING ABOUT ME AND THEY'RE SAYING THEY
 5   SHOULD PICKET ME AND THEY SHOULD GET ME.  SO NOW I'M REALLY
 6   SCARED.  SO THAT'S WHY I DID THAT.
 7          MR. DIAMOND:  THANK YOU VERY MUCH.  I HAVE NO
 8   FURTHER QUESTIONS.
 9          THE COURT:  ALL RIGHT.
10          CROSS-EXAMINATION, MR. KING.
11          MR. KING:  YES, YOUR HONOR.
12                  CROSS-EXAMINATION
13   BY MR. KING:
14   Q.   GOOD AFTERNOON, MR. ISAACS.
15   A.   GOOD AFTERNOON.
16   Q.   SO YOU WERE BORN IN 1951.  IS THAT RIGHT?
17   A.   YES.
18   Q.   YOU GREW UP IN BRONX, NEW YORK?
19   A.   YES.
20   Q.   YOU MOVED FROM NEW YORK TO L.A. IN 1978?
21   A.   YES.
22   Q.   YOU WORKED IN ADVERTISING FOR LOCAL NEWSPAPERS AFTER
23   THAT?
24   A.   WHEN I GOT TO LOS ANGELES.
25   Q.   TO LOS ANGELES.
```

```
 1   A.   WELL, YOU KNOW, IF YOU GO BACK TO '7, IT'S A LITTLE BIT
 2   DIFFERENT THAN '11.  SO IN '7, WHEN I DID THIS -- OR IN '11,
 3   YOU KNOW, WAS THERE TOO, IT'S A LITTLE BIT DIFFERENT
 4   MOTIVATION.
 5        IN '6 AND '5 -- OH, I'M TALKING ABOUT THE YEARS --
 6   I WAS VERY CONCERNED ABOUT THE SAFETY OF MY EMPLOYEES AND
 7   MYSELF BECAUSE, YOU KNOW, YOU WATCH A LARRY FLYNT MOVIE, HE
 8   GETS SHOT, HIS LAWYER GETS SHOT.  I'M A LITTLE CONCERNED
 9   THAT --
10   Q.   THE LAWYER GOT SHOT, TOO?
11   A.   YES, HIS LAWYER GOT SHOT, TOO (LAUGHING).
12   Q.   ALL RIGHT.
13   A.   YEAH, AND LARRY FLYNT GOT SHOT.  I'M A LITTLE CONCERNED
14   THAT IF I PUT MY REAL ADDRESS ON THESE ORDERS --
15   Q.   WHEN WAS HE SHOT?
16        MR. KING:  OBJECTION, YOUR HONOR.
17        THE COURT:  SUSTAINED.
18        THE WITNESS:  I DON'T KNOW.
19   BY MR. DIAMOND:
20   Q.   GO AHEAD.
21   A.   I WAS AFRAID IF I PUT MY REAL ADDRESS -- ALSO AT THE
22   TIME, THERE WOULD BE PEOPLE, CUSTOMERS, OTHER PEOPLE WHO'D
23   CALL ON THE PHONE AND I'D GET IT AND THEY'D ASK IF THE
24   MODELS WERE THERE.
25        A LOT OF PEOPLE THINK IN AN ADULT BUSINESS OR A
```

1  BUSINESS THAT FEATURES THINGS I DO THAT THERE ARE NUDE

2  MODELS RUNNING AROUND, AND IT'S LIKE A CRAZY -- IT'S LIKE A

3  MOVIE, AND IT'S NOT THE CASE.

4          BUT THEY DIDN'T KNOW THAT.  SO THEY'D CALL UP AND

5  EITHER SOMETIMES ASK THE GIRLS FOR DATES OR CAN THEY DO THIS

6  OR THAT, AND I WAS A LITTLE CONCERNED ABOUT THEIR SAFETY AND

7  MY SAFETY.

8          THEN I SAID, WHY DON'T I JUST GIVE THEM THE P.O.

9  BOX ACROSS THE STREET, WHICH I USED TO GET ORDERS, LIKE JUST

10 PAC BELL -- PAC BELL, THAT'S HOW OLD I AM -- JUST LIKE THE

11 PHONE COMPANY MIGHT USE A P.O. BOX TO GET THEIR ORDERS.  SO

12 I DID THAT.

13         BUT THEN I SAID WHAT HAPPENS IF SOMEBODY CRAZY

14 GOES AND KILLS THE PEOPLE AT THE P.O. BOX?  THAT'S NOT GOING

15 TO BE GOOD.

16         THEN I SAID, WELL, WHY DON'T I JUST MAKE UP AN

17 ADDRESS.  AND THAT WAY -- THEN I SAID WELL, IF I MAKE UP THE

18 ADDRESS, AND GOD FORBID I MAKE UP A REAL ADDRESS AND IT'S A

19 HOUSE AND THEY GO AND KILL THE PEOPLE IN THE HOUSE, THEN

20 WHAT.

21         SO I DECIDED -- I KNEW MY ADDRESS IN THE BRONX, IN

22 THE SOUTH BRONX IN A TENEMENT THAT HAD NO APARTMENT NUMBER.

23 IT'S A FIVE-STORY WALKUP IN THE SOUTH BRONX.  NO CRAZY'S

24 GOING THERE TO LOOK FOR PEOPLE BECAUSE IT'S THAT DANGEROUS

25 OF A NEIGHBORHOOD.

```
 1        SO I FELT THAT WOULD BE SAFE AND KEEP MY EMPLOYEES

 2   AND MYSELF AND EVERYBODY SAFE BECAUSE THERE ARE PEOPLE OUT

 3   THERE -- NOW, IN 2011, I'M ALREADY ON THE NAZI SITES, AND

 4   THE NAZI SITES ARE TALKING ABOUT ME AND THEY'RE SAYING THEY

 5   SHOULD PICKET ME AND THEY SHOULD GET ME.  SO NOW I'M REALLY

 6   SCARED.  SO THAT'S WHY I DID THAT.

 7        MR. DIAMOND:  THANK YOU VERY MUCH.  I HAVE NO

 8   FURTHER QUESTIONS.

 9        THE COURT:  ALL RIGHT.

10        CROSS-EXAMINATION, MR. KING.

11        MR. KING:  YES, YOUR HONOR.

12                  CROSS-EXAMINATION

13   BY MR. KING:

14   Q.   GOOD AFTERNOON, MR. ISAACS.

15   A.   GOOD AFTERNOON.

16   Q.   SO YOU WERE BORN IN 1951.  IS THAT RIGHT?

17   A.   YES.

18   Q.   YOU GREW UP IN BRONX, NEW YORK?

19   A.   YES.

20   Q.   YOU MOVED FROM NEW YORK TO L.A. IN 1978?

21   A.   YES.

22   Q.   YOU WORKED IN ADVERTISING FOR LOCAL NEWSPAPERS AFTER

23   THAT?

24   A.   WHEN I GOT TO LOS ANGELES.

25   Q.   TO LOS ANGELES.
```

```
 1   A.   I WORKED FOR A SHOE COMPANY, BUT THEN AFTER THAT, IT

 2   WAS BASICALLY NEWSPAPERS SELLING ADVERTISING.

 3   Q.   1987 YOU STARTED YOUR OWN ADVERTISING BUSINESS?

 4   A.   YES.

 5   Q.   AND YOU DID COUPON MAILERS --

 6   A.   YES.

 7   Q.   -- PRIMARILY?

 8   A.   YES.

 9   Q.   AND IN 1999 YOU CREATED A WEBSITE, "YES L.A.?"

10   A.   YES, YES, I DID.  IT NEVER GOT FULFILLED, BUT YES, THE

11   IDEA WAS THERE.  THE WEBSITE DOMAIN WAS REGISTERED, YES.

12   Q.   AND YOU DECIDED TO START ADVERTISING SOME FETISH

13   MOVIES?

14   A.   NO, YES L.A. HAS NOTHING TO DO WITH THAT.  I DON'T

15   UNDERSTAND THE CONNECTION YOU'RE MAKING.

16   Q.   WELL, AFTER YES L.A., YOU STARTED ADVERTISING --

17   A.   YES, AFTER.

18   Q.   -- FETISH MOVIES?

19   A.   YES, AFTER --

20        THE COURT:  MR. ISAACS, BACK OFF A LITTLE BIT.

21   PLEASE DO NOT TALK OVER EACH OTHER.  MY VERY, VERY ABLE

22   COURT REPORTER WILL NOT BE ABLE TO TAKE BOTH OF YOUR

23   STATEMENTS AT THE SAME TIME.

24        THE WITNESS:  OKAY.

25        THE COURT:  SO ONLY ONE PERSON CAN SPEAK AT A
```

```
 1   TIME.

 2            THE WITNESS:  YES.

 3            THE COURT:  LET HIM FINISH, THEN YOU MAY GO.

 4   BY MR. KING:

 5   Q.   SO YOU LATER STARTED ADVERTISING FETISH MOVIES ON A

 6   WEBSITE?

 7   A.   IS YOUR QUESTION DID I LATER START ADVERTISING OR

 8   SELLING OR BOTH?

 9   Q.   ADVERTISING.

10   A.   YEAH, I ADVERTISED ON THAT WEBSITE, YEAH, I DID.

11   Q.   YOU WERE SELLING THROUGH THOSE -- SELLING FETISH

12   MOVIES?

13   A.   YES.

14   Q.   AND THESE FETISH MOVIES YOU ACQUIRED FROM NEW YORK?

15   A.   MOST OF THEM.

16            SOME OF THEM, I, YOU KNOW, TRADED WITH PEOPLE I

17   KNEW, THINGS LIKE THAT.  THIS WAS A LONG TIME AGO, YEAH.

18   Q.   AND YOU WOULD TAKE ORDERS FROM PEOPLE WHO WANTED TO BUY

19   THOSE MOVIES?

20   A.   WHEN YOU SAY THAT, YOU MEAN ME PERSONALLY OR SOMEONE

21   WHO WORKED FOR ME?

22   Q.   EITHER ONE.

23   A.   YES, I SOMETIMES TOOK IT AND -- YOU KNOW, YES, BOTH.

24   Q.   AND YOU MADE COPIES OF THE FETISH MOVIES?

25   A.   YES.
```

*APRIL 26, 2012*
*TRIAL DAY 4*

**236**

```
1    Q.   AND THEN DELIVERED THEM TO THE PEOPLE WHO ORDERED THEM?

2    A.   YES.

3    Q.   WHEN YOU SAY "FETISH MOVIES," YOU MEAN MOVIES --

4              WHEN WE'RE TALKING ABOUT THOSE FETISH MOVIES,

5    WE'RE TALKING ABOUT MOVIES DEPICTING HUMAN BEINGS ENGAGED IN

6    SEXUAL ACTIVITY AND DEFECATION?

7    A.   IS YOUR QUESTION ALL MY MOVIES FEATURED THAT?

8    Q.   NOT ALL, JUST SOME OF THOSE MOVIES.

9    A.   SOME OF THOSE MOVIE DID FEATURE THAT.

10   Q.   AND SOME OF THE MOVIES ALSO FEATURED SEX BETWEEN HUMANS

11   AND ANIMALS?

12   A.   YES.

13   Q.   AND YOU SAID THAT YOU STARTED MAKING A LITTLE BIT OF

14   MONEY FROM THAT.  IS THAT RIGHT?

15   A.   YES, AT THE BEGINNING, YEAH.

16   Q.   SEVERAL THOUSAND DOLLARS A MONTH?

17   A.   I THINK THE FIRST MONTH I PROBABLY DID ABOUT THAT,

18   YEAH.

19   Q.   AND THEN YOU STARTED MAKING EVEN MORE MONEY AFTER THAT?

20   A.   YEAH.

21   Q.   FROM THE SALE OF THOSE MOVIES?

22   A.   YES.

23   Q.   AND THAT BECAME MORE PROFITABLE, IN FACT, THAN YOUR

24   ACTUAL ADVERTISING FIRM OF DOING COUPON MAILERS.  IS THAT

25   RIGHT?
```

*APRIL 26, 2012*
*TRIAL DAY 4*

**237**

```
 1   A.   WELL, IT DEPENDS ON WHAT TIMELINE YOU'RE TALKING ABOUT.

 2   Q.   I'M TALKING ABOUT OVER TIME --

 3   A.   OVER TIME EVENTUALLY.

 4   Q.   -- IT BECAME MORE PROFITABLE?

 5   A.   MORE PROFITABLE, YES, OVER TIME.

 6   Q.   ONE OF THOSE MOVIES THAT YOU WERE ADVERTISING AND

 7   SELLING WAS "MAKO'S FIRST TIME SCAT?"

 8   A.   YES.

 9   Q.   AND ALSO "JAPANESE DOGGIE 3 WAY?"

10   A.   YES.

11   Q.   AND YOU KNEW THE GENERAL NATURE OF THE CONTENT OF

12   "MAKO'S FIRST TIME SCAT" WHEN YOU WERE SELLING IT?

13   A.   I KNEW MOST OF THE CONTENT.  I DIDN'T KNOW ALL THE

14   CONTENT, BUT IT DOESN'T MATTER BECAUSE I'M RESPONSIBLE.

15   Q.   AND THE SAME GOES FOR "JAPANESE DOGGIE 3 WAY?"

16   A.   YES.

17   Q.   NOW, IN THE SUMMER OF 2006, YOU HIRED

18   MS. MARLAYNA TRICKETT.  IS THAT CORRECT?

19   A.   THAT IS CORRECT.

20   Q.   AND YOU INSTRUCTED HER ON HOW TO TAKE ORDERS BY PHONE?

21   A.   YES.

22   Q.   AND TO USE THE NAME "SARAH JAMES"?

23   A.   YEAH, I TOLD HER TO USE THAT NAME, SARAH JAMES, YEAH.

24   Q.   AND TO REFER TO YOU AS "MIKE" WHEN PEOPLE CALLED IN

25   ABOUT ORDERING THESE TYPES OF VIDEOS?
```

```
1   A.   YES.

2   Q.   NOT TO USE "IRA"?

3   A.   NO, BECAUSE I DIDN'T WANT TO CONFUSE THE SITUATION.

4   Q.   NOT TO USE THE NAME "IRA ISAACS"?

5   A.   NO.  UNLESS THEY WERE CALLING ABOUT MY ADVERTISING

6   COMPANY OR SOMETHING ELSE.

7   Q.   YOU ALSO INSTRUCTED HER HOW TO RECEIVE THESE VIDEO

8   ORDERS THROUGH EMAIL.  IS THAT CORRECT?

9   A.   SAY THAT ONE MORE TIME.

10  Q.   YOU ALSO INSTRUCTED HER HOW TO RECEIVE ORDERS, NOT JUST

11  BY PHONE --

12  A.   RIGHT.

13  Q.   -- BUT BY EMAIL?

14  A.   YES, PRETTY MUCH, YEAH.

15  Q.   OR THE INTERNET?

16  A.   YES.

17  Q.   AND YOU INSTRUCTED HER HOW TO FILL THE ORDERS?

18  A.   YES.

19  Q.   HOW TO MAKE THE D.V.D. --

20  A.   YES.

21  Q.   -- COPIES FROM -- I'M SORRY.

22       YOU'LL HAVE TO WAIT UNTIL I FINISH THE QUESTION.

23       -- FROM MASTER COPIES?

24  A.   YES.

25  Q.   AND HOW TO SHIP THE VIDEO TO THE CUSTOMER?
```

1    A.   YES.

2    Q.   AND SHE WAS FILLING ORDERS AT YOUR DIRECTION?

3    A.   YES.

4    Q.   AND THAT INCLUDED "MAKO'S FIRST TIME SCAT" THAT WAS

5    SENT IN THIS PACKAGING, GOVERNMENT EXHIBIT 10.  IS THAT

6    CORRECT?

7    A.   NO, I CAN'T TESTIFY BECAUSE I PERSONALLY DIDN'T MAKE

8    THE ENVELOPES UP.  BUT IF YOU SAY I MAILED THIS, AND I WOULD

9    HAVE TOLD HER TO MAIL IT.

10         IN OTHER WORDS, AN ORDER COMES IN.  SHE DOESN'T GO

11   TO ME, "IS IT OKAY FOR ME TO MAIL IT?"  SHE KNEW IT WAS

12   OKAY.  WE HAVE, YOU KNOW, A GENERAL POLICY.

13         SO EVEN THOUGH I'M NOT FAMILIAR WITH THIS

14   PARTICULAR ENVELOPE, I'M SURE THAT THIS CAME IN, WE DID IT,

15   AND THOSE ARE THE MOVIES IN IT IF YOU SAY THEY WERE.

16   Q.   AND THE SAME GOES FOR GOVERNMENT EXHIBIT 16.

17         THIS IS A MAILING LABEL THAT WOULD HAVE BEEN

18   PRODUCED AT YOUR DIRECTION, NOT SPECIFICALLY THIS ONE, BUT

19   TO FILL THESE ORDERS?

20   A.   WELL, THIS ONE I REMEMBER BECAUSE OF THE "JAMES KIRK"

21   AND THE WHOLE STAR TREK THING.  SO I DO REMEMBER GETTING

22   THIS ONE.

23         SO YEAH, I MEAN -- BUT I DON'T HAVE TO GO OUT WHEN

24   AN ORDER COMES IN AND SAY, "OKAY.  NOW, MARLAYNA, FILL

25   THIS."  THAT WAS HER JOB, AND SHE DID IT, AND IT WAS UNDER

1  MY DIRECTION.  BUT DO I REMEMBER THIS ENVELOPE.

2  Q.   NOW, LET'S TALK A LITTLE BIT MORE ABOUT THIS ADDRESS,

3  THIS RETURN ADDRESS THAT YOU PUT ON HERE.

4  A.   OKAY.

5  Q.   OR RATHER THAT YOU INSTRUCTED MS. TRICKETT TO USE.

6  A.   YES, I DID.

7  Q.   1768 WEEKS AVENUE, BRONX, NEW YORK, 10457?

8  A.   YES.

9  Q.   YOU'VE ALREADY SAID THAT YOU DIDN'T ACTUALLY OPERATE

10 THE BUSINESS OUT OF THAT ADDRESS.  CORRECT?

11 A.   NO, I DID NOT.

12 Q.   AND YOUR CONCERN WAS THAT PEOPLE MIGHT GO TO THE

13 ADDRESS -- PEOPLE WHO HAD ORDERED THESE VIDEOS?

14 A.   NOT NECESSARILY PEOPLE WHO ORDERED THEM.  THAT WOULD BE

15 ONE.  IT ALWAYS COULD BE THAT.

16      OR IT COULD BE JUST PEOPLE WHO WENT ON THE WEBSITE

17 DIDN'T CARE FOR THIS KIND OF STUFF, HAD AN AGENDA, AND WOULD

18 SEE MY ADDRESS AND THEY'D SAY "OKAY.  I'M GOING TO GO GET

19 THIS GUY" OR I'M GOING TO COME UP TO THE -- OR PEOPLE THAT

20 WOULD HASSLE THE GIRLS.

21 Q.   SO YOU WANTED TO PREVENT THAT TYPE OF PERSONAL

22 INTERACTION WITH A CUSTOMER OR SOMEBODY ELSE WHO MIGHT NOT

23 LIKE THE MATERIAL?

24 A.   I WOULD WANT TO AVOID PERSONAL INTERACTION WITH ANYBODY

25 THAT WANTS TO DO HARM WITH ME OR THE PEOPLE I KNOW, OR

```
 1   ANYBODY FOR THAT MATTER.

 2   Q.   BUT ISN'T IT TRUE THAT AT THAT SAME TIME, YOU ALREADY

 3   HAD A METHOD FOR DOING THAT --

 4             AND I'M SHOWING YOU WHAT'S BEEN --

 5             -- TO AVOID THAT?

 6             -- WHICH IS GOVERNMENT EXHIBIT NUMBER 7.

 7             YOU COULD TURN TO IT.

 8   A.   I CAN SEE IT.

 9   Q.   YOU CAN SEE IT?

10   A.   YEAH.

11   Q.   BECAUSE YOU ALREADY HAD A POST OFFICE BOX THAT YOU WERE

12   USING ON 7095 HOLLYWOOD BOULEVARD IN HOLLYWOOD, CALIFORNIA.

13   CORRECT?

14   A.   THAT IS CORRECT.

15   Q.   NOW, YOU WEREN'T ACTUALLY OPERATING, PHYSICALLY SITTING

16   IN THAT POST OFFICE BOX, WERE YOU?

17   A.   NO.  IT'S LIKE A MAIL-AND-MORE KIND OF PLACE.  I WASN'T

18   SITTING THERE DOING ANYTHING.

19             I JUST HAD A BOX.  I HAD A KEY.  THE STUFF, ORDERS

20   AND THINGS WOULD COME TO THAT.  THEY'D PUT IT IN THE BOX.  I

21   WOULD SEND MYSELF OR MARLAYNA LIKE OVER THERE WITH A KEY,

22   OPEN IT UP, AND TAKE THE MAIL.

23   Q.   AND YOUR EMPLOYEES WEREN'T ALSO PHYSICALLY LOCATED AT

24   THAT ADDRESS.  CORRECT?

25   A.   NO, NOTHING WAS PHYSICALLY LOCATED EXCEPT THE ACTUAL
```

```
 1   P.O. BOX WHERE AN ORDER COULD BE MAILED TO.  THERE WERE

 2   PEOPLE AT THAT PLACE WHO WORKED THERE, AND I WAS CONCERNED

 3   ABOUT THEIR SAFETY.

 4   Q.   NOW, IN 2007, YOU TESTIFIED ABOUT THE SEARCH WARRANT

 5   BEING EXECUTED ON YOUR PREMISES, YOUR BUSINESS PREMISES?

 6   A.   YES.

 7   Q.   BY DETECTIVE MYRICK.  I MEAN AGENT --

 8   A.   SPECIAL AGENT.

 9   Q.   -- SPECIAL AGENT MYRICK?

10   A.   YES.

11   Q.   AND SPECIAL AGENT MYRICK TOLD YOU THAT THE SEARCH

12   WARRANT WAS BEING EXECUTED PURSUANT TO AN INVESTIGATION INTO

13   THE DISTRIBUTION OF OBSCENE MATERIAL.  ISN'T THAT CORRECT?

14   A.   HE TOLD ME THAT AT THE VERY END.  HE DIDN'T GO INTO, AS

15   FAR AS I CAN REMEMBER.  WHAT I WAS TOLD WAS HE'S -- THEY'RE

16   DOING AN INVESTIGATION BASED ON MODEL RELEASES.  THAT WAS

17   WHAT -- THE CONVERSATION.  AT THE VERY END, HE HANDED ME A

18   WHOLE BUNCH OF PAPERS ABOUT OBSCENITY.

19        AND I REMEMBER BECAUSE I WAS SHOCKED READING IT

20   BECAUSE I HAD NO CLUE.  HE DIDN'T SAY ANYTHING ABOUT

21   OBSCENITY.  HE SAID, "I'M GOING TO GIVE YOU THESE PAPERS,"

22   AND I READ THEM, AND IT WAS ALL ABOUT THE OBSCENITY.

23        BUT EVERYTHING THEN BEFORE THAT, I FELT WAS JUST

24   THERE TO SEE IF THERE WAS ANY UNDERAGE WOMEN, WHICH IS A

25   GOOD THING THAT THE GOVERNMENT DOES CHECK THOSE KIND OF
```

1  THINGS.

2  Q.   SO THE ANSWER TO MY QUESTION IS, YES, HE DID TELL YOU

3  THAT A SEARCH WARRANT WAS BEING EXECUTED FOR AN

4  INVESTIGATION INTO OBSCENE MATERIAL?

5  A.   AT WHAT TIME FRAME?

6  Q.   SO THE ANSWER IS "YES"?

7  A.   YES, AT SOME TIME DURING IT, HE DID, YES.

8          WELL, CAN I SAY SOMETHING TO THAT?

9          **THE COURT:**  THERE'S NO QUESTION PENDING RIGHT NOW.

10  **BY MR. KING:**

11  Q.   NOW, IN JANUARY OF 2011, AN ORDER CONTAINING "HOLLYWOOD

12  SCAT AMATEURS NUMBER 7" WAS SHIPPED TO DETECTIVE LEWISON BY

13  U.S. MAIL IN THIS PACKAGING.

14  A.   YES.

15  Q.   IS THAT CORRECT?

16  A.   YES.

17  Q.   AND YOU RECEIVED THE ORDER?

18  A.   AGAIN, PERSONALLY, I DIDN'T RECEIVE THE ORDER.  I HAD A

19  PERSON WORKING FOR ME.

20  Q.   WHO RECEIVED THE ORDER?  WHO WAS THAT PERSON?

21  A.   HER NAME WAS MARISA BERGEN.

22  Q.   DID YOU RECEIVE THE MONEY FOR THAT ORDER?

23  A.   YEAH.  IT WAS A CREDIT CARD PURCHASE.

24  Q.   DID YOU MAKE A COPY OF THE D.V.D. FROM A MASTER COPY?

25  A.   YES, SHE DID.

```
 1   Q.   SHE DID?

 2   A.   YES.

 3   Q.   AND WHERE WAS THAT COPY MADE AT, THE PHYSICAL LOCATION?

 4   A.   MARCH, I THINK....

 5   Q.   THIS IS JANUARY.

 6   A.   OH, I THINK IN JANUARY, I WAS AT 7033 SUNSET BOULEVARD.

 7   I HAD OFFICES THERE.

 8   Q.   WHERE IS THE MASTER COPY OF "HOLLYWOOD SCAT AMATEURS

 9   NUMBER 7" RIGHT NOW?

10   A.   AT MY HOUSE.

11   Q.   WHO WROTE THE MAILING ADDRESS ON THIS PACKAGE?

12   A.   SHE DID.

13   Q.   AND WHO TOOK IT -- THIS WAS MAILED FROM SUNSET

14   BOULEVARD MAILBOXES?

15   A.   I REALLY DON'T REMEMBER.  SO I WOULD ASSUME IT PROBABLY

16   WAS, BUT I'M NOT A HUNDRED PERCENT SURE.  IT COULD HAVE BEEN

17   TAKEN TO THE POST OFFICE DIRECTLY.  I JUST DON'T REMEMBER.

18   Q.   DID YOU PERSONALLY MAIL THIS?

19   A.   NO.

20   Q.   WHO WAS IT THAT MAILED IT?

21   A.   WELL, MARISA, PART OF HER JOB WAS TAKE ANY, YOU KNOW,

22   ORDERS AND TAKE IT -- I THINK TO THE MAILING PLACE ON SUNSET

23   OR SOMETIMES THE POST OFFICE.  I'M NOT SURE WHICH THIS ONE

24   WAS.

25        USUALLY, WHEN IT'S THE MAILING PLACE, THEY PUT
```

```
1    SOMETHING WITH THEIR INFORMATION ON IT.  SO I'M NOT SURE
2    WHERE SHE TOOK IT, BUT SHE DID TAKE IT.
3    Q.   AND WAS SHE FULFILLING THESE ORDERS, INCLUDING THE ONE
4    FOR "HOLLYWOOD SCAT AMATEURS NUMBER 7" AT YOUR DIRECTION?
5    A.   YES.
6    Q.   AND WAS THIS METHOD OF SHIPMENT BEING USED AT YOUR
7    DIRECTION, U.S. MAIL?
8    A.   YES.
9    Q.   THE SAME QUESTION FOR GOVERNMENT EXHIBIT 36, WHICH
10   IS -- THIS IS THE PACKAGING FOR THE MARCH ORDER OF "JAPANESE
11   DOGGIE 3 WAY" THAT WAS SHIPPED TO DETECTIVE LEWISON BY U.S.
12   MAIL?
13   A.   YES.
14   Q.   THIS ORDER WAS FULFILLED AT YOUR DIRECTION?
15   A.   YES.
16   Q.   WHO FULFILLED THAT ORDER?
17   A.   THE SAME, MARISA BERGEN.
18   Q.   AND USED U.S. MAIL AT YOUR DIRECTION?
19   A.   YES.
20   Q.   AND IS THE MASTER COPY OF "JAPANESE DOGGIE 3 WAY" AT
21   YOUR RESIDENCE RIGHT NOW?
22   A.   YES.
23   Q.   SHOWING YOU GOVERNMENT EXHIBIT 40, THIS EMAIL.
24   A.   OH, YEAH.  YES.
25   Q.   DO YOU REMEMBER THIS EMAIL?
```

```
 1   A.   YES, I DO.

 2   Q.   YOU'RE THE ONE SENDING FROM THE ADDRESS, SARAH --

 3   A.   YEAH, I SENT THIS ONE.

 4   Q.   -- WEBMASTER@CINEMASCAT.COM?

 5   A.   YES.

 6   Q.   AND YOU SENT THE EMAIL BACK TO KEVIN, THE EMAIL ADDRESS

 7   KEVINYAMASHITA@ --

 8   A.   RIGHT.

 9   Q.   -- YAHOO.COM?

10   A.   YES, I DID.

11   Q.   AND YOU SAID, "GOOD WORK"?

12   A.   YES.

13   Q.   AND BECAUSE YOU KNEW IT WAS DETECTIVE LEWISON USING

14   THAT NAME?

15   A.   YES, I DID.  WELL, I KNEW IT AFTER CERTAIN FACTS CAME

16   OUT LATER, BUT YES.

17   Q.   YOU KNEW IT BECAUSE YOU FIGURED OUT THAT THIS IS HOW HE

18   HAD FOUND OUT IT WAS YOU SENDING THESE VIDEOS.  ISN'T THAT

19   RIGHT?

20   A.   I DON'T UNDERSTAND THAT QUESTION.  SAY IT AGAIN.

21   Q.   ISN'T IT TRUE THAT WHEN YOU WROTE "GOOD WORK" BACK TO

22   DETECTIVE LEWISON, WHO WAS USING AN UNDERCOVER IDENTITY, IT

23   WAS BECAUSE YOU WERE CONGRATULATING HIM ON HIS

24   INVESTIGATION --

25   A.   YES.
```

1   Q.   -- OF DETERMINING THAT IT WAS YOU WHO WAS STILL SELLING

2   THESE VIDEOS IN 2011?

3   A.   I DON'T KNOW IF IT WAS SO MUCH THAT.  I FIGURED I

4   WASN'T HIDING ANYTHING, AND I'M SELLING THE VIDEOS BECAUSE

5   THEY'RE NOT OBSCENE, AND NO ONE'S PROVED IT TO BE OBSCENE.

6        SO I'M DOING NOTHING WRONG IN MY MIND, AND IF THE

7   AUTHORITIES WANT TO KEEP INVESTIGATING ME, THEY CAN.  AND I

8   HAVE NO PERSONAL PROBLEMS WITH THAT.  EVERYBODY'S DOING

9   THEIR JOBS.

10        THEY'RE DOING THEIR JOBS.  I'M DOING MY JOB.  SO I

11   SAID, "GOOD WORK."  IT WAS GOOD WORK.

12   Q.   SHOWING YOU GOVERNMENT EXHIBIT 20, ONE OF THE

13   PHOTOGRAPHS FROM THE 2007 SEARCH, WHERE ARE THOSE

14   DUPLICATING MACHINES RIGHT NOW?

15   A.   AT MY HOUSE.

16   Q.   SHOWING YOU ANOTHER PHOTOGRAPH, DEPICTING THE MASTER

17   COPIES THAT MS. TRICKETT TESTIFIED ABOUT, WHERE ARE THOSE

18   LOCATED RIGHT NOW?

19   A.   AT MY APARTMENT.

20   Q.   LET ME ASK YOU ABOUT "HOLLYWOOD SCAT AMATEURS NUMBER 7"

21   THAT WAS PLAYED IN OPEN COURT YESTERDAY.

22   A.   OKAY.

23   Q.   AT THE BEGINNING OF "HOLLYWOOD SCAT AMATEURS NUMBER 7"

24   IS THE SLOGAN "ONLY AT SCATMOVIES.COM, THE WORLD'S LARGEST

25   FETISH SUPERSTORE."  IS THAT CORRECT?

```
 1   A.   YES.

 2   Q.   DID YOU INVENT THAT SLOGAN?

 3   A.   YES.  YES, I PROBABLY DID.

 4   Q.   AND WITH RESPECT TO "HOLLYWOOD SCAT AMATEURS NUMBER 7,"

 5   IT'S YOU DOING THE FILMING.  IS THAT CORRECT?

 6   A.   YES.

 7   Q.   IT WAS YOUR PENIS AND --

 8   A.   YES, MY PENIS.

 9   Q.   AND IT WAS YOU INSTRUCTING APRIL WHAT SEX ACTS TO

10   ENGAGE IN?

11   A.   YES.

12   Q.   AND YOU'RE THE ONE WHO TOLD HER TO, QUOTE, "EAT MY

13   SHIT"?

14   A.   I CAN'T REMEMBER EVERYTHING IN THE MOVIE EVEN THOUGH I

15   JUST WATCHED IT.  BUT IF YOU SAY THAT WAS IN THE MOVIE, I

16   COULD HAVE SAID THAT.  BUT I CAN'T REMEMBER EVERYTHING THAT

17   I SAID, BUT I COULD HAVE SAID THAT.  THAT'S SOMETHING LIKELY

18   I COULD HAVE SAID.

19   Q.   YOU AND APRIL WERE THE ONLY INDIVIDUALS THERE AT THE

20   FILMING.  IS THAT CORRECT?

21   A.   YES.

22   Q.   SO ANYTHING SAID BY A MALE VOICE WOULD HAVE BEEN YOU

23   SAYING THAT.  IS THAT CORRECT?

24   A.   YES, IT WAS ME.

25   Q.   AND IT WAS YOU SHOVING HER FACE INTO THE BOWL?
```

```
1    A.   I THINK THERE WAS A SCENE THAT THERE WAS A LITTLE BIT

2    OF THAT, AND I THINK I REMEMBER THAT WOULD BE ME BECAUSE I

3    WAS THE OTHER PERSON.

4    Q.   AND YOU ADVERTISED "HOLLYWOOD SCAT AMATEURS NUMBER 7"

5    FOR SALE.  IS THAT CORRECT?

6    A.   YES.

7    Q.   AND YOU ADVERTISED IT FOR SALE ON THE INTERNET?

8    A.   YES.

9    Q.   SHOWING YOU GOVERNMENT EXHIBIT NO. 13.

10   A.   OKAY.

11   Q.   AND THE WAY YOU DESCRIBED THE VIDEO AND ADVERTISED IT

12   IS THIS (AS READ:)

13        "EVERYONE'S FAVORITE NEW YOUNG SEXY SHIT QUEEN

14        IS AT IT AGAIN.  WATCH APRIL PLEASURE IN ALL OF

15        HER FAVORITE SHIT PLAY AND MORE.  THIS TIME APRIL

16        WILL DRINK SHIT FROM A TOILET BOWL, DRINK SHIT

17        FROM A GLASS, AND THEN GET IT DUMPED OVER HER

18        HEAD.  SHE LICKS SHIT OFF A GUY'S DICK AND OUT OF

19        HIS ASS.  THEN SHE'S FUCKED WHILE HOLDING A

20        STEAMING PILE OF SHIT IN HER MOUTH."

21                    (END QUOTED MATERIAL.)

22   BY MR. KING:

23   Q.   CORRECT?

24   A.   THAT'S WHAT IT SAYS, BUT I DIDN'T WRITE THAT.  BUT

25   THAT'S WHAT IT SAYS.
```

1   Q.   THAT'S HOW YOU ADVERTISED IT.  IS THAT CORRECT?

2   A.   YES, I ADVERTISED IT THAT WAY.  BUT I WASN'T THE AUTHOR

3   OF THE WORDS, BUT, YES.

4   Q.   NOW, LET ME ASK YOU ABOUT "HOLLYWOOD SCAT AMATEURS

5   NUMBER 10" THAT WAS PLAYED IN COURT EARLIER TODAY.  AGAIN,

6   IT WAS YOU OPERATING THE CAMERA?

7   A.   YES.

8   Q.   AND YOU INSTRUCTING APRIL AND MICHELLE WHAT SEX ACTS TO

9   ENGAGE IN?

10  A.   YES.

11  Q.   NOW, IS THAT YOU TELLING MICHELLE TO LICK APRIL'S ASS?

12  A.   YES.  WHATEVER WAS IN THERE, THAT WAS MY DIRECTION.

13  Q.   AND IT WAS ALSO YOU INSTRUCTING MICHELLE AT THE END OF

14  THE VIDEO (AS READ:)

15       *"ONE MORE MOUTHFUL OF SHIT, AND WE'RE DONE.*

16       *TAKE THAT OUT.  LET'S GET DOWN THERE.  LET'S PUT*

17       *SHIT IN YOUR MOUTH.  GET CLOSE, AND WE'LL GET A*

18       *REALLY GOOD 'BUY' WITH SHIT IN YOUR MOUTH.  TELL*

19       *EVERYBODY HOW MUCH YOU'RE A TOILET, HOW YOU LIKE*

20       *BEING A TOILET, AND YOU CAN'T WAIT TILL GUYS LOOK*

21       *AT THIS AND JERK OFF TO YOU BEING A TOILET."*

22                *(END QUOTED MATERIAL.)*

23  **BY MR. KING:**

24  Q.   IS THAT CORRECT?

25  A.   I THINK THAT'S WHAT WAS SAID, YES.

```
 1   Q.   ALL RIGHT.  WHAT'S THE INTELLECTUAL INTERPRETATION

 2   BEHIND "YOU CAN'T WAIT UNTIL GUYS LOOK AT THIS AND JERK

 3   OFF?"

 4   A.   WELL, YOU HAVE TO REMEMBER, IT'S A FETISH MOVIE, AND

 5   FETISH MOVIES BY ITS DEFINITION, HAS SEXUAL CONTENT TO IT.

 6   AND YES, THERE ARE GUYS WHO JERK OFF TO A LOT OF THINGS.

 7           AND THE IDEA, IT WAS A SHOCK MOVIE.  IT WOULDN'T

 8   BE VERY SHOCKING IF I DIDN'T CALL HER "A TOILET" OR I DIDN'T

 9   DO THOSE THINGS.  IT WOULDN'T BE SHOCKING, AND IT WAS

10   SUPPOSED TO BE A SHOCK MOVIE.

11   Q.   YOU ADVERTISED "HOLLYWOOD SCAT AMATEURS NUMBER 10,"

12   SHOWING YOU GOVERNMENT EXHIBIT 22 AS FOLLOWS (AS READ:)

13       "STOLEN CAR FILMS PRESENTS ANOTHER RELEASE FROM

14        EVERYBODY'S FAVORITE NEW SCAT QUEEN, APRIL, AND

15        INTRODUCING AND STARRING VERONICA JETT IN HER

16        FIRST SCAT ADVENTURE.  WATCH APRIL AND HER SEXY

17        YOUNG FRIEND, VERONICA, AS THEY GO AT IT HOT AND

18        HEAVY, SMEARING SHIT ALL OVER EACH OTHER IN THIS

19        VERY EROTIC PRESENTATION.  WATCH AS VERONICA GETS

20        HER FIRST TASTE OF STEAMY SHIT, THE GIRLS FEED THE

21        SHIT TO EACH OTHER, AND KISS IT OFF EACH OTHER'S

22        MOUTHS AND BODIES.  YOU CAN'T PASS UP.  GET THIS

23        HOTTEST EVER HOLLYWOOD SCAT AMATEUR RELEASE."

24            (END QUOTED MATERIAL.)

25
```

1    **BY MR. KING:**

2    Q.   CORRECT?

3    A.   THAT'S WHAT IT SAYS.

4    Q.   THAT'S HOW YOU ADVERTISED IT?

5    A.   THAT'S HOW I ADVERTISED IT.

6    Q.   NOW, YOU TOLD THE WOMAN IN THE VIDEO AT ONE POINT, WHO

7    GOES BY THE NAME "MICHELLE" AND ALSO "VERONICA JETT" ABOUT

8    WHY YOU WERE MAKING AND SELLING VIDEOS LIKE THIS PARTICULAR

9    VIDEO.

10        AND YOU SAID THAT "THERE ARE A LOT OF SICK FOLKS

11   OUT THERE IN THE WORLD AND NOBODY IS CATERING TO THEM.  I

12   HAVE A CORNER ON THIS MARKET."  CORRECT?

13   A.   NO, I NEVER SAID THAT TO HER.

14   Q.   ISN'T IT TRUE YOU TOLD HER, "I CAN MAKE THESE FILMS AND

15   MAKE MILLIONS"?

16   A.   I WISH.  NO.

17   Q.   ISN'T IT TRUE YOU SAID, "I CAN'T IMAGINE WHY THEY WANT

18   IT, BUT THEY DO.  IT'S ALL ABOUT MAKING MONEY FROM SICK

19   PEOPLE"?

20   A.   NO.  I NEVER SAID ANYTHING LIKE THAT.

21   Q.   SO IN YOUR MIND IT IS NOT ALL ABOUT MAKING MONEY --

22   A.   ALL ABOUT, NO.  IT'S NOT --

23   Q.   -- FROM SICK PEOPLE.

24   A.   NO.

25   Q.   IT'S NOT ALL ABOUT MAKING MONEY?

```
 1   A.   IT'S NOT ALL ABOUT MAKING MONEY.  I DON'T CONSIDER

 2   PEOPLE WHO ARE INTO FETISHES SICK, AND PEOPLE WHO

 3   ADVERTISE -- EXCUSE ME -- WHO ORDER ARE NOT SICK PEOPLE.

 4   THESE ARE VALID SEXUAL THINGS THAT PEOPLE GET INTO, AND

 5   THERE'S NO RIGHT AND WRONG.

 6        AND I WOULD NEVER -- THAT'S NOT THE WAY I TALK.

 7   I'M A LOT MORE ARTICULATE.  AND WHY WOULD I EVEN SAY THAT TO

 8   HER?  WHAT AMAZES ME ABOUT THIS -- THIS WHOLE STATEMENT

 9   IS -- IS --

10   Q.   MR. ISAACS --

11   A.   NO, I NEVER SAID ANYTHING LIKE THAT.  I NEVER SAID --

12   NO, NOTHING LIKE THAT.

13   Q.   THE ANSWER IS NO, YOU DIDN'T SAY IT?

14   A.   YES, THAT IS THE ANSWER.

15   Q.   SO LET'S TALK ABOUT MAKING MONEY, THOUGH.

16   A.   OKAY.

17   Q.   LET'S TALK ABOUT "MAKO'S FIRST TIME SCAT."

18   A.   OKAY.

19   Q.   THIS IS A VIDEO.  "MAKO'S FIRST TIME SCAT" IS A MOVIE

20   YOU DIDN'T MAKE.  CORRECT?

21   A.   I DID NOT MAKE IT.  I DID NOT PRODUCE IT.  I WASN'T IN

22   IT.  I HAD NOTHING TO DO WITH IT EXCEPT DISTRIBUTE IT.

23   Q.   AND SELL IT.

24   A.   YES, THAT'S WHAT I MEAN, SELL IT.

25   Q.   WHEN YOU SAY --
```

1    A.   YEAH, SOLD FOR IT MONEY, ABSOLUTELY.

2    Q.   RIGHT.  AND YOU ADVERTISED IT AS, SHOWING YOU

3    GOVERNMENT'S EXHIBIT NO. 11 (AS READ:)

4         *"AS AN ATTRACTIVE YOUNG ASIAN GIRL STARS IN*

5         *THIS EXCITING JAPANESE SCAT MOVIE.  THE ACTION*

6         *STARTS WHEN A GUY PISSES IN HER MOUTH.  SEE THIS*

7         *GEISHA GIRL GRAB HER ANKLES AND SHIT IN A BOWL.*

8         *THEN WATCH THIS YOUNG TOILET AS SHE GETS HAND FED*

9         *HER OWN SHIT.  SEE HER SMEARING HER SHIT ALL OVER*

10        *HER FACE AND BODY AS SHE GETS FUCKED HARD.*

11        *CLOSE-UP SHIT AND PISS SCENES AND SPLIT SCREEN*

12        *SHOTS FOR YOU TO VIEW."*

13             *(END QUOTED MATERIAL.)*

14   **BY MR. KING:**

15   Q.   IS THAT CORRECT?

16   A.   YES.  THAT'S WHAT IT SAYS.

17   Q.   THAT'S HOW YOU ADVERTISED IT?

18   A.   YES, THAT'S HOW I ADVERTISED IT.

19   Q.   I'LL ASK YOU TO GO AHEAD AND LOOK AT GOVERNMENT

20   EXHIBIT 22 AGAIN.

21        CAN YOU SEE THE ENTIRE EXHIBIT?

22   A.   YES, I CAN.

23   Q.   CAN YOU POINT TO ANYWHERE ON THAT WEB PAGE

24   ADVERTISEMENT WHERE THE WORD "ART" IS USED?

25   A.   I DON'T THINK THE WORD "ART" IS ON THERE.

```
 1   Q.   HOW ABOUT "ARTISTIC"?

 2   A.   I DON'T THINK SO.

 3   Q.   HOW ABOUT GOVERNMENT EXHIBIT 21, THE ADVERTISEMENT WEB

 4   PAGE FOR "JAPANESE DOGGIE 3 WAY."

 5        CAN YOU POINT TO WHERE "ART" IS USED ON THAT?

 6   WHERE DOES THE WORD "ART" APPEAR?

 7   A.   IT DOESN'T APPEAR.

 8   Q.   OR "ARTISTIC"?

 9   A.   THE WORD "ARTISTIC" ISN'T THERE, AS WELL.

10   Q.   HOW ABOUT GOVERNMENT EXHIBIT 13, THE WEB PAGE

11   ADVERTISEMENT FOR "HOLLYWOOD SCAT AMATEURS NUMBER 7."  DOES

12   THE WORD "ART" APPEAR ON THERE?

13   A.   NO.

14   Q.   OR "ARTISTIC"?

15   A.   NO.

16   Q.   HOW ABOUT GOVERNMENT EXHIBIT NUMBER 22, THE WEB PAGE

17   ADVERTISEMENT FOR "HOLLYWOOD SCAT AMATEURS NUMBER 10."  DOES

18   THE WORD "ART" APPEAR ANYWHERE ON THERE?

19   A.   NO.

20   Q.   THE WORD "ARTISTIC"?

21   A.   NO.

22   Q.   CAN YOU LOOK IN THE BINDER OF EVIDENCE AND --

23        NEVER MIND.

24        MR. KING:  NO FURTHER QUESTIONS, YOUR HONOR.

25        THE COURT:  MR. DIAMOND, ANY REDIRECT?
```

Government's Excerpts of the Record

Volume II

1     **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA**

3      **WESTERN DIVISION**

4  **THE HONORABLE GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE**

5

6 **UNITED STATES OF AMERICA,**  )
             )
7      **PLAINTIFF,**  )
             )
8     **VS.**    )  **NO. CR 07-732(A)-GHK**
             )
9 **IRA ISAACS,**     )   **VOLUME V**
             )
10     **DEFENDANT.**  )
 _____)

11

12

13   **REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS**

14     **LOS ANGELES, CALIFORNIA**

15  **FRIDAY, APRIL 27, 2012; 7:59 A.M. - 1:32 P.M.**

16     **TRIAL DAY 5; VERDICT**

17    **PAGES 1 THROUGH 152, INCLUSIVE**

18

19

20

21

22       **MARY RIORDAN RICKEY**
        **OFFICIAL COURT REPORTER**
23       **255 EAST TEMPLE STREET**
        **ROOM 181-G**
24       **LOS ANGELES, CA  90012**
        **MARY.USDC@YAHOO.COM**

25

```
1              LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 27, 2012

2                          7:59 A.M.

3                           --oOo--

4         (FOLLOWING HELD OUTSIDE JURY'S PRESENCE:)

5              THE COURT:  WE ARE BACK ON THE RECORD IN THE

6    MATTER OF THE UNITED STATES OF AMERICA VERSUS IRA ISAACS.

7              MR. ISAACS IS PRESENT; COUNSEL ARE PRESENT.  WE

8    ARE OUTSIDE THE PRESENCE AND HEARING OF THE JURY.  ALL

9    RIGHT.

10             COUNSEL, I UNDERSTAND THAT THE GOVERNMENT AT THIS

11   LATE HOUR IS NOW PROPOSING AN ADDITIONAL INSTRUCTION, WHICH

12   IS YET TO BE SET FORTH IN WRITING OTHER THAN TO REFERENCE TO

13   WHAT I HAD SAID ON THE RECORD IN THE PREVIOUS TRIAL.

14             IS THAT RIGHT, MR. GRANT?

15             MR. GRANT:  GOOD MORNING, YOUR HONOR.

16             YES, YOUR HONOR.

17             THE COURT:  HAVE YOU SHOWN THAT TO MR. DIAMOND?

18             MR. GRANT:  YES, YOUR HONOR, WE DID.

19             THE COURT:  MR. DIAMOND, WHAT'S YOUR VIEW ON THIS?

20             MR. DIAMOND:  THE INSTRUCTION WAS NOT SUBMITTED IN

21   THE RIGHT FORM FOR THE COURT TO CONSIDER.  IT'S TOO LATE AND

22   NOT NECESSARY, IN ANY EVENT.

23             THE COURT:  WELL, WHAT I'M NOT INCLINED TO DO --

24   I'M NOT INCLINED TO CHANGE THE JURY INSTRUCTION AT THIS

25   TIME.
```

```
 1              BUT I DO WANT TO CAUTION YOU, MR. DIAMOND, THAT IF
 2    YOU GET INTO ANYTHING THAT SUGGESTS THAT CONSENTING ADULTS
 3    HAS ANYTHING TO DO WITH THIS CASE OR THAT VIDEOS SOMEHOW ARE
 4    NOT TO BE VIEWED IN THIS SETTING, IT'S SUPPOSED TO BE IN THE
 5    PRIVACY OF A HOME -- I DON'T KNOW WHERE YOU'RE GETTING THIS.
 6              THIS IS TOTALLY OUTSIDE THE RECORD.  THAT'S WHAT
 7    YOU SAID IN YOUR OPENING STATEMENT.  YOU DIDN'T BACK THAT UP
 8    AT ALL WITH ANY EVIDENCE.
 9              SO I'M CAUTIONING YOU, NUMBER ONE, DO NOT ARGUE
10    OUTSIDE THE EVIDENCE; AND TWO, IF YOU DO TOUCH UPON OR TRY
11    TO INSINUATE INTO YOUR ARGUMENT SOMEHOW CONSENTING ADULTS
12    HAVE ANYTHING TO DO WITH THIS CASE, THEN I WILL GIVE THIS
13    INSTRUCTION AS A CURATIVE INSTRUCTION.
14              SO IF YOU DON'T GET INTO THE AREA LIKE YOU SAY
15    YOU'RE NOT GOING TO, GREAT, NO PROBLEM.  I'M NOT GOING TO,
16    AS A PEREMPTORY MATTER, GIVE AN INSTRUCTION ON IT.
17              BUT IF YOU DRAW IT, I WILL GIVE THE INSTRUCTION,
18    AND THE INSTRUCTION WILL BE SO THAT YOU'LL BE ADVISED AS
19    FOLLOWS DEPENDING UPON HOW YOU SAY IT, SOMETHING LIKE
20    (READING:)
21              "LADIES AND GENTLEMEN OF THE JURY, THERE'S BEEN
22        SOME MENTION OF CONSENTING ADULTS -- OF MATERIALS BEING
23        SENT TO CONSENTING ADULTS.  YOU SHOULD UNDERSTAND FOR
24        PURPOSES OF THIS CASE WHETHER OR NOT ANYBODY RECEIVING
25        THESE MATERIALS IS A CONSENTING ADULTS IS IRRELEVANT TO
```

1    *WHETHER MR. ISAACS IS GUILTY OF THE CHARGES.  THE*

2    *QUESTION IS WHETHER OR NOT IT IS OBSCENE, AND WHETHER*

3    *THE GOVERNMENT HAS PROVEN ALL OF THE ESSENTIAL ELEMENTS*

4    *OF THE CHARGES AS SET FORTH IN MY INSTRUCTIONS.*

5    *    "WHETHER ADULTS RECEIVING THE MATERIALS CONSENT TO*

6    *RECEIVING THEM IS NOT AN ELEMENT OF THOSE CHARGES.  IF*

7    *IT IS OBSCENE AND THE GOVERNMENT HAS PROVEN ALL OF THE*

8    *OTHER ESSENTIAL ELEMENTS BEYOND A REASONABLE DOUBT, IT*

9    *DOESN'T MATTER WHETHER SOMEBODY CONSENTS TO IT."*

10        **MR. DIAMOND:**  MAY I RESPOND?

11        **THE COURT:**  YOU MAY.

12        **MR. DIAMOND:**  WITH RESPECT TO THE ISSUE OF

13   CONSENTING ADULTS, IT IS NOT A DEFENSE IN AN OBSCENITY CASE

14   THAT MATERIAL IS SENT TO CONSULTING ADULTS IF IT'S OBSCENE.

15   THERE'S NO QUESTION ABOUT THAT.

16        **THE COURT:**  RIGHT.

17        **MR. DIAMOND:**  MY PROBLEM, YOUR HONOR, IS THAT SOME

18   TIMES JURORS IMPROPERLY CONSIDER THINGS DURING DELIBERATIONS

19   THAT THEY SHOULD NOT CONSIDER.

20        **THE COURT:**  LIKE WHAT?

21        **MR. DIAMOND:**  WELL, EVEN THOUGH AN ADULT GOT THIS,

22   THERE'S A POSSIBILITY IT COULD HAVE GOTTEN INTO THE HANDS OF

23   CHILDREN, AND THEREFORE, BECAUSE WE DON'T WANT CHILDREN TO

24   SEE THESE KINDS OF MOVIES, WE'D BETTER CONVICT MR. ISAACS OR

25   WHOEVER'S ALLEGEDLY INVOLVED -- WE'D BETTER CONVICT HIM

```
 1    FIVE-MINUTE RECESS AFTER I GIVE INSTRUCTIONS SO YOU CAN

 2    REVIEW IT, IF YOU NEED IT.

 3           (BENCH CONFERENCE BETWEEN THE COURT AND CLERK.)

 4              MR. DIAMOND:  I HAVE NO PROBLEM WITH.

 5              THE COURT:  ALL RIGHT.  WHO'S TO MAKE THE FIRST

 6    ARGUMENT, MR. KING?

 7              MR. KING:  I AM, YOUR HONOR.

 8              THE COURT:  HOW LONG DO YOU EXPECT TO BE?

 9              MR. KING:  APPROXIMATELY 30 MINUTES.

10              THE COURT:  MR. DIAMOND, HOW LONG DO YOU EXPECT TO

11    BE.

12              MR. DIAMOND:  AS MUCH AS AN HOUR, YOUR HONOR.

13             (8:08 A.M., JURORS ENTER COURTROOM.)

14              THE COURT:  ALL RIGHT.  WE'RE NOW IN THE PRESENCE

15    AND HEARING OF THE JURY.

16           GOOD MORNING, LADIES AND GENTLEMEN OF THE JURY.

17           I WANT TO THANK YOU FOR BEING PROMPT AND BEING

18    HERE ON TIME.  I REALLY APPRECIATE THAT.

19           WE'RE READY FOR YOU TO RECEIVE THE BULK OF THE

20    COURT'S INSTRUCTIONS TO YOU ON THE LAW AT THIS TIME; AND

21    THEN AFTER THAT, WE'LL HEAR ARGUMENT FROM COUNSEL.

22           THEN I'LL JUST HAVE A FEW BASICALLY HOUSEKEEPING

23    INSTRUCTIONS TO GIVE TO YOU REGARDING YOUR DELIBERATIONS.

24    THEN YOU'LL BE READY TO BEGIN YOUR DELIBERATION IN THE JURY

25    ROOM.
```

```
 1              JURY INSTRUCTIONS

 2        THE COURT:   (READING:) "MEMBERS OF THE JURY,

 3        NOW THAT YOU HAVE HEARD ALL OF THE EVIDENCE,

 4   IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT

 5   APPLIES IN THIS CASE.  A COPY OF THESE

 6   INSTRUCTIONS WILL BE AVAILABLE TO YOU IN THE JURY

 7   ROOM FOR YOU TO CONSULT.

 8        "IT IS YOUR DUTY TO WEIGH AND EVALUATE ALL THE

 9   EVIDENCE RECEIVED IN THE CASE AND, IN THAT PROCESS,

10   DECIDE THE FACTS.

11        "IT IS ALSO YOUR DUTY TO APPLY THE LAW AS I GIVE

12   IT TO YOU TO THE FACTS AS YOU FIND THEM WHETHER YOU

13   AGREE WITH THE LAW OR NOT.

14        "YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE

15   AND THE LAW AND YOU MUST NOT BE INFLUENCED BY ANY

16   PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES OR

17   SYMPATHY.  YOU WILL RECALL THAT YOU TOOK AN OATH

18   PROMISING TO DO SO AT THE BEGINNING OF THE CASE.

19        "YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT

20   SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

21   IMPORTANT.  PLEASE DO NOT READ INTO THESE INSTRUCTIONS

22   OR INTO ANYTHING I MAY HAVE SAID OR DONE ANY SUGGESTION

23   AS TO WHAT VERDICT YOU SHOULD RETURN.  THAT IS A MATTER

24   ENTIRELY UP TO YOU.

25        "THE INDICTMENT IS NOT EVIDENCE.  THE DEFENDANT
```

1    *HAS PLEADED NOT GUILTY TO THE CHARGES.  THE DEFENDANT*

2    *IS PRESUMED TO BE INNOCENT UNLESS AND UNTIL THE*

3    *GOVERNMENT PROVES THE DEFENDANT GUILTY BEYOND A*

4    *REASONABLE DOUBT.*

5       *"IN ADDITION, THE DEFENDANT DOES NOT HAVE TO*

6    *TESTIFY OR PRESENT ANY EVIDENCE TO PROVE INNOCENCE.*

7    *THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY*

8    *ESSENTIAL ELEMENT OF THE CHARGES BEYOND A REASONABLE*

9    *DOUBT.*

10      *"THE DEFENDANT HAS TESTIFIED.  YOU SHOULD TREAT*

11   *THIS TESTIMONY JUST AS YOU WOULD THE TESTIMONY OF ANY*

12   *OTHER WITNESS.*

13      *"PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT*

14   *LEAVES YOU FIRMLY CONVINCED THAT THE DEFENDANT IS*

15   *GUILTY.  IT IS NOT REQUIRED THAT THE GOVERNMENT PROVE*

16   *GUILT BEYOND ALL POSSIBLE DOUBT.*

17      *"A REASONABLE DOUBT IS A DOUBT BASED UPON REASON*

18   *AND COMMON SENSE AND IS NOT BASED PURELY ON*

19   *SPECULATION.  IT MAY ARISE FROM A CAREFUL AND IMPARTIAL*

20   *CONSIDERATION OF ALL OF THE EVIDENCE OR FROM LACK OF*

21   *EVIDENCE.*

22      *"IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF*

23   *ALL OF THE EVIDENCE YOU ARE NOT CONVINCED BEYOND A*

24   *REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, IT IS*

25   *YOUR DUTY TO FIND THE DEFENDANT NOT GUILTY.  ON THE*

1   OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL

2   CONSIDERATION OF ALL OF THE EVIDENCE, YOU ARE CONVINCED

3   BEYOND A REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY,

4   IT IS YOUR DUTY TO FIND THE DEFENDANT GUILTY.

5        "THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT

6   THE FACTS ARE CONSISTS OF:

7        1.  THE SWORN TESTIMONY OF ANY WITNESS;

8        2.  THE EXHIBITS RECEIVED IN EVIDENCE; AND,

9        3.  ANY FACTS TO WHICH THE PARTIES HAVE AGREED.

10       "IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY

11   THE TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  THE

12   FOLLOWING THINGS ARE NOT EVIDENCE AND YOU MAY NOT

13   CONSIDER THEM IN DECIDING WHAT THE FACTS ARE:

14       "1.  QUESTIONS, STATEMENTS, OBJECTIONS, AND

15   ARGUMENTS BY THE LAWYER ARE NOT EVIDENCE.

16       THE LAWYERS ARE NOT WITNESSES.  ALTHOUGH YOU MUST

17   CONSIDER A LAWYER'S QUESTION TO UNDERSTAND THE ANSWER

18   OF A WITNESS, A LAWYER'S QUESTIONS ARE NOT EVIDENCE.

19   SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR OPENING

20   STATEMENTS, WILL SAY IN THEIR CLOSING ARGUMENTS, AND AT

21   OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE

22   EVIDENCE, BUT IT IS NOT EVIDENCE.

23       IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE

24   WAY THE LAWYERS STATE THEM, YOUR MEMORY OF THEM

25   CONTROLS.

```
 1          "2.  ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN,
 2     OR INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE.
 3          "3.  ANYTHING YOU MAY HAVE HEARD OR SEEN WHEN THE
 4     COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO
 5     DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED AT THE
 6     TRIAL.
 7          "EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT
 8     EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY
 9     BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR
10     HEARD OR DID.
11          "CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE;
12     THAT IS, IT IS PROOF OF ONE OR MORE FACTS FROM WHICH
13     YOU CAN FIND ANOTHER FACT.
14          "YOU ARE TO CONSIDER BOTH DIRECT AND
15     CIRCUMSTANTIAL EVIDENCE.  EITHER CAN BE USED TO PROVE
16     ANY FACT.  THE LAW MAKES NO DISTINCTION BETWEEN THE
17     WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL
18     EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO
19     GIVE TO ANY EVIDENCE.
20          "BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING
21     AND SEE THAT THE SIDEWALK IS WET, YOU MAY FIND FROM
22     THAT FACT THAT IT RAINED DURING THE NIGHT.  HOWEVER,
23     OTHER EVIDENCE, SUCH AS A TURNED ON GARDEN HOSE, MAY
24     PROVIDE AN EXPLANATION FOR THE WATER ON THE SIDEWALK.
25     THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN
```

```
1        PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER

2        ALL OF THE EVIDENCE IN LIGHT OF REASON, EXPERIENCE, AND

3        COMMON SENSE.

4            "IN DECIDING THE FACT IN THIS CASE, YOU MAY HAVE

5        TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH

6        TESTIMONY NOT TO BELIEVE.  YOU MAY BELIEVE EVERYTHING A

7        WITNESS SAYS OR A PART OF IT OR NONE OF IT.  IN

8        CONSIDERING THE TESTIMONY OF ANY WITNESS YOU MAY TAKE

9        INTO ACCOUNT:

10           1.  THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE

11       OR HEAR OR KNOW THE THINGS TESTIFIED TO;

12           2.  THE WITNESS'S MEMORY;

13           3.  THE WITNESS'S MANNER WHILE TESTIFYING;

14           4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE

15       CASE, IF ANY;

16           5.  THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

17           6.  WHETHER OTHER EVIDENCE CONTRADICTED THE

18       WITNESS'S TESTIMONY;

19           7.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY

20       IN LIGHT OF ALL OF THE EVIDENCE; AND

21           8.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

22           "THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

23       NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO

24       TESTIFY.  WHAT IS IMPORTANT IS HOW BELIEVABLE THE

25       WITNESSES WERE AND HOW MUCH WEIGHT YOU THINK THEIR
```

```
 1    TESTIMONY DESERVES.

 2          "A SEPARATE CRIME IS CHARGED AGAINST THE

 3    DEFENDANT IN EACH COUNT.  YOU MUST DECIDE EACH COUNT

 4    SEPARATELY.  YOUR VERDICT ON ONE COUNT SHOULD NOT

 5    CONTROL YOUR VERDICT ON ANY OTHER COUNT."

 6          "YOU HAVE HEARD TESTIMONY THAT THE DEFENDANT

 7    MADE A STATEMENT.  IT IS FOR YOU TO DECIDE WHETHER THE

 8    DEFENDANT MADE THE STATEMENT AND IF SO, HOW MUCH WEIGHT

 9    TO GIVE TO IT.  IN MAKING THOSE DECISIONS, YOU SHOULD

10    CONSIDER ALL OF THE EVIDENCE ABOUT THE STATEMENT,

11    INCLUDING THE CIRCUMSTANCES UNDER WHICH THE DEFENDANT

12    MAY HAVE MADE IT."

13          "THE PARTIES HAVE AGREED TO CERTAIN FACTS THAT

14    HAVE BEEN STATED TO YOU.  YOU SHOULD, THEREFORE, TREAT

15    THOSE FACTS AS HAVING BEEN PROVED."

16          "YOU HAVE SEEN VIDEOS IN THE JAPANESE LANGUAGE.

17    TRANSCRIPTS OF THE VIDEOS HAVE BEEN ADMITTED INTO

18    EVIDENCE.  THE TRANSCRIPTS ARE OFFICIAL ENGLISH

19    LANGUAGE TRANSLATIONS OF THE VIDEOS.

20          "ALTHOUGH SOME OF YOU MAY KNOW THE JAPANESE

21    LANGUAGE, IT IS IMPORTANT THAT ALL JURORS CONSIDER THE

22    SAME EVIDENCE.  THEREFORE, YOU MUST ACCEPT THE ENGLISH

23    TRANSLATIONS CONTAINED IN THE TRANSCRIPTS EVEN IF YOU

24    WOULD TRANSLATE IT DIFFERENTLY."

25          "YOU HAVE HEARD TESTIMONY FROM UNDERCOVER
```

```
 1        AGENTS WHO WERE INVOLVED IN THE GOVERNMENT'S

 2        INVESTIGATION IN THIS CASE.  LAW ENFORCEMENT OFFICIALS

 3        MAY ENGAGE IN STEALTH AND DECEPTION SUCH AS THE USE OF

 4        INFORMANTS AND UNDERCOVER AGENTS IN ORDER TO

 5        INVESTIGATE CRIMINAL ACTIVITY.  UNDERCOVER AGENTS AND

 6        INFORMANTS MAY USE FALSE NAMES AND APPEARANCES."

 7             "A DEFENDANT MAY BE FOUND GUILTY OF THE OFFENSE

 8        AS CHARGED EVEN IF THE DEFENDANT PERSONALLY DID NOT

 9        COMMIT THE ACT OR ACTS CONSTITUTING THE CRIMES BUT

10        AIDED AND ABETTED IN THEIR COMMISSION.  TO PROVE A

11        DEFENDANT GUILTY OF AIDING AND ABETTING, THE GOVERNMENT

12        MUST PROVE BEYOND A REASONABLE DOUBT:  FIRST, THE

13        CRIMES CHARGED IN THE INDICTMENT WERE COMMITTED BY

14        SOMEONE; SECOND, THE DEFENDANT KNOWINGLY AND

15        INTENTIONALLY AIDED, COUNSELED, COMMANDED, INDUCED, OR

16        PROCURED THAT PERSON TO COMMIT EACH ELEMENT OF THOSE

17        OFFENSES; AND THIRD, THE DEFENDANT ACTED BEFORE THE

18        CRIMES WERE COMPLETED.  IT IS NOT ENOUGH THAT THE

19        DEFENDANT MERELY ASSOCIATED WITH THE PERSON COMMITTING

20        THE CRIMES, OR UNKNOWINGLY OR UNINTENTIONALLY DID

21        THINGS THAT WERE HELPFUL TO THAT PERSON, OR WAS PRESENT

22        AT THE SCENE OF THE CRIMES.  THE EVIDENCE MUST SHOW

23        BEYOND A REASONABLE DOUBT THAT THE DEFENDANT ACTED WITH

24        THE KNOWLEDGE AND INTENTION OF HELPING THAT PERSON

25        COMMIT THE CRIMES CHARGED.  THE GOVERNMENT IS NOT
```

```
 1      REQUIRED TO PROVE PRECISELY WHICH PERSON ACTUALLY

 2      COMMITTED THE CRIMES AND WHICH PERSON AIDED AND

 3      ABETTED."

 4            "AN ACT IS DONE KNOWINGLY IF THE DEFENDANT IS

 5      AWARE OF THE ACT AND DOES NOT ACT OR FAIL TO ACT

 6      THROUGH IGNORANCE, MISTAKE, OR ACCIDENT.  THE

 7      GOVERNMENT IS NOT REQUIRED TO PROVE THAT DEFENDANT KNEW

 8      THAT HIS ACTS OR OMISSIONS WERE UNLAWFUL.  YOU MAY

 9      CONSIDER EVIDENCE OF THE DEFENDANT'S WORDS, ACTS, OR

10      OMISSIONS, ALONG WITH ALL OF THE OTHER EVIDENCE, IN

11      DECIDING WHETHER THE DEFENDANT ACTED KNOWINGLY."

12            "THE INDICTMENT CHARGES THAT THE OFFENSES

13      ALLEGED WERE COMMITTED 'ON OR ABOUT' CERTAIN DATES.

14      ALTHOUGH IT IS NECESSARY FOR THE GOVERNMENT TO PROVE

15      BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE

16      COMMITTED ON DATES REASONABLY NEAR THE DATES ALLEGED IN

17      THE INDICTMENT, IT IS NOT NECESSARY FOR THE GOVERNMENT

18      TO PROVE THAT THE OFFENSES WERE COMMITTED ON PRECISELY

19      THE DATES CHARGED."

20            "COUNT 1 OF THE INDICTMENT CHARGES THAT:

21      BEGINNING ON A DATE UNKNOWN AND CONTINUING THROUGH ON

22      OR ABOUT APRIL 14, 2011, IN LOS ANGELES COUNTY, WITHIN

23      THE CENTRAL DISTRICT OF CALIFORNIA, AND ELSEWHERE,

24      DEFENDANT IRA ISAACS, DOING BUSINESS AS 'STOLEN CAR

25      FILMS' AND 'L.A. MEDIA,' ENGAGED IN THE BUSINESS OF
```

```
 1        PRODUCING WITH INTENT TO DISTRIBUTE AND SELL, AND

 2        ENGAGED IN THE BUSINESS OF SELLING, OBSCENE MATTER,

 3        INCLUDING, BUT NOT LIMITED TO, THE MOVIE ENTITLED

 4        'HOLLYWOOD SCAT AMATEURS NUMBER 7,' WHICH HAS BEEN

 5        SHIPPED AND TRANSPORTED IN INTERSTATE AND FOREIGN

 6        COMMERCE."

 7             "SECTION 1466(A) OF TITLE 18 OF THE

 8        UNITED STATES CODE PROVIDES, IN RELEVANT PART THAT:

 9        'WHOEVER IS ENGAGED IN THE BUSINESS OF PRODUCING WITH

10        INTENT TO DISTRIBUTE OR SELL, OR SELLING...OBSCENE

11        MATTER,...WHICH HAS BEEN SHIPPED OR TRANSPORTED IN

12        INTERSTATE COMMERCE...' SHALL BE GUILTY OF AN OFFENSE

13        AGAINST THE UNITED STATES."

14             "IN ORDER TO SUSTAIN ITS BURDEN OF PROOF FOR

15        THE CRIME OF ENGAGING IN THE BUSINESS OF PRODUCING WITH

16        INTENT TO DISTRIBUTE AND SELL AND ENGAGING IN THE

17        BUSINESS OF SELLING OBSCENE MATTER, INCLUDING BUT NOT

18        LIMITED TO, THE MOVIE TITLED 'HOLLYWOOD SCAT AMATEURS

19        NUMBER 7,' THE GOVERNMENT MUST PROVE THE FOLLOWING FOUR

20        ESSENTIAL ELEMENTS BEYOND A REASONABLE DOUBT:

21             "FIRST:  THAT THE DEFENDANT WAS ENGAGED IN

22        THE BUSINESS OF PRODUCING WITH INTENT TO

23        DISTRIBUTE OR SELL, OBSCENE MATTER, OR ENGAGED IN

24        THE BUSINESS OF SELLING OBSCENE MATTER;

25             "SECOND:  THAT THE DEFENDANT KNEW, AT THE
```

1     *TIME OF ENGAGING IN SUCH BUSINESS, THAT THE*

2     *MATERIALS WERE OF A SEXUALLY ORIENTED NATURE;*

3     *"THIRD: THAT THE MATERIAL HAD BEEN*

4     *SHIPPED OR TRANSPORTED IN INTERSTATE OR FOREIGN*

5     *COMMERCE; AND,*

6     *"FOURTH: THAT THE MATERIAL WAS OBSCENE.*

7     *"THE TERM 'ENGAGED IN THE BUSINESS' MEANS THAT*

8     *THE PERSON WHO PRODUCES, SELLS, OR OFFERS TO SELL*

9     *OBSCENE MATTER DEVOTES TIME, ATTENTION, OR LABOR TO*

10    *SUCH ACTIVITIES, AS A REGULAR COURSE OF TRADE OR*

11    *BUSINESS, WITH THE OBJECTIVE OF EARNING A PROFIT,*

12    *ALTHOUGH IT IS NOT NECESSARY THAT THE PERSON MAKE A*

13    *PROFIT OR THAT THE PRODUCTION, SELLING, OR OFFERING TO*

14    *SELL SUCH MATERIAL TO BE THE PERSON'S SOLE OR PRINCIPAL*

15    *BUSINESS OR SOURCE OF INCOME."*

16    *"COUNT 2 OF THE INDICTMENT CHARGES THAT: ON OR*

17    *ABOUT THE FOLLOWING DATE IN LOS ANGELES COUNTY WITHIN*

18    *THE CENTRAL DISTRICT OF CALIFORNIA, AND ELSEWHERE,*

19    *DEFENDANT, IRA ISAACS, DOING BUSINESS AS 'STOLEN CAR*

20    *FILMS' AND 'L.A. MEDIA,' KNOWINGLY USED A FACILITY AND*

21    *MEANS OF INTERSTATE AND FOREIGN COMMERCE, AND AN*

22    *INTERACTIVE COMPUTER SERVICE IN AND AFFECTING*

23    *INTERSTATE AND FOREIGN COMMERCE, FOR THE PURPOSE OF*

24    *SELLING AND DISTRIBUTING THE FOLLOWING OBSCENE PICTURE*

25    *AND FILM, NAMELY, THE MOVIE WITH THE FOLLOWING TITLE,*

```
 1    AND COUNT 2 ALLEGES A DATE OF JULY 21, 2006, AND THE

 2    TITLE OF THE MOVIE 'MAKO'S FIRST TIME SCAT.'"

 3         "SECTION 1465 OF TITLE 18 OF THE UNITED STATES

 4    CODE PROVIDES, IN RELEVANT PART, THAT:  'WHOEVER

 5    KNOWINGLY...USES A FACILITY OR MEANS OF, INTERSTATE OR

 6    FOREIGN COMMERCE...FOR THE PURPOSE OF SALE OR

 7    DISTRIBUTION OF ANY OBSCENE...PICTURE [OR] FILM...'

 8    SHALL BE GUILTY OF AN OFFENSE AGAINST THE

 9    UNITED STATES."

10         "THE DEFENDANT CAN BE FOUND GUILTY OF VIOLATING

11    TITLE 18, UNITED STATES CODE, SECTION 1465, ONLY IF ALL

12    OF THE FOLLOWING FACTS AND ELEMENTS ARE PROVED BEYOND A

13    REASONABLE DOUBT:

14         FIRST:  THAT THE DEFENDANT KNOWINGLY USED A

15    FACILITY OR MEANS OF INTERSTATE OR FOREIGN

16    COMMERCE FOR THE PURPOSE OF SELLING OR

17    DISTRIBUTING MATERIALS AS DESCRIBED IN THE

18    INDICTMENT;

19         SECOND:  THAT THE DEFENDANT KNEW, AT THE TIME

20    OF SUCH USE OF A FACILITY OR MEANS OF INTERSTATE

21    OR FOREIGN COMMERCE, THAT THE MATERIALS WERE OF A

22    SEXUALLY ORIENTED NATURE; AND,

23         THIRD:  THAT THE MATERIALS WERE OBSCENE.

24         "THE TERM 'FACILITY OR MEANS OF INTERSTATE

25    COMMERCE' INCLUDES PRIVATE AND COMMERCIAL INTERSTATE
```

1    CARRIERS.  UNITED PARCEL SERVICE (COMMONLY KNOWN AS

2    'U.P.S.') IS A FACILITY AND MEANS OF INTERSTATE

3    COMMERCE AS DEFINED."

4         "COUNT 3 OF THE INDICTMENT CHARGES THAT:  ON OR

5    ABOUT OCTOBER 20, 2006, IN LOS ANGELES COUNTY WITHIN

6    THE CENTRAL DISTRICT OF CALIFORNIA AND ELSEWHERE,

7    DEFENDANT IRA ISAACS, DOING BUSINESS AS 'STOLEN CAR

8    FILMS' AND 'L.A. MEDIA,' KNOWINGLY USED AN EXPRESS

9    COMPANY, COMMON CARRIER, AND INTERACTIVE COMPUTER

10   SERVICE, FOR CARRIAGE IN INTERSTATE COMMERCE AND

11   DELIVERY TO A LOCATION OUTSIDE OF THE STATE OF

12   CALIFORNIA, PACKAGES WHICH CONTAINED THE FOLLOWING

13   OBSCENE PICTURE AND FILM, NAMELY, THE MOVIE TITLED

14   'HOLLYWOOD SCAT AMATEUR NUMBER 7.'"

15        "SECTION 1462 OF TITLE 18 OF THE UNITED STATES

16   CODE PROVIDES, IN RELEVANT PART, THAT:

17   'WHOEVER...KNOWINGLY USES ANY EXPRESS COMPANY OR OTHER

18   COMMON CARRIER OR INTERACTIVE COMPUTER SERVICE...FOR

19   CARRIAGE IN INTERSTATE OR FOREIGN COMMERCE...ANY

20   OBSCENE...PICTURE, MOTION-PICTURE FILM,...OR OTHER

21   MATTER OF INDECENT CHARACTER...' SHALL BE GUILTY OF AN

22   OFFENSE AGAINST THE UNITED STATES."

23        "THE DEFENDANT CAN BE FOUND GUILTY OF VIOLATING

24   TITLE 18, UNITED STATE CODE, SECTION 1462 ONLY IF ALL

25   OF THE FOLLOWING ELEMENTS ARE PROVED BEYOND A

```
 1        REASONABLE DOUBT:

 2             FIRST:  THAT THE DEFENDANT KNOWINGLY USED A

 3        COMMON CARRIER TO TRANSPORT CERTAIN MATERIALS AS

 4        DESCRIBED IN THE INDICTMENT IN INTERSTATE COMMERCE

 5        FROM CALIFORNIA TO VIRGINIA;

 6             SECOND:  THAT THE DEFENDANT KNEW, AT THE TIME

 7        OF SUCH TRANSPORTATION, THAT THE MATERIALS WERE OF

 8        A SEXUALLY ORIENTED NATURE; AND,

 9             THIRD:  THAT THE MATERIALS WERE OBSCENE.

10             "THE TERM 'COMMON CARRIER' INCLUDES ANY PERSON

11        OR CORPORATION WHOSE BUSINESS IS TRANSPORTING GOODS AND

12        COMMODITIES FOR MEMBERS OF THE PUBLIC.  UNITED PARCEL

13        SERVICE, (COMMONLY KNOWN AS 'U.P.S.') IS A COMMON

14        CARRIER AS DEFINED."

15             "COUNTS 4 AND 5 OF THE INDICTMENT CHARGE THAT:

16        ON OR ABOUT THE FOLLOWING DATES, IN LOS ANGELES COUNTY

17        WITHIN THE CENTRAL DISTRICT OF CALIFORNIA AND

18        ELSEWHERE, DEFENDANT, IRA ISAACS, DOING BUSINESS AS

19        'STOLEN CAR FILMS' AND 'L.A. MEDIA,' KNOWINGLY CAUSED

20        TO BE DELIVERED BY MAIL ACCORDING TO THE DIRECTIONS

21        THEREON TO AN ADDRESS LOCATED IN LOS ANGELES COUNTY,

22        NON-MAILABLE OBSCENE MATTER, NAMELY, THE MOVIES WITH

23        THE FOLLOWING TITLES:  COUNT 4 REFERS TO THE DATE OF

24        APRIL 7, 2011, AND THE MOVIE TITLED 'JAPANESE DOGGIE 3

25        WAY,' COUNT 5 RELATES TO THE DATE OF APRIL 7, 2011, AND
```

```
 1    THE MOVIE TITLED 'HOLLYWOOD SCAT AMATEURS NUMBER 10.'"
 2         "SECTION 1461 OF TITLE 18 OF THE UNITED STATES
 3    CODE PROVIDES, IN RELEVANT PART, THAT: 'WHOEVER
 4    KNOWINGLY CAUSES TO BE DELIVERED BY MAIL ACCORDING TO
 5    THE DIRECTION THEREON [ANY NON-MAILABLE MATTER]...'
 6    SHALL BE GUILTY OF AN OFFENSE AGAINST THE
 7    UNITED STATES.  OBSCENE MATERIAL ARE NON-MAILABLE."
 8         "THE DEFENDANT CAN BE FOUND GUILTY OF VIOLATING
 9    TITLE 18, UNITED STATES CODE, SECTION 1461 ONLY IF ALL
10    OF THE FOLLOWING ELEMENTS ARE PROVED BEYOND A
11    REASONABLE DOUBT:
12        FIRST:  THAT THE DEFENDANT KNOWINGLY SENT OR
13    CAUSED TO BE SENT CERTAIN MATERIALS USING THE
14    UNITED STATES MAIL.
15        SECOND:  THAT THE DEFENDANT KNEW, AT THE TIME
16    OF MAILING, THAT THE MATERIALS WERE SEXUALLY
17    ORIENTED IN NATURE; AND,
18        THIRD:  THAT THE MATERIALS WERE OBSCENE.
19         "TO USE THE MAIL IS TO ACT SO THAT SOMETHING
20    WILL NORMALLY BE SENT THROUGH THE MAIL IN THE NORMAL
21    COURSE OF BUSINESS OR REASONABLY FORESEE THAT THE MAIL
22    WILL BE USED.  WHERE A PERSON DOES AN ACT WITH
23    KNOWLEDGE THAT THE USE OF THE MAILS WILL FOLLOW OR
24    WHERE SUCH USE CAN REASONABLY BE FORESEEN, THEN THE
25    PERSON CAUSES THE MAILS TO BE USED."
```

1
2          "AN ESSENTIAL ELEMENT THE GOVERNMENT MUST PROVE
3     IN COUNTS 1, 2, 3, 4, AND 5, IS THAT THE MATERIALS
4     CHARGED ARE 'OBSCENE.'  ALTHOUGH THE GOVERNMENT MUST
5     PROVE THAT THE DEFENDANT GENERALLY KNEW THAT THE
6     MATERIALS WERE OF A SEXUALLY ORIENTED NATURE, THE
7     GOVERNMENT DOES NOT HAVE TO PROVE THAT THE DEFENDANT
8     KNEW OR BELIEVED THE MATERIALS WERE LEGALLY OBSCENE.
9          "THE GOVERNMENT DOES NOT HAVE THE BURDEN TO
10    PROVIDE AFFIRMATIVE EVIDENCE THAT THE MATERIALS CHARGED
11    ARE OBSCENE OTHER THAN TO PLACE THE MATERIALS
12    THEMSELVES INTO EVIDENCE.  ONCE THE MATERIALS ARE
13    PLACED INTO EVIDENCE BY THE GOVERNMENT, THEY ARE
14    CONSIDERED THE BEST EVIDENCE OF WHAT THEY REPRESENT AND
15    ARE SUFFICIENT IN AND OF THEMSELVES FOR THE
16    DETERMINATION OF OBSCENITY.  THIS DETERMINATION OF
17    OBSCENITY MUST BE MADE BY YOU, USING THE THREE-PART
18    TEST I WILL DESCRIBE TO YOU SHORTLY.
19         "IN THE EXERCISE OF THE FUNDAMENTAL
20    CONSTITUTIONAL RIGHT OF FREE EXPRESSION, WHICH ALL OF
21    US ENJOY, SEX MAY BE PORTRAYED AND THE SUBJECT OF SEX
22    MAY BE DISCUSSED FREELY AND PUBLICLY.  MATERIAL IS NOT
23    TO BE CONDEMNED MERELY BECAUSE IT CONTAINS PASSAGES OR
24    SEQUENCES THAT ARE DESCRIPTIVE OF SEXUAL ACTIVITY.
25    HOWEVER, THE CONSTITUTIONAL RIGHT TO FREE EXPRESSION

1    *DOES NOT EXTEND TO THAT WHICH IS OBSCENE.  SAID IN*

2    *ANOTHER WAY, OBSCENE MATERIAL IS NOT PROTECTED BY THE*

3    *FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION.*

4            *"TO PROVE A MATTER IS 'OBSCENE,' THE GOVERNMENT*

5    *MUST SATISFY A THREE-PART TEST:*

6        *FIRST:  THAT THE WORK APPEALS PREDOMINANTLY*

7    *TO PRURIENT INTEREST;*

8        *SECOND: THAT IT DEPICTS OR DESCRIBES SEXUAL*

9    *CONDUCT IN A PATENTLY OFFENSIVE MANNER OR WAY;*

10   *AND,*

11       *THIRD:  THAT THE MATERIAL, TAKEN AS A WHOLE,*

12   *LACKS SERIOUS, LITERARY, ARTISTIC, POLITICAL, OR*

13   *SCIENTIFIC VALUE.*

14           *"AN APPEAL TO 'PRURIENT' INTEREST IS AN APPEAL*

15   *TO A MORBID, DEGRADING, AND UNHEALTHY INTEREST IN SEX,*

16   *AS DISTINGUISHED FRO A MERE CANDID INTEREST IN SEX.*

17           *"THE FIRST TEST, THEREFORE, IS WHETHER THE*

18   *PREDOMINANT THEME OR PURPOSE OF THE MATERIAL, WHEN*

19   *VIEWED AS A WHOLE AND NOT PART BY PART, AND WHEN*

20   *CONSIDERED IN RELATION TO THE INTENDED AND PROBABLE*

21   *RECIPIENTS, IS AN APPEAL TO THE PRURIENT INTEREST OF AN*

22   *AVERAGE PERSON IN THE COMMUNITY AS A WHOLE OR TO THE*

23   *PRURIENT INTEREST OF MEMBERS OF A DEVIANT SEXUAL GROUP.*

24   *IN MAKING THIS DECISION, YOU MUST EXAMINE THE MAIN OR*

25   *PRINCIPAL THRUST OF THE MATERIAL, WHEN ASSESSED IN ITS*

```
 1      ENTIRETY AND BASED ON ITS TOTAL EFFECT, NOT ON

 2      INCIDENTAL THEMES OR ISOLATED PASSAGES OR SEQUENCES.

 3           "THE SECOND TEST IS WHETHER THE MATERIAL

 4      DEPICTS OR DESCRIBES, IN A PATENTLY OFFENSIVE WAY,

 5      SEXUAL CONDUCT SUCH AS ULTIMATE SEXUAL ACTS, NORMAL OR

 6      PERVERTED, ACTUAL OR SIMULATED; MASTURBATION; EXCRETORY

 7      FUNCTIONS; OR LEWD EXHIBITION OF THE GENITALS.

 8           "THESE FIRST TWO TESTS WHICH I HAVE DESCRIBED

 9      ARE TO BE DECIDED BY YOU, APPLYING CONTEMPORARY

10      COMMUNITY STANDARDS.  THIS MEANS THAT YOU SHOULD MAKE

11      THE DECISION IN LIGHT OF THE CONTEMPORARY STANDARDS

12      THAT WOULD BE APPLIED TO AN AVERAGE PERSON IN THIS

13      COMMUNITY WITH AN AVERAGE AND NORMAL ATTITUDE TOWARD

14      AND INTEREST IN SEX.  FOR PURPOSES OF THIS INSTRUCTION,

15      THIS COMMUNITY IS A COMMUNITY EMBRACED BY THE CENTRAL

16      DISTRICT OF CALIFORNIA.  THE CENTRAL DISTRICT OF

17      CALIFORNIA INCLUDES LOS ANGELES, ORANGE, RIVERSIDE,

18      SAN BERNARDINO, SAN LUIS OBISPO, SANTA BARBARA, AND

19      VENTURA COUNTIES.  CONTEMPORARY COMMUNITY STANDARDS ARE

20      THOSE ACCEPTED IN THIS COMMUNITY AS A WHOLE.  YOU MUST

21      DECIDE WHETHER THE MATERIAL WOULD APPEAL PREDOMINANTLY

22      TO PRURIENT INTEREST AND WOULD DEPICT OR DESCRIBE

23      SEXUAL CONDUCT IN A PATENTLY OFFENSIVE WAY WHEN VIEWED

24      BY AN AVERAGE PERSON IN THIS COMMUNITY AS A WHOLE, THAT

25      IS, BY THE COMMUNITY AT LARGE OR IN GENERAL.  MATTER IS
```

```
 1        PATENTLY OFFENSIVE BY CONTEMPORARY COMMUNITY STANDARDS

 2        IF IT SO EXCEEDS THE GENERALLY ACCEPTED LIMITS OF

 3        CANDOR IN THE ENTIRE COMMUNITY AS TO BE CLEARLY

 4        OFFENSIVE.  YOU MUST NOT JUDGE THE MATERIAL BY YOUR OWN

 5        PERSONAL STANDARDS, IF YOU BELIEVE THEM TO BE STRICTER

 6        THAN THOSE GENERALLY HELD, NOR SHOULD YOU DETERMINE

 7        WHAT SOME GROUPS OF PEOPLE MAY BELIEVE THE COMMUNITY

 8        OUGHT TO ACCEPT OR REFUSE TO ACCEPT.  RATHER, YOU MUST

 9        DETERMINE THE ATTITUDE OF THE COMMUNITY AS A WHOLE.

10             "HOWEVER, THE PRURIENT INTEREST REQUIREMENT MAY

11        ALSO BE ASSESSED IN TERMS OF THE SEXUAL INTEREST OF A

12        CLEARLY DEFINED DEVIANT SEXUAL GROUP IF THE MATERIAL IN

13        QUESTION WAS INTENDED TO APPEAL TO THE PRURIENT

14        INTEREST OF THAT GROUP, AS DISTINGUISHED FROM THE

15        COMMUNITY IN GENERAL.

16             "IF YOU FIND THAT THE MATERIAL MEETS THE FIRST

17        TWO TESTS OF THE OBSCENITY DEFINITION, YOUR FINAL

18        DECISION IS WHETHER THE MATERIAL, TAKEN AS A WHOLE,

19        LACKS SERIOUS LITERARY, ARTISTIC, POLITICAL, OR

20        SCIENTIFIC VALUE.  UNLIKE THE FIRST TWO TESTS, THIS

21        THIRD TEST IS NOT TO BE DECIDED ON CONTEMPORARY

22        COMMUNITY STANDARDS BUT RATHER ON THE BASIS OF WHETHER

23        A REASONABLE PERSON, CONSIDERING THE MATERIAL AS A

24        WHOLE, WOULD FIND THAT THE MATERIAL LACKS SERIOUS

25        LITERARY, ARTISTIC, POLITICAL, OR SCIENTIFIC VALUE.  AN
```

1    *ITEM MAY HAVE SERIOUS VALUE IN ONE OR MORE OF THESE*

2    *AREAS EVEN IF IT PORTRAYS SEXUALLY ORIENTED CONDUCT.*

3    *IT IS FOR YOU TO SAY WHETHER THE MATERIAL IN THIS CASE*

4    *HAS SUCH VALUE.*

5         *"ALL THREE OF THESE TESTS MUST BE MET BEFORE*

6    *THE MATERIAL IN QUESTION CAN BE FOUND TO BE OBSCENE.*

7    *IF ANY ONE OF THEM IS NOT MET, THE MATERIAL WOULD NOT*

8    *BE OBSCENE WITHIN THE MEANING OF THE LAW.*

9         *"HAVING COVERED THESE THREE CHARACTERISTICS OF*

10   *OBSCENITY, THERE IS ONE ADDITIONAL FACTOR THAT YOU MAY*

11   *CONSIDER, AND THAT IS THE CONCEPT OF 'PANDERING.' YOU*

12   *MUST MAKE THE DECISION WHETHER THE MATERIALS ARE*

13   *OBSCENE UNDER THE TEST THAT I HAVE GIVEN YOU. IN*

14   *MAKING THIS DETERMINATION, HOWEVER, YOU ARE NOT LIMITED*

15   *TO THE MATERIALS THEMSELVES. IN ADDITION, YOU MAY*

16   *CONSIDER THE SETTING IN WHICH THEY WERE PRESENTED.*

17   *EXAMPLES OF WHAT YOU MAY CONSIDER IN THIS REGARD ARE*

18   *SUCH THINGS AS MANNER OF DISTRIBUTION, CIRCUMSTANCES OF*

19   *PRODUCTION, SALE, AND ADVERTISING. THE EDITORIAL*

20   *INTENT IS ALSO RELEVANT. WHAT YOU ARE DETERMINING HERE*

21   *IS WHETHER THE MATERIALS WERE PRODUCED AND SOLD AS*

22   *STOCK-IN-TRADE OF THE BUSINESS OF PANDERING. PANDERING*

23   *IS THE BUSINESS OF PURVEYING TEXTUAL OR GRAPHIC MATTER*

24   *OPENLY ADVERTISED TO APPEAL TO THE EROTIC INTEREST OF*

25   *THE CUSTOMER.*

```
 1              "THE QUESTION OF OBSCENITY IS TO BE ANSWERED BY
 2      APPLICATION OF THE BASIC TEST RECITED EARLIER, BUT YOU
 3      MAY CONSIDER THE EVIDENCE OF PANDERING TO ASSIST YOU IN
 4      YOUR DECISION.  SUCH EVIDENCE IS PERTINENT TO ALL THREE
 5      PRONGS OF THE BASIC TEST OF OBSCENITY.
 6              "IN SUMMARY, EVIDENCE OF PANDERING SIMPLY IS
 7      USEFUL IN APPLYING THE BASIC OBSCENITY TEST WHERE AN
 8      EXPLOITATION OF THE INTEREST IN TITILLATION BY
 9      PORNOGRAPHY IS SHOWN WITH RESPECT TO THE MATERIAL,
10      LENDING ITSELF TO SUCH EXPLOITATION THROUGH PERVASIVE
11      TREATMENT OR DESCRIPTION OF SEXUAL MATTERS.  SUCH
12      EVIDENCE MAY SUPPORT THE DETERMINATION THAT THE
13      MATERIAL IS OBSCENE, EVEN THOUGH IN ANOTHER CONTEXT,
14      THE MATERIAL MAY NOT BE OBSCENE."
15
16              "THE INSTRUCTIONS SPECIFICALLY RELATING TO
17      COUNTS 1, 2, AND 3 OF THE INDICTMENT USE THE TERMS
18      'INTERSTATE COMMERCE' OR 'FOREIGN COMMERCE.'  THE TERM
19      'INTERSTATE COMMERCE' INCLUDES ANY MOVEMENT OF GOODS OR
20      ARTICLES FROM ONE STATE INTO ANOTHER STATE.  THE TERM
21      'FOREIGN COMMERCE' INCLUDES COMMERCE WITH A FOREIGN
22      COUNTRY."
23                  (END QUOTED MATERIAL.)
24          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THAT
25      IS THE FIRST PART OF THE INSTRUCTIONS THAT I WILL GIVE YOU.
```

```
 1              THE UNITED STATES IS CONFIDENT THAT YOU WILL DO
 2   YOUR DUTY AND FOLLOW THE LAW AS GIVEN TO YOU BY THE COURT
 3   AND, THEREFORE, RETURN A VERDICT OF GUILTY ON ALL COUNTS.
 4              THANK YOU.
 5         THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,
 6   MR. KING.
 7              THE FINAL ARGUMENT ON BEHALF OF THE DEFENDANT
 8   THEN, MR. DIAMOND.
 9         MR. DIAMOND:  YES, THANK YOU VERY MUCH, YOUR
10   HONOR.
11              YOUR HONOR, SINCE I'M NOT GOING TO SHOW ANY OF THE
12   MOVIES AGAIN, COULD WE MOVE THIS A LITTLE BIT BACK SO I CAN
13   SEE ALL THE JURORS?
14         THE COURT:  OF COURSE.
15         MR. DIAMOND:  I WOULD LIKE TO SEE ALL THE JURORS.
16              CLOSING ARGUMENT BY THE DEFENSE
17         MR. DIAMOND:  THIS CASE IS ABOUT IRONY, AND THE
18   ULTIMATE, OBVIOUS IRONY JUST OCCURRED.  THE PROSECUTOR CHOSE
19   TO CLOSE HIS OPENING ARGUMENT BY A REFERENCE TO
20   THOMAS JEFFERSON.
21              THOMAS JEFFERSON FATHERED CHILDREN OUT OF WEDLOCK
22   BY HIS BLACK SLAVES, AND WHAT IS THIS CASE ALL ABOUT?  IT'S
23   ABOUT HYPOCRISY IN THE GOVERNMENT WITH RESPECT TO THE
24   UNITED STATES OF AMERICA.  HOW HE COULD REFER TO
25   THOMAS JEFFERSON AND AVOID THAT OBVIOUS PROBLEM IS BEYOND
```

```
 1   ME.

 2            THIS CASE IS ABOUT TESTING LIMITS AND BY

 3   ESTABLISHING WHAT REALLY IS ALLOWED IN THIS COUNTRY, WHICH

 4   PROCLAIMS ITSELF TO BE TOTALLY FREE WITH A FIRST AMENDMENT

 5   TO THE CONSTITUTION.

 6            I WANTED TO START OFF WITH THAT BECAUSE OF THE

 7   REFERENCE TO THOMAS JEFFERSON BECAUSE WHAT IRA ISAACS TRIES

 8   TO DO, AMONG OTHER THINGS, IS TO SHOCK PEOPLE, TO

 9   DEMONSTRATE THAT PERHAPS THE PROMISE OF THE FIRST

10   AMENDMENT -- AND THIS IS MENTIONED IN THE JURY INSTRUCTION

11   ABOUT THE FIRST AMENDMENT.  THE PROMISE OF THE FIRST

12   AMENDMENT IS THAT CONGRESS SHALL MAKE NO LAW ABRIDGING

13   FREE --

14            MR. KING:  OBJECTION, YOUR HONOR.

15            THE COURT:  SUSTAINED.

16            I'LL DO THE INSTRUCTING, MR. DIAMOND.

17            MR. DIAMOND:  YES.

18            THE COURT:  THANK YOU.

19            MR. DIAMOND:  WE TALK ABOUT FREE SPEECH UNDER THE

20   FIRST AMENDMENT.  EVERY COUNTRY, OR MOST COUNTRIES, HAVE THE

21   EQUIVALENT OF THE FIRST AMENDMENT, FREE SPEECH, BUT THEN --

22            MR. KING:  OBJECTION, YOUR HONOR.  FACTS NOT IN

23   EVIDENCE.

24            THE COURT:  MR. DIAMOND.

25            MR. DIAMOND:  IT'S A MATTER OF COMMON KNOWLEDGE.
```

```
 1                THE COURT:  MR. DIAMOND, STICK WITH THE RECORD,

 2    PLEASE.

 3                MR. DIAMOND:  YES.

 4                IF A COUNTRY PROCLAIMS THAT IT HAS FREEDOM, LET'S

 5    SAY A COUNTRY -- AFGHANISTAN, IRAQ -- OR SOMEPLACE WHERE

 6    THEY SAY THEY HAVE FREEDOM, BUT IF YOU HAPPEN TO PUBLISH A

 7    PICTURE OF MOHAMMED OR WRITE A BOOK THAT CRITICIZES A

 8    PARTICULAR RELIGION OR SOMETHING, IN SOME COUNTRIES EVEN

 9    THOUGH THEY SAY, "WE HAVE FREEDOM," YOU CAN GET EXECUTED --

10                MR. KING:  OBJECTION, YOUR HONOR.  FACTS NOT IN

11    EVIDENCE.

12                THE COURT:  MR. DIAMOND, YOU REALLY NEED TO STICK

13    TO THE RECORD, PLEASE.

14                MR. DIAMOND:  YOU CAN HAVE A PROBLEM THERE.

15                SO WE'RE GETTING BACK TO THIS PARTICULAR CASE

16    HERE, BUT I WANTED TO MENTION THOSE BY WAY OF EXAMPLES IN

17    TERMS OF THE PURPOSE OF THE SHOCK ART AND THE CONCEPT.  BUT

18    LET'S GO BACK AND LOOK AT THE EVIDENCE IN THIS CASE.

19                I'LL START FROM THE BEGINNING.  THE REASON I

20    JUMPED INTO THOMAS JEFFERSON WAS THAT HE WAS MENTIONED AT

21    THE CLOSE OF THEIR ARGUMENT.  SO I WAS TRYING TO MAKE A

22    PARTICULAR POINT, BUT LET'S GO BACK TO THE BEGINNING OF THIS

23    CASE.

24                THE F.B.I. -- AND THIS IS ALL THE EVIDENCE --

25    FORMS A SPECIAL OBSCENITY UNIT IN WASHINGTON, D.C., IN 2006.
```

```
1    AND THE UNIT, OF COURSE, HAS LONG SINCE BEEN DISBANDED.  IT

2    WAS DISBANDED, ACCORDING TO AGENT JAMES MYRICK, AT THE END

3    OF 2007 BEGINNING OF 2008.  SO WE'RE AT THE LAST REMNANTS OF

4    AN OBSCENITY INVESTIGATION THAT BEGAN YEARS AGO.

5           AND WHAT DID THAT OBSCENITY INVESTIGATION REVEAL?

6    WITH NO CLEVER POLICE DETECTIVE WORK, THEY FOUND IRA ISAACS.

7    MR. MYRICK, BY HIS OWN ADMISSION, WENT TO THE LOCATION WITH

8    NUMEROUS AGENTS JANUARY 17, 2007.

9           THEY HAD ALREADY PURCHASED TWO OF THE FOUR MOVIES

10   INVOLVED IN THIS CASE.  THEY MADE THE PURCHASE IN JULY AND

11   OCTOBER OF 2006.  AGENT MCDERMOTT BOUGHT ONE MOVIE, SHIPPED

12   TO HIM; AND MYRICK BOUGHT THE OTHER.  SO THEY ALREADY

13   PURCHASED TWO MOVIES IN 2006, AND THEY WENT TO MR. ISAACS'

14   OFFICE JANUARY 17, 2007.

15          THE REASON I'M MENTIONING THIS NOW IS THAT THE

16   THEME OF THE GOVERNMENT'S CASE IS THAT SOMEHOW MR. ISAACS IS

17   A MONEY-LOVING SNEAK WHO'S TRYING TO CONCEAL HIMSELF AND

18   HIDE FROM THE GOVERNMENT.

19          THEY ARE DOING THAT TO INFLAME YOUR PREJUDICE THAT

20   THEY THINK YOU WOULD HAVE AGAINST MR. ISAACS IF YOU THOUGHT

21   THAT WAS WHAT HE WAS ALL ABOUT, SOME KIND OF SNIVELING,

22   HIDING, SECRET OPERATIVE.  IT'S VERY CLEVER.

23          I TIP MY HAT TO -- OF COURSE, I'M NOT WEARING A

24   HAT -- THE GOVERNMENT FOR STARTING THE THEME BY GETTING YOU

25   ALL UPSET WITH MR. ISAACS.  HE WASN'T HIDING FROM THE
```

```
 1   GOVERNMENT.  THE GOVERNMENT KNOWS HOW TO FIND PEOPLE.  THEY

 2   FOUND HIM ON JANUARY 17, 2007.

 3           AND WHY WAS HE NOT USING HIS CORRECT ADDRESS?

 4   BECAUSE WE ALL KNOW WHAT HAPPENED TO LARRY FLYNT DURING AN

 5   OBSCENITY TRIAL IN GEORGIA.  DURING A RECESS, HE WAS SHOT

 6   ALONG WITH HIS LAWYER.  WHY?  BECAUSE THERE ARE PEOPLE IN

 7   THIS COUNTRY WHO DON'T LIKE WHAT PEOPLE LIKE MR. ISAACS --

 8           MR. KING:  OBJECTION, YOUR HONOR.  THAT'S NOT IN

 9   EVIDENCE.

10           THE COURT:  OVERRULED.

11           MR. DIAMOND:  THANK YOU.

12           WE KNOW THAT.  SO MR. ISAACS TESTIFIED AS TO WHY

13   HE WAS NOT USING HIS CORRECT ADDRESS -- TO PROTECT HIMSELF,

14   TO PROTECT HIS EMPLOYEES, AND TO PROTECT EVEN SOMEBODY WHO

15   WOULD BE MAYBE WORKING IN A POSTAL DROP WHERE THE RETURN

16   ADDRESS WOULD BE.

17           HE WASN'T HIDING FROM THE GOVERNMENT.  THE

18   GOVERNMENT HAD HIM IN JANUARY OF 2007.  HE DIDN'T HIDE.

19   THIS IS RIDICULOUS.

20           HE USED THE NAME "JOSEF K." FROM THE BOOK *THE

21   TRIAL*" BY KAFKA, AND THAT'S IN THE CREDITS IN THESE EARLIER

22   MOVIES.  THAT WASN'T A RECENT FABRICATION BY HIS ATTORNEY OR

23   BY ANYBODY TRYING TO FIGURE OUT HOW TO WIN A CASE.  THAT'S

24   IN THE RECORD.  THAT'S THE EVIDENCE.

25           HE ALWAYS USED THAT NAME, JOSEF K., IN THE MOVIE
```

```
 1   CREDITS BECAUSE HE ADMIRED THE CHARACTER THAT KAFKA CREATED

 2   IN THE GREAT BOOK, ONE OF THE GREATEST BOOKS OF ALL TIME

 3   CALLED "THE TRIAL," WHICH I HAD THE OPPORTUNITY TO FINISH

 4   READING INSTEAD OF WATCHING THE MOVIES.

 5           SO WE HAVE THE BOOK RIGHT HERE, AND I'LL GET TO

 6   WHETHER WE SHOULD WATCH THE MOVIES OR NOT WATCH THEM.  THEY

 7   ARE NOT FOR EVERYBODY.  THEY'RE PRETTY DISGUSTING.  AND YOU

 8   SHOULD BE ADMIRED AND COMPLIMENTED FOR BEING ABLE TO SIT

 9   THERE FOR TWO DAYS STRAIGHT OF PRETTY GROSS, DISGUSTING

10   MOVIES.  THEY WERE PRETTY BAD.  I COULDN'T EVEN WATCH THEM,

11   BUT I DON'T BUY THEM.  THEY'RE NOT FOR ME.  THEY'RE NOT FOR

12   EVERYBODY.

13           THE QUESTION IS ARE THEY FOR SOME PEOPLE IN A FREE

14   SOCIETY THAT PROCLAIMS TO BE FREE?

15           I'M GOING TO GET TO THAT LATER ON IN MY DISCUSSION

16   ABOUT POLITICAL CHALLENGES AND SHOCK ART AND SO FORTH.  BUT

17   IN ANY EVENT, JANUARY OF 2007, THEY HAD MR. ISAACS.

18           THE GOVERNMENT SAYS, "OH, THE CONCESSION HE'S MADE

19   AT THE TRIAL.  HE SIGNED STIPULATIONS OF FACTS.  HE TOOK THE

20   WITNESS STAND AND ADMITTED ALL THIS SHIPPING."  THEY'RE

21   SAYING, "WELL, NOW, IN APRIL -- APRIL 27, 2012 -- KNOWING

22   THAT NOW HE HAS BEEN CAUGHT RED-HANDED, HE HAS NO OPTION

23   EXCEPT TO ADMIT WHAT HE'S FORCED TO ADMIT."

24           THAT'S NOT TRUE.  MYRICK ADMITS THAT IN

25   JANUARY 2007 IRA TOLD HIM EVERYTHING.  SO FOR THEM TO SAY
```

```
 1   THAT HE'S SOME KIND OF AGENT IN HIDING TRYING TO CONCEAL HIS

 2   ACTIVITY, THAT'S JUST NOT TRUE.  THEY ARE JUST TOTALLY

 3   DECEPTIVE WHEN THEY ARGUE THAT POINT.

 4        THIS CASE IS ABOUT WHETHER THE MOVIES ARE LEGALLY

 5   OBSCENE UNDER THE TEST THAT THE COURT HAS GIVEN TO YOU.

 6   THAT'S THAT THIS CASE IS ABOUT; BUT THEY SPENT MOST OF THE

 7   TIME REPEATING WHAT THEY ALREADY HAD DONE FOR YEARS, WHICH

 8   WAS A WASTE OF TIME WHEN GIVEN HIS ADMISSION THEN TO

 9   AGENT MYRICK.  HE ADMITTED EVERYTHING, DIDN'T DENY ANYTHING,

10   WHEN HE WAS FIRST CONFRONTED JANUARY 17, 2007.  THIS WHOLE

11   THING IS A RED HERRING.

12        SO HERE WE ARE IN 2012.  AND THE POLICE OFFICER,

13   LEWISON, SAID HE BOUGHT TWO MORE MOVIES IN 2011 TO MAKE THE

14   OTHER TWO.  I DON'T KNOW.  I'M NOT GOING TO GET INTO

15   SPECULATION AS TO HOW THE GOVERNMENT CONDUCTS ITS CASES OR

16   WHAT HAPPENS.  AS I SAID, WE DO KNOW THIS OBSCENITY UNIT HAS

17   ALREADY BEEN DISBANDED.  THAT WAS THE ONE THAT WAS CREATED

18   BY ALBERTO GONZALEZ, THE ATTORNEY GENERAL OF THE

19   UNITED STATES OF AMERICA.

20        OKAY.  SO THE QUESTION IS THE MOVIES.  LET'S CUT

21   TO THE CHASE HERE.

22        THE COURT HAS GIVEN YOU AN INSTRUCTION ABOUT

23   COMMUNITY STANDARDS.  THAT'S IMPORTANT.  I'M GOING TO GO

24   OVER THE JURY INSTRUCTIONS IN MORE DETAIL IN A MOMENT.

25        BUT CONGRESS PASSED A LAW -- OBVIOUSLY, BECAUSE
```

```
 1   WE'RE DEALING WITH A FEDERAL CRIME NOW -- THAT IS UNLIKE ANY

 2   OTHER STATUTE, CRIMINAL STATUTE, ON THE BOOKS ANYWHERE

 3   BECAUSE THE STATUTE DOES NOT SPECIFY SPECIFICALLY WHAT IS

 4   PROHIBITED AND WHAT IS NOT.

 5          YOU WOULD THINK AFTER 2007 WHEN THEY HAD THE

 6   MOVIES, THAT THEY ARE TALKING ABOUT BESTIALITY AND

 7   SCATOLOGY, THAT THEY COULD AMEND THE STATUTE AND SAY

 8   SPECIFICALLY THESE MOVIES ARE PROHIBITED.

 9          YOU KNOW, CONGRESS IS NOT INCAPABLE OF MEETING

10   VERY QUICKLY ON A MOMENT'S NOTICE.  YOU REMEMBER A COUPLE OF

11   YEARS AGO WHEN MR. SCHAIVO --

12          MR. KING:  OBJECTION, YOUR HONOR.

13          MR. DIAMOND:  WE CAN ARGUE MATTERS OF COMMON

14   KNOWLEDGE, YOUR HONOR.

15          THE COURT:  THIS IS BEYOND THE RECORD, AND IT IS

16   NOT RELEVANT WHAT CONGRESS HAS CHOSEN OR NOT CHOSE TO DO.

17   THE LAW IS THE LAW, MR. DIAMOND.

18          MR. DIAMOND:  CONGRESS HAS PASSED THIS STATUTE, AN

19   OBSCENITY STATUTE, BUT IT DOESN'T SPECIFICALLY SAY WHAT CAN

20   BE SOLD AND WHAT CANNOT BE SOLD.

21          AND IT HAS A FLEXIBILITY PROVISION IN IT WHICH IS

22   CRITICAL TO THE EVALUATION OF THE OBSCENITY ELEMENT IN THIS

23   CASE; THAT IS, ALONG WITH THE JUDGE'S INSTRUCTION, THE

24   COMMUNITY STANDARD ISSUE BECAUSE UNDER THE LAW, AS THE COURT

25   HAS ALREADY INSTRUCTED YOU --
```

```
 1            AND YOU'LL HAVE THE WRITTEN INSTRUCTIONS WHEN THE
 2   CASE IS DELIVERED OR GIVEN TO YOU.
 3            -- THE COMMUNITY STANDARDS IN THE UNITED STATES
 4   VARY FROM DISTRICT TO DISTRICT.
 5            IF THEY DID NOT VARY FROM DISTRICT TO DISTRICT,
 6   THERE WOULD HAVE BEEN NO NEED FOR THE LAW TO SAY THAT WHEN
 7   DECIDING THIS CASE BASED UPON COMMUNITY STANDARDS, YOU HAVE
 8   TO CONSIDER THE PARTICULAR COMMUNITY AS DEFINED BY THE
 9   COURT.
10            AND THE COURT HAS ALREADY DEFINED THE COMMUNITY IN
11   THIS CASE AS BEING THE CENTRAL DISTRICT OF CALIFORNIA, WHICH
12   STARTS FROM SAN LUIS OBISPO AND GOES ALL THE WAY DOWN TO
13   ORANGE COUNTY; ORANGE COUNTY, LOS ANGELES COUNTY, VENTURA,
14   SANTA BARBARA, SAN LUIS OBISPO COUNTY, RIVERSIDE COUNTY, AND
15   SAN BERNARDINO COUNTY.
16            SO THAT IS THE DISTRICT WHERE WE DEAL WITH THE
17   COMMUNITY.  WE'RE NOT DEALING WITH GEORGIA.  WE'RE NOT
18   DEALING WITH MISSISSIPPI.  WE'RE NOT DEALING WITH MANY OF
19   THE RED STATES.  WE LIVE IN CALIFORNIA.
20            AND YOU, SINCE YOU ARE ALL RESIDENTS OF THE
21   CENTRAL DISTRICT OF CALIFORNIA, YOU KNOW GENERALLY WHAT THE
22   COMMUNITY IS IN CALIFORNIA AND, MORE SPECIFICALLY, THE
23   CENTRAL DISTRICT BECAUSE YOU ARE FROM THIS AREA.  AND YOU
24   KNOW THAT CALIFORNIA AND THIS DISTRICT IS A VERY PROGRESSIVE
25   PART OF THE COUNTRY.
```

```
 1          AND WE'RE DEALING IN THIS CASE WITH KIND OF A
 2   CULTURAL WAR BECAUSE WE ARE NOT GOING TO APPLY THE COMMUNITY
 3   STANDARDS FROM WASHINGTON, D.C., OR FROM MISSISSIPPI,
 4   GEORGIA, ALABAMA, OR OTHER STATES.  WE'RE LIMITED TO OUR
 5   DISTRICT.
 6          AND THE QUESTION IS WHAT DO PEOPLE DO?  WHAT DO
 7   THEY CONSIDER?  WHAT DO THEY ALLOW IN CALIFORNIA?
 8          AND THERE WAS A REFERENCE TO WOMEN.  WELL, WE
 9   KNOW, IN CALIFORNIA, WE ARE VERY LIBERAL AND PROGRESSIVE
10   WITH RESPECT TO WOMEN.  WE HAVE TWO WOMEN SENATORS,
11   FEINSTEIN AND BOXER.  FOUR OF THE SEVEN JUSTICES ON THE
12   CALIFORNIA SUPREME COURT ARE WOMEN.
13          SO WE KNOW IN CALIFORNIA WOMEN ARE TREATED WITH
14   RESPECT AND EQUAL TO MEN, AND AS I SAID, THEY ARE BOTH OUR
15   U.S. SENATORS AND OUR FOUR -- THE MAJORITY OF THE SUPREME
16   COURT OF CALIFORNIA.
17          SO WE WANT TO KNOW WHAT IS ALLOWABLE AND WHAT IS
18   RECOGNIZED AS PERMISSIBLE IN THE CENTRAL DISTRICT.  AND ON
19   THE SUBJECT OF COMMUNITY STANDARDS, I WANT TO MENTION TO YOU
20   THE FACT THAT THE GREAT MAJORITY OF THE POPULATION IN THE
21   CENTRAL DISTRICT IS BASED IN THE CITY OF LOS ANGELES AND
22   ALSO THE COUNTY OF LOS ANGELES.
23          AND SO IN EVALUATING THE COMMUNITY STANDARDS, YOU
24   HAVE TO CONSIDER, I BELIEVE, THE POPULATION DISTRIBUTION
25   WITHIN THE CENTRAL DIRECT.
```

```
 1        WE'VE LEARNED THAT FROM EARLIER CASES INVOLVING

 2   ONE PERSON, ONE VOTE, WHERE BASICALLY REPRESENTATIVE

 3   GOVERNMENT REPRESENTS PEOPLE NOT A GEOGRAPHIC AREA OF, SAY,

 4   LENGTHY SPACES OF FARM LAND, THAT SORT OF THING, UNOCCUPIED

 5   PEOPLE -- UNOCCUPIED SPACES.  SO WE'RE DEALING WITH

 6   POPULATION.

 7        THE OFFICER, DETECTIVE LEWISON, ADMITTED THAT

 8   SOUTHERN CALIFORNIA, LOS ANGELES, IS THE PORNOGRAPHY CAPITAL

 9   OF THE COUNTRY AND HAS A CONVENTION ONCE A YEAR RIGHT HERE

10   AT STAPLES CENTER RIGHT DOWN THE STREET FROM THIS

11   COURTHOUSE, BY THE WAY.  THE CONVENTION CENTER IS RIGHT

12   HERE.

13        I THINK THIS IS A MATTER OF COMMON KNOWLEDGE THAT

14   YOU CAN TAKE SORT OF JUDICIAL NOTICE OF.  WE HAVE THE

15   CONVENTION, BUT THAT PRIMARILY DEALS WITH THE RETAIL

16   OPERATORS, THE ONES WITH THE RETAIL BOOKSTORES NOT THE

17   DISTRIBUTORS BY INTERNET AND --

18        MR. KING:  OBJECTION, YOUR HONOR.  FACTS NOT IN

19   EVIDENCE.

20        MR. DIAMOND:  HE TESTIFIED --

21        THE COURT:  OVERRULED.

22        GO AHEAD.

23        MR. DIAMOND:  THANK YOU, YOUR HONOR.

24        AS YOU RECALL, DETECTIVE LEWISON ACKNOWLEDGED THAT

25   MOVIES THAT MAY NOT BE AVAILABLE IN TERMS OF RETAIL STORES,
```

1    IN TERMS OF GOING INTO A PARTICULAR STORE, ARE AVAILABLE ON

2    THE INTERNET INCLUDING THESE TYPES OF MOVIES THAT ARE ON

3    TRIAL HERE.  THEY ARE AVAILABLE FOR PURCHASE ON THE

4    INTERNET, AND YOU CAN TAKE JUST COMMON-SENSE NOTICE THAT THE

5    INTERNET IS ALL OVER.

6          PEOPLE USE THE INTERNET THROUGHOUT THE

7    UNITED STATES OF AMERICA, AND YOU CERTAINLY KNOW WHERE THE

8    POPULATIONS ARE AND YOU CAN CERTAINLY DRAW INFERENCES AS TO

9    WHERE PEOPLE ARE AND WHETHER OR NOT THEY ARE ORDERING

10   MATERIAL AT A PARTICULAR LOCATION IN TERMS OF DETERMINING

11   THE COMMUNITY STANDARD.

12         NOW, MR. ISAACS TESTIFIED AS TO HIS BACKGROUND.

13   NOW, YOU DON'T HAVE TO TAKE HIS WORD FOR HIS BACKGROUND

14   BECAUSE HE PRODUCED THE ACTUAL EVIDENCE OF HIS BACKGROUND.

15         AND AS I SAID BEFORE, HE ALREADY TALKED TO

16   AGENT MYRICK FOR A LONG TIME JANUARY 17, 2007.  SO THEY KNOW

17   EVERYTHING ABOUT IRA ISAACS.

18         HE'S NOT SOME KIND OF A SECRET GUY, BUT HE

19   EXPLAINED THE BACKGROUND FOR HOW HE GOT INTO THIS BUSINESS.

20   HE EXPLAINED HIS INSPIRATION.  HE TALKED ABOUT THE CHARACTER

21   FROM THE BOOK "*THE TRIAL*" BY FRANZ KAFKA.  AND SO HE

22   EXPLAINED WHAT SOME OF HIS GOALS AND INSPIRATIONS ARE, AND

23   HE LIKES TO GET INVOLVED WITH SHOCK ART.

24         WHAT IS SHOCK ART?  SHOCK ART IS ART THAT IS SO

25   DISTURBING OR ATTENTION-CATCHING THAT YOU ARE GOING TO

```
 1   RESPOND TO IT IN TERMS OF AN AUDIENCE.

 2            AND SO, IN THIS PARTICULAR CASE, WE WANT TO SEE

 3   WHAT A PERSON WILL DO.  THIS IS NEO-MODERNISM OR

 4   POST-MODERNISM ART.  WHEN YOU PRESENT SOMETHING THAT IS

 5   SHOCKING TO THE RECIPIENT, WHAT IS THE NATURAL REACTION

 6   GOING TO BE?

 7            THE REACTION CAN BE TO QUESTION CERTAIN MORES IN

 8   SOCIETY, TO QUESTION YOUR OWN SELF, AND TO DECIDE WHETHER OR

 9   NOT THE MATERIALS ACCURATELY REFLECT WHAT SOCIETY IS

10   EXPERIENCING.  IT'S CALLED "SHOCK ART," AND THERE'S A TERM

11   FOR IT AS IRA ISAACS EXPLAINED.

12            THAT WASN'T HIS SOLE MOTIVE IN MAKING THE MOVIES

13   AND DISTRIBUTING THEM, OBVIOUSLY.  HE ALSO HAD A DESIRE TO

14   EARN AN INCOME BECAUSE THAT IS SOMETHING THAT PEOPLE HAVE A

15   RIGHT TO DO.  THERE'S NOTHING WRONG WITH SELLING MOVIES.

16            NOW, HE WAS NEVER SELLING THEM AS PAINTINGS.  THEY

17   ARE NOT ART OBJECTS BECAUSE IF WE GET INTO THIS WE'LL SEE

18   THAT -- AND I'M GOING TO GO THROUGH THIS NOW IN MORE DETAIL,

19   BUT I'M JUST SORT OF GENERALLY TALKING HERE.

20            THE QUESTION IS WHETHER OR NOT THE MATERIAL TAKEN

21   AS A WHOLE, WHETHER IT LACKS SERIOUS LITERARY, ARTISTIC,

22   POLITICAL, OR SCIENTIFIC VALUE.

23            THIS IS THE KEY ELEMENT HERE THAT YOU HAVE TO

24   FOCUS ON IN DECIDING WHETHER OR NOT THE GOVERNMENT HAS

25   PROVEN BEYOND A REASONABLE DOUBT THAT THE MOVIES IN QUESTION
```

```
 1   ARE LEGALLY OBSCENE, NOT WHETHER THEY ARE DISGUSTING OR

 2   REVOLTING, OR NOT WHETHER THEY ARE MOVIES THAT YOU WOULD

 3   CHOOSE TO WATCH EITHER BY YOURSELF OR WITH OTHER PEOPLE.

 4         SO THE QUESTION IS THE MATERIAL, WHICH IN THIS

 5   CASE ARE THE FOUR MOVIES, TAKEN AS A WHOLE -- DO THEY LACK

 6   SERIOUS LITERARY, ARTISTIC, POLITICAL OR SCIENTIFIC VALUE?

 7         THE GOVERNMENT HAS THE BURDEN OF PROOF THAT THE

 8   MATERIAL LACKS LITERARY, ARTISTIC, POLITICAL OR SCIENTIFIC

 9   VALUE.  IRA ISAACS NEVER CLAIMED THAT THIS WAS A PAINTING OR

10   A PIECE OF SCULPTURE.

11         AND A SCULPTURE, BY THE WAY, IS ALSO A TYPE OF

12   MEDIUM THAT IS PROTECTED BY THE CONSTITUTION.  THANK GOD,

13   THAT'S PROTECTED BECAUSE YOU COULD HAVE SOME DO-GOODERS FROM

14   ONE OF THESE CONSERVATIVE AREAS OF THE COUNTRY COMPLAINING

15   THAT SOME SCULPTURE, SOME WORK OF ART -- LIKE MAYBE THE

16   STATUE OF DAVID -- WOULD BE OBSCENE BECAUSE IT PORTRAYS HIS

17   GENITALS, OR SOME OTHER WORK OF ART.

18         AND ALSO PHOTOGRAPHY.  WE DON'T WANT PEOPLE

19   TELLING US WHAT A PHOTOGRAPHER CAN TAKE A PICTURE OF AND

20   EXHIBIT FOR HIS OR HER PERSONAL OR PROFESSIONAL USE.

21         BUT THE GOVERNMENT HAS THE BURDEN OF PROOF ON

22   THESE ISSUES.  SO THE QUESTION NOW IS IS THERE ANY ARTISTIC

23   MERIT TO THE MOVIES?

24         WELL, IRA ISAACS ATTEMPTED TO EXPLAIN TO YOU THE

25   ARTISTIC CONCEPT, NOT THAT IT WAS A PAINTING.  HE
```

```
 1    DISTINGUISHED PAINTINGS FROM THE MOVIES.

 2            BUT THE QUESTION IS WHETHER OR NOT A MOVIE IS

 3    CAPABLE OF HAVING ARTISTIC MERIT.

 4            WHAT EVIDENCE DID THE GOVERNMENT PRESENT THAT THE

 5    MOVIE DID NOT HAVE ARTISTIC MERIT?  DID THE GOVERNMENT

 6    PRESENT ANY EXPERTS, ANY ART CRITICS, ANYBODY?

 7            NOW, IT IS TRUE THAT UNDER THE LAW THEY DON'T --

 8    THEY ARE NOT OBLIGATED TO DO THAT.  THEY ARE ENTITLED TO

 9    JUST GIVE YOU THE MOVIE.  BUT THAT DOES NOT MEAN THEY ARE

10    PRECLUDED FROM OFFERING SCIENTIFIC, ARTISTIC, OR OTHER

11    EVIDENCE TO HELP YOU MAKE THAT JUDGMENT.

12            IN THIS PARTICULAR CASE, THE GOVERNMENT CHOSE NOT

13    TO DO THAT.  I SUBMIT THEY WOULD NOT HAVE BEEN ABLE TO FIND

14    ANYBODY -- OR WHATEVER REASON THEY DIDN'T -- BUT THAT

15    DOESN'T REALLY MATTER.

16            THE FACT OF THE MATTER IS THEY FAILED TO PUT ON

17    ONE WITNESS ON THE ISSUE OF ARTISTIC VALUE, NOT WHETHER IT'S

18    A PAINTING, BUT A MOVIE CAN HAVE ARTISTIC VALUE BECAUSE IF A

19    MOVIE IS NOT CAPABLE OF HAVING THAT AT ALL, THEN IT WOULD

20    NOT EVEN BE ENTITLED TO CONSTITUTIONAL PROTECTION.

21            WE KNOW THAT A MOVIE, JUST AS A BOOK, UNLESS IT'S

22    LEGALLY OBSCENE IS ENTITLED TO HAVE CONSTITUTIONAL

23    PROTECTION UNDER THE FIRST AMENDMENT.  AND A LOT OF THINGS

24    DON'T OBVIOUSLY:  SHOES, ORANGES, CHAIRS, A BRIEFCASE.

25    THOSE THINGS DON'T.
```

```
 1          BUT METHODS OF EXPRESSION -- METHODS OF EXPRESSION
 2   ARE ENTITLED TO THE PROTECTION OF THE CONSTITUTION UNLESS
 3   LEGALLY OBSCENE, AND THAT IS WHY THIS CASE SO IMPORTANT
 4   BECAUSE WE'RE DEALING HERE WITH A BEAUTIFUL DOCUMENT THAT
 5   REALLY DEFINES OUR COUNTRY.
 6          IT'S THE CONSTITUTION OF THE UNITED STATES.  THIS
 7   IS ALMOST LIKE A LABORATORY IN THE CONSTITUTION.
 8          I KNOW THIS CASE WAS KIND OF MISERABLE FOR YOU TO
 9   SIT ON BECAUSE YOU HAD TO WATCH TWO DAYS OF DISGUSTING
10   MOVIES, BUT THIS CASE TRANSCENDS THE MOVIES YOU SAW TODAY.
11   THIS CASE IS ABOUT THE CONSTITUTION OF THIS COUNTRY.
12          SOME PEOPLE, ESPECIALLY -- AND I DON'T WANT TO
13   CRITICIZE ANYBODY, BUT CULTURAL CONSERVATIVES, PEOPLE FROM
14   OTHER STATES, THEY ALWAYS TALK ABOUT THE FLAG BEING THE MOST
15   IMPORTANT THING.
16          SO IF SOME ANTI-WAR DEMONSTRATOR HAS THE NERVE TO
17   DEMONSTRATE OPPOSITION TO, SAY, THE WAR IN VIETNAM AND BURNS
18   A FLAG, THEY GO CRAZY AND SAY THE FLAG IS THE HEART OF OUR
19   COUNTRY, IT'S THE SYMBOL OF OUR COUNTRY.
20          NO.  IT'S THE CONSTITUTION.  THE CONSTITUTION IS
21   MORE IMPORTANT THAN THE FLAG.  THE CONSTITUTION IS WHAT WE
22   ARE ALL ABOUT AS A COUNTRY; AND YOU ARE SITTING HERE BECAUSE
23   MR. ISAACS HAS THE RIGHT TO HAVE A JURY DECIDE HIS GUILT OR
24   INNOCENCE BECAUSE THAT'S ALSO IN THE CONSTITUTION.
25          YOU STAND BETWEEN THE AWESOME POWER OF THE
```

```
1    EXECUTIVE BRANCH OF GOVERNMENT -- YOU STAND BETWEEN THAT

2    BRANCH --

3            AND THE F.B.I.'S PART OF THE EXECUTIVE BRANCH; THE

4    PROSECUTOR IS PART OF THAT BRANCH.

5            YOU STAND BETWEEN THEM AND MR. ISAACS.

6            BECAUSE ONE DAY YOU COULD BE ON TRIAL AND YOU

7    WOULD WANT A JURY TO DECIDE YOUR GUILT OR INNOCENCE.  AND

8    THE QUESTION HERE IS WHETHER OR NOT THE FIRST AMENDMENT

9    MEANS ANYTHING BECAUSE UNLESS IT'S LEGALLY OBSCENE AS PROVEN

10   BY THE GOVERNMENT WE HAVE THE FREEDOM HERE THAT IRA ISAACS

11   IS ENTITLED TO ENJOY.

12           AND SO WHEN HE SET OUT TO MAKE THESE MOVIES AND

13   DISTRIBUTE THEM, HE THOUGHT HE HAD THE PROTECTION OF THE

14   CONSTITUTION.

15           NOW, IT IS TRUE THAT I GUESS YOU RUN THE RISK THAT

16   IF YOU ARE WRONG, YOU CAN BE IN TROUBLE.  BUT THAT WAS WHAT

17   HE DID BECAUSE -- WHEN THE GOVERNMENT STARTED ITS CLOSING

18   ARGUMENT HERE, IT SAID HE HAD A CHOICE TO MAKE.  IRA ISAACS

19   HAD A CHOICE TO MAKE.  WELL, GUESS WHAT, HE THOUGHT HE HAD

20   THE PROTECTION OF THE CONSTITUTION.

21           THAT'S WHAT YOU ARE GOING TO HAVE TO DECIDE NOW.

22   YOU'RE GOING TO HAVE TO DECIDE WHETHER THE GOVERNMENT HAS

23   TAKEN MOVIES OUT FROM THE PROTECTION OF THE CONSTITUTION,

24   HIS MOVIES, BECAUSE THE GOVERNMENT HAS PROVEN IT TO BE

25   LEGALLY OBSCENE BEYOND A REASONABLE DOUBT.
```

APRIL 27, 2012
TRIAL DAY 5

```
 1          AND I SUBMIT IT HAS FAILED BECAUSE -- AND WE'RE

 2   GOING TO GO THROUGH THE INSTRUCTIONS NOW.  THIS IS THE HEART

 3   OF THE CASE, AND I'M READING NOW.

 4          I DIDN'T HAVE THE OPPORTUNITY TO MAKE A POWERPOINT

 5   PRESENTATION IN WRITTEN FORM.  SO I HOPE YOU DON'T HOLD THAT

 6   AGAINST ME.  "IN THE EXERCISE OF THE FUNDAMENTAL

 7   CONSTITUTIONAL RIGHT OF FREE EXPRESSION -- "  THOSE AREN'T

 8   MY WORDS.  THOSE ARE THE COURT'S WORDS IN THE INSTRUCTIONS.

 9   YOU'LL HAVE THEM IN WRITTEN FORM.

10              (PAUSE IN THE PROCEEDINGS.)

11          MR. DIAMOND:  (AS READ:)

12          "IN THE EXERCISE OF THE FUNDAMENTAL

13      CONSTITUTIONAL RIGHT OF FREE EXPRESSION WHICH ALL OF US

14      ENJOY --"

15          INCLUDING IRA ISAACS

16          "-- SEX MAY BE PORTRAYED AND THE SUBJECT OF SEX

17      MAY BE DISCUSSED FREELY AND PUBLICLY.  MATERIAL IS NOT

18      TO BE CONDEMNED MERELY BECAUSE IT CONTAINS PASSAGES OR

19      SEQUENCES THAT ARE DESCRIPTIVE OF SEXUAL ACTIVITY.

20      HOWEVER, THE CONSTITUTIONAL RIGHT TO FREE EXPRESSION

21      DOES NOT EXTEND TO THAT WHICH IS OBSCENE."

22          SO YOU START WITH THE PRESUMPTION THAT IT'S

23   PROTECTED BY THE CONSTITUTION, FREE SPEECH.  THEN THE

24   QUESTION IS WHETHER OR NOT THAT RIGHT THAT'S PROTECTED BY

25   THE FIRST AMENDMENT CAN BE TAKEN AWAY FROM YOU ONLY IF THE
```

```
 1   GOVERNMENT PROVES BEYOND A REASONABLE DOUBT THAT IT MEETS

 2   ALL OF THE OBSCENITY TESTS.

 3            SO THE QUESTION NOW IS:  HAVE THEY PROVEN THAT?

 4               "FIRST, THE GOVERNMENT HAS TO PROVE BEYOND A

 5         REASONABLE DOUBT THAT THE WORK APPEALS TO THE PRURIENT

 6         INTERESTS --"

 7            AND WE'RE GOING TO GET TO WHOSE PRURIENT INTERESTS

 8   BECAUSE THIS GETS COMPLICATED AND VERY DIFFICULT TO FOLLOW.

 9   THESE ARE THE SHORTHAND SUMMARY YOU WERE GIVEN IN THE JURY

10   QUESTIONNAIRE.

11               "SECOND, IT DEPICTS OR DESCRIBES SEXUAL CONDUCT

12         IN A PATENTLY OFFENSIVE WAY."

13            THOSE ARE THE FIRST TWO TESTS.

14            NOW, YOU'RE GOING TO BE TOLD LATER ON IN THESE

15   INSTRUCTIONS BECAUSE YOU HAVE THEM IN WRITTEN FORM -- AND I

16   URGE YOU TO GO OVER THESE WRITTEN INSTRUCTIONS ON THE

17   DEFINITION OF "OBSCENITY" BECAUSE THAT'S WHAT THIS CASE IS

18   ALL ABOUT.

19            IT'S NOT ABOUT WHETHER IRA ISAACS WAS CONCERNED

20   ABOUT THE SAFETY OF HIS EMPLOYEES AND HIMSELF BECAUSE IN THE

21   PAST PEOPLE HAVE BEEN SHOT AND PARALYZED SUCH AS LARRY FLYNT

22   DURING HIS SITUATION THERE.

23            SO IT'S NOT ABOUT TRYING TO CONCEAL YOURSELF FROM

24   GOVERNMENT.  THAT'S JUST INFLAMMATORY RHETORIC BY THE

25   GOVERNMENT DESIGNED TO PREJUDICE YOU.
```

```
1            LET'S TALK ABOUT THE INSTRUCTIONS.

2            THE FIRST TWO PRONGS ARE ALL REQUIRED TO BE PROVEN

3    BEYOND A REASONABLE DOUBT BY THE GOVERNMENT, AND THESE FIRST

4    TWO PRONGS ARE ALSO INEXTRICABLY INTERTWINED WITH THE

5    COMMUNITY STANDARD CONCEPT.

6            THE QUESTION IS WHETHER OR NOT, IN DETERMINING

7    THESE TWO ELEMENTS, THE GOVERNMENT HAS PROVEN BEYOND A

8    REASONABLE DOUBT THAT THESE TWO TESTS WOULD FAIL IN THE

9    CENTRAL DISTRICT OF CALIFORNIA.

10               (PAUSE IN THE PROCEEDINGS.)

11           MR. DIAMOND:  READING ON (AS READ:)

12           "THESE FIRST TWO TESTS WHICH I HAVE DESCRIBED ARE

13       TO BE DECIDED BY YOU, APPLYING CONTEMPORARY COMMUNITY

14       STANDARDS."

15           NOTE, IT'S CONTEMPORARY.  "CONTEMPORARY" MEANS

16   TODAY.  IT DOESN'T MEAN WHAT THE STANDARD WAS, WHAT THE

17   COMMUNITY WAS WHEN CONGRESS PASSED THE STATUTE BECAUSE THE

18   STATUTE WAS OBVIOUSLY ADOPTED SOME TIME AGO.

19           BUT IN THE STATUTE, CONGRESS, ALSO LIMITED BY THE

20   FIRST AMENDMENT, SAID THAT IT'S TO BE BY THE COMMUNITY

21   STANDARD, OR AT LEAST THE COURT DECISIONS INTERPRETING IT.

22   YOU HAVE TO APPLY THE CONTEMPORARY COMMUNITY STANDARD.

23           CONTEMPORARY MEANS NOW.

24           SO THE QUESTION IS:  WHAT WAS THE COMMUNITY

25   STANDARD EARLIER?  AND WE KNOW, FROM YOUR OWN KNOWLEDGE AND
```

```
 1   YOUR OWN PARTICIPATION IN THE COMMUNITY, THAT THE STANDARDS
 2   EVOLVE OVER TIME.
 3          WE SEE THAT IN OTHER AREAS OF LAW.  WE SEE THAT,
 4   FOR EXAMPLE, IN THE AREA OF GAY RIGHTS.  THERE WAS A TIME --
 5          MR. KING:  OBJECTION, YOUR HONOR.
 6          THE COURT:  SUSTAINED.
 7          MR. DIAMOND:  WE KNOW THAT STANDARDS CHANGE, AND
 8   WE'VE BEEN BECOMING MORE LIBERAL, MORE TOLERANT, AND MORE
 9   PROGRESSIVE WITH RESPECT TO WHAT WE ALLOW IN SOCIETY.
10          WHAT WAS PERMITTED -- I'M SORRY -- WHAT WAS
11   IMPERMISSIBLE YEARS AGO IN TERMS OF SEXUAL CONDUCT AND SO
12   FORTH, SEXUAL ORIENTATION AND THAT SORT OF THING, THAT IS
13   DIFFERENT TODAY.
14          SO WE'RE LOOKING AT CONTEMPORARY COMMUNITY
15   STANDARDS.  IN FACT, WE'RE TALKING ABOUT, TECHNICALLY, 2006,
16   BECAUSE THE FIRST TWO MOVIES WERE PURCHASED IN 2006.
17          I SUPPOSE YOU WOULD HAVE TO DETERMINE WHAT WERE
18   THE COMMUNITY STANDARDS IN 2006 AND ARE THEY DIFFERENT IN
19   2011 WHEN THE SECOND TWO MOVIES WERE PURCHASED.  THAT'S
20   SOMETHING -- OBVIOUSLY, COMMUNITY STANDARDS ARE EVOLVING.
21          WE'RE SEEING COMMUNITY STANDARDS EVOLVING IN ALL
22   SORT OF AREAS OF SOCIETY.
23          FOR EXAMPLE, YEARS AGO, JUST BY WAY OF EXAMPLE, IT
24   WOULD BE CONSIDERED SHAMEFUL FOR A COUPLE TO LIVE TOGETHER
25   NOT MARRIED.
```

```
 1          MR. KING:  OBJECTION, YOUR HONOR.

 2          MR. DIAMOND:  I'M GIVING EXAMPLES OF HOW THE

 3   STANDARDS CHANGE.

 4          THE COURT:  YOU MAY SAY THAT, BUT YOU MAY NOT GIVE

 5   ANY EXAMPLES THAT ARE NOT PART OF THE RECORD.  MR. DIAMOND,

 6   WE ARE GOING TO TRY THIS CASE, AND YOU ARE GOING TO ARGUE

 7   THIS CASE ON THE RECORD THAT'S DEVELOPED.

 8          SUSTAINED.

 9          MR. DIAMOND:  YES, YOUR HONOR.

10          OKAY.  SO WE KNOW FROM YOUR COMMON SENSE THAT

11   STANDARDS CHANGE.  SO LET'S LOOK NOW AT THE STANDARDS WITH

12   RESPECT TO DEPICTIONS OF SEXUAL ACTIVITY.

13          THAT IS EVOLVING ALSO, AND I THINK ALSO, BASED

14   UPON YOUR PARTICIPATION AS MEMBERS OF SOCIETY AND THE

15   COMMUNITY, YOU KNOW, AS PEOPLE WITH COMMON SENSE THAT THE

16   STANDARDS HAVE CHANGED OVER TIME.  WE'RE EVOLVING, AND THAT

17   WAS BUILT INTO THE LAW.

18          SO IN OTHER AREAS, LIKE BANK ROBBERY OR MURDER OR

19   ROBBERY, OBVIOUSLY, YOU DON'T HAVE COMMUNITY STANDARDS

20   GOVERNING BANK ROBBERY.  A BANK ROBBERY IS A CRIME; SELLING

21   NARCOTICS IS A CRIME.  BUT IN THIS ONE AREA, IT'S KIND OF

22   UNIQUE TO THE LAW.  IT'S SHIFTING.  IT'S SHIFTING OVER TIME.

23          THAT'S WHY, IN THE INSTRUCTION, THE WORD IS

24   "CONTEMPORARY."  THAT'S WHAT IT MEANS, CONTEMPORARY,

25   CURRENT.
```

```
 1              AND AS I SAID BEFORE, WHEN THE LAW WAS WRITTEN AS

 2    INTERPRETED, IT HAS CARVED UP THE UNITED STATES INTO

 3    SUBUNITS OR DISTRICTS.  SO WHAT MAY BE IMPERMISSIBLE IN ONE

 4    PART OF THE COUNTRY IS PERMISSIBLE IN A DIFFERENT PART OF

 5    THE COUNTRY.

 6              AND I SUPPOSE, IN THIS UPCOMING ELECTION, WE'RE

 7    GOING TO SEE DIFFERENT STATES VOTING DIFFERENT WAYS.  I

 8    THINK IT'S A MATTER OF COMMON KNOWLEDGE THAT SOME PEOPLE ARE

 9    MORE PROGRESSIVE OR LESS PROGRESSIVE, DEPENDING ON WHERE

10    THEY ARE AND WHERE THEY LIVE AND AT WHAT TIME WE'RE LOOKING

11    AT.

12              SO THE QUESTION IS (READING:)

13         "CONTEMPORARY COMMUNITY STANDARDS ARE THOSE

14      ACCEPTED IN THIS COMMUNITY AS A WHOLE"?

15         "YOU MUST DECIDE WHETHER THE MATERIAL WOULD

16      APPEAL --"

17              WOULD APPEAL, NOT HAS APPEALED BUT WOULD APPEAL.

18         "-- PREDOMINANTLY TO PRURIENT INTERESTS AND WOULD

19      DEPICT OR DESCRIBE SEXUAL CONDUCT IN A PATENTLY

20      OFFENSIVE WAY WHEN VIEWED BY AN AVERAGE PERSON IN THIS

21      COMMUNITY AS A WHOLE, THAT IS, BY THE COMMUNITY AT

22      LARGE OR IN GENERAL."

23              (END QUOTED MATERIAL.)

24         MR. DIAMOND:  WHAT DOES THAT MEAN?  WHAT ARE THEY

25    TALKING ABOUT HERE, THE COMMUNITY?
```

```
 1            ARE THEY TALKING ABOUT TAKING A POLL AND ASKING

 2   PEOPLE, ONE ON ONE, LIKE A GALLUP POLL OR SOMETHING, "WHAT

 3   IS YOUR VIEW OF THIS"?

 4            WHO IS THE AVERAGE PERSON?  ARE YOU THE AVERAGE

 5   PERSON?  WELL, NO, BECAUSE THEY SAY YOU MUST NOT JUDGE THE

 6   MATERIAL BY YOUR OWN PERSONAL STANDARDS.  THAT'S IN THE

 7   INSTRUCTION.

 8            SO BY WHOSE STANDARDS ARE YOU TO JUDGE THE

 9   MATERIAL?  BECAUSE YOU ARE TOLD NOT TO JUDGE IT BY YOUR OWN

10   PERSONAL STANDARDS.

11            IN FACT, YOU HAVE BEEN INSTRUCTED BY THE COURT,

12   QUOTE:

13            "YOU MUST NOT JUDGE THE MATERIAL BY YOUR OWN

14       PERSONAL STANDARDS --"  YOU MUST NOT.

15                (END QUOTED MATERIAL.)

16       MR. DIAMOND:  SO IF YOU MUST NOT JUDGE IT BY YOUR

17   OWN PERSONAL STANDARDS, BY WHOSE STANDARDS ARE YOU TO JUDGE

18   THE MATERIAL?

19            WELL, IT SAYS (AS READ:)

20            "-- IF YOU BELIEVE THEM TO BE STRICTER THAN

21       THOSE GENERALLY HELD, NOR SHOULD YOU DETERMINE WHAT

22       SOME GROUPS OF PEOPLE MAY BELIEVE THE COMMUNITY OUGHT

23       TO ACCEPT OR REFUSE TO ACCEPT.  RATHER, YOU MUST

24       DETERMINE THE ATTITUDE OF THE COMMUNITY AS A WHOLE."

25                (END QUOTED MATERIAL.)
```

```
 1          MR. DIAMOND:  OKAY.  WHAT IS THE ATTITUDE OF THE

 2    COMMUNITY AS A WHOLE?  WE CAN INFER CERTAIN THINGS BASED

 3    UPON THE EVIDENCE.  DOES THE COMMUNITY, AS A WHOLE,

 4    GENERALLY OBJECT TO HARDCORE SEXUAL MATERIAL?  NO.

 5          NOW, WHAT THE GOVERNMENT IS NIT-PICKING HERE IS

 6    THAT, WELL, IT MAY BE TRUE AS THE OFFICER CONCEDED --

 7    OFFICER KYLE LEWISON CONCEDED THAT THIS SOUTHERN CALIFORNIA

 8    AREA IS THE HARDCORE PORNOGRAPHY CAPITAL OF THE COUNTRY AND

 9    THAT, IN THE CONVENTION CENTER, HARDCORE SEX ACTS ARE

10    REVEALED AND SOLD IN MATERIAL.  THE COMMUNITY OBVIOUSLY

11    ACCEPTS THAT.

12          SO THE QUESTION NOW IS IF ISAACS FOUND A

13    PARTICULAR SUBGROUP OF HARDCORE PORNOGRAPHY, A SUBGROUP,

14    DOES THAT MEAN IT'S OUT OF THE COMMUNITY STANDARD BECAUSE

15    IT'S DIFFERENT FROM WHAT IS PORTRAYED?  LEWISON ADMITTED

16    IT'S HARDCORE SEX ACTS.

17          SO IF THIS WERE A TRIAL NOT INVOLVING IRA ISAACS'

18    FOUR MOVIES BUT OTHER HARDCORE SEX MOVIES AND YOU HAD TO SIT

19    THERE AND DIDN'T LIKE IT, YOU HAD TO WATCH TWO HOURS OR FOUR

20    HOURS OF OTHER MOVIES INVOLVING HARDCORE SEX, NOT INVOLVING

21    HIS PARTICULAR NICHE -- AS THIS PROSECUTOR MENTIONS IT, IT'S

22    A NICHE -- IF YOU WERE JUST FORCED, AS A JURY, TO LOOK AT

23    OTHER HARDCORE SEX ACTS, I THINK YOU WOULD FEEL THE SAME

24    WAY.

25          YOU WOULD BE APPALLED BY IT IF YOU ARE NOT USED TO
```

1    IT, IF YOU DON'T LIKE IT BECAUSE THAT'S YOUR CHOICE AS AN

2    AMERICAN -- TO BUY OR NOT BUY IT.

3           YOU WOULD BE JUST AS DISGUSTED WATCHING THAT AS

4    WATCHING THIS.  I DON'T THINK THERE'S REALLY A DISTINCTION,

5    THERE'S A DIFFERENCE.

6           BUT WHAT DIFFERENCE DOES IT MAKE IF YOU DON'T LIKE

7    TO WATCH PEOPLE ENGAGED IN HARDCORE SEX ACTIVITY -- WHETHER

8    IT'S ANAL SEX, ORAL SEX, GROUP SEX, GAY SEX -- WHATEVER IT

9    IS?

10          WOULD YOU WANT TO SIT HERE AND WATCH GUYS -- TWO

11   MEN HAVE SEX WITH EACH AFTER FOR FOUR HOURS STRAIGHT IF YOU

12   WERE NOT GAY AND DIDN'T LIKE SEX MOVIES?  OF COURSE YOU

13   WOULDN'T WANT TO WATCH THAT.  YOU WOULD BE DISGUSTED BY THAT

14   ALSO.

15          SO DOES THAT MEAN THAT YOU HAVE TO FIND

16   IRA ISAACS' MATERIAL LEGALLY OBSCENE BECAUSE YOU DIDN'T LIKE

17   WHAT HE'S SHOWING?

18          THAT'S WHAT THEY ARE DOING.  IT'S VERY CLEVER.

19          IT'S A TRICK TO SAY:  WELL, YES, SOUTHERN

20   CALIFORNIA ACCEPTS HARDCORE SEX SOLD OVER THE INTERNET OR

21   SOLD IN PARTICULAR PLACES, BUT THERE IS A PARTICULAR NICHE

22   THAT MAYBE IS DESIGNED FOR JUST THOSE PEOPLE WHO LIKE THAT

23   KIND OF MOVIE.

24          I DON'T THINK THE COMMUNITY AS A WHOLE WOULD SAY

25   TO A PARTICULAR SUBGROUP "WELL, YOU'RE GAY.  YOU'RE NOT A

```
1    MAJORITY.  YOU'RE JUST ONLY 5 OR 10 PERCENT OF THE
2    COMMUNITY.  SO WE WON'T ALLOW YOU TO WATCH GAY SEX MOVIES"
3    OR "YOU PEOPLE, YOU LIKE TO WATCH THESE KINDS OF SEX MOVIES.
4    SO WE'RE NOT GOING TO LET YOU WATCH THAT."
5            SO THAT'S WHAT THEY'VE DONE.  IT'S VERY
6    INTERESTING, VERY CLEVER.  THEY CARVED UP THE WHOLE ADULT
7    INDUSTRY INTO SUBPARTS TO SAY THAT WITH RESPECT TO YOUR
8    SUBPART YOU ARE NOT IN THE MAJORITY AND, THEREFORE, WE'RE
9    GOING TO CONDEMN YOU.
10           THIS IS THE POSITION OF THE F.B.I. -- IT ACTUALLY
11   WAS WITH RESPECT TO ITS OBSCENITY UNIT, SINCE DISBANDED.
12           AND I SAY TO YOU THAT, IN DECIDING WHAT THE
13   COMMUNITY STANDARD IS, THE COMMUNITY STANDARD IS HARDCORE
14   SEX.  WE'LL ALLOW THAT BECAUSE WE'RE PROGRESSIVE AND WE
15   BELIEVE IN FREEDOM OF CHOICE FOR A CERTAIN SEGMENT OF THE
16   POPULATION; AND IF THAT'S WHAT THEY WANT TO WATCH, THAT'S
17   FINE WITH US.  WE'RE GOING TO ALLOW THAT.
18           THAT'S THE BASIC COMMUNITY STANDARD IN SOUTHERN
19   CALIFORNIA.
20           NOW, YOU MAY NOT LIKE THAT, THOSE OF YOU WHO DON'T
21   LIKE SEX PORTRAYED.  BUT THAT'S WHAT'S GOING ON RIGHT NOW IN
22   OUR COUNTRY, A CULTURAL WAR BETWEEN PROGRESSIVE, LIBERAL
23   PEOPLE AND CONSERVATIVE, RIGHT-WING RELIGIOUS ZEALOTS
24   BECAUSE THAT'S WHAT'S THIS CASE IS ALL ABOUT ALSO.
25           IT'S ABOUT CONTROLLING WHAT PEOPLE CAN WATCH.  AND
```

```
 1   IF THEY CAN CONTROL THIS, THEY CAN CONTROL EVERYTHING.

 2          THEY CONTROL A WOMAN'S RIGHT TO CHOOSE; THEY CAN

 3   CONTROL EQUAL PAY; THEY CAN CONTROL RELIGIOUS FREEDOM; THEY

 4   CAN CONTROL ANYTHING.

 5          AND THAT IS WHY WE HAVE TO PUT A STOP TO IT AND

 6   WHY I BELIEVE YOU HAVE TO VOTE NOT GUILTY IN THIS PARTICULAR

 7   CASE.

 8          AND DON'T BE SHAMED BY THOSE ON THE JURY WHO MIGHT

 9   SAY "THIS IS DISGUSTING." DON'T BE EMBARRASSED TO SAY "NOT

10   GUILTY," "NOT PROVEN BEYOND A REASONABLE DOUBT" BECAUSE

11   THAT'S GOING TO BE THE BIGGEST HANDICAP TO FAIR DELIBERATION

12   IN THIS CASE.

13          SOME OF YOU ARE GOING TO BE ATTACKED BY OTHERS AS

14   SAYING, "HOW COULD YOU LIKE THIS STUFF?" AND YOU'RE GOING

15   TO HAVE TO, I SUPPOSE, EITHER DEFEND YOURSELF OR DEFEND THE

16   LAW AND DEFEND THE CONSTITUTION.

17          BECAUSE SOME PEOPLE ARE GOING TO SAY, "CONDEMN

18   THAT GUY. HE'S A CREEP. HE MADE SOME OF THESE MOVIES.

19   HE'S TRYING TO DEFEND HIMSELF IN COURT. HOW DARE HE DEFEND

20   HIMSELF IN COURT? HE SHOULD JUST PLEAD GUILTY, AND THAT'S

21   THE END OF IT. HOW DARE HE HAVE A JURY TRIAL?"

22          THAT'S BASICALLY WHAT THEY'RE SAYING. AND THEY'RE

23   SAYING, IN SO MANY WORDS, HE HAD TO CONCEDE EVERYTHING

24   EXCEPT WHAT HE WANTS TO FIGHT OVER.

25          WELL, EXCUSE ME. IF HE ENGAGED IN THE ACTIVITY,
```

```
 1   SUCH AS SELLING THE MOVIES, HE'S AN HONEST GUY.  HE'S GOING

 2   TO TELL THE TRUTH AS HE TOLD JAMES MYRICK WHEN THE F.B.I.

 3   CAME INTO HIS PLACE IN 2007.

 4            BUT IF HE DOESN'T THINK THE MOVIE IS OBSCENE, HE

 5   HAS A RIGHT TO STATE THAT POSITION.  YOU CAN'T HOLD THAT

 6   AGAINST HIM.

 7            BUT IT'S REALLY IMPORTANT FOR YOU TO STAND YOUR

 8   GROUND AND RESIST THE TEMPTATION TO AVOID APPEARING TO LIKE

 9   OR BE ACCUSED OF LIKING THE DISGUSTING MATERIAL THAT YOU

10   UNFORTUNATELY WERE FORCED TO WATCH IN THIS PARTICULAR CASE.

11            IT'S NOT ABOUT THAT.  IT'S NOT ABOUT YOUR PERSONAL

12   DISGUST FOR THIS PARTICULAR MOVIE BECAUSE IF YOU'RE NOT

13   PREPARED FOR IT, IT'S PRETTY RAUNCHY STUFF.  BUT THAT'S TRUE

14   OF ALL HARDCORE PORNOGRAPHY INVOLVING SEXUAL ACTIVITY.  YOU

15   KNOW THAT.

16            IF YOU DON'T LIKE IT, YOU'RE NOT GOING TO WANT TO

17   WATCH IT.  AND THEY WOULD TRY -- I DON'T KNOW.  I'M NOT

18   GOING TO GET INTO THAT.

19            SO (AS READ:)

20            "YOU MUST NOT JUDGE THE MATERIAL BY YOUR...

21        PERSONAL STANDARDS IF YOU BELIEVE THEM TO BE STRICTER

22        THAN THOSE GENERALLY HELD, NOR SHOULD YOU DETERMINE

23        WHAT SOME GROUPS OF PEOPLE MAY BELIEVE THE COMMUNITY

24        OUGHT TO ACCEPT OR REFUSE TO ACCEPT.  RATHER, YOU MUST

25        DETERMINE THE ATTITUDE OF THE COMMUNITY AS A WHOLE."
```

```
 1                    (END QUOTED MATERIAL.)

 2          MR. DIAMOND:  THAT IS CRITICAL IN THIS CASE.  YOU

 3  HAVE TO DETERMINE THE ATTITUDE OF THE COMMUNITY AS A WHOLE.

 4  YOU HAVE TO DETERMINE THAT.

 5          AND WHAT DO YOU HAVE TO GO ON?  WHAT EVIDENCE DID

 6  THE GOVERNMENT PRESENT THAT REFLECTS THE ATTITUDE OF THE

 7  COMMUNITY?

 8          NO, WHAT YOU HAVE ARE REMNANTS OF THE OLD

 9  OBSCENITY UNIT THAT'S LONG SINCE BEEN DISBANDED, AND YOU

10  DON'T EVEN HAVE AN OPINION BECAUSE LEWISON WASN'T EVEN

11  CALLED AS AN EXPERT WITNESS.  HE DIDN'T EVEN GIVE A LEGAL

12  OPINION.  HE JUST TESTIFIED AS TO WHAT HE HAD SEEN, AND OVER

13  THE INTERNET, HE HAS SEEN IT ALL.

14          SO THESE INSTRUCTIONS ARE VERY IMPORTANT.

15          WHAT ABOUT SCIENTIFIC VALUE?  DO THESE HAVE

16  SCIENTIFIC VALUE?  I THINK A THERAPIST MIGHT SAY TO YOU THAT

17  A LOT OF PEOPLE HAVE SECRET THOUGHTS AND IDEAS AND --

18          MR. KING:  OBJECTION, YOUR HONOR.  FACTS NOT IN

19  EVIDENCE.

20          THE COURT:  NO EVIDENCE OF WHAT A THERAPIST MIGHT

21  THINK IN THIS CASE, SIR.

22          MR. DIAMOND:  OKAY.  I WILL TRY TO ARGUE BY

23  INFERENCE.  WE'LL KIND OF BACKTRACK FOR A MOMENT.

24          THERE IS A REFERENCE TO SCIENTIFIC VALUE.  YOU ARE

25  MEMBERS OF A COMMUNITY.  YOU HAVE COMMON SENSE, YOU HAVE
```

```
 1    EXPERIENCE.  YOU MUST HAVE SOME KNOWLEDGE OF THERAPY.  WHAT
 2    I'M ABOUT TO SUGGEST TO YOU, I THINK, IS BASED ON EVIDENCE
 3    AND COMMON SENSE AND EXPERIENCE; AND IF IT'S NOT, I'LL STOP.
 4            I THINK IT'S A MATTER OF COMMON KNOWLEDGE AND
 5    INFERENCE THAT PEOPLE THINK.  WE DO THINK.  EVEN THOUGH
 6    THAT'S NOT IN EVIDENCE, I THINK WE KNOW.
 7            I DIDN'T CALL A WITNESS TO TESTIFY THAT PEOPLE
 8    THINK.  BUT I THINK YOU KNOW, INTUITIVELY, THAT PEOPLE THINK
 9    BECAUSE YOU THINK AND YOU'RE A PERSON.  OKAY.
10            SO WE'VE ESTABLISHED THAT YOU THINK.
11            WHAT DO PEOPLE THINK ABOUT?  I THINK IT'S AN
12    INFERENCE THAT CAN BE DRAWN WITH SOME DEGREE OF
13    SATISFACTION, CERTAINLY, THAT PEOPLE -- SOME PEOPLE AT
14    LEAST -- THINK ABOUT SEX.  NOT EVERYBODY.  BUT I THINK A
15    REASONABLE INFERENCE CAN BE DRAWN THAT AT LEAST SOME PEOPLE
16    THINK ABOUT SEX.
17            I THINK A FURTHER INFERENCE THAT CAN BE DRAWN IS
18    THAT SOME PEOPLE WHO THINK ABOUT SEX THINK ABOUT KINKY SEX
19    OR ABERRATIONAL SEX.  I DON'T THINK EVERYBODY THINKS OF ONE
20    PARTICULAR KIND OF SEX.  I THINK THAT SOME PEOPLE THINK OF
21    DIFFERENT KINDS OF SEX.
22            NOW, FOR THOSE PEOPLE -- AND THE GOVERNMENT HAS
23    ARGUED THIS -- THAT THESE MOVIES WERE SOLD TO A PARTICULAR
24    GROUP, MAYBE A DEVIANT GROUP OR SOME OTHER GROUP -- THIS IS
25    IN EVIDENCE -- THAT THESE MOVIES ARE BEING TARGETED FOR A
```

```
 1   PARTICULAR GROUP.

 2             THAT MAY BE TRUE.  THERE MAY BE A GROUP OUT THERE.

 3   I THINK THIS IS EVIDENCED IN THE RECORD BECAUSE IT'S

 4   TARGETED.

 5             MR. ISAACS HAS ACKNOWLEDGED THAT PEOPLE ARE BUYING

 6   THESE MOVIES, AND THEY SEEM TO BE MARKETED IN CERTAIN WAYS.

 7             SO I THINK FROM THE EVIDENCE SO FAR ELICITED, WE

 8   CAN DRAW A REASONABLE INFERENCE THERE MUST BE A GROUP OUT

 9   THERE OF PEOPLE WHO WANT TO SEE THESE MOVIES.

10             AND WE'VE ALREADY ESTABLISHED THAT PEOPLE THINK,

11   AND THEY SOMETIMES THINK ABOUT SEX.

12             SO WE HAVE A GROUP OF PEOPLE WHO ARE THINKING

13   ABOUT SEX WHO ARE MAYBE THINKING ABOUT IT IN A DIFFERENT WAY

14   THAN OTHER PEOPLE THINK ABOUT IT.

15             SO THE QUESTION NOW IS TO THESE PEOPLE, THE PEOPLE

16   TO WHOM THE MATERIALS ARE MARKETED, DID THEY GET SOME SORT

17   OF VALUE FROM THESE MOVIES?

18             I THINK WE CAN SAY AND I THINK IT'S A SAFE

19   INFERENCE TO SAY THAT THEY DO GET SOMETHING OF VALUE BECAUSE

20   THEY WOULD NOT BE PAYING FOR IT.

21             NOW, WE DO KNOW THAT OTHER PEOPLE SOMETIMES BUY

22   THESE MOVIES.  WE KNOW THAT THE F.B.I. BOUGHT THESE MOVIES,

23   AND WE KNOW THE POLICE OFFICER, HE BOUGHT THE MOVIE.  BUT I

24   THINK WE CAN ASSUME THAT MOST OF THE PEOPLE WHO BUY THESE

25   MOVIES WANT TO WATCH THEM.
```

```
1          NOW, WHY WOULD THEY WATCH THEM?  THEY WOULD WATCH
2     THEM BECAUSE IT MAKES THEM FEEL THAT THEY ARE NOT ALONE IN
3     THIS UNIVERSE, THAT OTHER PEOPLE HAVE AND SHARE THE SAME
4     BIZARRE OR WEIRD SEXUAL FEELINGS THAT THEY DO, AND THAT IS A
5     COMFORT TO THESE PEOPLE.  THESE PEOPLE --
6          MR. KING:  OBJECTION, YOUR HONOR.  FACTS NOT IN
7     EVIDENCE.
8          THE COURT:  NOW YOU HAVE CROSSED THE LINE, SIR.
9          MR. DIAMOND:  I WAS VERY CLOSE.
10         THE COURT:  NO.  YOU WERE -- NOT THE LAST FEW
11    SENTENCES.  THEY WERE A LITTLE SLOW IN OBJECTING; YOU WERE
12    NOT CLOSE.  THE LAST FEW SENTENCES.
13         YOU KNOW WHERE THE LINE IS.  STICK WITH IT.
14         MR. DIAMOND:  OKAY.
15         SO THE QUESTION IS WHETHER OR NOT THESE MOVIES
16    HAVE SERIOUS SCIENTIFIC VALUE.
17         I BELIEVE YOU CAN DRAW YOUR OWN INFERENCE AS TO
18    WHETHER -- AS TO SOME PEOPLE THERE IS A VALUE, SCIENTIFIC
19    VALUE.
20         AND I PUT THE SUBJECT OF THERAPY IN THE FIELD OF
21    SCIENCE.  I THINK THERE'S SOME PEOPLE WHO GAIN SOME VALUE
22    FROM THESE MOVIES -- NOT 100 PERCENT OF THE POPULATION, BUT
23    ENOUGH THAT THE COMMUNITY WOULD SAY IF THERE'S PEOPLE OUT
24    THERE WHO WANT TO BUY THESE MOVIES, THEY OUGHT TO BE ABLE TO
25    GET THEM.
```

```
 1          THAT IS THE BOTTOM LINE, AND THAT IS THE COMMUNITY
 2   STANDARD THAT WE'RE TALKING ABOUT.
 3          MR. KING:  OBJECTION, YOUR HONOR.
 4          THE COURT:  WHAT BASIS?
 5          MR. KING:  THE BASIS ON WHAT WAS DISCUSSED PRIOR
 6   TO COURT.
 7          THE COURT:  OVERRULED.
 8          GO AHEAD.
 9          MR. DIAMOND:  THAT'S GOOD.  THAT'S OVERRULED.
10          THAT MEANS YOU CAN CONSIDER THAT.
11          THE COURT:  SIR, DON'T INSTRUCT, PLEASE.  JUST
12   ARGUE.  I'LL DO THE INSTRUCTING.  YOU KNOW THAT.
13          MR. DIAMOND:  YES.
14          SO WE'VE COVERED SCIENTIFIC VALUE, ARTISTIC VALUE.
15   NOW WE'RE GOING TO GET INTO POLITICAL VALUE.
16          I TOUCHED UPON THIS EARLIER, BUT I'LL TRY TO COME
17   BACK TO THIS THEME.  AND IF MY PRESENTATION IS SOMEWHAT
18   DISJOINTED, I APOLOGIZE TO YOU FOR NOT PRESENTING IT IN A
19   CERTAIN WAY.  WE DIDN'T DO THE POWERPOINTS, BUT I HOPE YOU
20   DON'T HOLD THAT AGAINST US.
21          WHAT IS THE POLITICAL VALUE, SERIOUS POLITICAL
22   VALUE, OF THIS WHOLE PROCESS?
23          AGAIN, TO DEMONSTRATE THAT THE IRONY IS THAT THE
24   CONSTITUTION AND THE COUNTRY MAY NOT, IN THE REAL SENSE OF
25   THE WORD, SPONSOR OR PROMOTE THE TYPE OF FREEDOM THAT WE
```

```
 1    BRAG THAT WE HAVE; THAT WE STILL DO NOT ENJOY COMPLETE

 2    FREEDOM OF SPEECH, PRESS, CONSCIENCE, AND EVERYTHING; THAT

 3    IF YOU GO TOO FAR, YOU ARE GOING TO GET NAILED; YOU'RE GOING

 4    TO BE SQUASHED DOWN AND PUT BACK IN YOUR PLACE.

 5            AND SO THE QUESTION IS WHETHER OR NOT IRA ISAACS,

 6    AS THE CHARACTER "JOSEF K." MIGHT DO, WHETHER HE PUSHED THE

 7    BUTTON SO FAR AS TO EVOKE A POLITICAL RESPONSE THAT

 8    DEMONSTRATES MORE CLEARLY THAN ANYTHING ELSE THAT WE'VE NOT

 9    YET ATTAINED THE PROMISE THAT OUR CONSTITUTION PURPORTS TO

10    GIVE TO US.

11            THAT IS THE ULTIMATE IRONY OF THIS CASE BECAUSE

12    WHAT IRA ISAACS HAS DONE IS PUSHED THE BUTTON OF THE

13    GOVERNMENT, EVOKING THIS TYPE OF RESPONSE WHERE THEY WOULD

14    SEND OUT THE NUCLEAR REGULATORY COMMISSION'S FORENSIC EXPERT

15    TO COME OUT AND TESTIFY ON ISSUES THAT HAVE NEVER BEEN IN

16    DISPUTE.

17            FROM DAY ONE, IRA ADMITTED EVERYTHING.  THEY

18    BROUGHT OUT THE NUCLEAR REGULATORY GUY.  THEY FLY IN PEOPLE

19    FROM ALL OVER.  THEY'VE GOT THIS GAL, THE WITNESS, THE

20    FORMER EMPLOYEE WHO IS LIVING IN THE STATE OF WASHINGTON.

21    THEY FLY HER DOWN TO TESTIFY.

22            THEY BRING IN ALL THESE PEOPLE.  FOR WHAT?  TO

23    TELL THE SOUTHERN CALIFORNIA COMMUNITY, "YOU ARE TOO

24    LIBERAL.  YOU ARE TOO TOLERANT.  WE DON'T LIKE YOUR

25    COMMUNITY STANDARDS.  WE'RE GOING TO TEACH YOU A LESSON.
```

```
 1   WE'RE GOING TO COME OUT HERE AND NAIL THIS GUY"?

 2          THAT'S WHAT HAPPENED IN THIS PARTICULAR CASE.  AND

 3   THE QUESTION IS WHETHER OR NOT YOU ARE GOING TO ALLOW THAT

 4   TO HAPPEN.  AND I'M NOT ARGUING THAT THE MOVIES AREN'T

 5   GROSS, BUT THIS CASE IS FAR BEYOND WHAT THE MOVIES ARE

 6   ABOUT.  THIS IS A POLITICAL --

 7          MR. KING:  OBJECTION, YOUR HONOR.

 8          MR. DIAMOND:  ON THIS --

 9          MR. KING:  OBJECTION, YOUR HONOR.

10          MR. DIAMOND:  ON -- ON --

11          THE COURT:  SIR, THERE'S AN OBJECTION.

12          MR. DIAMOND:  YES, YOUR HONOR.

13          THE COURT:  THE OBJECTION?

14          MR. KING:  MAY WE HAVE A SIDEBAR?  THIS IS ON AN

15   ISSUE --

16          THE COURT:  YES, YES.

17          (FOLLOWING HELD OUTSIDE HEARING OF JURORS:)

18          THE COURT:  MR. KING.

19          MR. KING:  YOUR HONOR, THE GOVERNMENT HAD MOVED

20   FOR A MOTION IN LIMINE REGARDING PRECLUDING THE DEFENSE FROM

21   ARGUING ANYTHING ABOUT MOTIVE OF THE GOVERNMENT OTHER THAN

22   TO ENFORCE THE LAWS OF THE UNITED STATES.  THAT MOTION WAS

23   GRANTED.  IT WAS UNOPPOSED BY THE DEFENDANT.

24          AND SO WE OBJECT BECAUSE HE IS ARGUING MOTIVE OF

25   THE GOVERNMENT CONTRARY TO WHAT THE COURT HAD PRECLUDED HIM
```

```
1    FROM DOING.
2         MR. DIAMOND:  THAT'S NOT TRUE.  ISAACS TESTIFIED
3    TO HIS -- ONE OF HIS INTENTS WAS TO TRIGGER A RESPONSE FROM
4    THE GOVERNMENT.  THAT'S FROM HIS OWN TESTIMONY.  THAT'S WHAT
5    I'M COMMENTING ON.
6         THE COURT:  THAT'S NOT WHAT YOUR LAST COMMENT IS.
7    HE DID NOT OBJECT TO THE GENERAL ARGUMENT ABOUT WHAT ISAACS
8    TESTIFIED ABOUT PUSHING THE LIMITS AND PROTESTING ALL OF
9    THAT.  HE DID NOT OBJECT.
10        AGAIN, YOU CANNOT TRY TO IMPUGN THE MOTIVES OF THE
11   GOVERNMENT BY CLAIMING POLITICAL PROSECUTION, MR. DIAMOND.
12   I HAVE WARNED YOU MANY TIMES.  THIS IS UNBECOMING OF YOU.
13        YOUR CONDUCT IN HAVING TO DRAW THESE OBJECTIONS
14   THAT I HAVE SUSTAINED IS SHOWING ITSELF TO BE A HABIT OF
15   YOURS OF INTENTIONALLY VIOLATING THE COURT'S ORDER AND
16   INTENTIONALLY VIOLATING YOUR OWN OATH AS A LAWYER OF KNOWING
17   WHAT IS ACCEPTABLE ARGUMENT AND WHAT IS NOT ACCEPTABLE
18   ARGUMENT.
19        NO CLIENT'S CASE IS WORTH THAT TYPE OF ACTIVITY BY
20   YOU.  I SUGGEST THAT YOU THINK LONG AND HARD BEFORE YOU
21   FLOUT THE LAW AGAIN AND MY ORDERS.
22        DO YOU UNDERSTAND THAT?  YOU HAVE MADE A HABIT OF
23   DOING IT.
24        MR. DIAMOND:  I APOLOGIZE TO THE COURT.  I THINK I
25   WAS COMMENTING --
```

```
1              THE COURT:  YOU WERE NOT JUST COMMENTING.  YOU

2    KNOW EXACTLY WHAT YOU ARE DOING, SIR.  YOU ARE A

3    SOPHISTICATED AND EXPERIENCED LAWYER.  YOU KNOW PRECISELY

4    WHAT YOU ARE TRYING TO COMMUNICATE.  YOU HAVE TO LOOK

5    YOURSELF IN THE MIRROR AND SEE WHAT THE PROBLEM IS.

6              YOU CANNOT DO THAT, MR. DIAMOND.  NO CLIENT IS

7    WORTH YOUR INTEGRITY.

8              YOU KNOW WHAT YOU ARE SUPPOSED TO DO, AND FOLLOW

9    MY ORDERS.

10             MR. DIAMOND:  YES, YOUR HONOR.

11             THE COURT:  I SUGGEST YOU DO THAT HENCEFORTH.

12             MR. DIAMOND:  YES, YOUR HONOR.

13         (FOLLOWING HELD IN PRESENCE AND HEARING OF JURORS:)

14             THE COURT:  ALL RIGHT.  WE'LL TAKE A BRIEF RECESS

15   BECAUSE IT LOOKS LIKE WE NEED TO TAKE A RECESS AT THIS TIME.

16             MR. DIAMOND, I APOLOGIZE FOR HAVING TO INTERRUPT

17   YOU.

18             MR. DIAMOND:  THAT'S OKAY.

19             THE COURT:  WE'LL TAKE OUR MORNING RECESS OF 15

20   MINUTES AT THIS TIME.

21             STILL KEEP IN MIND THE ADMONITION OF THE COURT NOT

22   TO DISCUSS THIS MATTER AMONG YOURSELVES OR WITH ANYBODY ELSE

23   UNTIL IT IS FINALLY GIVEN TO YOU FOR YOUR DELIBERATIONS.

24             WE'LL SEE YOU IN 15 MINUTES.

25             THE CLERK:  ALL RISE.
```

```
 1              (10:12 - 10:30 A.M., RECESS TAKEN.)

 2         THE COURT:  ALL RIGHT.  WE'RE ON THE RECORD IN THE

 3   MATTER OF UNITED STATES VERSUS ISAACS.  MR. ISAACS IS

 4   PRESENT, COUNSEL ARE PRESENT, THE JURORS ARE IN THEIR SEATS.

 5         ALL RIGHT.  FURTHER CLOSING ARGUMENT, THEN, BY

 6   MR. DIAMOND.

 7         FURTHER CLOSING ARGUMENT BY THE DEFENSE

 8         MR. DIAMOND:  YES, THANK YOU.  MAY IT PLEASE THE

 9   COURT.

10         MY ARGUMENT WAS TERMINATED -- INTERRUPTED BY THE

11   RECESS.  SO I GET TO FINISH THE ARGUMENT, BUT I'M NOT GOING

12   TO TAKE VERY LONG.  BUT SO THOSE OF YOU WHO ARE WORRIED

13   ABOUT FRIDAY RUSH HOUR, DON'T HOLD ANYTHING AGAINST ME IF I

14   TALK A LITTLE BIT.

15         AND ON THAT SUBJECT, I DON'T WANT TO BE

16   PRESUMPTUOUS TO TELL YOU HOW TO DELIBERATE, BUT I JUST WANT

17   TO CAUTION YOU:  THIS IS A VERY IMPORTANT CASE.  SO IF IT'S

18   APPROACHING TIME THAT YOU WOULD LIKE TO LEAVE TO GO HOME,

19   PLEASE STICK WITH YOUR BELIEFS AND PRINCIPLES AND

20   DETERMINATIONS IN JURY DELIBERATION AND DON'T JUST GIVE UP

21   YOUR POSITION OUT OF CONVENIENCE BECAUSE YOU WANT TO GET

22   HOME BEFORE THE TRAFFIC.

23         I KNOW THAT'S A PRACTICAL CONSIDERATION, BUT IT'S

24   OBVIOUSLY VERY IMPORTANT TO US.  SO I WOULD HOPE THAT THAT

25   WOULD NOT HAPPEN IN THIS PARTICULAR CASE.
```

```
 1              I WANT TO JUST TOUCH ON A FEW ENDING ISSUES.

 2              THE GOVERNMENT SAID THAT DURING THE OPENING

 3    STATEMENT I SAID CERTAIN THINGS WOULD BE ESTABLISHED.  A LOT

 4    OF TIMES THINGS AREN'T BROUGHT OUT BECAUSE OF RULINGS AND

 5    EVIDENTIARY MATTERS AND SO FORTH.  SO YOU'RE NOT ALLOWED TO

 6    SPECULATE AS TO WHY SOMETHING WAS OR WAS NOT DONE.

 7              BUT I WILL POINT OUT -- BECAUSE THIS DID OCCUR IN

 8    OPEN COURT -- MR. ISAACS DID TESTIFY.  HE WAS SUBJECT TO

 9    CROSS-EXAMINATION.  HE WAS NEVER ASKED BY THE PROSECUTION

10    ABOUT THE QUESTION WHETHER IT'S REAL OR NOT REAL.

11              BUT THAT'S NOT REALLY IMPORTANT BECAUSE OBSCENITY

12    LAW IS WEIRD IN THE SENSE OF WHAT YOU ARE LOOKING AT IS THE

13    ACTUAL MATERIAL; WHETHER IT'S A BOOK OR A MOVIE OR A

14    PICTURE, YOU ARE NOT REALLY JUDGING THE UNDERLYING CONDUCT

15    DEPICTED.

16              SO BY WAY OF EXAMPLE, LET'S ASSUME,

17    HYPOTHETICALLY, THAT YOU ARE A DOCUMENTARY FILM PRODUCER AND

18    YOU WITNESSED A HORRIBLE ACT OR YOU SAW SOMEBODY KILL

19    SOMEBODY AND YOU FILMED THAT.

20              THE QUESTION IS WHETHER THE FILM SOMEHOW CAN BE

21    CONDEMNED BECAUSE IT DISPLAYS A CRIMINAL ACT, AND THE SIMPLE

22    ANSWER IS:  YOU ARE JUDGING THE MATERIALS -- IN THIS CASE,

23    THE MOVIES -- YOU ARE NOT JUDGING THE CONDUCT AS SEPARATE

24    ACTS.

25              SO IF YOU HAPPEN TO NOTICE A CRIME BEING COMMITTED
```

```
 1   OR SOMETHING IMPROPER OR YOU THINK SOMETHING IS WRONG,

 2   THAT'S NOT RELEVANT.

 3          WHAT IS RELEVANT IS THE APPEARANCE, AND FOR THAT

 4   REASON, EVEN IF YOU HAD SEEN SOMETHING REAL OR SOMETHING

 5   FAKE OR WHATEVER, IT'S THE IMPACT ON THE AUDIENCE.  THAT'S

 6   WHAT'S IMPORTANT, NOT WHETHER THE CONDUCT THAT'S BEING

 7   PORTRAYED REALLY HAPPENED OR IS FAKE OR WHATEVER.

 8          IT'S THE IMPACT ON THE PERSON.

 9          AND I MENTION THAT ALSO IN TERMS OF HEALTH ISSUES.

10   YOU ARE NOT TO JUDGE THIS CASE BASED UPON WHETHER YOU

11   APPROVE OR DISAPPROVE OF THE CONDUCT ACTUALLY EXISTING

12   THAT'S PURPORTEDLY BEING FILMED, OR WHATEVER, OR WHETHER

13   IT'S BEING FAKED OR THROUGH OTHER DEVICES, THEY'RE USING

14   PROPS AND SO FORTH.

15          IT'S THE IMPACT ON THE VIEWER THAT THE OBSCENITY

16   LAW DEALS WITH, NOT WHETHER OR NOT THE UNDERLYING CONDUCT IS

17   OR IS NOT PERMISSIBLE.

18          I NOTICE, I GUESS -- AND I THINK THIS IS A MATTER

19   OF COMMON KNOWLEDGE, BUT IF YOU HAD A NEWSPAPER, SAY THE

20   L.A. TIMES, AND IT HAS A FRONT-PAGE STORY OF A SOLDIER IN

21   AFGHAN --

22          MR. KING:  OBJECTION, YOUR HONOR.

23          THE COURT:  OVERRULED.

24          MR. DIAMOND:  IF YOU HAVE A SOLDIER WITH A BODY

25   PART FROM AN AFGHAN OR A TALIBAN FIGHTER OR AN AL QAEDA
```

```
 1   FIGHTER OR YOU HAVE EVIDENCE OF ABUSE BY THE U.S.

 2   MILITARY -- WHATEVER IS IN -- AND YOU'RE PORTRAYING THAT

 3   BECAUSE YOU'RE A DOCUMENTARY FILMMAKER OR WHATEVER, YOU ARE

 4   NOT TO BE CONDEMNED BECAUSE YOU ARE SHOWING SOMETHING THAT

 5   IS REAL.

 6              SO WHETHER IT'S REAL OR NOT IN OBSCENITY LAW IS

 7   REALLY IRRELEVANT.

 8              BUT YOU WOULDN'T CONDEMN THE L.A. TIMES FOR

 9   RUNNING A STORY THAT HAD A REAL PICTURE OF A REAL PERSON

10   WITH A BODY PART, EVEN THOUGH THERE MIGHT BE A CRIMINAL

11   STATUTE THAT SAYS IT'S ILLEGAL TO MUTILATE A CORPSE OR TO DO

12   SOMETHING WITH A DEAD BODY.

13              SO YOU HAVE TO DISTINGUISH THE CONDUCT DEPICTED

14   FROM THE MOVIE OR THE BOOK OR THE PHOTOGRAPH THAT'S SHOWING

15   WHAT IS BEING DEPICTED.  THAT'S KIND OF A SUBTLE CONCEPT,

16   BUT IT'S IMPORTANT TO KEEP IN MIND HERE -- THAT YOU ARE NOT

17   TO JUDGE THE UNDERLYING CONDUCT, BUT THE MOVIE ITSELF, AS A

18   WHOLE.  THAT'S WHAT YOU ARE LOOKING AT.

19              SO I WANT TO CONCLUDE BY ASKING YOU TO PUT ASIDE

20   ANY PREJUDICE YOU MIGHT HAVE OR ANY INFLAMMATORY NOTION YOU

21   MAY HAVE BASED UPON THE VERY GOOD ARGUMENT OF THE

22   PROSECUTION.

23              THESE PEOPLE ARE GREAT.  THEY ARE VERY GOOD AT

24   WHAT THEY DO; AND IF I DON'T MEASURE UP TO THEIR ABILITY IN

25   TERMS OF MY ABILITY TO PRESENT THE DEFENSE TO YOU, I
```

```
1    CERTAINLY HOPE THAT DOES NOT RESULT IN ANY BAD THINGS
2    HAPPENING TO IRA ISAACS.  I'M DOING THE BEST I CAN TO
3    PRESENT WHAT I THINK IS A PROPER DEFENSE BASED UPON THE LAW.
4           AND I HAVE ASKED OVER AND OVER AGAIN -- READ THE
5    JURY INSTRUCTIONS.  READ THEM YOURSELVES.  AND AS I SAID,
6    YOU'LL HAVE THE WRITTEN INSTRUCTIONS IN FRONT OF YOU.
7           AND IT WOULD APPEAR TO ME, AS MUCH AS EITHER MOST
8    OR ALL OF YOU MIGHT WANT TO DECIDE THIS CASE BASED UPON YOUR
9    SORT OF GUT REACTION TO THESE MOVIES -- AS MUCH AS YOU WANT
10   TO DO THAT, YOU WANT TO FIGURE OUT SOME WAY TO NAIL THIS GUY
11   BECAUSE YOU THOUGHT THE MOVIES WERE DISGUSTING, AS MUCH YOU
12   WANT TO DO THAT --
13          AND I WOULD EXPECT THAT SOME OR MOST OF ALL OF YOU
14   WOULD WANT TO DO THAT.
15          -- PLEASE TAKE TIME, TAKE A DEEP BREATH, CALM
16   YOURSELVES DOWN, READ THE INSTRUCTIONS BECAUSE WE ARE A
17   COUNTRY OF LAWS, AND WE HAVE TO GO BY THE LAW.
18          AND WHEN YOU BECAME A JUROR IN THIS CASE, AS
19   UNFORTUNATE AS THAT MIGHT BE --
20          YOU'VE SPENT A WHOLE WEEK HERE, AND I KNOW YOU
21   COULD HAVE BEEN DOING OTHER THINGS MORE PRODUCTIVE OF YOUR
22   TIME, BUT WE ALL APPRECIATE THE FACT THAT YOU'RE TAKING TIME
23   FROM YOUR BUSY LIVES TO COME HERE AND DO, MORE OR LESS, A
24   PRETTY UNPLEASANT TASK, ALTHOUGH YOU DID SAY IN YOUR
25   QUESTIONNAIRES THAT YOU WOULD BE WILLING TO DO THIS.
```

```
 1          PLEASE, BEFORE YOU ULTIMATELY DECIDE THIS CASE,

 2   READ THE INSTRUCTIONS.  I MEAN, OBVIOUSLY, THEY ALL APPLY TO

 3   THIS CASE, BUT I'M TELLING YOU NOW THAT THERE'S NO DISPUTE

 4   THAT IT WAS IRA ISAACS WHO WAS INVOLVED.  HE TOOK

 5   RESPONSIBILITY FROM DAY ONE.

 6          SO YOU DON'T HAVE TO -- ALTHOUGH, IF THE

 7   GOVERNMENT WANTS YOU TO DO IT, YOU CAN DO IT.  HE'S ALREADY

 8   ADMITTING ALL THIS STUFF.

 9          SO YOU DON'T HAVE TO DEAL WITH COMPLEX ISSUES OF

10   TRANSPORTING SOMETHING THROUGH THE U.S. MAIL OR THROUGH A

11   COMMON CARRIER.  YOU DON'T HAVE TO DEBATE ABOUT WHETHER

12   U.P.S. IS A COMMON CARRIER OR NOT.

13          CUT TO THE CHASE.  YOU WILL SAVE YOURSELVES A LOT

14   OF TIME, AND JUST GO TO THE HEART OF THIS CASE, WHICH WOULD

15   BE THE DEFINITION OF OBSCENITY.

16          THAT'S WHAT'S THIS CASE IS ALL ABOUT, THE

17   DEFINITION OF OBSCENITY, AND WHETHER OR NOT -- IF THE MOVIE

18   IS NOT OBSCENE, WHETHER OR NOT WE CAN LIVE UP TO OUR GOAL

19   UNDER THE CONSTITUTION AND THE FIRST AMENDMENT.

20          AND SO I URGE YOU IN DECIDING THIS CASE TO READ

21   VERY CAREFULLY THE JURY INSTRUCTIONS, GO OVER THE ISSUES OF

22   WHETHER, FOR EXAMPLE -- THERE'S SO MANY ISSUES HERE --

23   WHETHER OR NOT A REASONABLE PERSON OR AN AVERAGE PERSON IN

24   THE COMMUNITY HAS A PRURIENT INTEREST.

25          BECAUSE IF YOU READ THE INSTRUCTIONS, IT SAYS YOU
```

```
 1    HAVE TO DETERMINE WHETHER OR NOT THE WORK APPEALS

 2    PREDOMINANTLY TO A PRURIENT INTEREST, AND THEN IT DEFINES

 3    "PRURIENT INTEREST."

 4              (AS READ:)  "AN APPEAL TO 'PRURIENT INTEREST' IS

 5         AN APPEAL TO A MORBID, DEGRADING, AND UNHEALTHY --"

 6              I'LL START OVER.

 7              "-- AND UNHEALTHY INTEREST IN SEX, AS

 8         DISTINGUISHED FROM A MERE CANDID INTEREST IN SEX."

 9                   (END QUOTED MATERIAL.)

10         MR. DIAMOND:  BUT AFTER, GIVEN THAT INSTRUCTION,

11    FARTHER DOWN, IT TALKS ABOUT AN AVERAGE PERSON.

12              SO THE QUESTION IS DOES AN AVERAGE PERSON HAVE A

13    MORBID, DEGRADING, OR UNHEALTHY INTEREST IN SEX?

14              YOU'RE GOING TO HAVE TO FIGURE THIS ONE OUT, AND

15    IT'S KIND OF A CONUNDRUM AS TO HOW YOU'RE GOING TO DEAL WITH

16    THAT.

17         MR. KING:  OBJECTION, YOUR HONOR.  MISSTATES THE

18    LAW.

19         THE COURT:  THAT DOES MISSTATE THE LAW.

20         MR. DIAMOND, IT DOES MISSTATE THE LAW.  THAT'S NOT

21    WHAT I INSTRUCTED ON, BUT THE JURY WILL HAVE THE

22    INSTRUCTIONS.

23              AND YOU CAN READ THE INSTRUCTIONS.

24              YOU MAY PROCEED.

25         MR. DIAMOND:  YES.
```

```
 1          I'M URGING YOU TO READ THE INSTRUCTIONS CAREFULLY

 2   AND APPLY THE PRURIENT INTEREST TEST TO THE AVERAGE PERSON

 3   DEFINITION.  AND YOU'LL BE ABLE TO DO THAT BECAUSE YOU, THE

 4   JURY, BASED ON THE INSTRUCTIONS BY THE COURT, YOU, THE JURY,

 5   DECIDE THIS CASE.  YOU DECIDE THE GUILT OR INNOCENCE OF

 6   IRA ISAACS.

 7          AND PLEASE KEEP IN MIND THAT HE IS THE ONE WHO IS

 8   ON TRIAL, NOT THE MOVIES.  THE MOVIES ARE SIMPLY EVIDENCE IN

 9   THIS CASE.  BUT THIS IS NOT A CIVIL ACTION FOR DECLARATORY

10   RELIEF WHERE SOMEBODY'S COME INTO COURT AND ASKED FOR A

11   CIVIL JUDGMENT DECLARING WHETHER THE MOVIES ARE OBSCENE OR

12   NOT.  HE'S THE ONE ON TRIAL.

13          THE REASON I MENTION THAT IS THAT THERE IS A

14   DIFFERENCE BETWEEN CIVIL AND CRIMINAL LAW, AND SOME OF YOU

15   INDICATED IN YOUR JURY QUESTIONNAIRE RESPONSES THAT YOU HAVE

16   SOME CIVIL JURY EXPERIENCE.  OTHERS, I THINK, HAVE CRIMINAL

17   JURY EXPERIENCE.  AND, OF COURSE, THIS IS A CRIMINAL CASE.

18          BUT IT MAY NOT HAVE ALL OF THE FEEL OF A CRIMINAL

19   CASE BECAUSE IT'S NOT A CRIME THAT IS ORDINARILY THE SUBJECT

20   OF WHATEVER.

21          SO IT'S NOT SOMETHING THAT WOULD BE ON T.V. SHOWS,

22   FOR EXAMPLE, OR MORE INTERESTING.  AND WE HAVE MORE DEALINGS

23   WITH, LIKE, MURDER CASES AND ROBBERY AND ARSON.

24          SO THIS MAY NOT HAVE THE FEEL OF A CRIMINAL CASE.

25   IT MAY FEEL MORE LIKE A CIVIL DISPUTE WHERE THERE'S AN
```

```
 1    ARGUMENT ABOUT A MOVIE AND WHERE YOU'RE BEING ASKED TO JUDGE

 2    A MOVIE OR WHATEVER.

 3              BECAUSE THIS IS A CRIMINAL CASE, YOU HAVE TO APPLY

 4    THE REASONABLE DOUBT STANDARD OF CRIMINAL LAW, NOT THE

 5    PREPONDERANCE OF EVIDENCE STANDARD OF CIVIL LAW.

 6              THAT'S VERY IMPORTANT BECAUSE THE GOVERNMENT IN A

 7    CRIMINAL CASE, WHICH THIS IS, HAS THE BURDEN OF PROOF BEYOND

 8    A REASONABLE DOUBT IN A CRIMINAL CASE.

 9              SO THEY HAVE THE BURDEN OF PROVING ALL OF THE

10    ELEMENTS OF OBSCENITY IN THE DEFINITION BEYOND A REASONABLE

11    DOUBT.  AND AS I SAID, IT'S IRA ISAACS WHO IS ON TRIAL, NOT

12    THE MOVIES.  BUT THE MOVIES ARE THE VEHICLE BY WHICH THE

13    GOVERNMENT WANTS TO CONVICT IRA ISAACS.

14              SO WE'RE SUGGESTING TO YOU AND I'M ARGUING TO YOU

15    NOW AND SUGGESTING AND TELLING YOU THAT BEFORE YOU DECIDE

16    THIS CASE, YOU HAVE TO DETERMINE WHETHER OR NOT THE

17    GOVERNMENT HAS SATISFIED ITS BURDEN OF PROOF ON EVERY

18    ELEMENT OF THE CRIME; AND THE ELEMENT OF THE CRIME INCLUDES

19    THE DEFINITIONS OF OBSCENITY.  THOSE ARE ELEMENTS OF THE

20    CRIME.

21              SO I WANT TO THANK YOU VERY MUCH FOR BEING SO

22    ATTENTIVE.  I KNOW IT WAS NOT PLEASANT WATCHING THIS, BUT IF

23    YOU WERE -- AS I GO TO FOOTBALL GAMES, MY WIFE HAS TO SIT

24    THROUGH FOOTBALL GAMES THAT ARE BORING AND DISGUSTING.  SHE

25    HATES THAT.  I HATE RAP MUSIC.  SO IF THIS WERE A RAP MUSIC
```

```
 1   TRIAL, AND I HAD TO SIT HERE AND LISTEN TO FOUR HOURS OF RAP

 2   MUSIC, I'D GO CRAZY.

 3            SO IF IT WASN'T PLEASANT FOR YOU TO HAVE TO WATCH

 4   THIS -- I THINK SOME OF YOU MAY NOT HAVE WATCHED IT.  IT WAS

 5   HARD TO PUT YOUR EYES ON THIS STUFF, BUT DO THE BEST YOU

 6   CAN.  AND AFTER YOU DELIBERATE, WE'RE ASKING THAT YOU VOTE

 7   IRA ISAACS NOT GUILTY BECAUSE THE GOVERNMENT HAS NOT PROVEN

 8   BEYOND A REASONABLE DOUBT ALL OF THE ELEMENTS OF THE

 9   OBSCENITY TEST.

10            AND I URGE YOU NOT TO GIVE IN TO THOSE WHO MIGHT

11   TRY TO SHAME YOU INTO THINKING, OH, HE'S JUST SOME CLEVER

12   LAWYER OR SOME RIDICULOUS LAWYER WHO'S COME UP WITH SOME

13   COCKAMAMY THEORY TO TRY TO BEAT THE RAP.

14            THIS IS AN IMPORTANT CASE.  IT'S A SIGNIFICANT

15   CASE.

16            IT INVOLVES VERY IMPORTANT CONSTITUTIONAL ISSUES

17   GOING TO THE HEART OF WHAT OUR COUNTRY IS ALL ABOUT,

18   FREEDOM.  THAT'S WHAT THIS CASE IS ABOUT, FREEDOM.

19            APPLY THE COMMUNITY STANDARD OF THE CENTRAL

20   DISTRICT OF CALIFORNIA, NOT THE COMMUNITY STANDARD OF

21   GEORGIA OR MISSISSIPPI OR ALABAMA OR ANYPLACE ELSE, AND THEN

22   APPLY THE CONTEMPORARY COMMUNITY STANDARD.

23            AND I'M CONFIDENT YOU'LL DETERMINE THAT THE

24   STANDARD IN THIS COMMUNITY, SOUTHERN CALIFORNIA, WOULD ALLOW

25   AND DOES ALLOW AND ACCEPTS THIS PARTICULAR MATERIAL, NOT FOR
```

```
1    EVERYBODY, BUT FOR WHOEVER WANTS TO PURCHASE IT.

2            THANK YOU VERY MUCH, LADIES AND GENTLEMEN OF THE

3    JURY.

4            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

5    MR. DIAMOND.

6            FURTHER ARGUMENT ON BEHALF OF THE GOVERMENT,

7    MR. KING.

8            MR. KING:  THANK YOU, YOUR HONOR.

9            FURTHER CLOSING ARGUMENT BY THE GOVERNMENT

10           MR. KING:  LADIES AND GENTLEMEN, JUST INITIALLY,

11   LET'S JUST CLEAR UP ONE THING BEFORE WE TURN TO THE OBSCENE

12   NATURE, THE OBSCENITY TEST, THAT MR. DIAMOND DISCUSSED AT

13   LENGTH.

14           IT'S THE DEFENSE WHO RAISED IN OPENING STATEMENT A

15   CLAIM THAT THE EVIDENCE WOULD SHOW THAT FECES INVOLVED IN

16   THE VIDEOS PRODUCED BY THIS DEFENDANT WERE FAKE AND NOT REAL

17   FECES, NOT THE GOVERNMENT.  WE DIDN'T MAKE ANY SUCH CLAIM.

18           WE AND THE DEFENSE HAD THE SAME OPPORTUNITY TO ASK

19   THE SAME QUESTIONS OF EACH AND EVERY WITNESS THAT WAS UP ON

20   THE STAND.  AND TO MAKE AN ARGUMENT THAT WE DIDN'T ASK, YOU

21   KNOW, A QUESTION, WHICH, FROM THE EVIDENCE THAT'S PRESENTED,

22   IS SO OBVIOUS WHEN THEY HAD THE OPPORTUNITY TO ASK THE SAME

23   QUESTIONS AND THEY'RE THE ONES WHO PUT THE FACT AT ISSUE,

24   REALLY IS JUST FARFETCHED.

25           BUT IT REALLY IS A TANGENTIAL ISSUE ANYWAY.  SO
```

```
 1              THE COURT:  NO.  IT'S NOT "AND."  ALL OF THESE ARE

 2     NOT GOING TO BE "AND."

 3              MR. DIAMOND:  BECAUSE IF -- ARE WE ON THE SECOND

 4     QUESTION NOW?

 5              THE COURT:  NO, WE'RE ON THE FIRST ONE.

 6              MR. DIAMOND:  SO WE'RE SIMPLY TALKING ABOUT THE

 7     DEFINITION OF "MORBID"?

 8              THE COURT:  YES, OR I CAN SAY "'MORBID' MEANS

 9     SHAMEFUL OR UNWHOLESOME."

10              MR. DIAMOND:  OKAY.

11              THE COURT:  DO YOU HAVE ANOTHER CHOICE?

12              MR. DIAMOND:  NO, I DO NOT, YOUR HONOR.

13              THE COURT:  OKAY.  MR. KING, WHAT'S YOUR VIEW ON

14     THIS?

15              MR. KING:  WHAT YOU PROPOSED, "A SHAMEFUL OR

16     UNWHOLESOME INTEREST IN NUDITY, SEX, OR EXCRETION" IS OUR

17     PREFERRED.  BUT IF --

18              THE COURT:  BUT THAT TECHNICALLY DEFINES "PRURIENT

19     INTEREST."

20              MR. KING:  RIGHT.  YES, YOUR HONOR.

21              THE COURT:  THEY ARE ASKING FOR ONLY "MORBID."  SO

22     IF THEY WANT US TO DEFINE MORBID, I WOULD SAY --

23              MR. KING:  SHAMEFUL OR UNWHOLESOME.

24              THE COURT:  -- SHAMEFUL OR UNWHOLESOME  OKAY.

25              NOW LET'S TALK ABOUT THE SECOND ONE.  THE SECOND
```

```
 1    NOTE SAYS (READING:)
 2              "UNDER THE PRURIENT INTEREST MUST ALL THREE
 3         CRITERIA BE MET, 'MORBID, DEGRADING, AND UNHEALTHY'
 4         INTEREST IN SEX."
 5                   (END QUOTED MATERIAL.)
 6         THE COURT:  UNFORTUNATELY, YOU FOLKS PROPOSED A
 7    JURY INSTRUCTION THAT SAYS "AND," AND THAT DID COME FROM THE
 8    FIFTH CIRCUIT.  THAT APPEARS TO BE CONTRARY TO COMMON SENSE
 9    AND THE LAW, ESPECIALLY IN NINTH CIRCUIT.
10         IN FACT, IN THE NINTH CIRCUIT, THERE IS A CASE
11    CALLED POLYKOFF VERSUS TOM COLLINS.  IT IS CITED AT
12    816 F.2D. 1326, NINTH CIRCUIT 1987.
13         AND IT, AMONG OTHER THINGS, DETERMINED A
14    INSTRUCTION WHICH HAD BEEN GIVEN BY THE COURT IN THAT CASE,
15    THE TRIAL COURT AND AMONG OTHER THINGS, IT SAID (READING:)
16              "A PRURIENT INTEREST IN SEX IS NOT THE SAME AS
17         CANDID, WHOLESOME, OR HEALTHY INTEREST IN SEX.
18         MATERIAL DOES NOT APPEAL TO THE PRURIENT INTEREST JUST
19         BECAUSE IT DEALS WITH SEX OR SHOWS NUDE BODIES.
20         PRURIENT INTEREST IS AN UNHEALTHY, UNWHOLESOME, MORBID,
21         DEGRADING, OR SHAMEFUL INTEREST IN SEX, A LEERING, OR
22         LONGING INTEREST."
23                   (END QUOTED MATERIAL.)
24         THE COURT:  OKAY.  THE COURT, NINTH CIRCUIT, THEN
25    SAID (READING:)
```

```
 1              "THE BARTANEN JURY REQUESTED CLARIFICATION -- "

 2         JUST LIKE HERE

 3              " -- ON WHETHER ALL THE FOLLOWING ADJECTIVES

 4         HAVE TO APPLY:  UNHEALTHY, UNWHOLESOME, MORBID,

 5         DEGRADING, AND SHAMEFUL.  THE TRIAL JUDGE REPLIED THAT

 6         THE DESCRIPTIVE TERMS IN THE INSTRUCTIONS ARE SET FORTH

 7         IN THE ALTERNATIVE AND NOTED THAT THE INSTRUCTIONS WERE

 8         TO BE CONSIDERED AS A WHOLE."

 9                   (END QUOTED MATERIAL.)

10         THE COURT:  AND THAT WAS UPHELD BY THE NINTH

11    CIRCUIT.

12         AND, IN FACT, THEREAFTER, IN A CASE CALLED

13    RIPPLINGER VERSUS COLLINS -- IT IS CITED AT 868 F.2D. 1043,

14    NINTH CIRCUIT 1989.  IT SAYS (READING:)

15              "WE HAVE APPROVED THE BARTANEN INSTRUCTION.

16         SEE POLYKOFF."

17                   (END QUOTED MATERIAL.)

18         THE COURT:  SO WHAT I READ TO YOU WAS THE

19    INSTRUCTION ACTUALLY GIVEN BY THE TRIAL JUDGE IN BARTANEN.

20         AND SO IT APPEARS TO ME THERE'S NINTH CIRCUIT

21    AUTHORITY THAT THESE CANNOT BE CONJUNCTIVE, BUT THEY ARE

22    DISJUNCTIVE.

23         SO MY PROPOSAL IS TO SAY -- IN FACT, I THINK I

24    SHOULD SAY WHAT THE NINTH CIRCUIT SAID.

25              (PAUSE WHILE COURT REVIEWS DOCUMENTS.)
```

1        **THE COURT:** THEY HAD APPROVED, AND THAT IS

2  (READING:)

3        *"THE TERMS OF THE INSTRUCTIONS ARE SET FORTH IN*

4      *THE ALTERNATIVE, BUT OF COURSE, YOU ARE TO CONSIDER THE*

5      *INSTRUCTIONS AS A WHOLE."*

6        **MR. DIAMOND:** AS I UNDERSTAND THE COURT'S

7  STATEMENT, BOTH SIDE AGREE TO THE FIRST FORM THAT THE COURT

8  NOW SAYS SHOULD NOT HAVE BEEN GIVEN, THAT THAT WAS A MISTAKE

9  INDUCED BY THE PARTIES IN BOTH JOINTLY REQUESTING IT.

10        **THE COURT:** RIGHT.

11        **MR. DIAMOND:** SO THE COURT, OBVIOUSLY, IS NOT AT

12  FAULT FOR GIVING THE WRONG INSTRUCTION SINCE BOTH SIDES

13  ASKED FOR IT. SO I THINK, GIVEN THAT SITUATION, THE PARTIES

14  ARE BOUND BY THE INSTRUCTION THAT THEY THEMSELVES WANTED AND

15  CANNOT COMPLAIN IT WAS ERRONEOUS BECAUSE WE'VE ARGUED THE

16  CASE.

17        **THE COURT:** WELL, THE PARTIES MAY NOT BE ABLE TO

18  COMPLAIN.

19        I HAVE INDEPENDENT DUTY TO THE JURY TO RESPOND TO

20  A JURY QUESTION; AND BECAUSE THE JURY ASKED THE QUESTION

21  THAT CAUSED ME TO HAVE TO REVISIT THIS AND, UPON

22  REVISITATION, I DISCOVERED THAT IT WOULD BE CONTRARY TO THE

23  LAW OF THE NINTH CIRCUIT, I AM CERTAINLY NOT OBLIGATED --

24        IN FACT, IT WOULD BE A BREACH OF MY DUTY TO

25  KNOWINGLY ADVISE THE JURY SOMETHING THAT'S CONTRARY TO

1　CIRCUIT AUTHORITY, REGARDLESS OF WHETHER YOU FOLKS AGREE TO

2　IT.  I HAVE AN INDEPENDENT DUTY NOT TO MISLEAD THE JURY.

3　　　　　**MR. DIAMOND:**  WELL, IT'S NOT MISLEADING.

4　　　　　**THE COURT:**  WELL, IT IS MISLEADING IF I TELL THEM,

5　OH, YES, EVERY ONE OF THOSE HAVE TO BE SATISFIED.  THAT'S

6　JUST NOT TRUE.

7　　　　　**MR. DIAMOND:**  EXCEPT WE'VE ALREADY ARGUED THE

8　CASE.  IF THIS WERE PRIOR TO ARGUMENT, I WOULD AGREE WITH

9　THE COURT THAT THE COURT COULD CERTAINLY FEEL FREE TO DEVISE

10　ITS OWN INSTRUCTION TO CONFORM TO NINTH CIRCUIT LAW.

11　　　　　BUT WHEN BOTH PARTIES HAVE AGREED ON AN

12　INSTRUCTION THAT THE PARTIES HAVE RELIED UPON, DELIVERING

13　ORAL ARGUMENT, WE HAVE A DIFFERENT INTEREST AT STAKE --

14　NAMELY, THE INTEGRITY OF THE CLOSING ARGUMENT WHICH --

15　　　　　**THE COURT:**  THE CLOSING ARGUMENT -- YOU FOLKS DID

16　NOT FOR ONE SECOND SAY WHETHER THIS SHOULD BE AN "AND" OR

17　"OR."  IT HAD PLAYED ZERO MATERIALITY IN YOUR CLOSING

18　ARGUMENT, MR. DIAMOND.

19　　　　　**MR. DIAMOND:**  YOUR HONOR, I DON'T THINK IT MATTERS

20　WHETHER I WAS EITHER LED TO BELIEVE I WOULD NOT NEED TO DO

21　THIS BECAUSE I DID REMIND THE JURY OVER AND OVER AGAIN TO

22　READ THE JURY INSTRUCTIONS CAREFULLY AND CLOSELY AND TO

23　FOLLOW THEM.

24　　　　　AND SO, IN DOING THAT, I CANNOT DISCLOSE WHAT MY

25　SUBJECTIVE INTENT WAS IN MAKING THAT ARGUMENT, BUT THE

APRIL 27, 2012
TRIAL DAY 5

**335**

```
 1    EFFECT IS THE SAME -- THAT I REPEATEDLY TOLD THE JURY THAT
 2    THE HEART OF THIS CASE IS NOT THE QUESTION OF WHETHER ISAACS
 3    DELIVERED STUFF BY MAIL OR WHATEVER, NOT ANYTHING TO DO WITH
 4    HIS RESPONSIBILITY; IT WAS A TECHNICAL QUESTION AS TO
 5    WHETHER THE MATERIALS WERE LEGALLY OBSCENE ACCORDING TO THE
 6    INSTRUCTIONS.
 7              THE COURT:  RIGHT.
 8              MR. DIAMOND:  I REMINDED THEM OVER AND OVER "READ
 9    THE INSTRUCTIONS."
10              THE COURT:  EXACTLY.  SO WHAT I'M TELLING THEM IS
11    AN INTERPRETATION OF WHAT THIS MEANS.  AN INTERPRETATION OF
12    WHAT THIS MEANS IS NOT ALL OF THEM HAVE TO -- NOT ALL THREE
13    CRITERIA MUST BE SATISFIED, ANY ONE WOULD DO.
14              MR. DIAMOND:  THAT WOULD BE MODIFYING THE
15    INSTRUCTION.
16              THE COURT:  I DON'T THINK SO.  I THINK IT'S JUST
17    AN INTERPRETATION OF IT, FRANKLY.
18              MR. DIAMOND:  WELL.
19              THE COURT:  ANYTHING FURTHER YOU WANT TO SAY, THEN
20    WE'LL MOVE ON?
21              MR. DIAMOND:  I RESPECTFULLY OBJECT.  I THINK THAT
22    THE ANSWER SHOULD BE, "YES, ALL THREE CRITERIA MUST BE MET
23    AS PREVIOUSLY INSTRUCTED IN THE INSTRUCTIONS TO THE JURY."
24              THAT'S THE WAY I WOULD DO IT.
25              THE COURT:  OKAY.
```

```
1            MR. KING.

2            MR. KING:  THE GOVERNMENT AGREES WITH THE COURT,

3    YOUR HONOR.  IT WOULD BE "OR."

4            THE COURT:  OKAY.  I'M GOING TO TELL THE JURY THAT

5    THE COURT'S INSTRUCTION IS MEANT TO COMMUNICATE THAT ANY ONE

6    OF THESE WOULD BE SUFFICIENT, NOT ALL OF THEM.  THESE ARE

7    JUST BY WAY OF EXAMPLE.  IT'S OBVIOUS THIS WAS JUST BY WAY

8    OF EXAMPLE.

9            THIS IS THE KIND OF THING THAT CONSTITUTES A

10   PRURIENT INTEREST; THAT IS, WHEN I SAID "AN APPEAL TO

11   PRURIENT INTEREST IS TO A MORBID, DEGRADING, AND

12   UNHEALTHY" -- OKAY -- AS DISTINGUISHED FROM.

13           THAT'S LIKE ONE GROUP.  THEY'RE NOT EVERY ONE OF

14   THEM, BUT THEY ARE OF THE SAME TYPE VERSUS SOMETHING

15   DIFFERENT WHICH IS MERE CANDID INTEREST IN SEX.

16           SO THAT'S WHAT I'M GOING TO -- I'M GOING TO TELL

17   THEM THAT THE ANSWER IS THAT NO, NOT ALL THREE CRITERIA MUST

18   BE MET; THAT IS, YOU DON'T HAVE TO FIND IT TO BE MORBID AND

19   DEGRADING AND UNHEALTHY.  ANY ONE OF THOSE WILL DO -- WILL

20   SATISFY THE PRURIENT INTEREST REQUIREMENT, BUT THEY SHOULD

21   CONSIDER THE INSTRUCTIONS AS A WHOLE.

22           MR. DIAMOND:  THAT LESSENS THE GOVERNMENT'S BURDEN

23   AND, AS I SAID, RETROACTIVELY IMPINGES UPON MY REPEATED

24   REQUEST OF THE JURY TO READ THE INSTRUCTIONS CAREFULLY SINCE

25   THAT WAS THE HEART OF MY ARGUMENT.
```

```
 1              "READ THE INSTRUCTION ON OBSCENITY."  I

 2    SPECIFICALLY SAID, "FORGET ALL THE OTHER INSTRUCTIONS ON

 3    COMMON CARRIER AND U.S. MAIL.  WE'VE ALL CONCEDED THAT."

 4    THIS IS THE ONLY AREA WHERE WE SAY THE JURY INSTRUCTIONS DO

 5    NOT REQUIRE OR ALLOW FOR A CONVICTION BASED UPON THE

 6    INSTRUCTIONS.

 7              THE COURT:  YOU MADE NO ARGUMENT WHATSOEVER

 8    THAT -- "PLEASE, READ IT CAREFULLY BECAUSE EVERY ONE OF

 9    THOSE MUST BE SATISFIED."

10              IF YOU HAD THAT DONE THAT, IT MIGHT BE -- MIGHT BE

11    A DIFFERENT ISSUE BECAUSE IT WOULD HAVE CONTRADICTED YOUR

12    ARGUMENT.

13              YOU MADE NO ARGUMENT IN THAT AREA.  THAT WAS NOT

14    YOUR ARGUMENT.  THE FACT THAT YOU TOLD THEM MERELY TO REVIEW

15    THE INSTRUCTION CAREFULLY IS NEITHER HERE NOR THERE.

16    NOBODY'S TELLING THEM NOT TO REVIEW IT.

17              THEY HAVE A QUESTION.  I'M CLARIFYING IT.  IT DOES

18    NOT CONTRADICT YOUR VERY GOOD ADVICE TO THEM THAT THEY

19    SHOULD READ THE JURY INSTRUCTION.

20              IN TERMS OF LESSENING THE BURDEN, THAT'S

21    FRIVOLOUS, MR. DIAMOND, BECAUSE THAT'S WHAT THE LAW SAYS.

22    THAT'S NOT LESSENING ANYTHING.  THAT'S PUTTING THEM TO THE

23    TEST OF WHAT THE LAW REQUIRES.

24              YOU'VE STATED YOUR OBJECTIONS ON THE RECORD.

25              YOUR OBJECTIONS ARE OVERRULED.
```

```
 1          ALL RIGHT.  CHRIS, GET THE JURY.

 2          (BENCH CONFERENCE BETWEEN THE COURT AND CLERK.)

 3          THE COURT:  ALL RIGHT.  THE CLERK HAS ADVISED ME

 4     THAT THE JURY IS IN THE MIDDLE OF WRITING A THIRD NOTE.

 5          SO I THINK WE SHOULD TAKE A RECESS, LET THEM GIVE

 6     US THAT NOTE, BRING IT TO YOUR ATTENTION, AND WE'LL GO FROM

 7     THERE.

 8          CHRIS, FILE THESE NOTES, 1 AND 2, PLEASE.

 9          THE CLERK:  THIS COURT NOW STANDS IN RECESS.

10               (12:49 P.M. RECESS TAKEN.)

11          THE COURT:  WE ARE BACK ON THE RECORD IN THE

12     MATTER OF THE UNITED STATES OF AMERICA VERSUS IRA ISAACS.

13     MR. ISAACS IS PRESENT; COUNSEL ARE PRESENT.

14          WE ARE OUTSIDE THE PRESENCE AND HEARING OF THE

15     JURY.

16          COUNSEL, I HAVE BEEN ADVISED THAT THE JURY REALLY

17     DIDN'T HAVE A THIRD NOTE.

18                    (LAUGHTER.)

19          THE COURT:  SO, ALL RIGHT.  JUST SO THE RECORD IS

20     VERY CLEAR THAT YOU KNOW WHAT I'M GOING TO SAY.

21          CHRIS, CAN YOU GIVE ME THE TWO NOTES AGAIN.

22          I WILL SAY IN RESPONSE TO NOTE NUMBER 1, WHICH IS

23     DEFINITION OF THE MORBID, "MORBID IS DEFINED AS A SHAMEFUL

24     OR UNWHOLESOME."

25          NUMBER 2, "UNDER THE PRURIENT INTEREST MUST ALL
```

```
1    THREE CRITERIA BE MET, QUOTE, 'MORBID, DEGRADING, AND
2    UNHEALTHY' INTEREST IN SEX."
3           MY RESPONSE IS AS FOLLOWS (READING:)
4              "THE WORDS 'MORBID, DEGRADING, AND UNHEALTHY'
5           THAT YOU ASKED ABOUT ARE NOT SEPARATE CRITERIA.  THEY
6           ARE DESCRIPTIVE TERMS THAT DESCRIBE WHAT IS A PRURIENT
7           INTEREST; THUS YOU NEED NOT FIND THAT THE MATERIAL
8           SATISFY ALL OF THESE DESCRIPTIVE TERMS."
9           SO THAT'S ESSENTIALLY WHAT I SAID BEFORE, BUT NOW
10   YOU KNOW PRECISELY WHAT I'M GOING TO SAY.
11          ANY OBJECTIONS ON BEHALF OF THE UNITED STATES?
12          MR. KING:  NO, YOUR HONOR.
13          THE COURT:  ANY OBJECTION OTHER THAN WHAT YOU
14   ALREADY PLACED ON THE RECORD?
15          MR. DIAMOND:  WE HAVE THE OBJECTION, BUT I'VE
16   ALREADY STATED IT; SO I WON'T ADD TO IT.
17          THE COURT:  VERY GOOD.  I THINK IT'S VERY CLEAR
18   THAT THESE WERE SET FORTH AS A GROUP, AS EXAMPLES, AS
19   OPPOSED TO SOMETHING THAT IS A MERE CANDID INTEREST IN SEX.
20          SO IT IS VERY OBVIOUS, EVEN AS STATED, THAT THESE
21   ARE EXAMPLES, AND THAT'S WHY I POINT IT OUT IN THAT FASHION.
22   BUT YOU HAVE YOUR RECORD.
23          CHRIS, BRING THE JURY IN.
24              (CLERK EXITS TO RETRIEVE JURY.)
25          THE COURT:  ACTUALLY, WHAT I'LL DO IS -- BEFORE I
```

```
 1    PREDICATE THIS STATEMENT, AS TO NUMBER 2, I'M GOING TO SAY

 2    THE ANSWER IS "NO" BECAUSE THE DIRECT QUESTION IS "UNDER

 3    THAT INTEREST, MUST ALL THREE CRITERIA BE MET?" AND THE

 4    ANSWER IS "NO."  SO JUST TO BE VERY CLEAR, AND THEN I'LL GO

 5    ON WITH THIS.

 6              AGAIN, MR. DIAMOND, YOUR OBJECTION IS PRESERVED.

 7         MR. DIAMOND:  YES, THANK YOU, YOUR HONOR.

 8           (1:05 P.M., JURORS ENTER COURTROOM.)

 9         THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN OF

10    THE JURY, GOOD AFTERNOON.

11              WE HAVE NOW RECEIVED YOUR NOTES NUMBER 1 AND

12    NUMBER 2, SIGNED BY MR. XXXXXXXX.  RIGHT?

13         JURY FOREPERSON:  YES.

14         THE COURT:  AND JURY NOTE NUMBER 1, WE HAVE HAD A

15    CHANCE TO REVIEW AND TALK IT OVER WITH COUNSEL.  WE'RE

16    PREPARED TO RESPOND TO THESE NOTES.

17              NUMBER 1 SAYS "THE JURY REQUESTS THE FOLLOWING:

18    THE DEFINITION OF 'MORBID.'"

19              THE DEFINITION OF "MORBID" IS SHAMEFUL OR

20    UNWHOLESOME.  THAT'S THE DEFINITION.

21              NUMBER 2.  "THE JURY REQUESTS THE FOLLOWING: UNDER

22    THE PRURIENT INTEREST, MUST ALL THREE CRITERIA BE MET?

23    MORBID, DEGRADING, AND UNHEALTHY INTEREST IN SEX."

24              THE ANSWER IS NO.  THE WORDS "MORBID,"

25    "DEGRADING," AND "UNHEALTHY" THAT YOU ASK ABOUT ARE NOT
```

```
 1    SEPARATE CRITERIA; THEY ARE DESCRIPTIVE TERMS THAT DESCRIBE

 2    WHAT IS A PRURIENT INTEREST.  THUS YOU NEED NOT FIND THAT

 3    THE MATERIAL SATISFIES ALL OF THESE DESCRIPTIVE TERMS.

 4              THANK YOU VERY MUCH FOR YOUR QUESTIONS.

 5              YOU MAY RETURN TO THE JURY ROOM TO CONTINUE YOUR

 6    DELIBERATIONS.

 7     (1:06 P.M., JURORS EXIT COURTROOM; DELIBERATIONS CONTINUE.)

 8              THE COURT:  ALL RIGHT.  WE'RE OUTSIDE THE PRESENCE

 9    AND HEARING OF THE JURY.

10              I'LL DIRECT THE CLERK TO GO AHEAD AND FILE STAMP

11    JURY NOTE NUMBER 1 AND 2.

12              ANY NEW OBJECTION TO THE COURT'S ACTUAL STATEMENT

13    OF THE RESPONSES TO THESE QUESTIONS.

14              MR. KING?

15              MR. KING:  NO, YOUR HONOR.

16              THE COURT:  MR. DIAMOND?

17              MR. DIAMOND:  I MEAN, I DON'T HAVE THE ACTUAL

18    INSTRUCTIONS HERE.  I PUT THEM IN MY CAR.  BUT GOING BY MY

19    NOTES, IT SEEMS TO ME THAT THE FIRST QUESTION ASKED FOR

20    DEFINITION OF "MORBID," AND APPARENTLY IT WOULD HAVE BEEN

21    "SHAMEFUL OR UNHEALTHY."

22              BUT THEN IN ANSWERING THE QUESTION, I THINK THE

23    COURT SUBSTITUTED THE WORD "UNHEALTHY" WITH THE WORD

24    "UNWHOLESOME."

25              I MAY BE WRONG ON THAT.
```